407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

```
 1   UNITED STATES DISTRICT COURT

 2   NORTHERN DISTRICT OF FLORIDA

 3   GAINESVILLE DIVISION

 4   CASE NO. 1:23-CV-45-AW-HTC

 5

 6   TERRY DUKES, SR.,

 7   PLAINTIFF,

 8

 9   V.

10

11   ROBERT MCCALLUM, JR., ET AL.,

12   DEFENDANTS.

13   _____/

14   VIDEOCONFERENCE DEPOSITION OF CORPORAL CHASE GREGORY

15   DATE:      JULY 24, 2023

16   REPORTER:  ANA MARTINEZ

17   PLACE:     ALL PARTIES APPEARED VIA VIDEOCONFERENCE

18

19

20

21

22

23

24

25
```

401 EAST JACKSON STREET,
SUITE 2370
TAMPA, FL 33602

315 EAST ROBINSON STREET,
SUITE 510
ORLANDO, FLORIDA 32801
CORPORATE

```
 1        Gregory, could you speak for me, please?

 2             THE WITNESS:  Can you hear me?

 3             THE REPORTER:  Yes.  Okay.  There's no

 4        feedback.  Thank you so much.  And if you could, Mr.

 5        Slater, please kindly repeat your last question.  So

 6        Mr. Gregory can repeat his answer, since I wasn't

 7        able to catch it, I would appreciate it.

 8             BY MR. SLATER:

 9        Q.   Sure.  I was just asking if he was familiar

10  with the answers provided in these interrogatories.

11        A.   Yes, sir.

12        Q.   Okay, great.  I want to go through some of

13  them.  So I'm on page 2 and this interrogatory asks you

14  to describe your educational history.  And you list here

15  that you are a high school diploma recipient from

16  Chiefland High School in 2008.  You attended an EMT

17  program and then you attended the Law Enforcement

18  Academy at Florida Gateway Community College; is that --

19  is that correct?

20        A.   That's correct.

21        Q.   Okay.  Can you tell me a little bit about your

22  training at this law enforcement academy?  What kind of

23  training is that?

24        A.   It is a basic recruit academy that is set

25  forth by the State of Florida.  We did everything the
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  State of Florida required us to do to pass that

2  training.  High liability, civil, driving tactics,

3  firearms, high liability.  I -- I don't remember every

4  single training aspect or educational aspect about the

5  class other than it was -- we did everything that State

6  of Florida required us to do to -- to pass that class.

7      Q.   Okay.  And when -- and how long is that

8  certification program?  How many weeks?

9      A.   The full-time course is, I believe, five, four

10  and a half, five months.  If you do the part-time class,

11  I believe there's roughly nine to ten months.  Those

12  dates are going to change since it's been since 2009

13  since I attended.

14         MR. SLATER:  Okay, great.  I just want to pause

15     for a second.  Madam Court Reporter, I think the

16     issue with the feedback is that the microphone that

17     Deputy Gregory's not using is still on.  Is it

18     possible to mute that?

19         THE WITNESS:  Hey, yeah, I thought I muted it a

20     second ago.

21         MR. SLATER:  Okay.

22         THE WITNESS:  Now it is.

23         MR. SLATER:  Okay.

24         THE WITNESS:  Is this better?

25         MR. SLATER:  Yeah, it sounds better.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  primary objective.

2       Q.   Okay.  And then I see you list here, the

3  Chiefland Police Department with dates of approximately

4  July 2009 through 2012.  I want to talk -- okay.  Go

5  ahead --

6       A.   That should be through the end of 2010.

7  September of 2012 was whenever I got hired on at Levy

8  County.

9       Q.   Okay.  So let me just be clear here.  So

10 Chiefland Police Department, you're saying July 2009

11 through 2010 --

12      A.   Toward the end --

13      Q.   -- and then --

14      A.   -- 2010.

15      Q.   End of 2010.

16      A.   If I remember correctly, yes, sir.

17      Q.   Okay.  That's fine.  We just -- I want to -- I

18 want to get it correct now.  And so you were there, and

19 we'll get back -- I'll get back to your duties and your

20 role there.  But then 2010, there's a gap.  Now between

21 2010 and 2012, what were you doing between 2010 and

22 2012?

23      A.   I went back to work for Rucker Fencing.

24      Q.   Okay.

25           THE REPORTER:  Pardon me for a moment.  This is

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    the court reporter.  I apologize.  If you could give

2    me a quick two-minute comfort break.

3         MR. SLATER:  Sure.

4         THE REPORTER:  Thank you so much.

5         MR. SLATER:  Of course.

6         THE REPORTER:  I apologize for that.  One

7    moment while I get us off record.

8         (OFF THE RECORD)

9         THE REPORTER:  On record.  Thank you.

10        BY MR. SLATER:

11    Q.   All right.  Before we went off record, Deputy

12  Gregory, I believe you were telling me about -- we were

13  correcting here where it referenced that you were at the

14  Chiefland Police Department through 2012.  You were

15  telling me that you left toward the end of 2010 back to

16  Rucker Fencing?

17    A.   Correct.

18    Q.   And so you were at Rucker Fencing for then for

19  two years from 2010 to 2012; is that right?

20    A.   No, sir.  It was the end of 2010 until

21  September of 2012.  So I'd say a year and a half,

22  probably.

23    Q.   Okay.  So not full two years.  Okay.  So about

24  a year and a half.  And then you went to the Levy County

25  Sheriff's Office in September 2012; is that right?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

```
 1        A.   Yes.  September 6th, I believe was my hire
 2   date.
 3        Q.   Okay.  And you've been with the Levy County
 4   Sheriff's Office continuously since then; is that right?
 5        A.   I have.
 6             MR. SLATER:  Okay.  I'm going to shift now.
 7        (coughs)  Pardon my coughing.  I'm coming off a
 8        terrible, terrible bug.  All right.  Okay.  I'm now
 9        showing you what's been marked as Plaintiff's
10        Exhibit 2, Bates stamps 544 through 657.
11             (EXHIBIT 2 MARKED FOR IDENTIFICATION)
12             BY MR. SLATER:
13        Q.   I'm just going to scroll through it sort of
14   quickly, Deputy Gregory.  There's a lot here, so I'm
15   just going to -- do you know -- do you know what this
16   record is?
17        A.   You scrolled by; I don't know -- I don't know
18   what I'm looking at.  Scroll through, so it maybe
19   lagging --
20        Q.   Okay.  I'll represent to you that this is your
21   personnel file that was produced to us through your
22   lawyer in this case.  And I want to direct your
23   attention -- okay.  I want to direct your attention to
24   what's been marked as Dukes, T. 624.  Okay.  Here.  You
25   see at the top of this page, Deputy Gregory, where it
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        Q.   Okay.  And I believe you were saying that you
 2   went to school with Reverend Scott's son; is that right?
 3        A.   Grandson.
 4        Q.   Grandson.  Okay.  And then I want to talk a
 5   little bit about your employment at the Levy County
 6   Sheriff's Office.  Did you start as a -- as a full-time
 7   employee or were -- or did you start as a volunteer?
 8        A.   I started as a full-time CA at the jail.
 9        Q.   CA what does that stand for?
10        A.   Civilian assistant.
11        Q.   What's a -- what's a civilian assistant do?
12        A.   I worked in main control.  I was not tasked
13   with supervising or handling any of the inmates.  That
14   would be a correctional officer.
15        Q.   Okay.  Main control, meaning you were in the
16   control room?
17        A.   That is correct.
18        Q.   Okay.  So you -- what were you tasked with,
19   watching videotape?  What were you -- what were your
20   duties as a CA?
21        A.   Watching the security cameras, opening up the
22   doors, logging who comes in and out of the jail.
23        Q.   And how long were you a CA?
24        A.   My hire date until 2014.  I don't know when I
25   went to the -- I do not know the exact date when I was
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900   www.MILESTONEREPORTING.com   Toll Free 855-MYDEPOS

1  transferred from that position to the patrol division to

2  the deputy sheriff.

3      Q.   Do you remember your rate of pay as a CA?

4      A.   No, sir.  I don't.

5      Q.   Did you have any complaints against you while

6  you were CA?

7      A.   No, sir.  Not that I can recall.

8      Q.   Okay.  I'll show you, okay, what's been marked

9  as Dukes, T. 635.  This is the Levy County Sheriff's

10  Office Oath of Office Loyalty and Code of Ethics.  Do

11  you see where I'm -- what I'm showing you?

12      A.   I do.

13      Q.   Okay, great.  And it says, "I, Coulter Chase

14  Gregory recognize and accept that I'm given a special

15  trust and confidence by the citizens and employees I

16  serve and represent.  Trust and confidence is my bond to

17  ensure that I shall behave and act according to the

18  highest personal professional standards.  In furtherance

19  of this pledge, I abide I will abide by the following

20  code of ethics."  And it lists about ten various -- I'm

21  just thinking of what you would call these, pledges, I

22  suppose, about safety and security, treat citizens with

23  dignity and respect, et cetera, respect the

24  constitutional rights of all people.  Right.  And then

25  at the bottom, it has your signature.  Is that your

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          www.MILESTONEREPORTING.com          **Toll Free 855-MYDEPOS**

1  signature?

2      A.   Yes, sir.

3      Q.   Okay.  All right.  And then it says, dated

4  here at the bottom, September 4, '12 -- 2012.  Would

5  that have been your first day of employment with the

6  Levy County Sheriff's Office?

7      A.   I believe my hire date was September 6th.

8  That was probably done prior to me being employed or

9  prior to me starting -- my hire date.

10     Q.   Understood.  You -- perhaps you were given a

11 package of items to start filling out before you came

12 in; is that fair?

13     A.   That's a possibility.  Yes, sir.

14     Q.   Okay.  And then so you signed this at the --

15 at the beginning of your employment about 11 years ago.

16 Have you ever had to sign, you know, do you ever -- did

17 you ever have to sign like an -- is this something you

18 would sign annually or just when you start your

19 employment?

20     A.   Just whenever you start your employment.

21     Q.   Okay.  Go up now -- I want to scroll up now to

22 what's been marked as Dukes, T. 553, still in

23 Plaintiff's Exhibit 2.  This is a memorandum to you,

24 Deputy Gregory, from the sheriff dated November 16,

25 2020, and stating that effective January 11, 2021,



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1   you'll be promoted to the rank of patrol corporal. Do

2   you see that?

3      A.   Yes, sir.

4      Q.   Okay. And so I'm going to -- I'm going to go

5   into a little bit more about -- I think we stopped -- we

6   cut off around 2013, 2014, when you moved from being a

7   CA to a patrol deputy, and now you're a patrol corporal,

8   and I apologize. I know I've been calling you Deputy

9   Gregory. I just -- I suppose at the time of the

10   incident, you were -- you were a deputy, so I apologize

11   for that. And I may -- I may end up calling you Mr.

12   Gregory as well. I'm kind of -- kind of bad with

13   honorifics, so please don't take any disrespect to that.

14   So I want to ask you -- let's go back. You were -- you

15   left -- you were transferred from the jail in around

16   2013 or 2014 to being a patrol deputy. How did that

17   come about? Did you ask to be transferred?

18      A.   Yes, I --

19      Q.   Were you asked to transfer?

20      A.   Whenever I was hired onto here, it was with

21   the intentions of going to the patrol division.

22      Q.   All right. And what were your duties as a --

23   as a patrol officer?

24      A.   I was a full-fledged deputy sheriff, duties of

25   any other deputy sheriff. I respond to call for

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1       Q.   And I want to go through and just in the -- in

2  the -- in the excerpts that we have right now, I'm

3  looking on page 540, I see that you have in April of

4  2016, you have 16 hours of active shooter emergency

5  response.  You have, around that time, two hours of

6  firearms qualification.  I see here on February of 2017

7  -- February 8, 2017, I'm on page 540, you have firearms,

8  building entry, et cetera, four hours.  What would you

9  learn in a course, if you can remember, what -- do you

10  remember what you learned in firearms, building entry,

11  and et cetera?

12      A.   We have -- you -- you're saying courses, but

13  then your dates are not -- at least they're not showing

14  on mine.

15      Q.   Can you -- if you look at what I have, if you

16  look at my screen, I don't know if you could see, I've

17  highlighted one.  Can you see that?

18      A.   Yeah.  I -- I -- I see the training you're

19  talking about, but you referenced to one, the first one

20  you said it was in April and you gave a specific date,

21  but I don't have that specific -- specific -- specific

22  date on this.

23      Q.   Okay.

24      A.   So which one do I look at?

25      Q.   Well, let's look at the one that I've

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  highlighted now, the February 8, 2017, ATRT firearms,

2  building entry, et cetera, four hours.

3      A.  I'm looking -- okay, February 8, 2017, ATR --

4  that particular training was with the -- with our --

5  what would be equivalent to a SWAT team.  That wasn't a

6  -- a class that the entire sheriff's office participated

7  in.  That was something that our -- just so everybody

8  knows what SWAT is, so what our SWAT team would've

9  taken.

10      Q.  Okay.  But talk to me a little bit about what

11  SWAT is.  You know, I -- I've seen I've seen TV, right,

12  but -- I've seen it on TV, but what is -- what is --

13  what does a SWAT team member at Levy County Sheriff's

14  Office do?

15      A.  We handle high-risk search warrants, arrest

16  warrants, respond to high priority incidences.  It could

17  be anywhere from a hostage situation to an active

18  shooter to a fleeing felon who maybe ran off in the

19  woods and now is on foot.  We execute high-risk search

20  warrants, high-risk arrest warrants.

21      Q.  And are you currently on the SWAT team at the

22  Sheriff's office?

23      A.  I am.  I am.

24      Q.  Okay.  Who else is on the SWAT team with you?

25      A.  You want names, or just how many people?

 MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Yeah, names.  Names.

2    A.   Deputy Murphy, Corporal Perryman, Deputy Rix,

3 Deputy Weaver, Deputy Williams, Deputy Bailey.

4    Q.   Anyone else?

5    MS. ADKINS:  I'm writing them down as they're -

6   - as he's saying them and he's now looking over my

7   notes to see that list.

8    A.   Murphy, Perryman, Rix, Weaver, Williams,

9 Bailey, myself.  We've got a couple that -- one that is

10 getting in the process I believe is getting off the team

11 so I'm not going to list him unless you want his name.

