

1  UNITED STATES DISTRICT COURT

2  NORTHERN DISTRICT OF FLORIDA

3  GAINESVILLE DIVISION

4  CASE NO. 1:23-CV-45-AW-HTC

5

6  TERRY DUKES, SR.,

7  PLAINTIFF,

8

9  V.

10

11  ROBERT MCCALLUM, JR., ET AL.,

12  DEFENDANTS.

13  _____/

14  VIDEOCONFERENCE DEPOSITION OF FRANCO ALMEIDA

15  DATE:        JULY 25, 2023

16  REPORTER:    GENESIS GARCIA

17  PLACE:        ALL PARTIES APPEARED VIA VIDEOCONFERENCE

18

19

20

21

22

23

24

25

407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

MILESTONE I REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

1  these sort of courses, like this one that I've

2  highlighted, the firearms and building entry course,

3  would this all -- would this generally take place in the

4  office or would you be out in the field practicing?

5      A.   It'd be in the office.  It could be in one of

6  our buildings here.  Especially if it's building

7  clearing, building entry, we're going to use a

8  structure.  It could be on the firearms range.

9      Q.   Okay.  When you do those trainings employing

10 structures, let's say it's one for responding to a

11 warrant, would you have -- would the structure be empty

12 or would you have, you know, sort of like pretend

13 subjects in the structure for the training purpose?

14     A.   It could be both.

15     Q.   Okay.  Have you ever been trained on -- just

16 let me step back for a second.  Have you ever been

17 trained on -- let me actually circle back.  Let's talk a

18 bit now.  Let's move on to the incident involving Terry

19 Duke, Senior.  It's my understanding, Lieutenant, that

20 you reviewed your incident report prior to this

21 deposition; is that right?

22     A.   Yes, sir.

23     Q.   Prior to the incident at ████████████ on May

24 25, 2019, had you ever interacted with Terry Dukes,

25 Senior, before?

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

```
 1        A.    Not that I recall.

 2        Q.    Have you ever interacted with Terry Dukes,

 3   Junior, prior to that May 25, 2019, incident?

 4        A.    Briefly in years previous.

 5        Q.    How were you interacting with him?

 6        A.    Disturbance calls with him and Shaquanda

 7   Sheffield (phonetic).

 8        Q.    Where were those calls?  What address?

 9        A.    ████████████████████

10        Q.    Did you ever respond to a call involving Terry

11   Dukes, Junior, at another address?

12        A.    One on Main Street one time.  I don't know if

13   it was before or after.  I don't --

14        Q.    Are you familiar with an area, I don't want to

15   get it wrong, University Oaks?

16        A.    Yes.

17        Q.    Have you ever responded to a call regarding

18   Terry Dukes, Junior, at University Oaks?

19        A.    I don't remember.

20        Q.    Okay.  What can you tell me about Terry Dukes,

21   Junior?  About his demeanor?  About your interactions

22   with him?

23        A.    From what I remember, you know, is not normal

24   interactions.  What I remember, I mean, upset and

25   everything.  Well, we were out on a disturbance, so -- I
```

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        Q.   Okay.  Can you take me back to when you first

 2   became aware of the probable cause regarding Terry

 3   Dukes, Junior, on the morning of May 25, 2019?

 4        A.   Spoke to Detective Wilkinson by phone.  He had

 5   responded to a hospital in Gainesville in reference to a

 6   battery incident between Dukes, Junior, and Shaquanda

 7   Sheffield.  Wilkinson established probable cause for

 8   aggravated battery domestic between those two, and the

 9   suspect being Dukes, Junior.

10        Q.   Okay.  Did he go into any details about what

11   had happened?

12        A.   I remember, you know, him -- pretty much she

13   was beaten up.  And I think she got bitten, but that's

14   -- obviously it was going by his word on that as an

15   officer.

16        Q.   Okay.  And you said that you had received a

17   phone call; is that right?

18        A.   Yeah.  We spoke by phone.

19        Q.   And would that be on your work issued phone?

20        A.   Yes, sir.

21        Q.   Do you still have the same phone that you had

22   in May of 2019?

23        A.   The same physical phone?  No.

24        Q.   Okay.  You have a different physical work

25   phone?
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1      Q.   Okay.  Okay.  So let's go back to the morning
 2  of the incident.  You received a phone call from
 3  Detective Wilkinson, what happened next?
 4      A.   He had probable cause for Dukes, requested we
 5  go to the residence on ████████ to attempt to locate
 6  him and pick him up on charges.
 7      Q.   Okay.  And when you say Dukes, you mean Dukes
 8  Junior?
 9      A.   Dukes Junior, yes, sir.
10      Q.   Okay.  And your -- I'm understanding that your
11  testimony is that Detective Wilkinson told you to go to
12  ████████████████; is that right?
13      A.   They requested us to go there and attempt to
14  locate him.
15      Q.   Okay.  And it's my understanding that at this
16  time, there was no warrant issued for Terry Dukes
17  Junior's arrest; is that correct?
18      A.   No, sir.  It's a felony probable cause.
19      Q.   When you have felony probable cause, but you
20  don't have a warrant, does that -- as far as you
21  understand it, does that allow you to go into someone's
22  house?
23      A.   That meets the criteria to enter the home
24  without a warrant, yes.
25      Q.   What are those criteria?
```



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    Consent, fresh pursuit, exigent circumstances.

2      Q.    Okay.  Okay.  So Detective Wilkinson suggested

3  -- requested, I think is the word you used, that you go

4  to                 , what happened next?

5      A.   Myself, at the time I was a corporal, at the

6  time, Deputy Gregory, Deputy Gaffey, and Deputy Murphy

7  responded there, because we had the manpower available

8  for officer safety, given the nature of the call and

9  complaint, I responded there.  Parked out in front or by

10  the road, went up to the home to attempt to make

11  contact.

12      Q.    Okay.  And you said that you gathered all this

13  manpower for officer safety; is that right?

14      A.    Yes, sir.

15      Q.    Okay.  What -- why did you think this was a

16  situation that warranted officer safety measures?

17      A.    Convicted felon, he has a probable cause

18  against him for aggravated battery on a pregnant female,

19  which is not the first incident we responded to like

20  that as an agency, and there's been reports of weapons

21  being at the residence.

22      Q.    Had you ever, prior to going to the residence,

23  observed weapons there?

24      A.    Not that I remember.

25      Q.    And you said that -- let just make sure I have


MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
 1  all the players correct.  It was you, Murphy, Gaffey,
 2  and Gregory; is that right?
 3      A.    Myself, Murphy, Gaffey, Gregory, yes, sir.
 4      Q.    Okay.  No one else was there when -- while you
 5  were sort of gathering up to go to █████████████
 6      A.    (audio cuts out) that I recall.
 7      Q.    Okay.  And you said then you drove up.  How
 8  many patrol cars?
 9      A.    Like, four.
10      Q.    Okay.  And you said you parked either out
11  front or by the road; is that right?
12      A.    Yes, sir.
13      Q.    Okay.  Were -- did you have sirens activated
14  at this time?
15      A.    No, sir.
16      Q.    Okay.  When you approached the house, was
17  there a gate, or a fence, or anything like that that you
18  had to bypass?
19      A.    Remember there being -- you there?
20      Q.    I'm here.  Sorry.  I didn't hear what you
21  said.
22      A.    Oh, I don't remember there being one.
23      Q.    Okay.  And my understanding is you had been --
24  you had been to this residence several times before,
25  right?
```

**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

      1        A.    I'd been there before.

      2        Q.    Okay.  Did you know who owned the house at the

      3   time?

