MILESTONE REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

```
 1   UNITED STATES DISTRICT COURT
 2   NORTHERN DISTRICT OF FLORIDA
 3   GAINESVILLE DIVISION
 4   CASE NO. 1:2-CV-45-AW-HTC
 5
 6   TERRY DUKES, SR.,
 7   PLAINTIFF,
 8
 9   VS.
10
11   ROBERT MCCALLUM JR., ET AL.,
12   DEFENDANTS.
13   _____/
14   VIDEOCONFERENCE DEPOSITION OF DETECTIVE BLAKE MURPHY
15   DATE:         JULY 26, 2023
16   REPORTER:     SHILAH BLAKENEY
17   PLACE:        ALL PARTIES APPEARED VIA VIDEOCONFERENCE
18
19
20
21
22
23
24
25
```

401 EAST JACKSON STREET,
SUITE 2370
TAMPA, FL 33602

315 EAST ROBINSON STREET,
SUITE 510
ORLANDO, FLORIDA 32801
CORPORATE

```
 1  believe this is involving Mr. Dukes' firearm.
 2       A.   It is.
 3       Q.   And then again on the next page with Almeida
 4  and references to the firearm, the revolver.
 5       A.   Yes, sir.
 6       Q.   And 187 also, evening, May 29, 25, same with
 7  the next page, 188.  And then we're done with the CAD.
 8  So if I'm -- if I'm not seeing it in here, would that
 9  mean it wasn't input into the CAD system?
10       A.   Correct.
11            MS. ADKINS:  Form.
12            BY MR. SLATER:
13       Q.   Okay.  Do you know if Detective Wilkinson
14  keeps a notepad or any other -- any other sort of way to
15  keep notes?
16       A.   I do not.
17       Q.   Okay.  Was -- when Detective Wilkinson asked
18  you to go to ████████████ that morning, was that
19  the first time you'd ever been there?
20       A.   Yes, sir.  For the original one, when he
21  wanted to do the drive by.
22       Q.   Okay.  Back to your report, sir.  Okay.  I am
23  back on your report, which is Dukes, T153.  So at around
24  5:11 in the morning, you called him back.  Did he advise
25  you on that call that he had developed probable cause?
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900   www.MILESTONEREPORTING.com
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

```
 1       A.   Yes, sir.
 2       Q.   Okay.  What did he tell you about that?
 3       A.   That he had probable cause for the arrest of
 4  Terry Dukes, Jr. for aggravated battery on Shaquana
 5  Sheffield.  That she was pregnant and I don't remember
 6  the exact details on how -- how he struck her or
 7  anything like that.  But I just remember -- recalling
 8  her being pregnant.
 9       Q.   Okay.  Did -- to your knowledge, did Detective
10  Wilkinson call anyone else?
11       A.   No, sir.  Not that I know of.
12       Q.   What happens next, sir?
13       A.   Detective Wilkinson requested that I took
14  Deputy Almeida and relayed the info to Deputy Almeida of
15  what -- what -- what's going on and the request of
16  Detective Wilkinson.  With it being at the end of shift
17  and it being slow, and with the other subjects being
18  familiar with Terry Dukes, Jr. and passing on the info
19  that I got from Detective Wilkinson, as far as him being
20  on Molly and possibility of having a weapon or firearm
21  -- I don't remember what it was -- and then went and --
22  so spoke with Detective Gaffey -- or Deputy Gaffey and
23  Deputy Gregory, and requested them to go to ▇
    ▇▇▇▇ with us to assist in the arrest of Terry
25  Dukes.
```


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