12    BY MR. SLATER:

13    Q.   Yeah.  I'd like his name.

14    A.   All right, Corporal Hiers.

15    Q.   Hours, you said?

16    A.   Hiers, H-I-E-R-S, the lieutenant over there,

17 Lieutenant Almeida, but he's in the process of -- of

18 taking another job, so he's no longer going to be on it.

19    Q.   Keep going.  Where -- where's Almeida going?

20 You said he's taking another job?

21    A.   He took an investigator position with the

22 State of Florida, I think it was FWC, possibly.

23    Q.   FWC, okay.

24    A.   I think that -- we've had a lot of people get

25 off and a lot of people join, but I'm pretty sure that's

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      www.**MILESTONEREPORTING**.com      Toll Free **855-MYDEPOS**

1   it for right now.  Oh, Garbosky, Deputy Garbosky -- or,

2   I'm sorry, Detective Garbosky.

3       Q.   Garbosky?

4       A.   Detective Garbosky.

5       Q.   Okay, detective.  And so I obviously, I know,

6   and I seen that Aleimeda was, I believe he was a

7   corporal in 2019, so he was promoted to Lieutenant?

8       A.   Correct.

9       Q.   When was that, do you know?

10      A.   I do not know.

11      Q.   Okay.  And do you know if Almeida was on SWAT

12  with you in 2019?

13      A.   He was.

14      Q.   And Murphy as well?

15      A.   I do not recall if he was or not.

16      Q.   Okay.  And what kind of -- how do you get on

17  SWAT at the Levy County Sheriff's Office?

18      A.   There's a set of standards that set forth that

19  you must complete.  They could be anywhere from physical

20  agility, to cardio exercises, firearms, and then an

21  interview.

22      Q.   What's the interview like?

23      A.   They will sit down with members of the T -- at

24  this time, it was called the ATRT, but now it is the TRU

25  team, Tactical Response Unit, they'll sit down with the

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1   TRU members, and they'll be asked a series of questions.

2       Q.   Like, what kind -- can you give me some

3   examples?

4       A.   Scenario questions, their plan for the

5   sheriff's office, where they want to see themselves,

6   what assets would they bring to the team.  And make sure

7   they understand the integrity that the team has in

8   trying to not do anything to diminish that -- what we

9   try to simulate at the Sheriff's office with being a

10  part of this team.

11      Q.   Is there a set number of hours you need to

12  complete for training before you can be on the SWAT

13  team?

14      A.   No, sir.  You have to -- to pass the

15  requirements that have been set forth to join the team.

16      Q.   When did you join the SWAT team?

17      A.   I was on the original -- when it was the ATRT,

18  that was in 2015, I believe.

19      Q.   Okay.  So going back to this ATRT training for

20  firearms and building entry, what would that -- what

21  would that have been about?

22      A.   Tactical building entries.  We go to -- we go

23  to a lot of the schools, and we will train.  And if we

24  have access to houses or mobile homes, we will do

25  tactical entries, scenario-based entries, entries that


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  each structure or house or split we go to requires

2  different entry tactics, so we'll go and -- and practice

3  those.

4      Q.  Okay.  So you've practiced -- so just so I'm

5  clear, you've practiced for the ATRT, which is now

6  called TRU, you've practiced tactical entries to, you

7  said schools, mobile homes, buildings, any other types

8  of structures?

9      A.  That's primarily the ones that we hit.  That's

10 the ones we mostly have access to.  We don't have access

11 to closed businesses or anything like that.  So we don't

12 get -- don't have the ability to -- to -- to train in,

13 you know, business-type structures.

14     Q.  I see -- I'm now on page 541.  I see here, I

15 believe in the excerpts I'm provided, but I understand

16 that you've -- you certainly were training for -- since

17 you know, since you joined the Levy County Sheriff's

18 Office, so I may not have all of your training records,

19 but I see here on page 541, dated November 13, 2019, you

20 had a taser, less lethal refresher, one hour.  Do you

21 see that?

22     A.  Yes, sir.  Yes, sir.

23     Q.  Okay.  Can you tell me what that -- can you

24 only have a refresher after you've been given an initial

25 taser course?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.    This was probably --

2    Q.    Or is a refresher just --

3    A.    This one was probably through our DMS system

4  through our -- our policies and procedures, what we use

5  for that.  That's probably what that one is.

6    Q.    What does that mean?

7    A.    I have to get on our website for -- that holds

8  our policies and procedures and probably watch a video

9  or take a test after watching a video.  And it's just

10  basically making sure that you're still familiar with,

11  and know how to, and when to use a taser.  It's just a

12  refresher course from what you learned when you first

13  got trained with the taser, which for me was in the

14  academy in 2009.

15    Q.    Do you recall any other training since the

16  academy?

17    A.    We've had multiple taser trainings, physical

18  trainings, where we come into the sheriff's office and

19  sit down for a slideshow training portion, and then we

20  have scenarios, and then we go outside, and we actually

21  fire the taser with a practice cartridge at a target to

22  show that we know how to operate it safely.

23    Q.    Okay.  And are you ever provided written

24  materials for these trainings?

25    A.    We do a slideshow on the computer in the



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

```
 1         THE REPORTER:  Of course, this will be Exhibit
 2    4, correct?
 3         MR. SLATER:  Yes.
 4         THE REPORTER:  Thank you.
 5         (EXHIBIT 4 MARKED FOR IDENTIFICATION)
 6         BY MR. SLATER:
 7    Q.   All right.  Have you -- have you ever -- and
 8 this is dated effective 2010, December 1st.  Have you
 9 seen this document before, Corporal?
10    A.   Yes, sir.
11    Q.   Okay.  And it says, the scope and purpose as
12 it applies to all LSCO, Levy County Sheriff's Office
13 personnel, who perform administrative, computer related,
14 or actual arrest warrant functions, and explains and
15 outlines -- and explains and outlines general and
16 administrative arrest warrant functions and duties that
17 they may be called upon to know and perform, okay?  I'm
18 going to scroll down.
19    A.   Sorry.
20    Q.   No, I actually don't want to -- so I'm glad
21 that you've acknowledged that, but I don't actually want
22 to go through that document.  I want to go through --
23 okay.  I want to go through what we'll mark as
24 Plaintiff's Exhibit 5.  It's titled Levy County
25 Sheriff's Office General Order 1400.1, Response to
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   Resistance.  The effective date is April 18, 2018, and
 2   it's marked Bates stamp Dukes, T. 467 through 485.
 3             (EXHIBIT 5 MARKED FOR IDENTIFICATION)
 4             BY MR. SLATER:
 5        Q.   Have you ever seen this document before,
 6   Corporal?
 7        A.   Yes, sir.
 8        Q.   Okay.  How are you familiar with this
 9   document?
10        A.   It is in our policies and procedures in our
11   DMS system.  I would've had to sign -- I read and signed
12   off that I read and reviewed that.
13        Q.   Is that an annual thing you have to do, or
14   just once?
15        A.   We are issued the policy and then we have a
16   certain date to have that policy read and signed off on,
17   but we can go back at any time and review that policy
18   whenever we need to.
19        Q.   Okay, great.  And how does that populate?  Is
20   it -- is there like a -- you would log into a computer
21   with your own credentials and there's like a file for
22   it, or is it stored on the website?  How do you access
23   that?
24        A.   It's through my computer.  I -- I don't know
25   what the actual D -- I have a DMS icon on my laptop, on
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  my home screen, and I access it through that.  So I'm

2  assuming it's probably a webpage that was created for

3  the Sheriff's office, and that -- that webpage holds our

4  policies and procedures.

5      Q.   Okay.  And when you go onto a computer at

6  work, do you have your own computer or is it sort of

7  like you grab whatever computer you can find?

8      A.   I have a computer that stays locked in my car,

9  and I use that.

10     Q.   Okay.  So that you have your own personal

11  computer, it's in your car.  Got it.

12     A.   Not -- it's not personal.  Not a personal --

13     Q.   I -- I'm sorry.  You're -- you -- you have a

14  work-issued computer that's assigned just to you?

15     A.   Yes, sir.

16     Q.   All right.  Thank you for correcting me.  I

17  wasn't artful there, so yeah, you have -- the office has

18  assigned you a computer.  Do you have to type in

19  credentials to open the computer?

20     A.   I do.

21     Q.   Okay.  And so this computer, is it like a

22  laptop or like a -- sort of a -- like a -- what do they

23  call those, like an iPad type of device?

24     A.   No, it's just a laptop.

25     Q.   Laptop, okay.  And so while you're in your

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  patrol vehicle, you can access a record like this; is

2  that fair?

3      A.   Yes, sir.

4      Q.   Okay, great.  And I understand -- I'm on page

5  467, that there's a section titled Purpose, which says

6  that the purpose of this general order is to establish

7  the uniform policy procedure and guidelines pertaining

8  to the use of less -- of lethal and less lethal force

9  when responding to resistance as a sworn and/or

10  certified member of the office.  And there's a

11  disclaimer that says it does not apply in criminal and

12  civil legal -- civil proceedings.  You see that?

13      A.   I do.

14      Q.   Okay.  But this is this -- is this the

15  document that governs how you were supposed to, in this

16  instance, respond to resistance at work?

17      A.   Say that again?

18      Q.   This is the document, when you're -- when

19  you're learning and deciding the Sheriff's Office

20  policies for how to respond to resistance, this is the

21  document that would guide you in that; is that right?

22      A.   Yes, sir.

23      Q.   Okay.  I want to go through the glossary.

24  There's a series of terms that are defined in here,

25  starting on page 468.  And I want to go down here on

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

1  page 469, we have de-escalation, right, we've talked

2  about that.  Decreasing the response to resistance.  And

3  my understanding is that you're trained in several ways

4  on how to deescalate, right?

5      A.   Yes, sir.

6      Q.   Okay.  And here it says, exigent

7  circumstances, also on page 469, something arising

8  suddenly out of the current events, any event or

9  occasional combination of circumstances calling for

10 immediate action or remedy.

11     A.   Yes, sir.

12     Q.   Can you give me an example of a situation

13 where there would be exigent circumstances?

14     A.   I am interviewing or speaking with a -- if I

15 respond to a domestic and I'm in the front yard talking

16 to the male half who is a possible suspect in this.  And

17 as I'm interviewing, he -- I can see he's giving

18 indicators that he may be about to take off on foot. And

19 he finally does turn to run, and whenever he turns to

20 run, I see a gun sticking out of his back, and he tries

21 to run inside the house, I believe the circumstances

22 would allow me to run after this individual and go

23 inside the house if I'm there investigating a possible

24 domestic battery case and he is the alleged suspect in

25 that.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  result you want, then you escalate to less lethal force.

2  Is there some sort of -- is there some sort of --

3       A.   I understand what you're trying to say.

4       Q.   Yeah.

5            THE REPORTER:  Oh, pardon me.

6            MS. ADKINS:  Objection --

7            THE REPORTER:  Deputy.  I'm sorry.  Corporal

8       Gregory, could you repeat that for the record,

9       please?

10           MS. ADKINS:  He started talking but stopped

11      when the -- when the question was finished.  I

12      placed an objection on the record.  And he'll answer

13      now.

14           THE REPORTER:  Thank you.

15      A.   So just to be clear, you're wanting me to

16  answer how do I determine what type of force I use based

17  on the situation that I encounter?

18           BY MR. SLATER:

19      Q.   Yeah, sure.

20      A.   We typically -- it -- it -- we elevate to the

21  next degree with the resistance we are currently

22  experiencing.  So if they're just standing there with

23  their hands in their pocket and not listening to us,

24  we're not going to immediately, unless we have certain

25  information or allegations that there could be a firearm

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    MR. SLATER:  You want to take a break now?

2    That's fine.

3    THE WITNESS:  That's fine.  Yes, thanks.

4    THE REPORTER:  Okay.  One moment to get us off

5    the record, please.

6    (OFF THE RECORD)

7    THE REPORTER:  On record.  Thank you.

8    BY MR. SLATER:

9    Q.   All right, Corporal Gregory, I want to go

10   through -- before we took a break, we were going through

11   some of the orders and general orders and directives

12   that your office has in place.  I want to take you now

13   through General Order 1505.1.

14   MR. SLATER:  I'll mark this as Plaintiff's 6.

15   (EXHIBIT 6 MARKED FOR IDENTIFICATION)

16   BY MR. SLATER:

17   Q.   I'll just make it bigger for you.  Can you see

18   that all right?

19   A.   Yes, sir.

20   Q.   Great.  So this is the Levy County Sheriff's

21   Office General Order 1505.1 for Special -- Specialty

22   Impact Weapons (Less Lethal Weapons), effective April

23   18, 2018.  And the Bates stamps are Dukes, T. 1702

24   through 1708.  Are you familiar with this general order,

25   Corporal?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    A.   Do you mind stand at the top of it real quick,
2  so I can read something real quick.  Yes, I am familiar
3  with it.  I just want to look at it.
4    Q.   Yeah, you want flip?  Yeah.  Let you -- want
5  me to just scroll through it slowly here?
6    A.   Right there.  Right -- right.  Right here's
7  fine.  Right there is fine.
8    Q.   Okay.  And I can keep going through the next
9  couple pages.  Would you like me to do that?
10   A.   Right -- right there -- right there is fine.
11   Q.   You let me know when you're ready to start
12 talking about it.
13   A.   Do you mind scrolling all the way to the top
14 again, sir?  Right there -- right there is fine.  Thank
15 you.
16   Q.   Are you familiar with this order?
17   A.   Yes, sir.  I am.
18   Q.   Okay.  And I think you told me that you told
19 me earlier that when the order becomes effective you're
20 given a certain period of time to review it and then
21 sign that you've read it and reviewed it and understand
22 it; is that right?
23   A.   Correct.
24   Q.   And have you done that to the best of your
25 recollection with this general order?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1  the same, I guess you could say, job.  However, the

2  newer models have -- have better options and features

3  and -- and, are in my opinion, a lot better than the old

4  ones.

5      Q.   Okay.  Yeah, what I was just trying to make

6  clear, is that the model you -- you've used with Levy

7  County Sheriff's Office, although it may be similar to

8  the model you trained on, it -- it's a different model,

9  right?

10     A.   It is a different model.  Yes, sir.

11     Q.   Okay, yeah.  I'm not trying to trick you.  I

12  just want to make sure we're all clear here.  All right.

13  Pardon me.  I'm still getting over -- my whole house,

14  we've had this upper respiratory virus for about two

15  weeks now and I'm still, as you can hear, still dealing

16  with it.  Do you know, have you ever received any

17  training materials from Axon, or any other -- any other

18  providers about how to use your taser?  Have you gotten

19  any sort of manuals or bulletins about taser use?

20     A.   Yeah, I believe we -- I believe we touched on

21  that earlier.  Whenever -- you asked me if I'd ever had

22  any training with the taser at the Sheriff's office and

23  -- and I said, "Yeah, you know, we come in and we

24  receive a -- we have a PowerPoint, you know, slideshow

25  with the -- with the model taser that we use."  I -- I

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  it is going to -- it's going to defer -- it's going to

2  -- it's going to differ, if that makes sense.

3      Q.   I'm also looking here under subparagraphs 3

4  and 4 on the same page.  It says, "The use of specialty

5  impact munition shall be at a distance of 20 feet or

6  more to be considered a 'less lethal force

7  alternative.'" And then under 4, "Discharging a

8  specialty impact munitions at a person's head, neck, or

9  throat area, or at a person's torso, above the waist,

10  excluding the arms, less than 20 feet away is considered

11  a deadly force application."  Do you agree with those

12  statements?

13      A.   I do.  Are you still referring to the taser,

14  or what are you referring to?

15      Q.   Yeah, for taser use.

16      A.   Okay.  That's not -- that's not -- your -- the

17  policy you're referring to is -- taser is not

18  illustrated in that as far as what this right here.

19  You're talking about a specialty impact munition weapon.

20  That's not a taser.

21      Q.   Okay.  But would you agree that that would be

22  the same -- the same thing for the use of a taser that

23  you --

24      A.   If it was the same thing for use of a taser,

25  it would be illustrated in there, but it's not.  You're

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   talking about two completely different uses of force,

2   two completely different tools that we have when dealing

3   with -- with acts of resistance.

4       Q.   Would you agree, though, that use of a taser

5   less than 20 feet away is considered a deadly force

6   application?

7       A.   No --

8            MS. ADKINS:  Form.

9       A.   -- absolutely not.  The purpose of a taser is

10  - - are -- the -- the cartridges that I use can be used

11  anywhere from one foot to 25 foot.  Some go to 35 foot.

12  That is -- that is the distance that I need to be to --

13  for my taser to -- to have the full effect.  And that

14  range goes from the -- my taser cartridge is 25 foot,

15  from 25 foot down to maybe one foot.  That's not the

16  same as a specialty impact weapon.  You're talking about

17  two completely different things.  Does that make sense?

18           BY MR. SLATER:

19      Q.   Makes sense.  I'm just asking about -- right

20  now, I'm asking about the risks of using a taser less

21  than 20 feet from the subject.  So are there any -- to

22  your understanding, are there any increased risks the

23  closer you get to using -- to the subject when you're

24  using your taser?

25      A.   No.  I'll say there is a decrease in risk the

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

 1  closer I am to the subject.  You're -- I think you're --

 2  you're -- you're -- you're confusing the purpose of a

 3  taser versus the purpose of a -- of a -- of a specialty

 4  impact weapon.  And I'd be more than happy to -- to

 5  explain the difference between the two, but I don't want

 6  you to confuse the two.

 7      Q.  No, I'm not trying to confuse the two.  I

 8  understand that one is a -- one -- you know, one is --

 9  you're talking about beanbags versus a -- versus a

10  probe, right?  You're talking about using rounds versus

11  using the probe of a taser.  I'm not trying -- I'm not

12  trying to confuse the issues.  I'm just trying to

13  understand.  I understand that the guidance you have

14  says that if you get closer to someone for using your

15  specialty impact munitions, it's considered deadly

16  force.  And I'm asking whether -- if you use your taser

17  and whether the proximity to the subject affects the

18  dangerousness of using the taser.  That's my question.

19      A.  No.  The closer you are, the better off you

20  are for the -- the -- the taser to have its full effect.

21  The closer you are, the safer it is for the individual

22  and the safer it is for you because the -- the closer

23  they are, the more accurate your taser is going to be.

24  But a taser, and especially if -- there are two

25  different types of weapons.  One does not need to be --

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1       Q.   And that would be consistent with what you
 2  said earlier, before we looked at this, that the head
 3  and the upper torso and I believe you also mentioned the
 4  groin, which is the sensitive areas marked on the second
 5  part of this area here, that those are the areas that
 6  you should try to minimize when you are deploying your
 7  taser; is that right?
 8       A.   That's what I said.  Yes, sir.
 9       Q.   Okay.
10       A.   Sir, just so we're clear, can you go back to
11  that model?
12       Q.   Yeah.  One second.  Let me pull it up.
13       A.   I don't -- I don't have to see the model.  You
14  -- if you can see it right there, it's fine.
15       Q.   Well, let's pull it up so that you can show me
16  what you're looking at.  One second.  Okay.  Can you see
17  it?
18       A.   Yeah.  Just so we're clear, where it shows the
19  preferred method and the -- the non-preferred method,
20  that -- those are talking about aiming points.  That's
21  not talking about where the taser probe are going to
22  strike.  That -- the -- there's still a chance, even if
23  aimed correctly in -- according to this diagram and
24  according to the taser company, this is where it's
25  wanting you to aim.  That does not necessarily mean
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1  that's where the probe is going to go.  So just so we're
 2  clear, you may aim correctly in according to taser's
 3  recommendations, but you still may have a probe strike
 4  the face or the chest area and the groin area.  Just so
 5  we are clear on that.
 6       Q.   Well, I'm -- I understand these are target
 7  areas, right?  What's the target area would mean the
 8  preferred areas of where you're supposed to hit?
 9       A.   No.  That is not accurate.  That's where
10  you're supposed to aim.  You got to understand the use
11  of a taser in order to understand why that -- what
12  you're saying is inaccurate.  A taser has two -- has two
13  probes that are -- that are going to come out whenever
14  you fire it, but there's a lot of factors that goes into
15  the -- into firing a taser versus distance, age, where
16  they're at, where they're standing.  There's a lot of
17  that goes into this.  Where you're aiming is where taser
18  recommends to aim, which is the -- where you see in
19  blue.  So even if I aim in the preferred method, which
20  is the abdominal area, I'm still most likely going to
21  have a probe striking the chest area, which is what it's
22  designed to do.  I'm going to have a probe at the chest
23  area, and I'm going to probe -- probably hit the groin
24  or maybe even the thigh area, depending on how far they
25  are.  Now, the reason why it's doing that is because, if
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  that make sense?

2     Q.  I think I understand what you're trying to --

3  what you're saying, which is that, even if you point at

4  a specific area, the probe may not end up there, right?

5  There may be some --

6     A.  Yes.

7     Q.  There may be some -- I don't know if it -- if

8  it's -- are you suggesting that it's on a curve, the

9  trajectory, or are you -- or are you just saying that

10 sometimes they just don't end up where you -- when you

11 practice, they don't end up where you point them?

12    A.  That's not what I'm saying.  Whenever -- the

13 closer you are to an individual, when you fire that --

14 that taser, those probes are going to come out

15 approximately an inch apart.  As the taser probes are

16 going towards the intended target, those probes are

17 going to separate, which means that -- that they're

18 going to have a spread to them.  The farther they go,

19 the wider the spread.  So if I shoot an individual at

20 five feet away with my taser, those probes may hit maybe

21 a foot apart from one another.  But if I'm 15 feet away,

22 that spread is going to be longer, and I may hit in the

23 chest area and I may have one hit the thigh because I'm

24 further away from the target, therefore the spread is

25 going to be greater.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1       Q.   Okay.  I understand -- I understand what

 2   you're saying.  All right.  I'm going to show you now

 3   what I've marked as Plaintiff's 8.

 4           (EXHIBIT 8 MARKED FOR IDENTIFICATION)

 5           BY MR. SLATER:

 6       Q.   This is another document produced.

 7           THE REPORTER:  Oh, pardon me.

 8           BY MR. SLATER:

 9       Q.   It's Bates stamped --

10           THE REPORTER:  Pardon me, Mr. Slater.  Just to

11       clarify, did you say eight, as in the number, or

12       ate?

13           MR. SLATER:  Eight.

14           THE REPORTER:  Okay.  Thanks.

15           MR. SLATER:  Eight as in the number.

16           THE REPORTER:  Thank you.

17           MR. SLATER:  And I will send these off to you

18       folks after the deposition.  And they're all marked

19       on the file name, so that should help.  So this is

20       Plaintiff's 8.  It's Bates stamped Dukes, T. 1731

21       through 47.  And at the top, it's titled Levy County

22       Sheriff's Office 643 Domestic Repeat Dating and

23       Sexual Violence Investigations Effective December 1,

24       2010.

25           BY MR. SLATER:
```