      4        A.    I knew Junior lived at his father's house,

      5   Senior's house.

      6        Q.    Okay.  But you knew that Terry Duke, Senior,

      7   also resided there?

      8        A.    Yes, sir.  But I don't -- I don't know him.  I

      9   just know he lived at his dad's.

     10        Q.    Okay.  Did you know about anyone else who

     11   lived at ████████████████?

     12        A.    I know Shaquwanda was there off and on.

     13        Q.    Okay.  Anyone else?

     14        A.    Not that I can remember, besides Senior,

     15   Junior, and Shaquwanda.

     16        Q.    Okay.  When you arrived at 9██████████

     ██████████   did you already have a plan in place as to how

     18   you would proceed towards the house, or did you develop

     19   that on the scene?

     20        A.    I think -- I think we planned a little bit

     21   about, you know, approaching and just making sure that

     22   no one attempted to flee on foot.

     23        Q.    Okay.

     24        A.    It's been a long time, so --

     25        Q.    I understand.  Let me just -- okay.  So you

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

 1  it, but I don't believe it was drawn -- it wasn't drawn

 2  when I approached.

 3      Q.   Was it drawn while you were outside?

 4      A.   Outside of the house?

 5      Q.   Yeah.

 6      A.   Not that I recall, no.

 7      Q.   And so my understanding is that you would --

 8  you -- you're describing that there's pretty high-level

 9  visibility in the -- in this area; is that right?

10          MS. ADKINS:  Hold on.

11      A.   On our side of the door.

12          MR. SLATER:  I heard hold on, sorry, what --

13          MS. ADKINS:  Form.  I objected to form.

14          MR. SLATER:  Oh, oh, okay.

15          BY MR. SLATER:

16      Q.   You can answer, Lieutenant.

17      A.   It was on -- it was illuminated on our side of

18  the door where the light was bouncing back on us.  It

19  was not illuminated in the bedroom, no.

20      Q.   Oh, okay.  Can you describe to me what Gregory

21  was doing at this time?

22      A.   Trying to keep the door open and giving

23  commands to the subject to show his hands.

24      Q.   And was a service weapon drawn at this time?

25      A.   At some point, it was.  I don't -- it was a

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1  trying to close the door and Deputy Gregory was trying

 2  to keep it open to keep that line of contact.

 3      Q.   Can you recall anything that was being said at

 4  the time?

 5      A.   Show me your hands.

 6      Q.   Who was saying that?

 7      A.   Gregory.

 8      Q.   Do you remember him saying anything else?

 9      A.   Fine details, you know, certain things -- I

10  mean, not that I recall.  He was trying to get

11  compliance, and he wasn't getting it.

12      Q.   Did you -- the person that you said was in the

13  room, did you hear anything that he said?

14      A.   I think they were asking, like, why we were

15  there, but I don't recall exactly what was said.

16      Q.   Okay.  Let's -- in response to why you're

17  there, do you remember anything that either you,

18  Gregory, or Gaffey said to the Subject?

19      A.   I don't -- I don't recall.

20      Q.   Okay.  When was the first time you saw the man

21  who was in the room?

22      A.   Like, saw part of his body, or saw him?

23      Q.   Let's -- well let's break that down.  Saw part

24  of his body?

25      A.   I could see it was a Black male from -- at

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900   www.MILESTONEREPORTING.com   Toll Free 855-MYDEPOS

1  times, I could see, like, a portion of his -- what would

2  have been his right arm and hand and, like, the corner

3  of, like, his hair and head -- on the right side, I

4  guess it would be, because he was facing out, so to my

5  left is his right side of his body.

6      Q.   Okay.

7      A.   But that wasn't a -- it wasn't, like, a

8  sustained view.  It was just every now and then.

9      Q.   All right.  So Gregory, according to your

10  testimony, is using his foot and hand to try to keep the

11  door open.  What happens next?

12      A.   It's a back and forth for a while, trying to

13  get the subject to comply and the subject's refusing to

14  comply and keeps trying to push the door closed.

15      Q.   How long did that go on for?

16      A.   I don't recall.  I mean, it's fast-paced going

17  on so, I mean, at least -- you know, I don't know,

18  greater than 30 seconds.  But, you know, it's a lot

19  going on at once.

20      Q.   And I just want to make sure I caught what you

21  said.  You said it was greater than 30 seconds or not

22  greater than 30 seconds?

23      A.   I believe it was greater than 30 seconds,

24  but --

25      Q.   Okay.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1      A.   -- like I said, it was a hectic moment, and

2 it's four years and change ago.

3      Q.   Okay.  So that goes on for 30 seconds or so?

4           MS. ADKINS:  Form.

5           BY MR. SLATER:

6      Q.   Let me rephrase.  You said that it went on for

7 around 30 seconds --

8           MS. ADKINS:  Form.

9           BY MR. SLATER:

10     Q.   -- what happens next?  You can answer.

11          MS. ADKINS:  You may answer, Lieutenant.

12     A.   Okay.  Well the -- the subject behind the

13 door, and I gave a -- a push to push the door open.  And

14 prior to that, I had observed a firearm on the bed, and

15 Gregory had too because he announced it.  And the

16 subject pushed back, and I could see he moved back into

17 the room towards the bed where the gun was at.  And

18 Deputy Gregory deployed his taser in an attempt to stop

19 him from going towards the gun.

20          BY MR. SLATER:

21     Q.   Okay.  You said you observed the firearm, was

22 that before or after you said Gregory announced it?

23     A.   I -- I saw it before, just before.

24     Q.   Okay.  Where did you see it?

25     A.   It was lying on the bed, which would have been

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  to the right of the door.  So you could -- kind of the

2  way the door hinge works and the way the door was

3  partially open at times, that's why I could see it from

4  where I was standing.

5       MR. SLATER:  Okay.  If -- let me show you

6    actually now what we'll mark as Exhibit 3.