```
 1      Q.   Was -- and just so that I understand what you
 2  just said clearly, was it Detective Wilkinson had told
 3  you about Molly and firearms?
 4      A.   Yes, sir.
 5      Q.   Okay.  Did he tell you how he knew that?
 6      A.   No, sir.
 7      Q.   Okay.  And so you spoke then -- just to sort
 8  of distill that.  You spoke to Corporal Almeida.  And
 9  what did you folks discuss?
10      A.   That we would go to the residence to attempt
11  to make contact with Terry Dukes, Jr.
12      Q.   And then you looped in Gregory and Gaffey,
13  right?
14      A.   Correct.
15      Q.   Okay.  And what did you folks discuss with
16  Gaffey and Gregory?
17      A.   As -- as far as -- I relayed all the info that
18  I was told from Detective Wilkinson.  And as far as Mr.
19  Dukes,' recent drug use and behavior and what he is a
20  suspect in.
21      Q.   Did any of the other deputies share any of
22  their personal observations with respect to Mr. Dukes,
23  Jr.?
24      A.   No, sir.
25      Q.   So where were you physically located when you
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900   www.MILESTONEREPORTING.com
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

```
 1  called Detective Wilkinson back at 5:11?
 2       A.   At the Sheriff's Office.
 3       Q.   Where at the Sheriff's Office?
 4       A.   Inside the building somewhere, my assumption.
 5       Q.   Okay.  You're assuming you don't -- you don't
 6  recall?
 7       A.   Yeah, I don't -- I don't recall where I
 8  would've done the phone call.  There's a chance that I
 9  might've received a phone call and then distanced myself
10  from the others to speak on the phone.  I don't know.  It
11  could have been inside the building or in the parking
12  lot.
13       Q.   Okay.  So you folks, the four of you talk and
14  then you decide to go to ███████████████, correct?
15       A.   Yes, sir.
16       Q.   Did you -- while you were at the Sheriff's
17  Office, did you discuss what you would do when you would
18  get to the house?
19       A.   I don't recall if it was discussed at the
20  Sheriff's Office or when we went and pulled up to the
21  residence.  But the --
22       Q.   Did you let -- go ahead.  Did you activate
23  sirens when you went to ███████████████?
24       A.   No, sir.
25       Q.   Did you park outside the house?
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

```
 1        A.   I believe we parked on the street, which
 2   would've been right in front of the house.  Just we
 3   didn't pull into the driveway to pull up on the limerock
 4   road itself.
 5        Q.   Was there a gate or a fence at the time?
 6        A.   I don't recall.  If there was, it would've
 7   been open.
 8        Q.   Do you remember what the property looked like
 9   at all?
10        A.   Vaguely, double-wide mobile home, possibly.
11   And I remember there was dirt surrounding the property.
12   I don't think there was any grass.  Other than that, I
13   don't recall.  I remember there was a -- there was a --
14   a -- I think a small porch on the front that had the
15   stairs to the door, to the front door.
16        Q.   Okay.  When you approach -- when you -- when
17   you got onto the property, what happened next?
18        A.   Myself and Corporal Almeida traveled to the
19   front door.  Deputy Gaffey and Gregory traveled to the
20   rear.  There was only two doors on the residence.  Most
21   of the windows were open.  It was dark inside.  I
22   knocked on -- knocked loudly on the front door,
23   announced "Sheriff's Office" loudly, then knocked on the
24   side of the house, which sometimes in -- in the past,
25   we've knocked on doors and some people might not really
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

```
 1  pick up on what that sound is, you know, and they might
 2  think it was TV or something else.  And when you're
 3  knocking on the side of the house, especially a mobile
 4  home, it has a little bit of vibration to it.  That's
 5  something that we always or at least I always try to do.
 6  Knocked again, announced "Sheriff's Office" loudly.
 7  Nothing.  Went back to the front door, knocked again.
 8  "Sheriff's Office."
 9       Q.   Was your flashlight on at the time?
10       A.   Yes, sir.
11       Q.   With that time of morning -- you said
12  something about the morning?
13       A.   Yeah.  With that time of morning or in -- in
14  the middle of the night, anything I have to go do, I'm
15  trying to go and at least illuminate the area or make it
16  known that it's law enforcement due to the, you know,
17  the possibility of a homeowner having a firearm.
18       Q.   Do you know what time the sun came up that
19  morning?
20       A.   I do not.  I know it -- it came up before we
21  left the scene.
22       Q.   Okay.  Is there a reason why you went to the
23  house before sunup?
24       A.   I would believe that there was in fear of
25  trying to locate Terry Dukes, Jr.  If he sent his
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900   www.MILESTONEREPORTING.com   Toll Free 855-MYDEPOS