**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1  a wanted flyer."  Do you see that?
 2       A.   I do.
 3       Q.   Is it the practice of your office to wait
 4  throughout the shift or a 24-hour period or over the
 5  weekend to make -- to obtain a warrant in the case of a
 6  serious domestic violence felony where the suspect is
 7  not in the area prior to the deputy's arrival?
 8            MS. ADKINS:  Form.
 9            BY MR. SLATER:
10       Q.   Is that correct?
11       A.   This policy gives us that option.
12       Q.   It gives you the option?
13       A.   Well, yes, sir.  It says right here under --
14  under "seeking an arrest warrant."  It doesn't say that,
15  once we take the initial call and we develop the
16  probable cause, that we go straight to the arrest
17  warrant option.  We have the option of making a diligent
18  effort to locate a suspect.  So if we have -- if we know
19  the suspect and we have a known location, we know where
20  his business, we know where he lives, we have the
21  ability to try to go and effect the arrest because that
22  would be quicker and more feasible than wasting time
23  with an arrest warrant whenever we have possible
24  locations where he may be.  But it'd be quicker for us
25  to go locate the suspect and arrest him on the probable
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1 cause versus coming to the office and going through the

2 arrest warrant procedures.

3     Q.   There are instances where you would just go

4 straight to making the arrest warrant?

5     A.   If we have clear and convincing evidence that

6 they're no longer in the area, that would be a more

7 feasible scenario to go get an arrest warrant.

8     Q.   I want to show you now what we're -- we've

9 marked -- what I pre-marked as Plaintiff's 9, and we're

10 going to turn now to talk about Mr. Dukes a bit,

11 Corporal.

12            (EXHIBIT 9 MARKED FOR IDENTIFICATION)

13     A.   Okay.

14            BY MR. SLATER:

15     Q.   And so I'm looking now at what I've marked as

16 Plaintiff's 9, and this is Bates stamped Dukes 495.  And

17 you see this is an e-mail from Detective Michael B.

18            Wilkinson to Patrol, subject: Terry Dukes, Jr.

19 And it's dated Saturday, May 25, 2019, at 9:22 a.m., and

20 it says, "I've left the probable cause paperwork in

21 Sergeant Houchin's box and dispatched for Terry Dukes,

22 Jr.  The charge is aggravated battery on a pregnant

23 woman.  The victim advised that Dukes is using molly,

24 which makes him have violent tendencies.  Please use

25 caution when dealing with Dukes.  Dukes works at Julie's

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

```
 1   Diner in Bronson.  He usually comes to work in the

 2   afternoons and stays until closing.  I appreciate your

 3   help."  Okay. And so this is -- and I'll represent to

 4   you that -- and we'll go over this in more detail, that

 5   May 25, 2019, is the date of the incident regarding my

 6   client, Terry Dukes, Sr.  And I'll represent, and we'll

 7   go through this again, that you were at his house

 8   earlier in the morning, not at 9:00 a.m. but around 5:00

 9   or 6:00 a.m. And so when Detective Wilkinson writes, "I

10   left the probable cause paperwork in Sergeant Houchin's

11   box in dispatch for Terry Dukes, Jr.," what does that

12   mean?  Do you know what that means?

13           MS. ADKINS:  Form.

14       A.   That means, if we develop probable cause on a

15   suspect for any crime -- mostly misdemeanor, sometimes

16   felony, but majority of the time it's a misdemeanor.  If

17   we develop probable cause, if we cannot locate the

18   suspect right away or if they left before we got there

19   and we are unable to find them, we will complete an

20   arrest affidavit and we will leave it for the oncoming

21   shift.  So we'll continue to try to find a suspect, but

22   whenever we go home, the shift that is coming on duty

23   can also make attempts to locate the suspect.  If the

24   other shift locates the suspect, they can arrest the

25   subject, transfer the office, and get our probable cause
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Pendray?

2         A.   P-E-N-D-R-A-Y.

3         Q.   Okay.  Do you -- when you were texting, would

4    that be just regular text messages, or would that be on

5    any sort of software?

6         A.   Sir, I have no idea.

7         Q.   Okay.  It wouldn't be, like, on WhatsApp or on

8    some sort of third-party software application?

9         A.   The standard text messaging app that comes

10   with the cellphone.

11        Q.   Okay.  Do you know if your work-issued

12   cellphones are backed up to the cloud?

13        A.   No idea, sir.

14        Q.   Okay.  Who would be the person that could

15   answer that question for me?

16        A.   Probably Mark Morgan or Mike West.

17        Q.   Mark Morgan or Mike what?

18        A.   West.

19        Q.   West?  Okay.

20        A.   Yep.  W-E-S-T.

21        Q.   Okay.  All right.  I want to -- I want to talk

22   to you now about the morning of May 25, 2019.  Prior to

23   -- prior to arriving at ████████████  May 25, 2019,

24   had you ever interacted with Terry Dukes, Sr., prior to

25   that date?

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Coulter Gregory Chase - 04-20-2023                    Page 158

```
1   Plaintiff's Second Set of interrogatories."  It is three
2   pages long.  On the third page, it has your name,
3   Coulter Chase Gregory, and your -- is that your
4   signature?
5        A.   It is.
6        Q.   Okay.  It says number 502 there.  Is that your
7   badge number?
8        A.   That's correct.
9        Q.   Three interrogatories here, and the first one
10  asks you how many times you'd been to ████████████
    ████████.  And you said, according to RMS, you'd responded
12  July 21, 2018, in reference to Terry Dukes, Jr., calling
13  911 to report a possible burglary; is that right?
14       A.   Yes, sir.
15       Q.   Okay.  Do you remember what -- do you remember
16  -- can you give me the details of that interaction on
17  July 2018?
18       A.   Terry Dukes, Jr., called in to report
19  burglary. The alleged suspect in this was his live-in
20  girlfriend at the time, which was the victim in this
21  case.  While we responded on this date, Shaquanda
22  (phonetic) Sheffield.  Without having --
23       Q.   Did you show --
24       A.   -- that report in front -- without having that
25  report in front of me, I -- I -- I don't know the
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  particulars about that case, other than I believe we

2  unfounded the incident because they lived together, if I

3  remember correctly.