7       (EXHIBIT 3 MARKED FOR IDENTIFICATION)

8       BY MR. SLATER:

9    Q.   Okay.  This is -- can you see what I've pulled

10 up, Lieutenant?

11   A.   Yeah, I can see it.

12   Q.   Okay.  It's 122 pages.  This is a document

13 that was produced to us by your lawyer, and it's Bates

14 stamped Dukes T132 through 253.  And it includes a host

15 of different documents such as, here towards the bottom,

16 there's a General Order 14.01400.1.

17   A.   There's --

18   Q.   There's another general order -- there's

19 another general order in here, there are some pictures

20 of Mr. Dukes and his son from David, there's the sworn

21 complaint and arrest warrant for Terry Dukes, Junior,

22 the CAD detail for this incident, the internal

23 investigation regarding Mr. Dukes' complaint, the

24 Reporting Active Use of Force Subject Resistance Report,

25 the diagram, sworn complaint again, a series of pictures

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  from the scene, and then the narratives, including your

2  narrative which begins here on Dukes151, okay?  So I

3  want to take -- I want to direct your attention though

4  to the photographs that begin on 156 to page 160.  Have

5  you seen these photographs before?

6      A.   They're black and white, so -- they're not

7  very clear either, and that's without having color

8  definition on them.

9      Q.   Okay.  Are you -- have you seen these

10 photographs in color?

11     A.   I mean, if they were part of our Incident

12 Report, they would have been -- I would have seen them.

13     Q.   Okay.  Show you that they are a supplement to

14 Incident Report 201905002271, and a report run by Kinik,

15 and a signature -- an initial here by JA, do you know

16 who that -- who those initials would be?

17     A.   It would be probably James Anderson.

18     Q.   Okay.  And I want to look at the picture on

19 Dukes T160.  I understand it's very granular, so it's a

20 little bit hard to see.  But my understanding, and you

21 can correct me if I'm wrong, is that this is a picture

22 of the bed.  It's on its side, but this is a picture of

23 the bed through the doorway to the bedroom?

24     A.   Where's the floor at on this?  Is it to the

25 right?



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  -- it looks like the bed is several feet away from the

2  door; is that right?

3       A.   It's closer than you think.

4       Q.   Okay.  How many feet do you think that is from

5  the threshold?

6       A.   A few.

7       Q.   A few, three?  Four?

8       A.   Maybe, like, five or six, I think.

9       Q.   Okay.

10      A.   Maybe eight.  Maybe.

11      Q.   Okay.  Looking at the bed --

12      A.   It's --

13      Q.   Looking at the bed, and I understand we may

14  not be able to see the entire bed.  But looking at what

15  we can see on this picture --

16      A.   Uh-huh.

17      Q.   -- can you give me a sense of where you saw

18  the gun?

19      A.   On the left side of the bed.

20      Q.   On the left side?  The left side -- I'm going

21  to draw a box.  The left corner closest to the door

22  where I've drawn the box, that side?

23      A.   I don't think it was on the corner, but it was

24  on the left side.

25      Q.   Okay.  So you don't think it was on the

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  let's just call it the firearm.  You saw the firearm on

2  the left side of the bed.

3      A.    Uh-huh.

4      Q.    And I don't want to misstate what you

5  previously said, so do you -- just to refresh, my

6  understanding is that you -- you're saying you saw the

7  firearm before Gregory announced its presence,; is that

8  fair?

9      A.    I believe it was, like, right before he

10  announced, I had saw it -- I seen it.

11      Q.    Okay.  Okay.  What happened after Gregory

12  announced that there was a firearm?

13      A.    It was just -- makes tension go up higher when

14  we have a subject that's refusing to go out.  We're

15  there to attempt to locate a Black male, Terry Dukes,

16  Junior, on felony battery charges, and the Subject

17  behind the door at the residence where Junior lives is

18  refusing to show himself, refusing to show his hands,

19  and there's a firearm in close proximity to that subject

20  in the room.

21      Q.    Okay.  Okay.  So what happens next?

22      A.    The subject attempts to push the door closed a

23  final time and retreats back towards the bed where the

24  firearm is located, and Deputy Gregory deployed his

25  taser.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Okay.  So Deputy Gregory deployed -- was

2  Deputy Gregory standing outside the room or inside the

3  room when he deployed the taser?

4    A.   I think he was, like, right there at the

5  doorway.

6    Q.   Okay.  All right.  And the subject was moving

7  towards the gun is what you were saying, right?

8    A.   Yeah, the gun.

9    Q.   Okay.  Put back up Plaintiff's 3.  And I'm

10 looking at what's been marked as Dukes T163 and 164, and

11 this is called a Subject Resistance Report, do you see

12 that?

13   A.   I see it.

14   Q.   Okay.  What is that?

15   A.   A Response to Resistance Report documenting

16 use of force.

17   Q.   Okay.  And I see here the incident is for

18 Terry Duke Sr., the date of the incident is May 25,

19 2019, and the location is ███████████████, is that

20 -- am I reading that correctly?

21   A.   Yes, sir.

22   Q.   Okay.  I see just below the Case Information,

23 Subject Information, there is a Resistance and Control

24 Measure legend, do you see that?

25   A.   Okay.  Yep.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Okay.  And it -- and it identifies -- it looks
2  like two things, one, the type of resistance you
3  encountered, and second, the officer control measures
4  that were implemented; is that fair?
5    A.   Yes.
6    Q.   Okay.  And then on Response to Resistance, I
7  see here that it lists Gregory Gaffey and you as the
8  officers; is that right?
9    A.   Yes.
10    Q.   And I see that it has your ID numbers and your
11  signatures, correct?
12    A.   Yes.
13    Q.   Okay.  And is that your signature?
14    A.   Yes.
15    Q.   Your name?  Do you know when you would have
16  signed this document?
17    A.   It wouldn't have been -- we back on shift that
18  next day, probably would have been that same day.
19    Q.   I see here, and I'm just going to focus on
20  your response, you identify the resistance encounter as
21  ABR and the control measure as 14.  So let -- I just
22  want to run through these.  So A is passive resistance;
23  is that right?
24    A.   Yes.
25    Q.   B is refused commands?

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1       A.   Yes.

2       Q.   And then R stands for other specifying report?

3       A.   Yes.

4       Q.   Okay.  What was the -- what was the other in

5  Resistance?

6       A.   Physically attempting to push the door back,

7  against law enforcement, closed, and moving towards a

8  firearm in the room.

9       Q.   Okay.

10      A.   Active resistance.

11      Q.   Okay.  You see here there's a Section G for

12  Pushed/Pulled Away, do you see that?

13      A.   We chose other because he's pushing a door,

14  not a deputy.

15      Q.   Okay.  All right.  And then I see under

16  Control Measures, you've identified 14, "Handgun display

17  with commands"; is that right?