```
 1      A.   Yes, sir.
 2      Q.   Would this look to you like Detective
 3 Wilkinson's report?
 4      A.   Yeah.  Yes, sir.
 5      Q.   Okay.  And so do you think we could agree that
 6 he was at Shands in Gainesville?
 7      A.   Yes, sir.
 8      Q.   Okay.  And you went to college in Gainesville?
 9      A.   Yes, sir.
10      Q.   Okay.  How long -- how long approximately does
11 it take to get from Gainesville to Bronson?
12      A.   If he is at Shands, which is what, Archer?
13 Probably -- I mean, at that time, a half hour, 35
14 minutes maybe.
15      Q.   Okay.
16      A.   Maybe a little -- maybe a little less.
17      Q.   Okay.  Okay.  And so I understand that you
18 told me that you generally don't have a lot of time to
19 wait for a detective, but had you ever been asked to go
20 wait or do something for about 30 minutes?
21      A.   Yes, that -- that'd be believable.
22      Q.   Okay.  Is there a -- did you decide -- why did
23 you -- why did you decide that four officers would go to
24 ████████   that morning?
25      A.   Due to Terry Dukes' history, his use of Molly,
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900   www.MILESTONEREPORTING.com   Toll Free 855-MYDEPOS

```
 1  and the potential of weapons.  And honestly, if there
 2  was six guys, that would've made it better than the four
 3  guys.
 4       Q.   Okay.  And so would that be for -- I've heard
 5  this term before, officer safety.  Would that be for
 6  that?
 7       A.   Exactly.
 8       Q.   Okay.  So sort of better protection the more
 9  officers that are on the scene?
10       A.   Definitely.
11       Q.   Okay.  Is it more dangerous to enter a home
12  looking for a suspect at night than during the day?
13       A.   Yes, sir.
14       Q.   Okay.  Were you aware of any particular reason
15  in this case why you were asked to go immediately to the
16  house instead of -- instead of waiting for a later
17  point?
18       A.   I don't know the particular reason.  All I
19  could speculate is, again, with the potential of him
20  being at the house.
21       Q.   Okay.  And the victim as far as you understood
22  was in the next county at Shands?
23       A.   Yes, sir.
24       Q.   Okay.  Before you -- oh, let's --
25            THE REPORTER:  It looks like we have lost
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1  standard issue flashlights, but I know from, you know,
2  from with a mag light or something like that, you can
3  kind of click on the -- on the button, but it doesn't --
4  it -- but you don't have to press it all the way in and
5  it'll kind of click on and off, right?  Is that how your
6  flashlight would work?
7      A.  I don't recall, but being able to turn it on
8  and off quickly, yeah.  You can definitely do that.
9      Q.  Okay.  When you were approaching the house,
10 was your flashlight on when you were approaching or did
11 it come on later?
12     A.  I don't recall.
13     Q.  Okay.  Do you remember any debris or anything
14 on the premises?
15     A.  No, sir.
16     Q.  Okay.  Did anyone trip or fall as they were
17 approaching the house in your recollection?
18     A.  Not that I know of.
19     Q.  So at what point do you -- do you remember
20 having your flashlight on?
21     A.  When I was on the porch, when I was knocking
22 on the door, when I was announcing.
23     Q.  And was your flashlight on the solid or
24 flashing function at that time?
25     A.  Solid.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900    www.MILESTONEREPORTING.com
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