4      Q.   And you -- but you came to the house that

5  date?

6      A.   I did.  I was training Deputy Wilson.  Deputy

7  Wilson was with me in my car.  He -- I was -- I was

8  training him.  He was hired on here at the time I was

9  training him.  I was nearly, as a backup, letting him

10 investigate this incident.  I would only intervene if

11 Deputy Wilson was either about to do something like

12 violating a policy or state law, or if he needed help

13 and needed to ask me something, I would've help him

14 then.

15     Q.   I also see here that you said, there could

16 have been more times that I've responded to this address

17 during the time frame listed.  However, RMS, our report-

18 writing system, only shows this incident involving me

19 responding to this address.  A lot of times we will

20 respond to calls for service as a backup deputy, and

21 unless Dispatch puts us on the scene, RMS will not

22 reflect us showing up.  Do you see that?

23     A.   Correct.

24     Q.   So I -- I'm -- so I understand that your

25 testimony and your interrogatories, and correct me if



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

 1  but he works for the county.  I believe he -- he's

 2  assigned to, like, the landfill section of the county.

 3       Q.   Have you ever been out to the landfill?

 4       A.   Yes, sir, I have.

 5       Q.   Do you ever recall seeing Mr. Dukes, Sr., at

 6  the landfill?

 7       A.   I don't recall if I have or haven't.

 8       Q.   Would it -- if I told you that Mr. Dukes, Sr.,

 9  recalls you being at the landfill, pretending to place

10  him under arrest, would that jog your memory at all?

11       A.   No, sir, it wouldn't.

12       Q.   In number 20 here, you're asked to state all

13  facts upon which you base your contention that

14  plaintiff, "Has another house where he stays.  I don't

15  think he stays," this is at ███████████  "full-time."

16  And this is from your -- from your recorded statement

17  that your attorney produced as Defense Exhibit 10.  In

18  response, you say, "I was under the impression Mr. Duke,

19  Sr. stayed at a house closer to North Pine Street,

20  possibly off School Street.  I later discovered this

21  house belonged to Mr. Duke's brother, Gerald."  Why were

22  you under the impression Mr. Duke, Sr. stayed on Pine

23  Street?

24       A.   Because every time I've ever been to ███

    ██████████, it was always because of Harry Dukes, Jr. and

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

1  him either calling us because of Shaquanda or just for

2  whatever reason he would call.  I've never seen Dukes,

3  Sr. at that address.  I thought he lived at the address

4  closer to Pine and School Street, and that his son lived

5  at the address that we responded to that night, ██████

   ██████████

7       Q.   Okay.  Have you ever been over to ████

   ██████████  for a complaint that Terry Dukes, Jr. shot a

9  shotgun off on the property?

10      A.   I don't recall.  I could have.  I -- I don't -

11 - I've been in that house quite a few times for various

12 -- various calls, but what those calls specifically

13 were, I can't -- I can't say.  You know, and if our RMS

14 does not, you know, reflect me being there, where I can

15 actually go and look at the CAD notes itself to help jog

16 my memory, then -- I mean, I've -- I've been to

17 thousands of calls in my career and to remember every

18 single one of them is impractical.

19      Q.   Let's go back to Plaintiff's 11.  This is a

20 document that your attorney produced to us, and it lists

21 this ID number.  Do you see it in the sort of middle

22 after the Social Security numbers?  And I -- I'm going

23 to -- when I -- when I provide this, I see now the

24 Socials are still in here.  I'm going to redact those

25 out before I send them to the court reporter, but do you

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    A.  I've only been out there just -- just a couple

2  of times, sir.  I'm sure there are other deputies that

3  have, you know, been out there more, maybe less times

4  than I have.

5    Q.  And you were saying he would -- to your

6  understanding, Terry Dukes, Jr., would bounce back and

7  forth between ███████████████████████; is that

8  right?

9    A.  When he's dating Shaquanda Sheffield, he's at

10 ████████████ and whenever he's dating -- her name is -

11 - her last name's Bryant.  Alexis Bryant?  I forget her

12 first name.  But whenever he's dating her, he'll go stay

13 out there.  He bounces back and forth between Bryant and

14 Sheffield.  When he's with Sheffield, he's at ████

████████████.  When he's with Bryant, ███████████████

███████  Or if he's with both of them at the same time, he

17 goes night to night there and back.  I mean, it's -- I'm

18 not trying to be funny, it's just -- just what he does.

19   Q.  Okay.  So in your mind -- so in your mind,

20 there's two possible places that you would go to find

21 Terry Dukes, Jr. depending on the circumstances?

22   A.  No.  No.  I'm saying there is two separate

23 places that we can find him.

24   Q.  Okay.  I want to -- I want to talk -- I want

25 to go back now to the date of the incident.  You were --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1   when did you start your shift on May 25, 2019?

2        A.   1800 hours, which would be 6:00 p.m.

3        Q.   Okay, so the day before?  So the 24th at 6:00

4   p.m.?

5        A.   Correct.

6        Q.   And how long is your shift?

7        A.   12 hours.

8        Q.   Okay.  Do you remember when you were called to

9   -- about the incident involving Terry Dukes, Jr.?  Do

10  you know what time that was?

11       A.   It was toward the end of shift, so probably

12  around 4:30 in the morning, maybe.  I don't know the

13  exact time.

14       Q.   Let me help you out with this, okay?  I'm

15  going to show you what's been marked as Plaintiff's 12.

16  All right.  This is a series of documents that were

17  produced to us by your attorney, and it's Bates stamped

18  Dukes, T. 132, I guess, through 253, okay?  And it's a

19  series of documents, including some of the general

20  orders, some things from DAVID, the arrest warrant for

21  Terry Dukes Jr., your CAD, the investigative report

22  relating to this incident, your sworn complaint,

23  pictures from the incident, narratives from you and the

24  other officers, and a statement from Mr. Dukes.  Do you

25  see all that?

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Deputy Gregory Chauvin 4-29-2021                                    Page 145

1       A.    I do.

2       Q.    So this was just produced to us compiled

3  together.  And, so let me go now to -- it's in a report,

4  you see that?  I'm on page 145.

5       A.    I do.

6       Q.    And this is the one we talked about earlier, I

7  believe, that you said that you had reviewed prior to

8  the deposition.

9       A.    It is.

10      Q.    And it lists officers involved.  Assisting --

11      A.    Correct.

12      Q.    -- Murphy, Almeida, Gaffey, Wilkinson, and

13  then reporting officer you; is that right?

14      A.    Correct.  Correct.

15      Q.    Okay.  And it lists the address for the

16  incident as ████████████████, right?

17      A.    Correct.

18      Q.    And then here on page 147, it says, "Original

19  narrative author: Deputy C. Gregory, 502 badge."  That's

20  you?

21      A.    That is.

22      Q.    Okay.  And it says it's created May 26, 2019,

23  at almost midnight; you see that?

24      A.    I do.

25      Q.    Okay.  So this would be the day after the

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  incident; is that right?

2      A.   Yes, sir.  Looks to be so.

3      Q.   Okay.  So this is from your notes, and we can

4  go to the CAD to also confirm this, but you state in

5  your narrative that it was around 5:15 in the morning

6  that you responded to the residence.  But am I to

7  understand perhaps you received a phone call from

8  Detective Wilkinson earlier than that?

9          MS. ADKINS:  Form.

10     A.   I did not receive a phone call from Detective

11 Wilkinson.

12          BY MR. SLATER:

13     Q.   How did you learn about the probable cause for

14 the aggravated battery on a pregnant woman?

15     A.   I believe Deputy -- Detective Wilkinson

16 contacted Deputy Murphy and advised him, and he -- I

17 believe he relayed that information to possibly Corporal

18 Almeida.  And I don't remember exactly who first told me

19 about the incident.  I just remember being notified

20 about it and us getting together, talking about it, and

21 making the decision to go out there with more than one

22 deputy because of the allegations, the type of arrest it

23 was, the history that we personally have with Terry

24 Dukes, and the possibility that he is on an illegal

25 narcotic and with firearms possibly being in the house.

**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1      Q.   Okay.  Let's let me walk through that a little
 2 bit.  So I heard -- I heard that you believe that
 3 Wilkinson relayed the information to Murphy that you
 4 were there.  How many of you were talking about this?
 5 You said -- I think you said you discussed it.  Who was
 6 there?
 7      A.   The ones that was listed in that report that
 8 you read off.
 9      Q.   So Murphy, Gaffey, Almeida, you, and then --
10 but Wilkinson wouldn't have been there, right?
11      A.   Yeah.  He was at the hospital with the victim.
12      Q.   Okay, so you, Almeida, Murphy, and Gaffey.
13 Where were you when you were discussing this,
14 physically?
15      A.   At -- at the Sheriff's Office.
16      Q.   Okay.  Inside the office?
17      A.   Outside of our dispatch area.  Between our
18 dispatch area and the parking lot where CID parks their
19 vehicles.
20      Q.   Okay.  Do you know how Wilkinson reached out
21 to Murphy?  Was it a telephone call?  Was it an e-mail?
22      A.   You'd have to ask --
23           MS. ADKINS:  Form.
24      A.   -- you'd have to ask him, sir.  I don't know.
25           BY MR. SLATER:
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Okay.  And what -- so -- and, so I -- I'm to
2  understand that you just thought you were discussing
3  whether to have more than one patrol unit go; is that
4  right?
5    A.   Correct.
6    Q.   And it was because of your -- you said -- I
7  think you said your past history with Terry Dukes and
8  the possibility of drugs and firearms -- that he was on
9  drugs and that he may have firearms; is that right?
10   A.   Not necessarily my past history, but the past
11  history that the Sheriff's Office has had with Terry
12  Dukes, Jr.
13   Q.   Are you -- were you personally aware of any
14  instances where he was on drugs prior to May 25, 2019?
15   A.   He is known to law enforcement at the
16  Sheriff's Office to be a known drug user.
17   Q.   What kind of drugs?
18   A.   In this case, Molly.  That was relayed by the
19  victim.
20   Q.   Is Molly -- is -- Molly's a street term?
21   A.   It is.
22   Q.   For what?
23   A.   To give you the -- to give you the exact name
24  for Molly, I cannot.  But probably like a very --
25   Q.   If I represent to you MDMA; does that sound

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  right?

2      A.   That -- it -- it does, but then -- but it has

3  an actual name, too.  But yes, I mean, that -- that is

4  what Molly is, MDMA.

5      Q.   Okay.  What are the -- what -- in your -- in

6  your experience, when -- in your experience, when

7  someone's on MDMA, what kind of -- what kind of -- what

8  -- how are they reacting when they're on it?

9      A.   Depends on the individual, it depends on what

10  they have done prior to using that, if they had any

11  other drugs in their system.  If -- I mean, MDMA is a

12  what they would call an upper, which would mean they

13  would tend to act a certain way.  But if they smoke

14  marijuana, which is a downer, it could affect the way

15  the MDMA would affect them.  It is just -- it is a drug

16  that is best described as unpredictable.  You cannot

17  predict what an individual's going to do when they're

18  under the influence of MDMA.  I can't sit here and say.

19  You know, marijuana, you can pretty much give a

20  description.  Okay, someone's under influence of

21  marijuana, they tend to have the same actions,

22  regardless of who you are.  It has the same effect. MDMA

23  is different.  They're unpredictable.

24      Q.   Have you -- have you read any studies about

25  MDMA?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

1  right?  You're just saying that's what you understood

2  from --

3      A.   He did not --

4      Q.   -- the other deputies?

5      A.   -- to me -- he did not speak to me

6  specifically.

7      Q.   Okay.  So one of the other deputies, either

8  Murphy, Gaffey, or Almeida is who told you what the

9  probable cause was and what Wilkinson wanted you to do?

10     A.   I don't -- I don't remember specifically who

11  said Detective Wilkinson has probable cause to arrest

12  Terry Dukes, Jr., can you-all go try to find him and

13  arrest him?  I don't remember who specifically said

14  that.  I just remember I -- I was advised of this

15  because of who it was, our history with him, the

16  allegations, the -- the -- the circumstances surrounding

17  this particular incident with the charge, the

18  information that the victim stated that, you know, was

19  clearly an officer safety issue.  We decided it best to

20  not send one or two to this house, rather, we -- if we

21  have the ability, we'd send as many as we can.  And, so

22  this night it was four of us.

23     Q.   Did -- were you the one who said that you

24  should go to ███████████ or was that one of the other

25  officers who decided that was the place to go to find

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   Terry Dukes, Jr.?
 2            MS. ADKINS:  Form.
 3            BY MR. SLATER:
 4       Q.   Let me rephrase it.  Who decided that you
 5   would go to ███████████████ to look for Terry
 6   Dukes, Jr.?
 7       A.   I believe Detective Wilkinson is the one that
 8   said this is where he was at because that's what the
 9   victim told him.
10       Q.   Did you have a warrant when you went to ███
     ████████████████████
12       A.   We did not.
13       Q.   Were you told that there was any exigent
14   circumstances related to the probable cause?
15       A.   Say that again?
16       Q.   Was there any exigent circumstances?
17            MS. ADKINS:  Form.
18       A.   Prior to going to the house?
19            BY MR. SLATER:
20       Q.   Did Detective Wilkinson -- to your
21   understanding, did Detective Wilkinson say that there
22   were any exigent circumstances related to the arrest of
23   Terry Dukes, Jr.?
24       A.   He gave us information that -- I -- I don't
25   know if I'm understanding your -- your -- I mean, I -- I
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  may be -- be misunderstanding exigent circumstances.  I

2  mean, typically that's used in a right here, right now

3  scenario, whereas an action needs to be taken right here

4  right now because of whatever is unfolding requires us

5  to take that -- take whatever action it is that we that

6  we take.