18      A.   Yeah, that's the only option for handgun

19  display.

20      Q.   Okay.  But my -- did you make any commands

21  while you're in the house?

22      A.   I don't recall.  Gregory was primary contact.

23      Q.   Okay.  Do you remember if Gaffey made any

24  commands?

25      A.   I don't recall.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Okay.  And what about Gregory, what commands

2  did he make, if any?

3    A.   I -- I mean, you know, "Show me your hands"

4  stands out.

5    Q.   Okay.

6    A.   That's the biggest thing but, like I said,

7  it's a long time ago.

8    Q.   And what about after he announced that there

9  was a firearm, did he -- did you hear any commands after

10  that?

11    A.   I don't recall, besides the -- the hands.

12  That -- that was --

13    Q.   Was "Show me your hands" before -- to the best

14  of your recollection before Gregory announced that there

15  was a firearm or after?

16    A.   That was being said throughout the entire

17  situation that he -- he was telling them that so, yeah,

18  it would have been said before.

19    Q.   Okay.  Okay.  And I see here for Gaffey and

20  Gregory, under Control Measures, they identify six,

21  which is their -- which is ECD display with commands,

22  eight, which is ECD fired for Gregory, and 14, which is

23  handgun displayed with commands for Gregory, am I

24  reading that correctly?

25    A.   Yes, sir.  Yes, sir.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 explain something. I don't want you to understand it

2 the wrong way.

3 Q. I appreciate that. I really want to

4 understand it. So you're -- I just want to understand,

5 you see him moving. You know, I want to sort of

6 understand, you know, what direction he was facing, what

7 he was doing. Anything you can remember, Lieutenant.

8 A. I mean, his leverage point would've been from

9 us facing into the right of the door. So his left of

10 the door. And obviously, Gregory is towards the left

11 side of the door for us and the right side of the door

12 for him, for his leverage point on the door. So when he

13 pushed the door closed on Gregory, trying to, and

14 Gregory pushed it back, he started moving from what we

15 could see is the right side of the door for him, the

16 left side of that doorway towards the area where the

17 firearm was.

18 Q. Okay. And what -- could you tell whether the

19 -- this person was wearing clothes?

20 A. After everything was done or during?

21 Q. During.

22 A. He didn't show -- he didn't show his hands

23 even. He only -- we only saw one of his hands for a

24 small period of time, and I could see, like, a corner of

25 his head, so no idea.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**       **www.MILESTONEREPORTING.com**       **Toll Free 855-MYDEPOS**

```
 1      Q.    Okay.  After the fact, after the taser was

 2  deployed, could you tell whether the subject was wearing

 3  any clothes?

 4      A.    He was naked.  After the fact, that was

 5  learned.

 6      Q.    Did he have any clothes on any part of his

 7  body?

 8      A.    Not that I recall.

 9      Q.    What about around his ankles?  Anything like

10  that?

11      A.    Like I said, four years and change.  I don't

12  know if he was wearing anything on his ankles.  I just

13  know that I noticed he was naked after the fact.

14      Q.    I want to show you -- I want to go back to the

15  photographs we have from inside the residence.  This is

16  Plaintiff's 2.  Page -- on page 8 -- picture eight,

17  okay?

18      A.    Okay.

19      Q.    And so I obviously understand that the bed is

20  not there anymore in the room.

21      A.    Yeah.

22      Q.    But my understanding is that the tasers that

23  were being used have two probes; is that correct?

24      A.    Yes.

25          MS. ADKINS:  Form.
```

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1          BY MR. SLATER:

2      Q.   And one of the probes struck Mr. Dukes,

3  Senior, is that a fair statement?

4      A.   Yes.

5      Q.   Okay.  So that would mean that -- am I correct

6  in saying that there was another probe that did not

7  strike Mr. Dukes, Senior?

8      A.   Yes.

9      Q.   Okay.  Do you know where that probe would've

10 landed?

11     A.   I don't recall.  There might be a picture in

12 the report of where it was, but I don't recall.

13     Q.   Okay.  Let me pull up the report.  And again,

14 bear with me.  I'm back on Plaintiff's 3, page 158, 159.

15 And you see here on page 159, there's a probe, what

16 looks like a probe; is that right?

17     A.   Yes, it's in his shoulder.

18     Q.   You're saying it's in shoulder?

19     A.   Yes, in his shoulder.

20     Q.   Okay.  And it looks like -- I guess we can't

21 tell which shoulder that is, but the diagram in your

22 report shows the right shoulder; is that fair?

23     A.   Look -- looking at that picture, that'd be a

24 right shoulder at a -- and it's at an angle.

25     Q.   Okay.  And it looks like the angle is -- is

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1       color copies of the images from the incident report.

 2       I'm going to pull those up now and mark them as

 3       Plaintiff's 4.  Just make this bigger on my end.

 4             (EXHIBIT 4 MARKED FOR IDENTIFICATION)

 5             BY MR. SLATER:

 6       Q.   Okay.  Can you see the photographs here,

 7  Lieutenant?

 8       A.   I do.

 9       Q.   Okay.  And as we can see on -- and these are

10  Bates stamped Dukes2702 through 2718.  Now we see --

11  starting at the bottom, going up, we see images of a

12  revolver; is that right?

13       A.   Yes.

14       Q.   Okay.  We see --

15       A.   There's the probe.

16       Q.   -- the next two images are the -- would this,

17  the probe in a nightstand, it looks like?

18       A.   Yeah.  Something like that.

19       Q.   Some sort of -- yeah.  Okay.  I don't see the

20  cord.  We just see the probe; is that fair?

21       A.   Yeah.  I don't -- I don't see the wire.  I

22  just see the probe.