```
 1        A.    Yes, sir.
 2        Q.    So here's picture 1, picture 2, picture 3,
 3   picture 4, picture 5, picture 6, picture 7, 8, 9, 10 and
 4   11.  I'm going to scroll back up to picture 1.  Do you
 5   recognize what's depicted in this photograph, sir?
 6        A.    I believe that's the front of the house.
 7        Q.    Okay.
 8        A.    I see two gates.
 9        Q.    Okay.  Do you remember those gates being there
10   when you were at the house on the morning of May 25th?
11        A.    No, sir.
12        Q.    And I understand that we agree that this is --
13   that the house is cut off to -- the right side of the
14   house is cut off with this picture?
15        A.    Correct.
16        Q.    Okay.  But -- and I apologize, I don't have a
17   better picture of the front door, but can you see the
18   front door depicted?
19        A.    Yes, sir.
20        Q.    Okay.  And is that this sort of wooden area
21   with the little slanted roof that looks like it's sort
22   of fallen a little bit?
23        A.    Yes, sir.
24        Q.    And you said that you were up on the steps?
25        A.    Yes, sir.
```


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  It sounded like in the closest room to the door.  They
2  said something along the lines of I'm coming or, you
3  know, they -- they seemed like they acknowledged my --
4  my announcement, which is expected at, you know, 5:00 in
5  the morning.
6       Q.   Do you recall seeing any cars parked outside
7  the house?
8       A.   No, sir.
9       Q.   Did you knock anywhere other than on or near
10 the front door?
11      A.   Just the front door and on the side of the
12 house.
13      Q.   Okay.  And so you heard -- you heard the sound
14 of someone saying something like, come in, I think is
15 what you said?
16      A.   Something along the lines.  I couldn't -- I
17 couldn't tell you, but just acknowledging.
18      Q.   Okay.  Did -- at that point, were you able to
19 see or hear anything else in the house?
20      A.   No.
21      Q.   Okay.  What happened next, sir?
22      A.   I was waiting for whoever that subject was
23 that responded to come to the front door.  And then
24 that's when I heard that they were inside the -- the
25 house.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1  database prior to going to the house?
2      A.   Yeah, it's not a -- it's not a requirement.
3  When I got Detective Wilkinson advised, that's where
4  Terry Dukes, Jr. resides.  He's speaking to the
5  girlfriend and the other deputies, they were familiar.
6      Q.   Did the other deputies talk about any other
7  instances when they had gone to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
8  prior to your arrival?
9      A.   No, sir.
10     Q.   When you were knocking on the -- on the front
11 of the house, was your service weapon drawn?
12     A.   No, sir.
13     Q.   Was Almeida's service weapon drawn?
14     A.   I don't believe so.
15     Q.   I think you said something to the effect that
16 some of the windows were open; is that right?
17     A.   Yes, sir.
18     Q.   When you mean open, do you mean were there --
19 were there screens?
20     A.   I don't recall.  I just know that they were --
21 they were open.
22     Q.   Were you able to get a good -- and I
23 understand, and we'll talk about the sort of the events
24 that happened next, but were you able to get a -- were
25 you able to hear pretty well into what was going on in

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