7      Q.   Yeah.  That's how I understand it, too.  And,

8  so my -- I guess my question is, that didn't exist here,

9  right?

10     A.   Well, at the time of this, he's at the

11 hospital, we're at the Sheriff's Office, and Dukes Jr.

12          is possibly at ██████████.  What exigent

13 circumstances could there be at this specific time for

14 us to take immediate action?  As far as why we went in

15 numbers, as far as why we decided to black out and walk

16 up, I'm -- I'm having a hard time understanding what you

17 mean by exigent circumstances.

18     Q.   Well, so I think you --

19     A.   We had -- we had information -- we had

20 information that we felt was an officer safety issue and

21 we felt the exigency maybe that way to show up with four

22 of us instead of just one.

23     Q.   Why did you think it was an officer safety

24 issue?

25     A.   For reasons that I stated before.  Terry

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  Dukes, Jr. is known to the Sheriff's Office to be a

2  known drug user.  He's known to -- to be violent, he's

3  known to be on drugs, illegal drugs.  He is, according

4  to the victim, possibly on Molly, and is in the

5  possession of a firearm.

6       Q.   You were told before you went to ████████████

7  ████████ that Terry Dukes, Jr. had a firearm?

8       A.   We were told there was possibly a firearm

9  inside the residence.

10      Q.   Who told you that?

11      A.   I don't recall specifically, but if you would,

12 give me one second.  If you look at the stuff at number

13 5 under Detective Wilkinson's incident report, he

14 illustrates it.  I'm not speaking for Deputy Wilkinson

15 -- or Detective Wilkinson, I'm --

16      Q.   I'm sorry, what are you -- what are you

17 reviewing right now, Corporal?

18      A.   If you have -- you showed me the incident

19 report a second ago.  You should have Detective

20 Wilkinson's narrative supplement to my report.  I'm not

21 speaking for him.  I'm just stating it illustrated in

22 his report with what I just said about the firearm in

23 the residence.

24      Q.   Okay.  I'm just -- and I'm not asking you to

25 speak for him.  I'm just trying to understand what you



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

1    A.   It is.

2    Q.   Okay --

3    A.   The policy that you -- the policy you read

4  earlier gives us that that option, and it's actually

5  more practical to do it that way.

6    Q.   Is it -- is it your normal practice to go try

7  to arrest someone at their home without an arrest

8  warrant?

9    A.   We have --

10       MS. ADKINS:  Form.

11   A.   Yes, if we have probable cause, we will

12 hopefully do a diligent search of where we may know

13 they'll be at to effect that arrest.  That is -- that is

14 a very common practice, I think, among the law

15 enforcement community, not just our agency.

16       BY MR. SLATER:

17   Q.   All right.  I want to -- I want to now shift

18 to when you arrived at ████████████████.  So my

19 understanding is there were four patrol cars that

20 arrived on the scene.  Where did you park?

21   A.   Yeah, we -- we didn't -- we didn't immediately

22 drive up to the residence.  We --

23   Q.   Okay.  Where'd you go?

24   A.   We parked before the residence and blacked out

25 -- well, the term we would use is black out our cars.  We

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  would turn all of our lights off and we would park

2  before the residence and then we would approach on foot.

3  It's a -- it's a tactic that law enforcement probably

4  around the world use it whenever they are going to

5  arrest a suspect for a violent crime or if a suspect

6  that they know can be violent, has a tendency to be

7  violent, or all the above.

8      Q.   Okay.  And is this -- did you come in from --

9  I believe there's like a grocery on one side heading up

10  ███████████ and then ██████████ curves and then intersects

11  with some other streets.  Were you coming in from the

12  side where the grocery is, or the other way?

13      A.   We did.  We came up the side of where Dollar

14  General is located.  We turned right there and traveled

15  all the way to where the road 90's back to the left. And

16  when it 90's back to the left, that's Wilson Ave. And

17  whenever we turned left, we drove almost to where the

18  residence is at, but we stopped just shy of it.  We

19  blacked out our cars and stopped just shy of it.  And

20  then we got out and we walked up on foot from there.

21      Q.   Okay.  And why did you black out your cars?

22      A.   Because if we show up at the house and if

23  Dukes, Jr. is there and sees our car, there is a great

24  possibility that he will take off on foot and it would

25  defeat our purpose of being there, which would be to

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  up, are you walking together?  Are you splitting up into

2  teams for front and back?  How are you approaching the

3  house?

4       A.   Deputy Gaffey and myself, if I remember

5  correctly, we walked together around the -- if you're

6  facing the residence from the road, it'd be to the right

7  side of the -- of the house.  This would be the -- I

8  guess the north side.  We walked around the corner on

9  the north side.  Deputy Gaffey stayed on that northwest

10 side of the residence, and I walked to the back door.

11      Q.   Okay.  Did -- so you walked -- if you're

12 coming up straight at the house, right?  You're saying

13 Gaffey or Murphy walked to the left by the front door,

14 to the left of the front door?

15      A.   I don't know where Deputy Murphy walked.  I

16 mean --

17      Q.   Okay.  Sorry.

18      A.   -- Gaffey -- Deputy Gaffey walked, if you're

19 walking up to the house to the right of the house and

20 then around the house.

21      Q.   Okay.

22      A.   Deputy Gaffey stayed at the corner, and I went

23 to the back door behind the house.

24      Q.   Okay.

25      A.   While Deputy Murphy and Deputy -- Corporal

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 swinging door, if an inward-swinging door.  If it is an

2 outward-swinging door, which way does it open?  If it's

3 an inward-swinging door, which way does it swing inward?

4 That would determine whether we position to the left or

5 to the right, but there's a lot of factors that go --

6 that go -- I know it sounds simple, just walking up to

7 this back door.  But there's -- I mean, there's other

8 factors that go into this that helps us make our

9 decision as to where we stand.

10     Q.   Okay.  And what were you doing while you were

11 standing back there?  Were you doing anything?

12     A.   I was waiting for Deputy Murphy and Deputy --

13 Corporal Almeida to -- in theory, somebody answer their

14 -- their front door, somebody's knocking.  So they was

15 knocking, trying to make contact with Dukes, Jr. or

16 whoever was inside, if anybody was inside.  I was

17 just --

18     Q.   Did you hear -- did you hear knocking?

19     A.   I could hear knocking and Sheriff's Office

20 clearly from where I stood.

21     Q.   Do you remember whose voice you heard saying

22 that?

23     A.   Deputy Murphy, I believe.

24     Q.   Okay.  You -- at any time before you went

25 inside the house, did you knock on the back door?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.   I did not.  That would defeat the purpose of
2  me being there.

3    Q.   Okay.  So before you went into the house, how
4  long were you out there waiting?

5    A.   A few minutes, maybe.  To give an exact time,
6  I can't -- I can't do that.  I'll say a few minutes.

7    Q.   And then what happened?

8    A.   After several series of knocks and announce --
9  we'll call it knock and announce, knock and announce,
10 Sheriff's Office.  I could hear some faint footsteps and
11 someone talking or mumbling, come to the house.  It
12 sounded like it was getting closer to me as -- then
13 shortly after I heard that, the back door opened up all
14 the way.  And as the back door was opening up, I could
15 see an individual as the door was opening.  An
16 individual turned -- you were going to say something?

17   Q.   No, I'm sorry.  I missed -- was a cough.

18   A.   Oh.

19   Q.   I'm sorry.

20   A.   As the door was opening up, I could see an
21 individual turn as the door was opening up, and, like,
22 going walk -- walking back inside the house.

23   Q.   Did this individual talk to you?

24   A.   He -- no, he mumbled.  He -- I could hear him
25 saying or mumbling something as, like, before opening

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  the door.  I don't know what he said.  And, like, as the

2  door was opening, I could hear him mumbling something,

3  but I -- I couldn't make out what he was saying.

4      Q.   Okay.  So then you see him go back into the

5  house and I'm going to show you what -- to assist sort

6  of as we go through this, I'm going to show you what

7  I've marked as Plaintiff's 13.

8          (EXHIBIT 13 MARKED FOR IDENTIFICATION)

9          BY MR. SLATER:

10     Q.   These are a series of photographs taken at ███

   ████████████████████    Do you recognize the first

12  photograph?

13     A.   I do.

14     Q.   Okay.  Does this look like a ████████████████

   ██████████   to you, the house there?

16     A.   It does.

17     Q.   Okay.  And you can see the front door is sort

18  of to the right frame of the picture?

19     A.   See them.

20     Q.   Okay.  And you can see the two windows to the

21  left on the far left.

22     A.   The one -- the one just to the left of the

23  front door or the ones that's farthest to the left?

24     Q.   The farthest to the left, those two windows?

25     A.   See them.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

```
 1        Q.   Okay.  And this is on -- I don't have these

 2  Bates stamped, but this is the first picture on this

 3  composite marked as Plaintiff's 13.  Is that your

 4  understanding of where Mr. Dukes' bedroom was at the

 5  time of the incident?

 6           MS. ADKINS:  Form.

 7        A.   No, sir.  That -- no, sir.  I -- at this time,

 8  I -- I thought Dukes, Junior -- Dukes, Senior lived at

 9  the house off School Street, close to Pine.  I don't

10  know whose bedroom that would be.

11           BY MR. SLATER:

12        Q.   Okay.  So let me rephrase.  At the time of the

13  incident, is that the room where you found -- would that

14  be the room where you found Mr. Dukes, Senior?

15        A.   That is correct.

16        Q.   Okay.  I'm going to turn now to the second

17  picture, which is zooming in on those two left windows.

18  Do you see that?

19        A.   I do.

20        Q.   Okay.  And you see the windows are up towards

21  the roof?

22        A.   They are.

23        Q.   See that the windows are -- they're not --

24  they're not down at the floor, right?  They're kind of

25  the top of the windows goes almost up to towards the
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1  there.  I remember walking up the steps.
 2       Q.   Okay.  And there's the door open?
 3       A.   Yes, sir.
 4       Q.   And to your recollection, did the back door
 5  swing on -- from the left side of the -- of the doorway?
 6       A.   Yes.  An outward-swinging door swinging from
 7  right to the left whenever you open it, if they swing
 8  it --
 9       Q.   Okay.
10       A.   -- from outside.
11       Q.   Okay.  Okay.  And you see -- and then what --
12  we're going now inside, you see here, the kitchen on the
13  left?
14       A.   I do.
15       Q.   And then this living -- this living room,
16  straight ahead?
17       A.   I do.
18       Q.   Okay.  And then I'll represent to you that
19  this -- you see the bed here in the living room.  You
20  can kind of see it.  I'm on now the sixth picture.
21  Sorry. I'm not -- I haven't been great about this, Madam
22  Court Reporter.  But this is now the sixth picture.  The
23  fifth picture was from inside the kitchen.  The fourth
24  picture is the back door open.  The third picture is the
25  back door closed.  So now I'm in the sixth picture, and
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 picture?

2     A.  No, sir.  I was standing just to the right of

3 that handrail.  Right --

4     Q.  Okay.

5     A.  -- where your cursor is there.

6     Q.  Okay.  So I -- can you see this box I've

7 created?

8     A.  That's it -- that's -- that's far as --

9     Q.  Okay.  So right here.  So just --

10     A.  Right off --

11     Q.  Just --

12     THE REPORTER:  Pardon me.  This is the court

13     reporter speaking.  I'm having a little bit of

14     trouble hearing.  Please remember to speak one at a

15     time for the record, and to take a little pause in

16     between question and answer.  Thank you.

17     MR. SLATER:  My apologies.  I'm known for just

18     talking and talking over folks and I -- it's a

19     problem, so I apologize.  But all right.

20     BY MR. SLATER:

21     Q.  So Corporal, so I understand correctly, you

22 were in the frame of this picture, just, like, right

23 against the right handrail?

24     A.  Where that handrail comes to an end at the

25 bottom, I was just to the right of that.  Right there

1  where your cursor is.

2      Q.   Okay, great.  And so eventually, you heard

3  some noises and the door opened?

4      A.   I heard Deputy Murphy announcing, Sheriff's

5  Office, and I heard loud knocking several times.  And

6  then between that, I heard some footsteps and some

7  noise, a voice coming from inside the house.  And then a

8  few moments later, the back door opens up all the way.

9  And I could see somebody kind of turning as the door was

10  opening up, almost as if you would go to your back door,

11  turn the knob, and just push it out and then turn around

12  as soon as you did that.  Instead of crossing that

13  threshold, just open the door, turn it out, turn it --

14  push it out and then turn around and walk away.

15      Q.   Okay.  And you said all the way.  Are you

16  suggesting that the door was open as far as it goes on

17  the hinge, like, in picture -- like, in picture 4?

18      A.   No, because at the time, there was a handrail

19  up there.  So it wouldn't -- it -- the handrail was

20  prevented from opening up all the way, but it was opened

21  up wide enough to where I didn't have to open that door

22  to go in the house.  It was opened up wide enough for me

23  to walk straight into the house.

24      Q.   And you said you saw the person inside walk

25  away, walk and walk towards the kitchen; is that right?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1       A.    Walk away from the door from that spot right

2  there.  There's only one place they could go.  That

3  would be back through the laundry room, back through the

4  kitchen.

5       Q.    Okay.  Did you say anything when the door

6  opened?

7       A.    No, sir, I did not.

8       Q.    Okay.  At the time the door was open, did you

9  have your gun drawn or your -- I'm sorry, your taser

10 drawn?

11      A.    I did not have my firearm or my gun, or my

12 taser drawn.

13      Q.    Did you shine your flashlight at the subject

14 when the door was open?

15      A.    I did not.

16      Q.    Okay.  Stop sharing for a second.  When you --

17 when the -- when the person went back into -- went back

18 away from the door, did you alert any of your fellow

19 officers?

20           MS. ADKINS:  Form.

21      A.    No, not immediately.

22           THE REPORTER:  And just to clarify for the

23     record, Ms. Adkins, you just placed an objection,

24     correct?

25           MS. ADKINS:  That's correct.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

```
 1              THE REPORTER:  Thank you.

 2              BY MR. SLATER:

 3       Q.    When you say not immediately, how long until

 4  you -- until you alerted your other deputies?