23       Q.   Okay.  And here on page 2708, we looked at

24  this earlier in black and white.  Now we have it in

25  color and a little bit higher resolution.  Does this
```

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**  **www.MILESTONEREPORTING.com**  **Toll Free 855-MYDEPOS**

1    A.   No, it doesn't have to be.  Dukes would be

2  kind of positioned at -- going -- angled towards that

3  left corner.  He was trying to go -- he was going

4  towards that side of the bed where the firearm was.

5    Q.   Okay.  So my understanding then is, it would

6  depend -- when you look at this wound or when you look

7  at the -- sort of the puncture here, right?  And how

8  everything is lined up.  It -- you're -- what my

9  understanding of your testimony is that it would -- sort

10 of where Gregory was versus where Dukes, Senior, was,

11 would depend not just on sort of where they're

12 positioned, but how they're facing; is that right?

13   A.   Yes.  That would make sense, yeah.

14   Q.   Okay.  And so my -- I just want to understand

15 your testimony clearly.  I wasn't in -- I wasn't there,

16 right?  And so I'm just trying to piece things together

17 to understand them.  And so I want to understand, when

18 you -- when you're suggesting -- or when you're stating

19 rather that Mr. Dukes, Senior, was headed -- was going

20 towards the bed, my understanding is, you're saying he

21 was at sort of an angle; is that right?

22   A.   He was angled moving towards that side of the

23 bed where the firearm was located.

24   Q.   Okay.  How was he angled?  Was he angled away

25 from you?  Towards you?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    A.   I believe he was somewhat facing towards the

2  door moving towards that corner.  Because remember, this

3  door is on an angle.  This door is not a traditional

4  squared-up wall, so --

5    Q.   Let's go back to the door.

6    A.   Go ahead.

7    Q.   Let's -- here.  So here's the door --

8    A.   Back --

9    Q.   -- on page 2708.  Excuse me?  Sorry?

10   A.   Can't see the angle cut in the interior wall

11 there.

12   Q.   The interior wall, meaning, and I'm just going

13 to pull it up, the wall here to the left?

14   A.   The wall.  So the way that door is, it's cut

15 at an angle in that room to where that door is not

16 looking at the room square.  It's looking at the

17 opposite angle.

18   Q.   Okay.  Let me go back to the other photographs

19 we looked at in Plaintiff's 2 to see if that can help us

20 better illustrate this.  So I'm back on Plaintiff's 2.

21   A.   Uh-huh.  There.

22   Q.   Okay.  So I'm on picture six.  Okay.  All

23 right.  So when you say interior door, you mean the door

24 sort of towards the kitchen?

25   A.   No.  So the door -- the interior doorway.

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

 1   with the deputy at the time, could this angle -- could

 2   this puncture be consistent with a shot where someone

 3   wasn't moving?

 4          MS. ADKINS:  Form.

 5          BY MR. SLATER:

 6     Q.   You can answer, Lieutenant.

 7     A.   Well, based on your saying, just standing

 8   there, you would have a more accurate strike with two

 9   strikes most likely.

10     Q.   But that's an assumption, right?

11     A.   You're putting a hypothetical out, too.

12   You're not saying what happened.

13     Q.   Well, I understand.  I'm not saying what

14   happened based on your testimony.  I'm just trying to --

15   and I understand that I'm giving you some examples here,

16   but you -- you're probably aware that that Mr. Dukes,

17   Senior, has a different version of the events than your

18   version, right?

19     A.   Yeah.  You want me to give you an answer for a

20   stationary target, and it's not a stationary target when

21   a suspect is moving.  I'm not going to give you an

22   answer for a stationary target when it wasn't the

23   incident that happened.  I can't.

24     Q.   Well, Lieutenant, I'm asking you to tell me if

25   -- if you -- if this -- let -- let's go back.  My

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1       A.    Yeah, that would be abdomen, down.

 2       Q.    Okay.  So -- but for my hypothetical, let's

 3  just assume that -- and I'm not suggesting that when I

 4  say this, that Deputy Gregory was targeting any area

 5  other than what he says he was targeting.  But if

 6  someone was targeting at someone in their chest, 25 feet

 7  away, would the -- would you be able to -- if you --

 8  would you have to aim up because the trajectory might

 9  fall, would you aim directly at the chest and the probes

10  would end up there, or what -- is there some sort of

11  decay in the trajectory of a taser probe?

12       A.    It should -- it should strike in that general

13  area.  If you're aiming at something 25 feet away, if

14  the cable doesn't break before then and cause accuracy

15  issues.

16       Q.    Okay.  All right.  And sort of, again, I just

17  want to get a sense, it looks like this dresser back

18  here is just, what, a couple feet off the ground?

19       A.    Possibly, yeah, something like that.

20       Q.    Okay.  And the angle of the probe is down?

21       A.    Yeah, down.  Looks like it.

22       Q.    Okay.  Let's go back now to when -- after the

23  taser was deployed, what happened next?

24       A.    After the taser was deployed?  Oh, we had one

25  probe strike, so the effect of the taser was not
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
 1   delivered.  Subject, from what I remember, I think he
 2   then went to the ground.  He was -- you know, he was
 3   naked.  He was allowed to put some clothes on, detained.
 4   I know myself and Murphy checked the inside of the
 5   residence to make sure there was nobody else there,
 6   secure the scene, and no one else was occupying the
 7   residence at that time that we could see.  And he was
 8   then walked out to the roadway after he was able to, you
 9   know, cover himself and get seen by EMS.
10        Q.   Okay.  Other than searching to see if anyone
11   was in the house, did you folks, otherwise, search the
12   home?
13        A.   No.  I just -- where a person could be, just
14   to make sure.
15        Q.   Okay.  Did anyone else, besides the four of
16   you who first arrived at the house, later arrive?
17        A.   Detective Wilkinson arrived later.
18        Q.   Okay.  Anyone else?
19        A.   I mean, one of his friends, Mr. Dukes,
20   Senior's friends, and I believe it was somebody where --
21   where he worked at the county, I think.  One of their
22   supervisors came out there, I believe.  And EMS,
23   obviously, arrived.
24        Q.   Okay.  Did you talk to Detective Wilkinson
25   when he arrived on the scene?
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    scene used a tone of voice that was louder than what

2    Deputy Gregory was giving at the time?

3       CORPORAL ALMEIDA:  No, sir.  We made sure we

4    spoke loud enough for him to hear, audibly speaking

5    up during conversation, but we never had to yell or

6    raise our voices to that extent, like Deputy Gregory

7    did during -- he was -- he was giving his commands

8    during the incident.  Obviously, we spoke to him

9    loudly. Whenever it was explained, he had -- he had

10   trouble hearing, and we -- obviously, we wanted to

11   make sure he could hear what we were saying, but

12   nowhere near as loud as the verbal commands given

13   during that -- when that incident took place.

14      LIEUTENANT TUMMOND:  Okay.

15      BY MR. SLATER:

16   Q.   You noted here that Mr. Duke, Senior, had

17 trouble hearing.  How did you know that?

18   A.   I noted that based on what he told us, like I

19 said before, after the fact.

20   Q.   I'm going to now play -- just make sure I

21 start at the right portion of it.  I'm going to start at

22 13 -- minute 13:18 seconds.

23      (VIDEO PLAYBACK)

24      CORPORAL ALMEIDA:  This would be -- this would

25   be primary channel, be over dispatch radio and



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