```
 1  the house?
 2       A.   I could hear that they were -- there was
 3  commotion saying, "Show me your hands."
 4       Q.   Okay.  You could hear that?
 5       A.   Yes, sir.
 6       Q.   Could you hear it as clearly as we're talking
 7  now?
 8       A.   Yes, sir.
 9       Q.   Were the voices inside the house muffled at
10  all?
11       A.   No, sir.
12       Q.   So is it fair to say you had a pretty good
13  sense of what was being said in the house?
14       A.   Yes, sir.
15       Q.   Okay.  At some point, did you change your
16  position on where you were located with respect to the
17  house?
18       A.   Yeah, originally I was pretty much at the
19  front door and then once I heard the commotion, was able
20  to go and figure out that the person that they were
21  directing the commands to was in the room that was in
22  close proximity and I was able to go.  And that was one
23  of the windows that was open.
24       Q.   Okay.  Let me -- let me pull back up
25  Plaintiff's Exhibit 2.  Can you -- and we're looking at
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

```
 1      A.   Correct.
 2      Q.   Could you walk me through what you saw?
 3      A.   I believe it was -- Deputy Gregory advised
 4  that he observed a gun.  Then I looked in the -- in the
 5  room, and because he -- I don't remember if he said it
 6  was on the bed or if he just had said he observed a gun,
 7  then I locate -- I observed a revolver on the -- on the
 8  mattress.  And at that time, that's when -- or shortly
 9  after, that's when Mr. Dukes walked away from the door
10  and was walking towards the pistol, towards my -- where
11  I was positioned on the outside of the door -- I mean,
12  outside of that window.
13      Q.   Okay.
14      A.   Behind the door.
15      Q.   How far away from you was the -- was the
16  pistol?
17      A.   I mean, you could see from that window to that
18  pistol.  I mean, I don't know, maybe figure six foot
19  maybe to the window, and then I might be, you know, a
20  foot off of the window.  So you could say maybe seven to
21  ten feet.
22      Q.   Okay.  So I'm just going to draw.  And where
23  on the bed was it?  In the middle?  To the side?
24      A.   I believe that's it right there.
25      Q.   This right here?
```



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900     www.MILESTONEREPORTING.com
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

```
 1        A.   Yeah.  Yes, sir.
 2        Q.   It's hard for me to see.  You're saying that
 3   this is -- what we've zoomed in on, this sort of
 4   black --
 5        A.   Yes, sir.  If that's not it, it was in that
 6   same vicinity.
 7        Q.   Okay.
 8        A.   Because I was able to go, and after Deputy
 9   Gregory advised that he observed the gun, I remember
10   going and just being able to peer on that bed and
11   realizing how close it was to me.
12        Q.   Okay.  And so -- and just for the record,
13   you're -- we're on page Dukes, 2708.  We're looking at
14   the mattress in the room.  And there is a black object
15   on the left side of the mattress if you are looking
16   through the threshold.  And that, Detective, is what
17   you're saying you believe is where the gun was?
18        A.   Right.
19        Q.   Either it is the gun or that's where the gun
20   was?
21        A.   Correct.
22        Q.   Okay.  And so going back to your report, you
23   say that he was observed walking away from the -- and
24   I'm back on Exhibit 1.  "He was observed walking away
25   from the door in the direction of the pistol and at that
```



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900   www.MILESTONEREPORTING.com   Toll Free 855-MYDEPOS

```
 1  time, I heard the noise of the taser being deployed."
 2  What kind of timeline are we talking about here?
 3       A.   Seconds.
 4       Q.   Seconds?
 5       A.   Again, it's I mean, one of those things that
 6  from me going and being able to see Dukes behind that
 7  door concealing himself and not showing his hands to --
 8  I don't know.  I might've seen it maybe -- it might've
 9  been 30 seconds of me being able to watch him from the
10  backside, and then him walking off.
11       Q.   Okay.  So 30 seconds from when you got to the
12  window to when the taser went off?
13       A.   Yeah, could've been longer, could've been
14  shorter, but I'd say 30.
15       Q.   And I believe you testified that you had
16  pulled the sheet or curtain, whatever it is, away from
17  -- away from the window to remove your -- the
18  obstruction from your view; is that right?
19       A.   Correct.  If --
20       Q.   How'd you move it?
21       A.   With my hand.
22       Q.   No, I -- sure.  Did you grab it, and move it
23  to the right?  Did you move it to the left?  How --
24  how'd you -- how'd you move it?
25       A.   With the position of that window, it makes
```

MILESTONE REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

| Supplement #3 Narrative | Author: B. Murphy #730 | Date Created: 05/26/2019 2203 Hrs | Supp #: 3 |
|---|---|---|---|

On the 25th of May 2019, I responded to ▮▮▮▮▮▮▮▮▮▮ with other deputies in an attempt to make contact with Terry Carl Dukes Jr. in reference to probable cause for his arrest for aggravated battery.