 5       A.    Within 15 seconds of that door opening.

 6       Q.    15 seconds?

 7       A.    I would say 15 to 20 seconds.  Yes, sir.

 8       Q.    And how did you -- how did you alert them?

 9       A.    My radio.

10       Q.    And what did you say on the radio?

11       A.    That I was inside the house.  I don't remember

12  specifically what I said.  I'm sure I could go back, and

13  I actually still have that recording.  I could listen to

14  it.  But I do remember telling -- notifying them that I

15  was inside the house.  Anything past that, I don't, you

16  know, recall.

17       Q.    Why did you go inside the house without

18  announcing yourself, or why do you go inside the house

19  without announcing your presence?

20              MS. ADKINS:  Form.

21       A.    Because my training and experience, it would

22  be more feasible for me to get through that threshold of

23  the door before I announce, Sheriff's Office.  So that's

24  what I did.

25              BY MR. SLATER:
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  actually have a physical warrant signed by the judge and

2  we're there to execute that, there are certain things

3  that we have to do per state law that would require us

4  to do that before we execute a actual warrant.  Does

5  that make sense?

6      Q.   Sure.  So you go inside the house.  Do you

7  turn your flashlight on at all?

8      A.   After I enter the house.

9      Q.   Okay.  And do you turn your flashlight on

10 after you've radioed the deputies?

11     A.   I don't recall what order it was in.

12     Q.   What did you say over the radio?

13          MS. ADKINS:  Form.

14     A.   I don't recall exactly what I said.  I just

15 remember saying that I was inside the house.

16          BY MR. SLATER:

17     Q.   Did you have any -- your service weapon or

18 your taser drawn at this point?

19     A.   Not at that time.

20     Q.   Did you do anything else to alert your

21 deputies besides calling over the radio?

22     A.   No, sir.  Within seconds of me notifying them

23 over the radio, they were coming inside the house.

24     Q.   Do you recall giving an interview in

25 connection with your entry into the house at 900

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        A.   It would've been Gaffey, who was at the back
 2   of the house.
 3             BY MR. SLATER:
 4        Q.   All right.  And let me keep playing it for a
 5   second.  Okay.  So you say it's your decision.  So
 6   you're the one who decided that that you would go in
 7   without your flashlight on, right?
 8        A.   Based on my training, yes.  That's what I
 9   decided to do.  Yes, sir.
10        Q.   Do you think it was odd that the person opened
11   the door at all?
12             MS. ADKINS:  Form.
13        A.   Sir?
14             BY MR. SLATER:
15        Q.   So I -- I'm just trying to understand your
16   thought process, Corporal.  You -- at this point, my
17   understanding is, you're assuming it's Terry Dukes, Jr.
18             in the house, right?
19        A.   That's who I believed to be inside this house.
20        Q.   Okay.  Did you have any reason to believe
21   anyone else might be in the house?
22        A.   I didn't have any reason to believe it, nor
23   did I have any reason not to believe it.
24        Q.   Okay.  So you testified that you heard -- I
25   believe you said it was Murphy out front knocking and
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   announcing Sheriff's Office, right?

 2        A.    Correct.

 3        Q.    Okay.  And so your understanding, then, is

 4   after announcing Sheriff's Office, that Dukes, Junior

 5   came and opened the door and just left it open for you

 6   to come in; is that right?

 7        A.    Okay.  Say that one more time?

 8        Q.    Your understanding is after -- after Deputy

 9   Murphy knocked and announced that the Sheriff's office

10   was there, that Dukes, Junior came to the back door,

11   opened it up and went back inside, right?

12        A.    I don't know who opened up the back door.  I

13   couldn't tell.

14        Q.    Okay.  Right.  You couldn't -- there's no --

15   was there a light on?  Any light on in the house at the

16   time?

17        A.    There was not.

18        Q.    Did you try to turn on any of the lights in

19   the house while you were inside?

20        A.    I did not.

21        Q.    Okay.

22        A.    Not that I recall.  I -- I don't -- I don't

23   think I did, but I don't recall if I did after, you

24   know, everything was done, and after Dukes Senior was

25   secured in handcuffs, I'm not -- I'm not certain if
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1     A.   I walked through the door, I got inside the --

2  and you got to remember, I mean, all this is done within

3  a matter of seconds, and by the time it took me to walk

4  up the steps, cross that threshold, and get to a

5  position where I felt safe enough to announce Sheriff's

6  Office, by the time I got to that position, the

7  individual was already almost going inside of his door

8  into that bedroom.  From the distance from that doorway

9  to his bedroom, I would say is probably 25 feet, maybe.

10  So it took me, you know, going up the steps, entering

11  that threshold, and getting out of that, what we'd call

12  the fatal funnel, that danger zone, getting out of that

13  area, which -- and with this, would be the kitchen. When

14  I entered -- you know, as I was going to the kitchen and

15  out of that, what we'd call, the fatal funnel, that's

16  whenever I announced the Sheriff's Office and asked the

17  individual to stop.  By that time, he was going inside

18  the bedroom, though.

19     Q.   He wasn't -- so you're saying he wasn't in the

20  bedroom yet, but he was walking inside of it to get

21  inside of it?

22     A.   That's correct.

23     Q.   Okay.  Did you have -- so when did your

24  flashlight go on?

25     A.   Whenever I was inside that -- in front of the



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    -- in front of Duke, Sr.'s door.

2        Q.   Okay, so on -- back on page 6 of Plaintiff's

3    13, so when you got - positioned in front of the door is

4    when you turned on your light?  Sorry, we're talking

5    over each other.

6        A.   Yeah, I'm sorry.

7        Q.   So when you --

8        A.   Yeah, I got to it --

9        Q.   -- got in front of the door -- oh, we're doing

10   it again.  Let me ask it, and then just hold on until

11   I'm finished, and then you can answer.  So my

12   understanding is your flashlight went on when you got

13   positioned in front of the door; is that right?

14       A.   Correct.

15       Q.   Okay.

16       A.   Correct.

17       Q.   So when you said in your recorded interview,

18   just about two or three months after the incident, that

19   you shined your flashlight on Gaffey, was that just what

20   you -- would that mean that your flashlight didn't stay

21   on for the remainder?

22       A.   No.

23           MS. ADKINS:  Form.

24       A.   No, for the flashlight that I carry, I have an

25   option of just, I -- if I push it all the way down, it

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  would stay activated, or if I just bump it real fast, it

2  would just turn on for just a -- not even a -- just a

3  split second.

4          BY MR. SLATER:

5      Q.   Okay.  And so I -- and I just want to

6  understand again, so from the moment you entered the

7  home, until the moment you got in front of this door and

8  turned on your flashlight, you know, not just -- not

9  just the sort of flash function, but turned on your

10 flashlight, how many seconds do you think that was?

11     A.   From the time that I started going up the

12 steps to the time I turned my flashlight on?

13     Q.   Yeah, that's fine.

14     A.   Seven, eight seconds, maybe.  Six --

15     Q.   Seven, eight seconds?

16     A.   Yeah, I mean, I'm --

17     Q.   Okay, so we'll say six to eight seconds; is

18 that fair?

19     A.   That's fair.

20     Q.   Okay.  And during this time, you said you also

21 called across the radio?

22     A.   I did, yes, sir.  I -- I notified the other --

23 the -- you know, the other deputies outside that I was

24 inside the residence.

25     Q.   Is that -- is your radio -- is it -- are the

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  Gaffey, okay, right?

2       A.   Correct.

3       Q.   And Gaffey, is he still on the corner of the

4  house, in the opposite corner?

5       A.   I believe so.  Yes, sir.

6       Q.   Okay.  And then you come on in, and you radio

7  over to say that you're inside the house?

8       A.   I don't know if that was before or after I

9  announced Sheriff's Office.

10      Q.   Okay.  Okay.  So it's possible --

11      A.   When I walked into that house and in that

12 kitchen, as I seen that male subject going inside the

13 door to his bedroom, I announced Sheriff's Office, but

14 he continued -- he continued going inside the door.  I

15 announced Sheriff's Office, I asked, you know, if Terry

16 Duke, Jr. was here.  I don't recall exactly at what

17 point in time I grabbed, you know, my mic on my shoulder

18 and said, hey, I'm inside the house, or whatever

19 transmission I gave to the other deputies outside.

20      Q.   Okay.  And that's fair.  I'm not asking you

21 know, if you just don't remember, that's certainly, you

22 know -- I understand that.  I'm just -- I'm just trying

23 to make sense of sort of the order of things, and if you

24 don't remember, then that's fine, and just tell me that.

25 So -- okay, so then -- but my understanding, and correct

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    found on Duke, Sr.'s bed.  So that was --

2         Q.   Okay.

3         A.   -- us running that, and it -- it says, "/no

4    record," that means, you know, there was no -- no hit on

5    that firearm, which means it wasn't stolen or anything

6    like that.

7         Q.   Okay.  All right, so let's go back now to --

8    you're at -- you're at the door.  Let me pull up the

9    image again.  You were at the door, and at some point,

10   you announced Sheriff's Office, right?

11        A.   After I entered and got to a -- get to a

12   position where I feel safe enough to announce Sheriff's

13   Office.

14        Q.   Okay.

15        A.   Which would've been probably ten feet from the

16   threshold of that door.

17        Q.   I'm sorry, so you were -- you said you were

18   ten feet from the threshold of the door?

19        A.   I would say approximately ten feet from the

20   threshold of that door, from the time I entered and --

21   and announced Sheriff's Office.

22        Q.   Okay.  At some point did you get closer to the

23   door before deploying your taser?

24        A.   I'm talking about the door that I entered

25   through, the back door, not the --

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   Oh, I see.

2      A.   -- so not the door -- not the door that Duke

3  went into.

4      Q.   Okay, right, because we've established --

5      A.   I --

6      Q.   -- you were sort of just there, right?  Like,

7  around -- just in --

8      A.   So I announced --

9      Q.   -- front of this black bag?

10      A.   So I announced Sheriff's Office before getting

11  to that position.

12      Q.   I see.  Okay, so where -- so you're saying

13  you're about ten feet after you -- so you entered the

14  home, you go to the left, and you go about ten feet

15  before you announce Sheriff's Office?

16      A.   If you go back to one of those pictures, and

17  you right there --

18      Q.   Yeah, I'm on page -- I'm on picture 5, so this

19  is the hallway leading into the kitchen area.

20      A.   Yeah, leave it right there.

21      Q.   Where do you think you would've been on this

22  picture when you announced Sheriff's Office?

23      A.   As you go between the stove and the right-side

24  countertop, as it starts to open up right there, that's

25  where I announced, "Sheriff's Office," because I can see

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  where I'm getting out of that fatal funnel, I'm getting
2  out of that line of fire, I'm getting out of that danger
3  zone, and I'm getting to a wide open room where I can
4  move if somebody starts shooting at me.  And that's
5  whenever I announced, "Sheriff's Office."
6      Q.   Okay.
7      A.   And that's when I went into the threshold of
8  the back door.
9      Q.   Okay.  So you get to that point, you announce
10 Sheriff's Office, is your flashlight on when you've
11 announced Sheriff's Office?
12     A.   I don't recall that, sir.
13     Q.   Okay.  Were there any lights on in the house
14 when you got to that -- out of what you call the fatal
15 funnel?
16     A.   There was not.
17     Q.   Okay.  What made you decide to turn to the
18 right towards that bedroom?
19     A.   That's where the -- the male that I seen was
20 walking forward.
21     Q.   How could you see him?
22     A.   Well, it wasn't overcast that night.  I mean,
23 the -- there -- there was light illuminating from --
24 from outside from, you know, the moon and the stars.  I
25 -- I could see inside the house well enough to walk into

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 that -- that back door and make my way through there.  I

2 would assume that whenever I got through that, where I

3 just illustrated, in that opening right there, I

4 activated my flashlight.  I can't say for certain if I

5 did or not, but I would assume I did.

6      Q.   Were there any -- could you see any lights

7 coming in from the officers who were out front?

8      A.   I don't recall, sir.

9      Q.   Okay.  And I want to understand when you --

10 when you turned, I'm back on picture 6.  When you

11 turned, what -- I think you said the man was entering

12 the room; is that right?

13      A.   Yeah.  I mean, that -- that picture that

14 you're looking at, that door is not in perfect line of

15 sight of, you know, the -- the door that I entered in.

16 I had to come kind of through that little -- that little

17 doorway area.  You know, what -- what -- it's not

18 really, you called it a hallway, but it's not a hallway,

19 it's just you got the laundry right there -- you just

20 got the laundry room and then the kitchen.

21      Q.   And we're on -- we're on picture 7 now.  All

22 right, go ahead.

23      A.   That -- you called it a hall -- there's no

24 hallway right there.  It's just, you got the laundry

25 room and then you have the kitchen.  And -- and that

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1  kitchen, living room, and dining room area is a big open

2  floor plan.  It -- it's wide open through there.  So as

3  I come through that laundry room and enter the kitchen

4  area, you know, that door is kind of tucked behind, you

5  know, I just -- I just can't walk to that front door and

6  see his bedroom door.  You got to come into the kitchen

7  to see that bedroom door because it's kind of tucked

8  back there a little bit.  It's not in a direct line of

9  sight of -- even standing at the threshold of the door,

10 if I entered the room and never left the laundry room, I

11 couldn't see that door.  I would have to walk into the

12 kitchen area to -- to see -- have a good direct line of

13 sight with that bedroom door.

14     Q.   Okay.  So what happens next?

15     A.   When I -- when I came through that little

16 fatal funnel, I'll call it, I announced, "Sheriff's

17 Office." And then I asked if Terry Dukes, Jr. was here.

18 The male was going into the room, shutting the door as I

19 was saying that.

20     Q.   Okay.

21     A.   Whenever I --

22     Q.   At that time, where were the other deputies,

23 to your knowledge?

24     A.   I think they were still outside.

25     Q.   Do you know when they would've come inside the

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  house?

2      A.   It would've been within -- within 15 to 30

3  seconds, I would assume, of me letting them know I was

4  inside the house.  You know, however long it takes them

5  to walk from one end of the house around to the other

6  end to get to where I was at.  And they may be able to

7  better answer that, I -- I don't know.  My attention and

8  focus was on the individual that was on the other side

9  of that door.