```
1      them, or came in, if the door opened and they just
2      followed somebody in.  I couldn't hear anything
3      going on inside, so I made sure I said over the
4      radio, if you're inside announce yourselves.  When I
5      came around to the back door, I could hear Deputy
6      Gregory speaking to somebody inside. I walked up the
7      back steps of the home.  I could start hearing
8      things getting louder and Deputy Gregory telling
9      somebody to show him their hands.
10          BY MR. SLATER:
11      Q.   I'm just going to stop it there because the
12  point that I wanted to go over is sort of shifting gears
13  into what's happening in the house.  And the point I
14  wanted to go over was the entry into the house.  And you
15  say that you walked over because you didn't hear any
16  commotion; is that right?
17      A.   Not initially.
18      Q.   Okay.  And then you say, I didn't know if
19  anybody came and talked to him.  Let me just make sure
20  -- I don't want to misquote you, so let me just go back
21  and replay just that small portion of it.  One second.
22      A.   Okay.
23          (VIDEO PLAYBACK)
24          LIEUTENANT TUMMOND:  -- broadcast?
25          CORPORAL ALMEIDA:  I believe that was Deputy
```



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1    yelling, no nothing, no commotion.  I mean, I made

 2    sure they're inside because I couldn't -- I don't

 3    know if anybody came and talked to them, or greet

 4    them, came in, if the door opened and they just

 5    followed somebody in.

 6         BY MR. SLATER:

 7    Q.   "Or if the door opened, they just followed

 8    somebody in."  So you gave -- when you're talking to

 9    Lieutenant Tummond here, you say you don't know whether

10    they were greeted and went in or if the door opened --

11         MS. ADKINS:  Form.

12         BY MR. SLATER:

13    Q.   -- the door -- I haven't finished asking my

14    question.  One second.  If the door opened and they

15    followed somebody in.  Okay.  So were those -- is that

16    -- am I fairly describing the -- what you said there on

17    the recorded statement?

18    A.   You're describing what I said there.  We both

19    just listened to it, yes, sir.

20    Q.   Okay, great.  So that being said, both options

21    involve someone opening the door for the deputy?

22    A.   Sure.

23    Q.   If someone opens the door for a deputy, does

24    that give you -- are you allowed to go in the house?

25    A.   You have a invitation into the home?  Yeah.
```

**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

```
 1       Q.   Okay.

 2       A.   We can communicate without speaking --

 3       Q.   Even if that person hasn't said anything?

 4       A.   We can communicate without speaking.

 5            MS. ADKINS:  Form.

 6            BY MR. SLATER:

 7       Q.   Would someone opening the door, alone, without

 8  any gestures or anything like that, would that -- would

 9  you construe that as an invitation to come into a home?

10            MS. ADKINS:  Form.

11            BY MR. SLATER:

12       Q.   You can answer.

13       A.   Based on the situation leading up to it, yes.

14       Q.   What do you mean by that?

15       A.   Loud knocking -- loud knocking and announcing.

16  Eventually someone saying they're coming, or going to

17  the door, going wherever.  And then where a deputy's

18  positioned at, somebody opens a door for them.  Yes, I

19  can understand that to be invitation into the home.

20       Q.   Okay.  It -- do you understand that through

21  your training as a deputy?  How do -- how did you form

22  that understanding?

23       A.   It's common sense.  We're law enforcement

24  officers there, announcing.  You -- you came and opened

25  the door for us.  A reasonable person would believe
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

```
 1   they're letting us in.
 2        Q.   Okay.
 3        A.   Like I said --
 4        Q.   Is that --
 5        A.   -- I -- residence and I walked around based on
 6   what was taking place at the time, and at the home base
 7   on what was taking place at the time.
 8        Q.   Do you know any specific training -- sorry,
 9   let me strike that.  Do you know any specific policies
10   at the sheriff's office about entering into someone's
11   home?
12        A.   Yeah, it's policy.  It's the same thing I said
13   before, consent is one of them.
14        Q.   Okay.  And so --
15        A.   And I view it as consensual entering of the
16   home.
17        Q.   You say you view it as an invitation to enter
18   the home?
19        A.   Consensual entering of the home.
20        Q.   Okay.  Consensual entering of the home.  And
21   what is consensual entry to the home mean?
22        A.   You opened a door to welcome us in.  After we
23   announced who we were loudly, multiple times.
24        Q.   Okay.
25        A.   And you acknowledge that announcement,
```

**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     www.**MILESTONEREPORTING**.com     Toll Free **855-MYDEPOS**

1 obviously, from the audible from inside the home, we

2 heard, and then you opened the door for us. And it

3 would make sense for why the rear door was open, not the

4 front door, because it looked like the front door had a

5 bunch of stuff and blocking -- and blocking the way in,

6 so you wouldn't use that door. And we just had a deputy

7 there that the door was open for.

8     Q.   Okay. Have you ever entered a home before

9 after someone had opened it, but without -- you know, in

10 a similar situation, like this, where someone opens the

11 door and then goes back into the house?

12     A.   Yeah. People open the door for us, and we go

13 in and we go and knock on their door.

14     Q.   Okay.

15     A.   If they open a door and move out of the way

16 for you to come in, you interpret that as being allowed

17 to enter the home.

18     Q.   Okay. So just so that I'm -- that I

19 understand correctly, if someone opens the door, you

20 understand that as an invitation to come into the home?

21        MS. ADKINS: Form.

22     A.   Okay. That's not what I said anyways.

23        BY MR. SLATER:

24     Q.   Okay. All right. Well, what -- I want to --

25 I want to -- I don't want to misrepresent what you say,

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

```
 1   Lieutenant, I want to understand exactly what you're
 2   saying.  So if you could help me understand it better,
 3   that would be appreciated.
 4        A.   If a law enforcement, of any kind, especially
 5   uniformed law enforcement, knocks and announces at your
 6   door or there for a lawful reason, you come to the door,
 7   open it for us, and move so we can enter the home, that
 8   would be interpreted as being invited into the home.
 9        Q.   Okay.
10        A.   Any little person could understand that.
11        Q.   Is that how your -- in your understanding, how
12   your fellow officers at the Levy County Sheriff's Office
13   would understand it?
14             MS. ADKINS:  Form.
15             BY MR. SLATER:
16        Q.   You can answer.
17        A.   I'm not in their head.  I don't know what
18   their thoughts are, but I understand, and what I can
19   interpret from something.
20        Q.   Okay.  Have you been trained on consent to
21   enter a home?
22        A.   You go over, you know, Fourth Amendment in the
23   Police Academy and you're obviously field trained.
24        Q.   Has Levy County Sheriff's Office ever given
25   you any training on consent to enter a home?
```

**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1       A.   I talked earlier about the state attorney's
 2  office done Fourth Amendment Constitutional Law
 3  Training.  We have policy.
 4       Q.   You have a specific policy on consent?
 5       A.   Policy, what we can and can't do.  I can't
 6  state exactly what policy.  We have tons of policies.
 7       Q.   To your knowledge, has anyone ever complained
 8  about a Levy County Sheriff's Office deputy going into
 9  their home without consent?
10            MS. ADKINS:  Form.
11            BY MR. SLATER:
12       Q.   You can answer.
13       A.   I don't know.  Well, obviously, if you're
14  asking about it, you're insinuating that part of this
15  lawsuit is complaint against this going on.  And your
16  point of view or your client's point of view, but prior
17  to that, not that I'm aware of.  It could have happened.
18       Q.   Okay.  Since you became a Levy County
19  Sheriff's Office employee, I understand that you said
20  the state attorney would come to provide you on Fourth
21  Amendment training, do you recall --
22       A.   They have.
23       Q.   -- how many?  Sorry?
24       A.   They have.
25       Q.   They have?  Do you know how many times they've
```