At approximately 0434 hours the same date, Investigator Wilkinson contacted this deputy via telephone and requested for me to travel to the above residence and inform him of what I observed, which I did and relayed the information at approximately 0511 hours. Inv. Wilkinson advised that he had probable cause for the arrest of Dukes Jr. after he conducted his investigation (201905002270). Inv. Wilkinson requested that Corporal Almeida and myself travel to the residence in attempt to arrest Dukes Jr. Deputy Gregory and Deputy Gaffey were available to assist as well, so they traveled to the residence with Cpl. Almeida and myself. Dep. Gregory and Dep. Gaffey traveled to the rear of the residence in case Dukes Jr. attempted to flee.

I knocked loudly on the front door of the residence and announced "Sheriffs Office" in a loud voice, which there was no response from anybody inside. I knocked loudly again on the side of the residence and announced "Sheriffs Office", still no response. I knocked loudly a third time on the front door and announced myself. I shined my flashlight towards the windows of the residence, which the majority of them were wide open. When I shined the light into the window that was just left of the front door, a male individual acknowledged our presence. The subject, later identified as Terry Carl Dukes Sr., stated something similar to "Coming" or "Just a minute", unknown of his exact response, however he acknowledged us.

The flashlights from the deputies that were covering the rear were observed shining into the residence, then I noticed that the light became brighter inside. Dep. Gaffey informed dispatch and the other units via radio that he was inside the residence with Dep. Gregory. A small light was seen inside the same room that I heard Dukes Sr. in, which appeared to be made from a cellular telephone screen. That room then became illuminated by the flashlights from the deputies and I was able to see inside the open window. I observed a naked black male facing away from the window and was concealing his body behind the bedroom door. I could hear Dep. Gregory instructing Dukes Sr. to show him his hands and said that there was a pistol on the bed, which I could see from my position. Dukes Sr. was not cooperating to Dep. Gregory's commands and Dukes Sr. mentioned that he was naked. Dukes Sr. was observed walking away from the door in the direction of the pistol and at that time, I heard the noise of a Taser being deployed.

Cpl. Almeida instructed this deputy via radio to travel through the rear door and join them in the residence, which I did. Once I entered, I observed Dukes Sr. in handcuffs with one probe in his shoulder. Inside the bedroom, the other probe was located in a piece of wood furniture, so both probes did not enter him. I cleared the residence with Cpl. Almeida and Dukes Jr. was not located. I returned to the bedroom that Dukes Sr. was in, where I observed a black in color revolver pistol on the bed with an open cylinder and approximately 6 bullets next to it. I later took possession of the firearm and removed the probe from the furniture. The Rock Island Armory .38 Special revolver was ran through dispatch and the wants / warrants check was negative.

Dukes Sr. was escorted to the tailgate of Inv. Wilkinson's vehicle and awaited the arrival for Levy County EMS. Dukes Sr. was extremely upset and questioned why he was shot with the Taser. Dukes Sr. would repeatedly say that he was going to sue Levy County and the county would be his. Dukes Sr. confirmed that Dukes Jr. resides at that residence, however he did not see him on that date. Dukes Sr. was concerned with his job, since he was scheduled to work that date. I traveled inside the residence and located his cellular telephone, so that he could contact his employer. Dukes Sr. made contact with somebody via telephone and while he was speaking with them, his recollection of the events that occurred were skewed. Dukes Sr. stated that he was compliant with law enforcement and originally thought our presence was Dukes Jr. even though he acknowledged me, while I was at the front of the

residence. Levy EMS arrived and assessed his condition, then eventually transported him to the hospital per his request.

The firearm and ammunition were returned to Dukes Sr. at his residence later this date. Photographs of the firearm and the probe inside the furniture will accompany this report.

| Signed: B. Murphy #730 | Reviewed: Sergeant K. Kinik #335 |