10     Q.   And you said on the other side of that door.

11 Was the door closed?

12     A.   The door was closed.

13     Q.   Fully closed?

14     A.   Fully closed.

15     Q.   Did you open the door?

16     A.   He opened the door.  After I -- after I

17 announced Sheriff's Office a couple times and asked if

18 Terry Dukes, Jr. was there, at one time I could hear

19 some muffling, him saying something from behind the

20 door.  I couldn't tell what it was.  After the second or

21 third time, I knocked on the door, I gave loud commands

22 to open the door.  After doing this several times, the

23 door did open up, you know, slightly, not a lot, just

24 opened up a little bit.  And, you know, the male behind

25 the door asked what I was doing.  I told him, you know,

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 to identify himself.  Told him to come out from behind

2 the door.  I told the, you know, whoever was behind that

3 door who I was, who I worked for.  The male subject

4 didn't comply.  He opened the -- he opened the door a

5 little bit more and kind of like, peeked his head out

6 real quick and looked to see, you know, who I -- maybe

7 who I was.  He wouldn't keep his facial area where I

8 could see, he just would like, just peak really fast. So

9 I told him again, you know, who I was and that I worked

10 for the Sheriff's Office.  And he -- he done that little

11 peeking motion several times, but he would only do it

12 for just a second, and then he would kind of tuck back

13 behind the door with the door, you know, slightly

14 opened.  He, at one time, you know, stuck his arm

15 through the gap of the door, it would've been his right

16 arm, through the gap of the door.

17        Q.   Did he -- you said you asked him to identify

18 himself?  Did he identify himself?

19        A.   He did not.

20        Q.   He didn't say anything, or you just couldn't

21 hear what he was saying?

22        A.   It was -- I knew that he would say something,

23 but I couldn't tell what he said, it was muffled.  I

24 just -- I couldn't understand him.  And it was around

25 this time whenever he'd done this, you know, that I -- I

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  drew my -- my service weapon and, you know, had it at
2  low ready.
3      Q.  Get your service weapon or your -- or your --
4  or your taser?
5      A.  My service weapon.
6      Q.  Okay.  So it's -- from my understanding of
7  your testimony, you're saying that the door with -- the
8  door opened up at some point, and I think you said you
9  were able to see his face; is that right?
10      A.  No.  No, sir.  I didn't say that.  That I
11  could see part of his face.
12      Q.  Okay.
13      A.  He was peeking over the --
14      Q.  Part of his face?
15      A.  Yes.  A very small portion of it.
16      Q.  What portion of it?
17      A.  Long enough for him to look real quick and cut
18  back around.  Not long enough to identify him, but long
19  enough just to see part of the face, whether it be his
20  cheek, his nose, his eyes, his eye and cheek.  Because I
21  know I can't say for certain all, say, you know, part of
22  his face.
23      Q.  Tell if he was young or old?
24      A.  No, sir.  If I was able to see his face, I
25  would've known that this was Dukes, Sr. and not Dukes,

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

 1 | Jr.  That was the issue, I didn't know who was behind
 2 | the door.
 3 |     Q.   I just want to -- I want to show you.  These
 4 | are from the DAVID records.  You see these two -- these
 5 | two pictures?
 6 |     A.   The one on the left is Dukes Jr., the one on
 7 | the right is Dukes Sr., looks like.
 8 |     Q.   Okay.  This is -- this is Plaintiff's 16.  I'm
 9 | sorry, these are from the composite in Plaintiff's 12.
10 | I'm just going to show you here.  You can see one of
11 | Dukes, Sr. is on page 194, right?  You also see,
12 | Corporal, that for the photo that I used in that
13 | comparison, that's number 1 here on page 194.  And you
14 | see the photo date is May 31, 2019.  Do you see that?
15 |     A.   Yes, sir.
16 |     Q.   Okay.  So that would've been taken just
17 | several days after the incident?
18 |     A.   It appears so.
19 |     Q.   Okay.
20 |          THE REPORTER:  And Mr. Slater, the last exhibit
21 |     we have marked for the record is Exhibit 13, the
22 |     photos of the residence.  As to, I think you called
23 |     it Exhibit 16, would you like to mark that as
24 |     Exhibit 14 or is it just as a reference?
25 |          MR. SLATER:  Exhibit 14 is going to be the

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Okay.  I'm just going to show you -- this is

2    marked page 192 in Exhibit 12.  If you can see here,

3    this is from the DAVID database for Dukes, Jr.  Can you

4    read to me his height?

5    A.   It says 6'2".

6    Q.   Okay.  Okay.  So let's go back to your -- you

7    testified that you saw just part of his face, but you

8    couldn't tell who it was, right?  At this time, did you

9    have your service weapon drawn?

10   A.   I drew my service weapon, yes.  Whenever he

11   stuck his arm out behind the door and I could tell that

12   the individual behind the door -- first off, I knew it

13   was a male because I could hear a voice which was a

14   male's voice, and he stuck his arm from behind the door

15   and I knew it was a, you know, a black male.

16   Q.   Okay.

17   A.   At that's when I drew my service weapon.

18   Q.   Okay.  When you drew your service weapon --

19   okay.  So then -- and I just want to understand.  So

20   you're there, the -- by the time Duke, Sr. has put his

21   arm through the door, were Gaffey and Almeida in the

22   house at that time?

23   A.   I don't recall, sir.  I -- I don't recall.  My

24   focus was not on who and when and what time other

25   deputies were coming into the house, my attention was on



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  the individual behind the door.  That was where my

2  threat was.  That was where my attention was.

3       Q.   Okay.  But you are aware that at some point

4  prior to you deploying the taser that Gaffey and Almeida

5  were also in the house?

6       A.   That -- when that taser was deployed, Deputy

7  Gaffey and Corporal Almeida was inside the house.

8       Q.   Okay.  So then -- so then -- so, we've gotten

9  to the point where you can see part of the face, you

10 don't know who it is.  Right arm comes through the door.

11 What happens next?

12      A.   I give more commands to identify himself, to,

13 you know, come from behind the door and he doesn't

14 comply.  At one time he opened the door a little bit

15 more, and he did ask me who I was and why I was there.

16 Whenever he did this, I could see like part of his body,

17 part of his torso, and -- and only part of his face, but

18 not, you know, his full face, just part of his face.

19 Whenever he opened this door a little bit wider and --

20 and I could see a little bit better, I could see past

21 him, I could see the bed.  And on the bed, I could see a

22 gun on the -- laying in plain view on top of the bed.

23      Q.   Okay.

24      A.   And whenever I --

25      Q.   Whenever you what --



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

```
 1      A.   Whenever I -- whenever I seen that, I started
 2  giving more commands, come from behind the door and show
 3  me both of his hands.  But he wouldn't comply.
 4      Q.   Okay.  And your -- and was your service
 5  weapons still drawn while you were issuing those
 6  commands?
 7      A.   My service weapon was drawn.
 8      Q.   Okay.  Were you aware that Terry Dukes, Sr.
 9  was hard of hearing?
10           THE REPORTER:  Form.
11      A.   No, sir.  I've had -- I've had conversations
12  with Dukes, Sr. in the past, and Dukes, Sr., every time
13  I've ever communicated with him, did not show any sign
14  of hearing impairment.
15           BY MR. SLATER:
16      Q.   He wearing -- do you know if he was wearing
17  hearing aids during your previous encounters?
18      A.   I do not.  I cannot answer that.
19      Q.   Okay.  Okay.  So at some point you -- my
20  understanding is, at some point you returned your
21  service weapon to its holster and drew your taser; is
22  that right?
23      A.   No, sir.  That's not right.
24      Q.   Okay.  Tell me what -- tell me what happened
25  then?
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.   I seen the gun on the bed whenever the door

2  got opened up a little bit more.  I'll give him commands

3  to come from behind the door, to show me his hands, he

4  was not complying.  The male subject, he said something,

5  but I couldn't understand what he said.  And right after

6  he mumbled something, he turned and walked back toward -

7  - from behind the door, and like toward where the gun

8  was, back toward his bed.

9    Q.   Okay.  Was he clothed at the time?

10    A.   I have no idea.  Couldn't see that.  I could

11  just see from the gap of the door, from the light from

12  my service weapon, I have a -- a tactical light on my

13  service weapon that was activated.  I could -- from that

14  through the doorway, I could see him put his arm back

15  in, turn, and as he turned, and the angle that I was at,

16  and how wide the door was opened, I could see him

17  walking back towards that bed.

18    Q.   What'd you do next?

19    A.   I kicked the door in and drew my taser with my

20  left hand, activated it, and deployed it at the

21  individual that was by the bed, closer to the gun.

22    Q.   You said that the individual was walking.  He

23  -- and I just want to make sure I'm sort of visualizing

24  correctly.  So the door was partially shut, and you see

25  him walking towards the bed where the firearm is, right?

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1     A.    The door was partially closed.

2     Q.    Okay.

3     A.    But there was still a gap in the door.

4     Q.    Okay.  How wide was the gap?

5     A.    10, 12 inches.

6     Q.    Okay.  So you see this individual walking

7  towards the bed where the gun is, and you kick the door

8  open.  You obtain your taser with your -- with your left

9  arm, with your left hand, and you deploy it.  And where

10 do you strike the subject?

11    A.    One taser probe striked his chest, and the

12 other taser probe striked a dresser behind him.

13    Q.    Okay.  And I just want to understand, so the

14 chest, can you sort of point to me where the probe

15 would've landed, the one that hit his chest?

16    A.    His right -- I guess the correct terminology

17 would be his right pectoral.

18    Q.    Okay.  Can you just point to me on your body

19 where that would be?

20    A.    I'm sorry.  I think it was his left -- left

21 chest -- left pectoral.  I don't want to -- give me a --

22 it's probably in my -- in my report, so give me a

23 second.  Instead of trying to doing it from memory.  If

24 I had my -- do you have my response to resistance form?

25 I think you may have had some of those documents

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1      A.    Then I got him in his right pec there, so --

2          THE REPORTER:  Pardon me.  Corporal, couldn't

3      hear what you said.  Could you repeat your answer

4      for the record?

5      A.    Yes.  Yeah, no problem.  If that's what is --

6  is indicated in my -- my sworn complaint, that -- that's

7  most likely where the taser probe hit.  It's hard to

8  remember all this from memory without having, you know,

9  the whole case file in front of me to be able to look

10 at.  The response to resistance form actually has a

11 diagram on there that would actually indicate and marked

12 where the taser probes strike the -- the target.  That's

13 why I wanted to refer to that.  I know that would be,

14 you know, certain where that taser probe hit.

15          BY MR. SLATER:

16     Q.    So here it shows upper left.  I'm on page --

17 Exhibit 12, page 164.  Do you see that?

18          (EXHIBIT 12 MARKED FOR IDENTIFICATION)

19     A.    Yes.

20     Q.    That's --

21     A.    That shows upper right.  That shows the upper

22 right.

23     Q.    Oh, sure.  Yes, you're right.  You're right.

24 So upper right.  So consistent with your sworn -- your

25 sworn complaint.  Okay.  So you said that the -- so that

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    one probe hit there, the other probe hit to the right of
2    him or the left of him?  So over here on the left side,
3    or over here on the -- on the right side?
4         A.   I don't know.  I don't know which side of his
5    body the second taser probe went.  I just know where it
6    ended up at.
7         Q.   Okay.
8         A.   You have to remember this was -- this was a --
9    a dark -- the only light that I had at -- now at this
10   time, would be the light coming from my taser, which is
11   not very bright, but it's bright enough for me to see my
12   -- the target.
13        Q.   Okay.
14        A.   But exactly, I don't know.  The -- the taser
15   comes out so fast, I don't know where -- you know, where
16   it goes.
17        Q.   Okay.  But we're in agreement that only one
18   probe struck Mr. Dukes?
19        A.   Correct.
20        Q.   How long between when you kicked the door open
21   and fired the taser, do you estimate?
22        A.   Not even two seconds.  It was -- it was all --
23   it was not a -- a series of events.  It was all one --
24   one motion.
25        Q.   Okay.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   It was not -- it was not kick the door in,

2  grab my taser, activate it, shoot it.  It was all one

3  continuous motion, if that makes sense.

4      Q.   Did you issue any commands before firing your

5  taser?

6      A.   I did not.

7      Q.   And the subject was -- and just to be clear,

8  the -- just what -- my understanding, and please correct

9  me if I'm wrong, is seeing this person who you're saying

10  you did not know the identity of this person, but that

11  he was a black male, seeing him walk towards the bed

12  where you'd seen the revolver and you'd seen the firearm

13  is what prompted you to kick the door open; is that

14  right?

15      A.   That's not right, sir.

16      Q.   Okay.  Tell me what -- tell me what -- tell me

17  what is right then?

18      A.   Yeah, the -- to -- to -- in order for me to

19  answer that, you've got to back up whenever we met at

20  the Sheriff's Office.  Because I -- I can't -- I can't

21  just say only the circumstances that -- that transpired

22  inside the house was the reason why I did what I did.

23  The reason why I did what I did backed up to where we

24  met at the Sheriff's office.  We received this

25  information, personal information that we have with

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

407.423.9900          www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

Toll Free 855-MYDEPOS

```
 1   Dukes, Jr., him being possibly under the influence of
 2   Molly, even knowing him being a known drug user, being -
 3   - having firearms in the house.  I see the firearm in
 4   the house already.  The actions behind the -- the
 5   individual behind the door, refusing to identify
 6   himself, refusing to cooperate.  Me telling him, "Don't
 7   go to the gun," me giving loud commands to just, "Show
 8   me your hands.  Come from behind the door."  All of this
 9   stuff goes into -- goes into effect whenever I'm making
10   the decision that I made.  It wasn't just because he did
11   this and this that I did this.  It backs up way before
12   that.
13        Q.   Okay.  How tall are you, Corporal?
14        A.   6'.
15        Q.   6'.  And do you recall where the second probe
16   landed?
17        A.   In the one dresser -- in the dresser behind
18   Dukes, Sr.  There should be pictures of that attached to
19   the incident report if I remember correctly.
20        Q.   Sure.  And I do recall seeing pictures of the
21   dresser there, but I -- they're -- the copies I have are
22   too difficult to see what's going on with them, so we'll
23   work on that.  And where was the dresser located in the
24   room?
25        A.   Directly behind Dukes, Sr., all the way
```

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   dresser -- you -- your recollection of where the dresser
 2   was, where the other probe went?
 3       A.   Yeah, it -- it was probably a little bit more
 4   to the right of that right there, because I -- he had a
 5   big bed.  If I remember, he had like a king-size bed and
 6   it stuck out, you know, quite -- quite a bit.  It was
 7   probably just to the right of -- of that area.  But --
 8   but that's, you know, pretty close to where it was at.
 9       Q.   Okay.  Okay.  How far away was Dukes from you
10   when you -- when you deployed your taser, if you can
11   remember?
12       A.   Let me see if it's in my report.  I would say
13   probably ten foot, maybe.
14       Q.   Okay.
15       A.   12 foot.
16       Q.   So you were -- you were about 10, 12 feet from
17   him.  And I think we established that you were about
18   what, one to two feet from the entrance of the door?
19       A.   I want to say I was pretty close to the door
20   because I -- at one time I put my foot in front of the
21   door.  When he opened it up, I put my foot in front of
22   the door to keep him from shutting the door.  I could
23   see -- I -- he had his one arm out and I would -- I
24   would keep one foot, like kind of in front of the
25   threshold of the door where he couldn't shut the door on
```