**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.**MILESTONEREPORTING**.com     Toll Free 855-MYDEPOS

201905002271 - Levy County Sheriffs Office - Levy (FL38)

**Supplement #2 Narrative**

| Author: | Date Created: | Supp #: |
|---|---|---|
| Corporal F. Almeida #517 | 05/26/2019 0112 Hrs | 2 |

Supplement to Report # 201905002271
Cpl. Almeida 517
05-25-2019

On the morning of 05-25-2019, after 5AM, Dep. Murphy, Dep. Gaffey, Dep. Gregory, and I responded to ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ in reference to attempting to locate Terry Dukes Jr, after Det. Wilkinson established probable cause to arrest him for a charge of aggravated battery. Deputies parked in front of the property and walked down the north driveway to the residence. Dep. Murphy and I were standing in the front yard. Dep. Gregory and Dep. Gaffey were on the back side of the residence. The residence was completely blacked out with no lighting inside or outside. Dep. Murphy knocked very loudly and announced "sheriff's office" very loudly and there was no response from within the residence. Dep. Murphy knocked and announced again very loudly and there was again no response from within the residence. Dep. Murphy knocked and announced very loudly for a third time there was finally a response from within the residence when I heard a male voice say that he would be right out. We waited and nobody came to the front door. Eventually Dep. Gaffey advised via radio that the back door had been opened and then advised that Dep. Gregory was inside of the residence. As I walked around back, I could hear Dep. Gregory announcing "sheriff's office" very loudly from within the residence.

When I walked around to the area of the back door, I heard Dep. Gregory speaking to a subject inside the residence. I walked in and heard Dep. Gregory yelling for the subject to show his hands. I then walked to the area where Dep. Gregory and Dep Gaffey were standing outside of a bedroom door that was partway open and there was a subject on the other side of the door, in the bedroom. The subject was a black male and I could see part of his face, part of his upper right torso, and his right arm/hand. The subject was given numerous very loud verbal commands by Dep. Gregory to show both of his hands and come out, but the subject did not comply. I observed a revolver lying on the bed in the room where the subject was located. Dep. Gregory also advised other LEO verbally that there was a gun on the bed. The subject was trying to close the door and Dep. Gregory was keeping the door open with his hand and /or foot. I drew my agency issued pistol and held it in a ready position with the weapon light activated due to the circumstances. Dep. Gregory gave loud verbal commands to the subject continuously while this incident took place. The subject eventually pushed the door one last time to try to close it on LEO and he moved further into the room toward the area of the bed where the revolver was located. Dep. Gregory deployed his agency issued Taser and the subject was struck with one Taser probe, but the second probe missed. The subject was moving when the Taser was deployed. The firearm was cleared and unloaded by Dep. Gregory for safety. The subject was not wearing any clothes and he was allowed to clothe himself with pants before he was detained in handcuffs by Dep. Gregory. The subject was identified after the incident as Terry Dukes Sr. During the incident, LEO was not able to distinguish the subject as Terry Sr instead of Terry Jr due to the home being completely dark because of no electricity, Terry Sr was concealing himself behind the door, and the only lighting was from moving flashlights shining into the dark room. Terry Sr is Terry Jr's father and they favor each other in appearance.

The area where LEO was standing outside of the bedroom was illuminated more than the interior of the bedroom where Terry Sr was located during the incident due to the light reflecting back toward from LEO from the light colored door.

Terry Jr was not located inside of the residence by LEO on scene. The rest of the home, other than the master bedroom, was checked by Dep. Murphy and I after the incident and no other persons were located in the home.

Dukes, T. 000151

Terry Sr was walked out to the roadway where he was evaluated, checked, and cleared by EMS. Prior to the arrival of EMS, Terry Sr said he thought it was his son outside, not LEO, and he opened the door to let him in. Terry Sr also said at one point that he did not know who was outside. Terry Sr said that he thought it was his son and that he did not know who it was. These statements by Terry Sr conflicted with each other. Terry also said numerous times that he did not know why LEO "busted" into his home. The back door of the residence was opened from the inside and LEO entered through the open door that was opened after LEO knocked and announced. LEO did not make forced entry into the home. Terry also made statements about how he would sue Levy County, about how he would "own Levy County", and how he would have our jobs.

The handcuffs were removed from Terry Sr's wrists prior to him being evaluated by EMS. EMS removed the Taser probe from Terry Sr's right shoulder/right pectoral area. Friends of Terry Sr responded to the scene. Terry Sr was transported to the hospital by EMS at his request.

Terry Sr's revolver was recovered from the scene by Dep. Murphy to be held for safekeeping due to him being transported to the hospital and the firearm had already been secured by LEO in a patrol vehicle prior to him being transported.

Photographs were taken on scene by Dep. Gregory.

Det. Wilkinson arrived on scene after the incident in the house had taken place and Det. Wilkinson met with other deputies out in the roadway.

LCSO response to resistance paperwork was completed for this incident.

A sworn complaint will be filed against Terry Sr in reference to Resist LEO Without Violence.

| Signed: Corporal F. Almeida #517 | Reviewed: Sergeant K. Kinik #335 |
|---|---|

# LEVY COUNTY SHERIFF'S OFFICE
## Subject Resistance Report

### CASE INFORMATION

| CASE/INCIDENT #: | DATE OF INCIDENT: | TIME: | LOCATION: |
|---|---|---|---|
| 201905002271 | 05-25-2019 | | ▉ |

### SUBJECT/INMATE INFORMATION

| SUBJECT/INMATE NAME: | INMATE ID #: | DOB: |
|---|---|---|
| Terry Dukes SR. | | ▉ |

### RESISTANCE AND CONTROL MEASURE LEGEND

**RESISTANCE ENCOUNTERED**

A. PASSIVE RESISTANCE
B. REFUSED COMMANDS
C. THREATENING/HOSTILE BODY LANGUAGE
D. VERBALLY HOSTILE/ABUSIVE
E. MADE THREATS
F. FLED FROM LEO/DO
G. PUSHED/PULLED AWAY
H. VIOLENT GRAB OR SHOVE
I. SELF INJURY
J. MOTOR VEHICLE - FLEEING
K. STRIKE WITH HANDS/ELBOWS
L. STRIKE WITH FOOT/KNEE
M. BLUNT OBJECT
N. EDGED WEAPON