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

```
 1  it.
 2       Q.   And then I want to just go back to your
 3  narrative.  This is in Plaintiff's 12, your original
 4  narrative.  From the incident report, Pages 147, Dukes,
 5  T. 147 through 148.       I apologize.  And I just see
 6  here, I'm just noting that from your report you say, and
 7  I'm just at the second paragraph here, "The distance
 8  from the door to where I observed the gun was
 9  approximately eight feet.  The bed was located directly
10  behind and to the right of this door if looking from the
11  outside of the bedroom.  Do you stand by that?
12       A.   Yeah, I stand -- I stand by that.
13       Q.   Okay.  So Mr. Dukes was struck by the probe.
14  What happened next?
15       A.   He fell to the ground and was secured and
16  handcuffed.
17       Q.   Okay.  How long between when he fell to the
18  ground and he was handcuffed?
19       A.   Sir, I don't know.  Ten, 15 seconds, maybe.
20       Q.   Okay.
21       A.   And once -- once we got into the room and we
22  could identify the individual there, I personally know
23  Dukes, Sr., and I knew that -- who this was.
24       Q.   Okay.  Now, did he say anything to you after
25  he was struck with the probe?
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.   I don't recall exactly what he said.

2    Q.   But he did say something?  You think he said

3 something, you just don't remember what?

4    A.   Yes, sir.  I'm sure he said something.

5    Q.   Okay.  Was he wearing any clothes when you

6 cuffed him?

7    A.   No, sir.

8    Q.   And at what point did you identify him as

9 Dukes, Sr.?

10    A.   Give me one second, okay?  I would like to

11 note that you asked this earlier.  He -- he tried

12 several times during this incident to shut the door, but

13 each time he tried, I stopped the door by putting my

14 foot against the bottom portion of it so he couldn't

15 shut the door on them.

16    Q.   Okay.  And that corroborates what you were

17 saying, that you were pretty close to the door?

18    A.   Yes, sir.

19    Q.   Okay.  So I --

20    A.   I have -- I have --

21    Q.   I want to understand when you identified him

22 as Dukes, Sr.

23    A.   To answer your question a second ago, whether

24 he made any statements inside the bedroom after we

25 handcuffed him, I have -- I have in my report that he --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  recall exactly what those statements were as you sit

2  here today?

3       A.   No, I never said that.  I do know what he

4  said, but I forgot that he --

5       Q.   Okay.  What did he say?

6       A.   -- was whenever the statements were made.  So

7  he --

8       Q.   What did he say?

9       A.   He said that the reason why he opened the back

10 door and then walked away was because he thought it was

11 his son Dukes, Jr., not law enforcement.  He said that

12 he seen lights shining in his house and that resembled

13 Dukes, Jr.'s cell phone light, but he later advised that

14 he didn't know who was at his back door.  And he said

15 one -- he said he thought it was first Dukes, Jr., but

16 then he later advised that he didn't know who was at his

17 back door.  He --

18      Q.   Okay.  Are you just reading from your

19 statement, Corporal?

20      A.   This is where I'm getting my -- yes, sir.

21      Q.   Okay.  I have your statement, so that's fine.

22 We can -- we can let the record reflect that according

23 to your statement, he -- you know, according to your

24 narrative, he made those statements, but I'm asking

25 other than what's in your statement, do you recall

**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  anything else that he said to you?

2      A.   No, sir.

3      Q.   Okay.  And so I had previously shown you what

4  I marked as Plaintiff's 16, which was a sworn complaint.

5  I'm going to pull that back up.  And I'm seeing here on

6  what's marked as page 13, it lists a charge as, "Resist

7  officer.  Obstruct without violence.  Misdemeanor.  Class

8  F misdemeanor.  Violation of section 843.02."  And this

9  is for Dukes, Sr.; is that correct?

10     A.   That's correct.

11     Q.   And you're the affiant on this sworn

12 complaint?

13     A.   I am.

14     Q.   Okay.  Your -- what was the basis for charging

15 Dukes, Sr. with resisting?

16     A.   That decision was not made by me, but by my

17 superiors.

18     Q.   Who?

19     A.   Who specifically gave that order to do that?

20 I do not know.  It was -- went down to the chain of

21 command that this is what was going to be done, and I

22 complied with their order.

23     Q.   Okay.

24     A.   Who -- who ultimately made that decision, I do

25 not know.  It was above me.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.   Okay.  Did you talk to any of the other

2  deputies about Mr. Dukes being charged?

3    A.   Not that I recall.

4    Q.   Okay.  Who told you specifically -- I

5  understand that maybe there were some other people up

6  above you making these decisions.  But who told you

7  specifically to draft up this sworn complaint?

8    A.   I don't remember who specifically told me.  It

9  probably would've been either Corporal Almeida or maybe

10 Lieutenant Anderson, but I can't say for certain who

11 told me to do the sworn complaint.

12   Q.   Okay.

13   A.   I was advised that it -- I was just advised to

14 do it, so I did it.

15   Q.   Okay.  Were you advised -- do you know if you

16 were advised in-person or was this something that you

17 would've been e-mailed?

18   A.   Sir, I don't recall.  I would imagine this

19 would've been something -- probably phone calls being

20 made, and a phone call was probably made and -- either

21 to me or maybe to Corporal Almeida and somehow, shape,

22 or form, I was notified about it, and that this is what

23 I needed to do.

24   Q.   Okay.

25   A.   But this could have been -- this could have



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1  been a decision that was made above my lieutenant, but

2  it was handed down through the chain of command.  I

3  don't know who officially made this decision.

4      Q.  Okay.  But I'm sort of understanding you

5  didn't want to make the decision?

6      A.  I did not.

7      Q.  Okay.  Can you tell me why not?

8      A.  Because I did not feel that a sworn complaint

9  or an arrest was warranted in this situation for Dukes,

10 Sr.

11     Q.  Okay.  And why not?

12     A.  Because Dukes, Sr., was a victim of his son,

13 not a victim of us being there.  And this happened to

14 him.  Dukes, Sr., who is an elderly man and who may or

15 may not have been hard of hearing at the time -- I -- I

16 can't say for certain.  I -- I know what my past

17 experience has been like with him, but at the end of it,

18 when it was all said and done, and we got a clear

19 perception of what all happened and what was going

20 through Dukes, Sr.'s mind and with the issues he has had

21 with his son over the years, I just felt that this was

22 not the appropriate decision for --

23     Q.  Okay.  I appreciate your candor there.  And

24 I'm just going to show you -- we're going to run through

25 a few of these quickly.  I want to wrap up since it's

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  getting pretty late.  I'm just going to show you now

2  what I previously marked as Plaintiff's 17, and this is

3  the No Information produced.  This is Dukes, T. 15, and

4  this is the charge against Terry Carl Dukes, Sr., in the

5  misdemeanor division for the count of resisting without

6  violence, and here it says reason for dismissing the

7  case is request of investigating agency; do you see

8  that?

9       A.   I do.

10      Q.   Okay.  Do you know -- do you know why this

11  charge was dropped?

12      A.   You'd have to talk to whoever made that

13  decision.

14      Q.   Okay.  Do you know who made that decision?

15      A.   I have no idea.

16      Q.   Okay.  Okay.  And I understand from your

17  report that you -- I understand that you had taken those

18  photographs after -- Did anyone search the house?

19      A.   A search -- I do believe was conducted to

20  ensure that nobody else was inside the house.

21      Q.   How long did that search go on for?

22      A.   I cannot answer that, sir.  I always -- my

23  attention was at -- with Dukes, Sr.

24      Q.   Okay.  Well, at the time -- at the time of his

25  arrest, had -- I understand that detective from the CAD,

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

## Incident Narratives

**Original Narrative**

| | Author: | Date Created: | Supp #: |
|---|---|---|---|
| | Deputy C. Gregory #502 | 05/26/2019 2329 Hrs | 0 |

201905002271
Dep. C Gregory
May 25, 2019
Resisting W/O Violence

On May 25, 2019, at approximately 05:15 hrs., Dep. Gaffey, Cpl. Almeida, Dep. Murphy, and I responded to the residence located at ▮▮▮▮▮▮▮▮ in reference to attempt to contact Terry Dukes Jr.

Detective Wilkinson, on this date, developed probable cause for the charge of Aggravated Battery on a Pregnant Women, with Dukes Jr being the suspect (Case: 201905002270).

Upon arrival, Dep. Gaffey and I walked to the back (West) section of this residence, while Cpl. Almeida and Dep. Murphy attempted to make contact with Dukes Jr at the front (East) section of this residence. Once at the back side of this residence I positioned myself beside the south west door steps (These steps led up to the back door), while Dep. Gaffey positioned himself on the north west corner of the residence. While at the front of the house Dep. Murphy knocked loudly and announced "Sheriff's Office". Dep. Murphy did this several times. After several attempts to make contact via "knock and announce", I faintly heard a male voice come from within the residence, however I couldn't hear what this male said. Right after I heard this voice, I heard the sound of footsteps coming from within the residence. Right after I started hearing these footsteps the back door opened. As soon as this door opened, I walked up the steps and entered the residence through the open door.

Once inside I observed a subject walk into a bedroom and shut the door. After announcing "Sheriff's Office", and asking if Terry Dukes Jr here, I heard a male voice come from within the bedroom I observed the subject walk into. I could not determine what this male was saying due to his voice being muffled. I announced "Sheriffs Office" a second time, and again, asked if Terry Dukes Jr was here. The male subject didn't say anything. I then knocked on this door while giving loud and clear commands to open the bedroom door. After several knocks / commands, this door opened slightly, and a male voice asked what I was doing. I advised the male he needed to identify himself, and to come out from behind the door. I advised the male subject again who I was, and that I worked for the Sheriffs Office. The male subject, instead of complying, opened the door a little bit more, stuck his right arm on the outside of the door, and then would quickly look through the gap in the door before concealing his face completely back behind the door.

Once the subject stuck his arm out of the door, I could tell that the male behind the door was African American. Dukes Jr is African American.

Based on the fact that Dukes Jr is African American, the male inside is African American, the male inside repeatedly refused my commands, and the male's suspicious behavior, I drew my service weapon, and began giving loud clear commands to the male. I advised the male to show me his hands and to come from behind the door. While I was giving these commands, the male subject opened the door a little bit more, asked who I was, and why was I there. Once the door opened more, I could see partially the male subject's torso and part of his face. Right past this male, was a bed, and on this bed I could see a pistol. Once I observed this pistol, I gave more clear commands to come from behind the door and to show both his hands. The male subject did not comply with my commands. As I continued giving commands, I heard the male say something (I couldn't understand what he said), and then walk from behind the door, and toward his bed where the gun was. Once I witnessed, through the gap in the door, the male walking toward the bed, I quickly opened the bedroom door, and deployed my TASER. The deployment of my

TASER caused the male subject to fall in front of his bed.

The distance from the door, to where I observed the gun, was approximately 8 feet. This bed was located directly behind and to the right of this door if looking from the outside of the bedroom.

Once inside the bedroom it was learned that this male was Terry Dukes SR, the father of Terry Dukes Jr. Dukes Sr was nude, and after being allowed to put his pants on, Dukes Sr was secured in handcuffs. While Dukes Sr was putting his pants on I walked to the bed and cleared the firearm for safety purposes.

I would like to note that within 10-15 seconds of me entering the residence, Dep. Gaffey entered the residence through the same door I did.

I would like to note that during this incident, Dukes Sr attempted to shut the door several times, and with each time I would stop the door from closing by placing my foot against the bottom portion of it.

Dukes Sr advised that the reason he opened the back door and then walked away, was because he thought it was Dukes Jr, and not Law Enforcement. Dukes Sr also advised the lights he seen shining in his house resembled Dukes Jr's cell phone light. Dukes Sr later advised that he did not know who was at his door. Dukes Sr also advised that he would "own all of Levy County after suing us", and that he was going to "have all of our jobs for doing this".

Prior to arrival at this residence, Det. Wilkinson was advised by the victim in the above referenced case number that Terry Dukes Jr resides at this address. Apart from the victim advising this information, Law Enforcement is very familiar with Terry Dukes Jr from prior incidents, and this address, ██████████ is the address Law Enforcement knows to be Dukes Jr's primary address. Det. Wilkinson was also advised by the victim that Dukes Jr, has been using the drug known as "Molly" (MDMA).

During this incident Terry Dukes Sr, did not identify himself nor did he comply, or advise that he would comply, with the orders I gave in regards to showing his hands or coming from behind the door.

I would like to note that this residence does not have power. The only light source inside this residence was either from my (or other deputies) flashlight, TASER light, or from the flashlight that is attached to my firearm. The door Dukes Sr was standing behind was painted white. The light reflecting off of this door clearly illuminates my Sheriffs Office insignia. During this incident Dukes Sr, on multiple occasions, would quickly look through the gap in the door before concealing his face back behind the door.

I would like to note that Law Enforcement was informed that there were firearms inside this residence, and that Dukes Jr is known to have a violent past.

Dukes Sr was evaluated by EMS on scene, and after being cleared by EMS, requested to be transported to the hospital.

Photographs were obtained, and attached to this case file.

A Sworn Complaint will be filed with the SAO for the charge of Resisting W/O Violence.

| Signed: Deputy C. Gregory #502 | Reviewed: Sergeant K. Kinik #335 |  |