O. MOTOR VEHICLE - ASSAULT
P. FIREARM DISPLAY
Q. FIREARM DISCHARGED
R. OTHER (SPECIFY IN REPORT)
S. OTHER STRIKE
T. AGGRESSIVE ANIMAL
U. ACTIVELY FIGHTING ANOTHER OFFICER

**ABBREVIATIONS**
ECD - ELECTRONIC CONTROL DEVICE
OC - OLEORESIN CAPSICUM

**OFFICER CONTROL MEASURES**

1. ESCORT/CONTOL/HOLDS COMPLIANCE TECH.
2. PRESSURE POINTS
3. TAKE DOWN
4. OC DISPLAY W/COMMANDS
5. OC SPRAYED
6. ECD DISPLAY W/COMMANDS
7. ECD DRIVE STUN
8. ECD FIRED
9. INCAPACITATION TECHNIQUES
10. STRIKE WITH FOOT/KNEE
12. STRIKE WITH HAND/ELBOW
13. FLASHLIGHT STRIKE
14. HANDGUN DISPLAY W/COMMANDS
15. HANDGUN DISCHARGED
16. SPECIALITY IMPACT MUNITIONS

16. SHOTGUN W/ COMMANDS
17. SHOTGUN DISCHARGED
18. RIFLE DISPLAY W/COMMANDS
19. RIFLE DISCHARGED
20. SPIT GUARD
21. RIP HOBBLE
22. RESTRAINT CHAIR
23. BATON DISPLAY W/COMMANDS
24. BATON CONROL HOLD
25. BATON STRIKE
26. DEFENSE WEAPON (FOLLOWING SPECIFY IN REPORT)
27. OTHER
28. OTHER STRIKE

### RESPONSE TO RESISTANCE

| DEPUTY/DET. OFFICER'S NAME | ID# | SIGNATURE | RESISTANCE ENCOUNTERED | | | CONTROL MEASURES |
|---|---|---|---|---|---|---|
| Dep. C. Gregory | 502 | Dep. C. Greg | A | B | R | 6  8  14 |
| Dep. T. Gaffey | 581 | Dem. T. Gaffey | A | B | R | 6 |
| CPL. F. Almeida | 517 | CPL. F. Almeida 517 | A | B | R | 14 |

### EXTENT AND LOCATION OF INJURY LEGEND

**EXTENT OF INJURY**

200 MAJOR - BROKEN BONES, EXCESSIVE BLEEDING, MAJOR CUTS, ETC.
201 MINOR (TREATED AT SCENE) - MINOR CUTS, ABRASIONS, BRUISES
202 MINOR (TREATED AT HOSPITAL)
203 REFUSED TREATMENT
204 TERMINAL
205 OTHER (EXPLAIN IN REPORT)
206 ECD Drive Stun or ECD Fired (Specified location in report)

**LOCATION OF INJURY**

| | | | |
|---|---|---|---|
| 100 ANKLE | 106 GROIN | 112 NECK | 118 LOWER LEG |
| 101 BUTTOCKS | 107 HAND | 113 SHOULDER | 119 UPPER LEG |
| 102 EARS | 108 HEAD | 114 WRIST | 120 LOWER TORSO/BK |
| 103 ELBOWS | 109 HIPS | 115 MOUTH | 121 UPPER TORSO/BK |
| 104 EYES | 110 KNEE | 116 LOWER ARM | 122 UPPER TORSO/FT |
| 105 FOOT | 111 NOSE | 117 UPPER ARM | 123 LOWER TORSO/FT |
| | | | 124 OTHER (SPECIFY) |

### SUBJECT/INMATE INJURY

| WAS SUBJECT/INMATE INJURED? | PHOTOS TAKEN? | EXTENT OF INJURY | LOCATION OF INJURY | MEDICAL TREATMENT REQUIRED? | UNDER THE INFLUENCE? |
|---|---|---|---|---|---|
| YES X   NO __ | YES X   NO __ | 206 | 122 | YES X    NO __ | ALCOHOL ___   DRUGS ___ |

### DEPUTY/DETENTION OFFICER'S INJURY

| DEPUTY/DET. OFFICER'S NAME | ID # | SIGNATURE | EXTENT OF INJURY | LOCATION OF INJURY | MEDICAL TREATMENT |
|---|---|---|---|---|---|
| | | | | | YES ___   NO ___ |
| | | | | | YES ___   NO ___ |
| | | | | | YES ___   NO ___ |

### REPORT OF MEDICAL EXAMINATION (IF APPLICABLE)

| MEDICAL SIGNATURE: | ID #: | DATE: |
|---|---|---|

**COMMENTS:**

EMS responded and removed the Taser Probe. Subject cleared by Ems. Subject transported to Hospital at his request

-CPL. F. Almeida 517



**INDICATE BY EACH NOTED CONTACT THE WEAPON USED.**

## REPORT FINDINGS

**SERGEANT'S FINDINGS:**
AFTER REVIEWING DEPUTIES REPORTS APPROPRIATE ACTIONS TAKEN BY
DEPUTIES IN RESPONSE TO RESISTANCE ENCOUNTERED

| SERGEANT'S SIGNATURE: _S6₂ 7k l·7k___ | ID #: JJT | DATE: 5/27/19 | INTERVIEWED INMATE? __ YES ✓ NO | VIEWED VIDEO? __ YES ✓ NO | VIEWED PICTURES? ✓ YES __ NO |

**LIEUTENANT'S FINDINGS:**
Agree with Sgt.s Findings. Deputies actions under these circumstances
Were Lawful and Within S.O.P.

| LIEUTENANT'S SIGNATURE: Irving Anderson | ID #: 13 | DATE: 5/28/19 | INTERVIEWED INMATE? __ YES ✓ NO | VIEWED VIDEO? __ YES ✓ NO | VIEWED PICTURES? ✓ YES __ NO |

**CHIEF OF STAFF COMMENTS:**

|  |  |  | | ___ APPROVED | ___ DISAPPROVED |
| CHIEF OF STAFF SIGNATURE: | ID #: | DATE: | INTERVIEWED INMATE? __ YES __ NO | VIEWED VIDEO? __ YES __ NO | VIEWED PICTURES? __ YES __ NO |

**UNDER SHERIFF'S COMMENTS:**

|  |  |  | | ___ APPROVED | ___ DISAPPROVED |
| UNDER SHERIFF'S SIGNATURE: | ID #: | DATE: | INTERVIEWED INMATE? __ YES __ NO | VIEWED VIDEO? __ YES __ NO | VIEWED PICTURES? __ YES __ NO |

Dukes, T. 000164