

1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF FLORIDA

3   GAINESVILLE DIVISION

4   CASE NO. 1:23-CV-45-AW-HTC

5

6   TERRY DUKES, SR.,

7   PLAINTIFF,

8

9   V.

10

11   ROBERT MCCALLUM, JR., ET AL.,

12   DEFENDANTS.

13   _____/

14   VIDEOCONFERENCE DEPOSITION OF TUCKER GAFFEY

15   DATE:          JULY 25, 2023

16   REPORTER:      GENESIS GARCIA

17   PLACE:         ALL PARTIES APPEARED VIA VIDEOCONFERENCE

18

19

20

21

22

23

24

25

407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

MILESTONE I REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

1      Q.   What kind of classes did you take?

2      A.   Geography -- or not geography.  Geology, Fly

3  Fishing, Mountain Orienteering.

4      Q.   Sounds like a blast.

5      A.   It was.

6      Q.   Right.  And then I see the next thing you list

7  here is Law Enforcement Academy College of Central

8  Florida in Ocala, 2016; is that right?

9      A.   (No verbal response.)

10     Q.   And is that where you received your law

11  enforcement training?

12     A.   Yes.

13     Q.   Did you receive a certificate at the end of

14  that training at the Law Enforcement Academy?

15     A.   Yes.

16     Q.   Did you attend any other post-secondary

17  education?

18     A.   No.

19     Q.   Okay.  Now I'm looking at Interrogatory number

20  four, and this is asking about your employment history

21  since you graduated from high school.  And so I see that

22  you list several years in Connecticut doing landscaping,

23  construction it looks like; is that right?

24     A.   Yes.

25     Q.   I see here for several years you had your own

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  not a certified trainer.  For training, they would go to

2  the Training Division or to an external college or

3  accredited place to get their training.

4      Q.   Understood.  And I think you just mentioned,

5  you know, if their uniform is not right, you would train

6  them on that, right --

7      A.   Correct.

8      Q.   -- sort of more informally?  What about if one

9  of your subordinate deputies was doing something that

10  that you knew was not permitted under your policies,

11  would you be -- would it be part of your role to train

12  them on how to correctly implement the Levy County

13  Sheriff's Office policies?

14      A.   Correct.

15      Q.   Okay.  I looked through some of your training.

16  I'm here in the exhibits here, Interrogatories Duke's T

17  742.  I'm just looking here at November 13, 2019.  I've

18  highlighted it.  "Taser Less Lethal Refresher," do you

19  see that, Corporal?

20      A.   Yes.

21      Q.   What kind of training would you receive at a

22  taser refresher?

23      A.   Excuse me.  More than likely we'd go -- I

24  can't -- I can't tell you exactly what this was, but

25  more than likely we'd be going over the policy, possibly

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  seeing a slide on the use, and way to use the taser, and
2  then possibly firing the taser at a target, I guess you
3  would say.
4      Q.   Okay.  Do you know the recommended target
5  zones for deployment of a taser probe.
6      A.   Torso or back.
7      Q.   Upper torso?  Lower torso?  Where on the
8  torso?
9      A.   Lower torso.
10     Q.   Okay.  Torso or back, okay.  I want to now
11  draw direct your attention to just below that, a course
12  that you took on January 12, 2021, called De-escalation
13  and Minimizing Use of Force, do you see that?
14     A.   Yes.
15     Q.   Okay.  What kind of training would you receive
16  for De-escalation and minimizing use of force?
17     A.   More than likely that would be the volume of
18  your voice, the type of -- excuse me, the type of speech
19  that you're using, whether you're yelling.  Generally,
20  with de-escalation, you might have a subject that's
21  yelling at us as law enforcement.  If we yell back, that
22  could escalate.  But if we talk in more -- did somebody
23  say something?
24     Q.   I just -- I probably did a -- I probably said
25  something, but please continue.


**MILESTONE | REPORTING  COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
 1      A.   If a subject is yelling, we as law enforcement
 2 sometimes would go in a lower voice because that's --
 3 can bring down that other person.  That would be
 4 minimizing, de-escalation.
 5      Q.   Are you trained on any ways to deescalate a
 6 situation where someone might be at risk of either
 7 harming themselves or another individual?
 8      A.   I did do a crisis intervention training and
 9 that's -- I believe it's a 40-hour course that's
10 generally talking and dealing with subjects that are
11 going through a crisis.  That was an in-person class
12 here at the agency.
13      Q.   Okay.  What would you learn for CIT training?
14      A.   I couldn't -- what did I learn?
15      Q.   Yeah, what kind of -- what kind of techniques
16 did you learn at -- for crisis intervention?
17      A.   Just talking to the -- the different people.
18 There's a lot of different people in this world and they
19 react to every situation differently, so trying to get
20 on their level, and relating to them, and trying to
21 speak, obviously, with respect and understanding the
22 crisis that they're going through.
23      Q.   Okay.  I want to direct your attention now to
24 the next page, Duke's T 743, the course on December 11,
25 2021, Constitutional Law, do you see that?
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    A.   Yes.

2    Q.   Okay.  What would you -- can you talk me --

3  I'm very sorry.  I'm having a hard time here.  Can you

4  give me a sense of what a constitutional law course

5  would be like?

6    A.   Normally, the state's attorney, they'll

7  volunteer or be asked to come and teach the deputies

8  here at the office generally about your -- the Fourth

9  Amendment, search and seizure, and the proper ways to

10  deal with that on a day-to-day basis.

11    Q.   Okay.  Do you receive any constitutional

12  training other than through the State Attorney's Office?

13    A.   Not generally, no.  This -- the -- the State's

14  Attorney's Office did it generally and through my

15  training when I was going through the FTO process, I'm

16  sure some, you know, that's when you first start

17  learning.  That's when my FTOs taught me about it.  Then,

18  of course, in the academy we learned about it.

19    Q.   I'll direct your attention now to a training

20  you took on April 2, 2022, Anti-biased Training for Law

21  Enforcement, what is that?

22    A.   How not to be biased.  I believe that was an

23  online course.  It's a video you watch and how to treat

24  everybody with respect and equality.

25    Q.   What would you learn in order to effectuate



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    that?

2         A.   Can you reword that?

3         Q.   Yeah, sure.  So you said you were -- it was a

4    course designed to teach you how to treat -- teach --

5    treat everyone with equality and respect; is that right?

6         A.   Correct.

7         Q.   Okay.  So how would -- what would they teach

8    you in order to implement that?

9         A.   The people we deal with on a day-to-day basis,

10   they're all the same.  It's all just people that live

11   different lives.

12        Q.   Okay.  Have you ever had any training on the

13   -- let me step back for a second.  Have you -- are you a

14   member of the -- what's now called the TRU?

15        A.   No.

16        Q.   No.  Okay.  Were you ever a member of that

17   team?  I believe it was called the what, ARCT

18   previously?

19        A.   I've never been a member.

20        Q.   Okay.  Have you ever had any training on entry

21   into a building or other structure?

22        A.   Yes.

23        Q.   What kind of training?

24        A.   We do building -- excuse me.  We do building

25   clearing training on shift.  We do it during other

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  firearms trainings and things and how to enter a room.

2  We just had a active shooter training at one of the

3  schools where we go in and they train us how to enter

4  rooms and things like that.

5      Q.   Okay.  When -- and so it sounds like for the

6  active shooter training you described, you were

7  physically present at the school for that training; is

8  that right?

9      A.   Correct.

10     Q.   Have you ever had any training on entry into a

11 mobile home?

12     A.   No.  Not -- not -- let me -- not just mobile

13 home entry.  No, but we do building clearing, which it's

14 buildings, right.  A mobile home would be a building.

15     Q.   Okay.  So when you -- but obviously, there's a

16 difference between, you know, entry into maybe a

17 commercial building and a residential building; is that

18 right?

19         MS. ADKINS:  Form.

20     A.   It can be.

21         BY MR. SLATER:

22     Q.   Okay.  Have you ever had any specific training

23 on entry into a residential home or property?

24     A.   Documented training or on -- sorry, I have to

25 have you reword it because it --

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1     Q.   Sure.

2     A.   I don't do a training.  That's just entering,

3 you know, a residential property training.  We don't

4 have that.

5     Q.   Have you ever had a mock training where you

6 went to a structure that was designed to be like a home

7 or residence?

8     A.   No.

9     Q.   Okay.  What I recall you saying that part of

10 your job is -- your job is to, as a deputy and as a

11 corporal is to help citizens and enforce the laws of the

12 State of Florida; is that right?

13    A.   Yes.

14    Q.   How do you learn the laws of the State of

15 Florida?

16    A.   By research and by through training.

17    Q.   Okay.  What kind of research?

18    A.   Reading, yeah.

19    Q.   Reading what?

20    A.   Florida State Statutes, case law.

21    Q.   How do you read case law?

22    A.   With my eyes.  What do you mean?

23    Q.   Let me -- yeah, let me help you out.  Are you

24 reading -- is someone printing out case law for you, or

25 are you using some sort of online --

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

```
 1       A.   No, you just -- sorry, you were still talking.

 2       Q.   No, it's fine.

 3       A.   Just go online.  Just go online and research.

 4       Q.   Like on Google?

 5       A.   Yep.

 6       Q.   Okay.  Is this something you do on your own or

 7  is this something that your office requires you to do?

 8       A.   Do it on my own.

 9       Q.   Okay.  Besides reading the statutes and

10  reading case law, are there any other sources that you

11  derive your knowledge of the state of law -- the State

12  of Florida's laws?

13       A.   Just coworkers, learn everything.

14       Q.   Are you -- are you also -- are there any

15  policies or procedures that the office issues that

16  you're supposed to follow?

17       A.   Yes.

18       Q.   And are you required to sign anything with the

19  Levy County Sheriff's Office indicating that you have

20  read those policies?

21       A.   Yes.

22       Q.   Is there any area of the -- and so my

23  understanding is that you're researching case law

24  online.  Is there any area of the law in which you have

25  particularly focused your online research?
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

```
 1        A.    No.

 2        Q.    Have you ever researched the law on use of

 3   force?

 4        A.    No.

 5        Q.    Have you ever researched the law on Fourth

 6   Amendment search and seizure?

 7        A.    I -- I've looked at it.  I'm sure I haven't

 8   researched it recently.

 9        Q.    You've looked at it, what does that mean?

10        A.    I've read it.

11        Q.    And are we talking about cases you've read

12   cases?  Is that what you're saying?

13        A.    No, the Fourth Amendment.

14        Q.    You're saying you've read this -- the words of

15   the Fourth Amendment?

16        A.    Correct.

17        Q.    Okay.  Have you ever been trained on what laws

18   permit you to go inside someone's house?

19        A.    Been trained on it?  Yes, through the agency,

20   just through -- there's only a couple reasons why you

21   can enter a home.

22        Q.    What are they?

23        A.    Consent would be one, fresh pursuit, exigent

24   circumstances, or with a warrant.

25        Q.    Okay.  All right, so I heard four things,
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   consent, fresh pursuit, exigent circumstances, and a
2   warrant; is that right?
3       A.   Correct.  Yes.
4       Q.   Okay.  And you said the agency has trained you
5   on that.  When you say the agency, you mean the Levy
6   County Sheriff's Office?
7       A.   Correct.
8       Q.   And how would you learn what -- let's say, for
9   example, fresh pursuit, how would you learn what that
10  means through the agency?
11      A.   Through maybe doing a scenario, or on a call,
12  or in an active training.
13      Q.   Okay.  What about for consent?  The same
14  thing?
15      A.   Yeah.  If somebody says, come on in, that's
16  consent.  Consent is kind of self-explanatory.
17      Q.   And is that -- when you say -- when you say --
18  when you say that, is that something that you've learned
19  from your office or is that something that you just
20  understand?
21      A.   Say what?
22      Q.   You said -- I believe you said consent is
23  self- explanatory.  You know, when someone says, come on
24  in, it's self-explanatory.  Is that something you
25  learned through your training or is that something that

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  you learned otherwise?

2      A.    Through training and through just experience.

3      Q.    That -- do you recall a specific training

4  where you would have learned that?

5      A.    No, sir.

6      Q.    What about use of force?  Do you know when --

7  have you been -- my understanding is you said you've

8  been trained on when to use force; is that right?

9      A.    It would be on that list of training.  I don't

10 know when it was.

11     Q.    Okay.  Could you give me -- I understand

12 there's a lot of variables in play when you can and

13 cannot use force, but could you give me sort of like a

14 30,000-foot view?

15     A.    You're going to have to reword that for me,

16 sir.

17     Q.    Yeah.  So let me give you some examples.  Have

18 you been trained on when to use force when you're --

19 have you been -- I kind of want to understand.  Let me

20 just step back for a second.  I want to understand the

21 contours of your training, and so I'm not trying to be

22 -- I -- you know, the answer may be you just don't

23 remember or you don't know, but I want to understand

24 sort of the specificity -- the level of specificity of

25 your training.  So have -- you know, you've said you've

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1    been trained on use of force.  I want to know if that's

2    you've been trained on use of force sort of generally,

3    or if you've been trained on use of force in certain

4    situations.  For example, have you been trained on use

5    of force when someone has a firearm?

6         A.   Correct.  Yes.

7         Q.   Okay.  Have you been trained on use of force

8    specifically when you are inside a structure versus when

9    you are out in a field?

10        A.   Yes.

11        Q.   Okay.  Okay, great.  So that's -- I'm just

12   trying to narrow the level of specificity.  So you've

13   been trained on use of force inside a building?

14        A.   Yes.  And that -- can I go into that a little

15   bit?

16        Q.   I would love -- yeah, I would love for you to

17   do that, please?

18        A.   So I haven't received interior of a building

19   training.  It's within all the trainings, a confined

20   space, whether an open space, they are different

21   variables.  That's -- I haven't been to a training that

22   said you're inside a home and this happens, this is how

23   you do it.  Does that kind of clarify that?

24        Q.   Yeah, absolutely.  So some of your training --

25   so your training will encompass sort of a range of

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  different situations?

2       A.   Yes.

3       Q.   Okay.  Do you recall any training that you've

4  received where you've -- the specifics of the training

5  you've learned about being in a confined space in the

6  use of force?

7       A.   I don't recall it, no.

8       Q.   Okay.  Have you ever in your role at the Levy

9  County Sheriff's Office been disciplined?

10      A.   No.

11      Q.   Okay.  Have you ever received or learned about

12  any formal written complaints about -- against you?

13      A.   No.

14      Q.   Okay.  Have you learned that you were ever the

15  subject of an investigation while you're at the Levy

16  County Sheriff's Office?

17      A.   No.

18      Q.   Okay.  Thank you.  I want to turn our

19  attention now to the incident with Terry Dukes, Senior.

20  Do you remember Terry Dukes, Senior?

21      A.   From that deal four years ago?

22      Q.   Sure.

23      A.   Yes.

24      Q.   Okay.  Had you ever seen him prior to the

25  incident on May 25, 2019?

**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

```
 1        A.   I don't recall I did.

 2        Q.   Have you ever seen him since the incident?

 3        A.   Yes.

 4        Q.   When?

 5        A.   On a couple calls for service.  I think one or

 6   two calls for service.  We had to go over there.  I

 7   don't know the date off the top.

 8        Q.   Could you tell me the reason for the calls of

 9   service, if you remember?

10        A.   Yeah, I believe one, his property goes around

11   a corner on a dirt road and somebody was throwing some

12   trash.  So he called the sheriff's office to try and

13   figure out who dumped that trash.  That was the most

14   recent one that I remember, sir.

15        Q.   Okay.  You -- I think you said there may have

16   been more than one?

17        A.   There may have been, but I -- I don't remember

18   the other one, sir.

19        Q.   Okay.  It's all right.  Prior to the incident

20   in 2019, had you ever encountered Mr. Dukes, Senior's

21   son, Terry Dukes, Junior?

22        A.   I think in my report, I have my report right

23   here, I believe I had ran into him once, and that was

24   about it.  But I can't -- I can't confirm nor deny.  I

25   -- I just believe I saw him once.
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

1  to the home.

2     Q.   And do you remember who told you?  Was it --

3  who told you -- was it Almeida who told you about this?

4     A.   I believe so.  Yes, sir.

5     Q.   Okay.  Do you remember if Almeida gave any

6  specifics to you about what Terry Dukes was alleged to

7  have -- Terry Dukes, Junior was alleged to have done?

8     A.   I believe it was he -- the victim.  And I'm

9  closing my eyes.  I am listening, I'm just remembering.

10 The victim was Ms. Sheffield.  I believe she was

11 pregnant or known to be pregnant at the time.  And

12 Junior committed a acting of battery against her, making

13 it a felony battery.  And I think that is when some chat

14 came up, that Junior possibly was armed and under the

15 influence of a unknown narcotic, possibly Molly or MDMA.

16    Q.   Is Molly different from MDMA?

17    A.   Same makeup, just different names.

18    Q.   Okay.  And so you said there's some chatter

19 about him being possibly armed.  Do you remember sort of

20 the specifics of that conversation?

21    A.   No, sir.  Only that he's a convicted felon.

22    Q.   Okay.

23    A.   And that had more safety concerns to us

24 deputies.

25    Q.   Did you personally know about Terry Dukes,



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1      Q.   So let's go back to -- you're at the sheriff's
 2  office.  You're in the parking lot.  And the four of you
 3  go to ███████████      And my understanding, correct me
 4  if I'm wrong, from your earlier testimony, was that you
 5  hadn't yet formulated a plan as to how you would proceed
 6  once you arrived at the house; is that right?
 7      A.   Correct.  I believe we did that once we got to
 8  the house.
 9      Q.   Okay.  So you arrived at the house.  Do you --
10  where do you park?
11      A.   In the road.
12      Q.   Okay.  Right in front of the house?  Away from
13  the house?
14      A.   I can't recall.
15      Q.   Okay.
16      A.   I think it was -- I think it was before the
17  house.
18      Q.   What happens next?
19      A.   Myself and Deputy Gregory go to the rear of
20  the home, and Murphy and Almeida go to the front of the
21  home.
22      Q.   Okay.  Did you have a conversation about that
23  decision?
24      A.   Yeah, that's where we had our little meeting,
25  I believe.  And it was formulated that Gregory and I
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**   www.MILESTONEREPORTING.com   **Toll Free 855-MYDEPOS**

```
 1  were going to go to the back, and Murphy and Almeida

 2  were going to go to the front and make -- attempt

 3  contact.

 4       Q.   Okay.  How long was this conversation?

 5       A.   I couldn't tell you.  Don't remember.

 6       Q.   Did you run up to the house to get a position

 7  or --

 8       A.   No, I did not run up.

 9       Q.   Okay.  You walked?

10       A.   Yes, sir.

11       Q.   Were your flashlights on at the time?

12       A.   Probably intermittently, just due to objects

13  and possible things in the yard.  Don't want to trip and

14  fall my face.

15       Q.   Do you remember there being objects on the

16  ground?

17       A.   Yeah, there was clutter throughout the

18  property.

19       Q.   Do you know if anyone tripped or fell or

20  anything like that?

21       A.   Not that I recall.  No, sir.

22       Q.   So you and Gregory go around back.  Do you go

23  around from the left side or the right side?

24       A.   If you're looking at front of the house, be

25  the right side or the north side.
```

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free **855-MYDEPOS**

1    Q.   And were you in front of Gregory or behind

2    him? Walking side by side?  How -- let me just -- how

3    were you positioned while you were walking there?

4    A.   I believe I was behind him.

5    Q.   Okay.  How far behind him?

6    A.   Couldn't tell you, I don't remember.

7    Q.   When you get -- when you get to the sort of

8    back edge of the house, what did you do next?

9    A.   I stood at the corner.  It'd be the northwest

10   corner, I guess you would say.  And Deputy Gregory went

11   to the rear door.  Well, on the ground in the rear door.

12   Q.   Did you hear any noises while you were walking

13   back there?

14   A.   There was slight movement from obviously

15   Gregory and then Almeida up in the front.  I could hear,

16   you know, walking and yelling out sheriff's office, and

17   things like that.

18   Q.   Was that while you were still walking back

19   there?

20   A.   No.  When I got to the back, sir.

21   Q.   Okay.  Could you see any light from

22   flashlights or otherwise in front of the house?

23   A.   No, I didn't -- I didn't see any light from my

24   vantage point in the back.

25   Q.   Okay.  When you were around back, did you have

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

```
 1  your flashlight on at all?
 2       A.   No, it was intermittently if I had it on.  I
 3  don't leave it on.
 4       Q.   Okay.  What happens next?
 5       A.   From the front I hear, I believe it was Deputy
 6  Murphy, announcing himself in a loud tone, "Sheriff's
 7  office," multiple times.  I believe it was three.  I'm
 8  still on the back corner.  Deputy Gregory's at the back
 9  door.  After that, I don't -- I don't hear anything, and
10  that's all I hear.
11       Q.   Okay.  At some point the door opened; is that
12  right?
13       A.   Correct.
14       Q.   Okay.  How long between when you got in
15  position around back until the door was opened?
16       A.   Be a complete guess, probably between 30
17  seconds and a minute.
18       Q.   Okay.  When you were at the house, did you
19  have a warrant?
20       A.   No.
21       Q.   So the door opens.  Can you see it open?
22       A.   Yes, because it opened toward outside and
23  towards me.
24       Q.   Okay.  Was there -- when the door opened, was
25  there any flashlights shining or anything like that?  Any
```

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900   www.MILESTONEREPORTING.com   Toll Free 855-MYDEPOS

1    of consent.  I believe you said it was common sense that

2    you're invited in; is that right?

3        A.   Well, consent would be you're allowed to go

4    in, yes.  Consensual entry.

5        Q.   Okay.  Did you believe you had consent to go

6    into the house at this time?

7        A.   When I went in, I believed that Corporal

8    Gutter already had consent.

9        Q.   Okay.  And why did you believe that?

10       A.   Why do I believe that?

11       Q.   Yeah.

12       A.   Because the door opened and he walked inside.

13       Q.   Have you ever known one of the -- one of your

14   fellow officers to go inside someone's house without

15   consent?

16           MS. ADKINS:  Form.

17           BY MR. SLATER:

18       Q.   You can answer.

19       A.   For -- but yeah, we go in multiple different

20   reasons, exigent circumstances, threat of pursuit,

21   warrants, that's -- or consent.  That's why we go into a

22   home.

23       Q.   Okay.  Let me just clarify.  Have you ever

24   known an officer of Levy County Sheriff's Office to go

25   inside someone's home without a warrant, exigent C, hot

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  pursuit, or consent?

2     A.   No, sir.

3     Q.   Okay.  Would the mere opening of the back

4  door, in your view, constitute consent?

5        MS. ADKINS:  Form.

6        BY MR. SLATER:

7     Q.   You can answer.

8     A.   With the information I had at this time, that

9  door opening, I went on the belief that he was invited

10 in, so yes, sir.

11    Q.   So your testimony is that, when you saw then

12 Deputy Gregory enter the home, you believe that he was

13 invited to go into the home?

14    A.   Correct.

15       MS. ADKINS:  Form.

16       BY MR. SLATER:

17    Q.   All right.  You saw Gregory go inside the

18 home. What did you do next?

19    A.   I followed suit shortly after.

20    Q.   Okay.  Did you run in or walk?

21    A.   I believe I walked.

22    Q.   Is there a reason why you walked instead of

23 ran?

24    A.   Because the way that it was set up, it was

25 consent -- I -- it appeared to be a consensual entry for

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

```
 1   me, so therefore, it wouldn't be, you know, no reason to
 2   run if it's being consensual.
 3        Q.   Okay.  How long do you think it took you to
 4   get inside the house?
 5        A.   Probably ten to 15 seconds, I'm thinking.
 6        Q.   Okay.  Did you -- while you were walking
 7   towards the door, did you turn on your flashlight at
 8   all?
 9        A.   I don't recall.
10        Q.   Do you recall if you saw any light inside the
11   house?
12        A.   There was, like, flashlight movement, I
13   believe.
14        Q.   Okay.  And just to get a sense, how long
15   between when you saw the door open and Greg and -- how
16   long did it take for Gregory -- strike that.  You saw
17   the door open -- the back door open and then Gregory
18   went inside, what was -- how long was that period of
19   time?
20        A.   From the time the door opened to the time
21   Gregory went inside?
22        Q.   Yes.
23        A.   Five seconds, maybe.
24        Q.   Okay.  Did you hear -- you -- I think you said
25   you saw some light inside the house while you were
```

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1      Q.   Okay.  Did you hear any noise at the time you
 2 entered -- you got to the door's threshold?
 3      A.   I believe that's when -- when I got in, that's
 4 when Gregory -- can't remember if it was that time,
 5 right when I got in, is when he was at that door, trying
 6 to make contact with somebody at the bedroom door, or if
 7 it was shortly after I entered.  I did a lot of, let me
 8 see your hands.  Let me see your hands.
 9      Q.   Before Gregory went into the house, did he
10 alert you in any way?
11      A.   No, sir.
12      Q.   Just bear with me for a second.  If I told you
13 that one of the officer -- that Deputy Gregory said in
14 his recorded interview that he shined a light on you to
15 get your attention before going into the house, would
16 that be accurate to your recollection of the events?
17           MS. ADKINS:  Form.
18           BY MR. SLATER:
19      Q.   You can answer.
20      A.   It very well could have happened.  I just
21 don't recall off the top of my head, sir.
22      Q.   Okay.  Did you hear anything over the radio
23 before you went into the house?
24      A.   No, sir.
25      Q.   Did you use the radio to communicate before
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

```
 1        A.    If it goes through, there will be a recording,
 2   but our radios don't generally work very well anywhere.
 3   But if it -- if it -- if it goes through in dispatch,
 4   it's -- like, can hear it, then generally the -- it's
 5   recorded.
 6        Q.    Okay.  Would that be recorded on the CAD?
 7        A.    Like, they type it in as we say it?
 8        Q.    Yeah.
 9        A.    Not necessarily.  It depends on the
10   dispatcher.
11        Q.    Okay.  If, let's say, it gets through to
12   dispatch, do they -- would they store it if it's not on
13   the CAD?
14        A.    That's above my pay grade.  I think they do.
15   The recordings stay or they keep the recordings for a
16   certain amount of time.
17        Q.    Okay.  Have you heard a copy of your -- of the
18   recording you made?
19        A.    No, not -- not the recording from the radio
20   tracking.  I don't believe so.  No, sir.
21        Q.    Okay.  So you're going into the house.  You
22   make your statement over the radio.  You see that
23   there's something going on with the door.  Can you talk
24   to me about that?
25        A.    I can see the hand of a black male on the
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   interior of the bedroom, and then Deputy Gregory is on
 2   the exterior of the bedroom, let me see your hands.  Let
 3   me see your hands.  They're, you know, back and forth
 4   with the door.
 5        Q.   Okay.  What happens next?
 6        A.   That continues for unknown amount of time.  I
 7   don't know how long it was.  And then I hear I believe
 8   it was Deputy Gregory say he saw a gun on the bed, and
 9   that's when I also observed a gun on the bed.
10        Q.   At this time, has anyone else entered the
11   home?
12        A.   I believe Lieutenant Almeida was behind us, I
13   believe, at that time.
14        Q.   Okay.  Did you have your service weapon drawn?
15        A.   I had my taser out.
16        Q.   Could you see whether Deputy Gregory had his
17   service weapon drawn?
18        A.   I believe he had his service weapon at the
19   beginning.  He was at lethal, I was at less lethal, and
20   then he transitioned.
21        Q.   Could you -- do you remember anything that any
22   of the three of you who were in the home were saying at
23   the time?
24        A.   Hands, hands, and sheriff's office.
25        Q.   Okay.  Did the individual who we now know to
```



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  be Terry Dukes, Senior, in the room, did he say

2  anything?

3      A.   I don't -- I think some of it, couldn't really

4  understand, but I -- I don't recall what he was saying,

5  sir.  No, sir.

6      Q.   I just want to pull back up what was

7  previously marked as Plaintiff's Exhibit 2.  The -- this

8  is the 100 or so pages of documents produced by your

9  counsel, that includes some general orders and also the

10  CAD that we were looking at.  And it also includes

11  pictures of Terry Dukes, Junior and Senior, the arrest

12  warrant for Terry Dukes, Junior, here in the CAD.  And I

13  just want to direct you to your narrative.

14      A.   Uh-huh.

15      Q.   Okay.  And I believe it starts here on page

16  Dukes T149 --

17      A.   Yes, sir.

18      Q.   -- and continues on until Dukes 150.  And I

19  believe you said you had that with you?

20      A.   Yes, sir, right here in front.

21      Q.   Okay.  And do you have any other documents

22  with you relating to this case?

23      A.   I have the taped interview -- the typed out

24  tape interview of the internal and my first set of

25  Interrogatories.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1    Q.   Okay.  Besides your Interrogatories, your

2    incident report, and your -- the transcript of your

3    interview, have you reviewed anything else to prepare

4    for today's testimony?

5    A.   No, sir.

6    Q.   Okay.  And I see that this supplement was

7    created, says at the top, May 26, 2019, at 1:45 in the

8    morning, do you see that?

9    A.   Yes, sir.

10   Q.   So that would be about 18 or so hours after

11   the incident, give or take?

12   A.   Sounds right.

13   Q.   Okay.  And I'm just looking here on the -- it

14   looks like it's the third full paragraph.

15   A.   Okay.

16   Q.   Okay.  And this is kind of where we were just

17   talking.  "We announced ourselves again, shouting,

18   sheriff's office, and a black male, later identified to

19   be Terry Dukes, Senior, opened the door slightly so only

20   a portion of his face, right torso, and his right hand

21   were visible."  And you say, "There's no power to the

22   home, therefore there were no lights on.  And the only

23   light in the home was from Deputy Gregory and my

24   flashlights."

25   A.   Uh-huh.

**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

```
 1      Q.   How do you know that there was no power in the

 2 hub?

 3      A.   It was visible that there was no power because

 4 there was no lights of any sort.  No clocks or a stove,

 5 microwave, no lights of any sort on within the home,

 6 illuminating.

 7      Q.   Did you try to turn on any lights in the

 8 house?

 9      A.   No, sir.  That's not normal practice.

10      Q.   Okay.  Could have been possible that the

11 appliances weren't plugged in?

12      A.   Absolutely, it could be possible.

13      Q.   And then the next sentence says, "I had my

14 taser pointed at the subject at this time, ordering him

15 to show both of his hands.  Myself and Deputy Gregory

16 ordered him multiple times to show both of his hands,

17 using loud verbal commands, and the subject repeatedly

18 asked why and did not comply."

19      A.   Well, I guess the subject said, why?  From my

20 report, I didn't remember that, looking at --

21      Q.   Okay.  But did you -- do you remember any

22 other -- besides saying, why --

23      A.   No.

24      Q.   -- do you remember anything else?

25      A.   No, sir.
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Do you remember the context of the why?  Was
2  it after -- was it after something specifically you or
3  one of the other deputies said?
4    A.   No, sir.  I don't -- I don't recall.
5    Q.   Okay.  And I'm looking now for the next
6  paragraph.  It says that Deputy Gregory advised you
7  there was a gun on the bed and that you, Gaffey, glance
8  at the bed and observed a black in color revolver,
9  approximately five to eight feet from Dukes, Senior,
10  okay?
11    A.   Yes.
12    Q.   All right.  So can you -- and let's just
13  finish talking about this and I'm going to show you some
14  pictures.
15    A.   Okay.
16    Q.   It says that "Due to observing the gun in the
17  reach of Dukes, Senior, Deputy Greg shoved the door open
18  so that Dukes, Senior, could not retreat and get
19  possession of the firearm."  You see that?
20    A.   Yes.
21    Q.   When you say shoved, what do you mean?
22    A.   Forced the door open.
23    Q.   Okay.  With his hands, his feet, a
24  combination? How did he do that?
25    A.   It might've been a combination, because I

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  remember his foot being at the bottom for leverage.

2       Q.   Okay.  And then you say, "When Deputy Gregory

3  shoved the door, Dukes, Senior, retreated back into the

4  bedroom, in the direction of the bed where the firearm

5  was."  Do you recall -- how was he retreating?  Can you

6  sort of explain that to me?

7       A.   He was going in the direction of the bed.

8       Q.   Okay.  So he was walking towards the bed,

9  lunging towards the bed?  Could you give me a better

10  sense of sort of what he was doing?

11       A.   Advancing towards the bed.

12       Q.   Sorry.  What words did you use?  I couldn't

13  hear you.

14       A.   Advancing.  Advancing.

15       Q.   Advancing.

16       A.   It's another movement.

17       Q.   Okay.  Advancing.  Is that like a --

18       A.   It's a short distance, so I can't say if he

19  was running or moving quickly.  It's a short distance,

20  so he advanced towards that direction.

21       Q.   Okay.  Did he -- did you see him lunge towards

22  the gun?

23       A.   No, I didn't see a lunge.  He went towards the

24  -- he advanced in that direction.

25       Q.   Okay.  Was he facing Deputy Gregory or was he



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  facing the gun?

2      A.   I think, at -- at that moment, he was turning

3  towards -- he was in between both.

4      Q.   Okay.  So he was turning -- he was in between

5  both, what -- I -- what does that mean?

6      A.   He's in between both, right?  So he is not

7  facing one.  He is not facing the other.  He is in

8  between.

9      Q.   Okay.  So what -- could it -- was he initially

10 facing Gregory and then turning in the direction of the

11 gun, is that -- is that -- is that what you're saying?

12     A.   That's what it sounds like, yeah.

13     Q.   Okay.  So he's turning to face towards the

14 bed?

15     A.   Correct, because it -- also, it states down

16 there in my report, I think it's the -- I don't know

17 which paragraph.  Right here where it says, "When Deputy

18 Gregory shoved the door," in that line of that, it also

19 says there was a short period where I was unable to

20 clearly see the subject due to lighting and the bedroom

21 door being in my line of sight because of the angle of

22 the door.

23     Q.   Okay.  But -- and I understand that.

24     A.   You know, very oddly shaped bedroom and

25 doorway.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1       Q.   Yeah.  And let's actually go look at some
 2  pictures of that so that we can get a better sense.
 3            MR. SLATER:  We'll mark this as --
 4            BY MR. SLATER:
 5       Q.   And show you a series of pictures.  Some of
 6  them are pictures that were taken by your office and
 7  some of them are pictures that were taken by my office
 8  more recently.  But before I go to the pictures,
 9  Corporal, I understand, from your report and from what
10  you're saying now, was that, at a certain period of
11  time, you lost sight of Mr. Dukes, Senior?
12       A.   Correct.
13       Q.   Okay.  But the last thing you saw, if I'm
14  understanding your testimony correctly, was that he was
15  advancing towards the bed and that he was turning from
16  facing Gregory towards the bed?
17       A.   Correct.
18       Q.   Okay.  Thank you.
19       A.   Yes, sir.
20       Q.   All right.  I'm going to show you now what's
21  -- what I'm marking as Plaintiff's Exhibit 3.
22            (EXHIBIT 3 MARKED FOR IDENTIFICATION)
23            BY MR. SLATER:
24       Q.   Okay.  And these are -- the pictures are
25  flipped so that we can see them more clearly, but --
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1      A.   Or -- no.  Sorry.  I'm going to where my feet
 2 were.  We'll go with where my feet were.
 3      Q.   Yeah.  Where your feet work, Sir?
 4      A.   Go left, left and up.
 5      Q.   Left and up.
 6      A.   Keep going a little bit.  Left now.  Left.
 7 Right probably in that general, except my screen keeps
 8 blinking.  Right there in that general area.
 9      Q.   Okay.  And I see there's like, let me just
10 mark this the way I did the other ones.  One second.
11 Yes.  A second, just bear with me.  I'm going to try to
12 -- so I have this yellow, can you see the yellow circle?
13      A.   Yes, sir.
14      Q.   Okay.  Tell me where I need to move it to
15 better reflect where you were?
16      A.   It's probably pretty close to where I was
17 right where you got it.
18      Q.   Okay.  Okay.  So I'll just -- I'm making it an
19 X since we don't -- okay, so let me just make sure I
20 save this.  Okay.  All right.  So I have the X is where
21 you believe you were standing at the time.  Can you show
22 me on here where you believe Deputy Gregory was
23 standing?
24      A.   Move your cursor to the right?  Oh, sorry.
25      Q.   Sorry.
```

**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

```
 1        A.    Hands.  Let me see your hands.

 2        Q.    Okay.  And I am looking now on what was marked

 3  as Duke's T164, do you see that?

 4        A.    Yes.

 5        Q.    Okay.  And it's a diagram of the front of a

 6  person and the back of a person; is that fair?

 7        A.    Yes.

 8        Q.    Okay.  And we see here on the left diagram of

 9  the forward-facing person, we see an X above the right

10  breast, sort of above the armpit area, do you see that?

11        A.    Yes.

12        Q.    And what does that -- what does that mean?

13        A.    That X shows where the Taser Pro made contact

14  with the subject.

15        Q.    Okay.  Have you ever deployed a taser before?

16        A.    Yes.  Yes.

17        Q.    Have you deployed it -- have you been trained

18  on how to use a taser?

19        A.    Yes.

20        Q.    Okay.  What model taser do you use, sir?

21        A.    I believe it's the X26.

22        Q.    Do you know the range on the X26?

23        A.    Depends on the cartridge.

24        Q.    Okay.  What -- do you have more than one kind

25  of cartridge you folks use at the Levy County Sheriff's
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

```
 1   do they -- I'm -- what I -- let me step back for a
 2   second.  I'm interested in understanding, and you were
 3   there for Lieutenant Almeida's testimony.  You know, I
 4   think he was referencing that they don't shoot like out
 5   of -- like a -- you know, a bullet out of the -- out of
 6   the barrel of a gun, that they shoot differently.  And
 7   I'm kind of trying to understand that and I was hoping
 8   you could help me with that.  When you deploy the
 9   probes, so what do they do?
10        A.   Well, I don't know exactly what they do, but
11   the one probe generally goes straight and the other
12   probe goes slowly at an angle down.  If you're -- if the
13   taser is held perfectly vertical, okay?  That one probe
14   would go straight and one probe would go towards the
15   ground right directly under that.  If the taser is held
16   at a slight cant, right?  That means that one would go
17   straight and the other one would go slightly to the
18   right or depending on the cant, slightly to the right or
19   slightly to the left.
20        Q.   What if the taser was pointed down?
21        A.   Then you shoot your toe.
22        Q.   And I don't mean directly down at your toe.
23   What if the taser was -- what if there's a target ten
24   feet from you lying down on the ground.  If you aim
25   towards that target, would they still, would they -- you
```



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1       Q.   You can answer.

2       A.   I'm not a taser instructor.  I'm a user of a

3  taser instructed by taser instructors.  They'd be your

4  professional opinion to inform you.

5       Q.   Do you have any instructor, taser instructors

6  at the Levy County Sheriff's Office?

7       A.   Yes.

8       Q.   Can you give me their names please?

9       A.   I only know of two off the top of my head.

10  It'd be Corporal Adam Hires and Sergeant Daniel Ritter.

11       Q.   Okay.

12       A.   There could be more, but those are the two I

13  know.

14       Q.   Okay.  Now after -- so let -- let's go back to

15  what was happening the morning of.  I think we

16  established from your testimony that that Mr. Dukes,

17  Senior, was -- that the door was shoved open, and I'm

18  using your word there, shoved open.  That Gregory

19  deployed his taser.  That one probe struck Mr. Dukes,

20  Senior in the right shoulder.  What happened next?

21       A.   We, after the taser went off, we got into the

22  room.  Mr. Dukes, it was then noticed that it was Dukes,

23  Senior.  He was naked.  I don't recall, somebody put

24  handcuffs on him.  I assisted him with putting some

25  pants on and we walked him out of the residence.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        Q.    Who do you think put handcuffs on him?

 2        A.    It'd be an assumption right now.  I -- I

 3   couldn't tell you.  I mean, it might be in my report. If

 4   you want me, I can look at it, but I don't remember.

 5        Q.    That's fine.  You -- but it wasn't you?

 6        A.    No, sir.  I helped him put pants on.

 7        Q.    Okay.  Did he have any clothing on?

 8        A.    No, he was -- he was fully nude.

 9        Q.    Did he have any sort of clothing around his

10   legs or anything like that?

11        A.    No, sir.

12        Q.    Okay.  What happens next after you put Mr.

13   Dukes in cuffs?

14        A.    After he was placed in the cuffs?

15        Q.    After he was -- yeah, thank you.  After he was

16   placed in cuffs.  I understand you didn't do it.  After

17   he was placed in cuffs, what happened next?

18        A.    Put his pants on, assisted him with putting

19   his pants on.  Walked him out of the back door, the same

20   door we came in, out to the front, and -- and the EMS

21   unit showed up to check on him and remove the taser

22   probe.  I then went in to grab him, I believe I, I think

23   I did, went in and grabbed him a pair of shoes because

24   he didn't have any shoes, brought those back to him and

25   cleared the scene.
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

201905002271 - Levy County Sheriffs Office - Levy (FL38)

## Supplement #1 Narrative

| | Author: | Date Created: | Supp #: |
|---|---|---|---|
| | Deputy T. Gaffey #581 | 05/26/2019 0145 Hrs | 1 |

On the above listed date and time, I responded to the listed location in reference to locating Terry Dukes Jr. Detective Wilkinson advised he had probable cause for his arrest for the charge of Aggravated Battery on a pregnant person. I was informed that there are firearms in the home and Terry Dukes Jr. has a violent history.

Dep. Gregory and I went to the back of the home and Cpl. Almeida and Dep. Murphy went to the front of the home. I posted on the rear, north corner of the home and Dep. Gregory went to the back door at the bottom of the steps. I heard Dep. Murphy announce "Sheriffs Office" three times. After the third time I heard movement inside the home. Approximately 30 seconds to one minuet later, I observed the back door to the residence open and Dep. Gregory walk up the wooden steps, inside through the back door.

I followed shortly behind Dep. Gregory and entered the home. I observed Dep. Gregory in the kitchen and he advised someone opened the door and retreated back into the residence. We announced ourselves again shouting "Sheriffs Office" and a black male, later identified to be Terry Dukes Sr., opened the bedroom door slightly, so that only a portion of his face, right torso, and his right hand were visible. There is no power to the home, therefore there were no lights on and the only light in the home was from Dep. Gregory and my flashlights. I had my issued Taser pointed at the subject at this time ordering him to show both of his hands. Myself and Dep. Gregory ordered him multiple times to show both of his hands using loud verbal commands and the subject repeatedly asked why and did not comply.

While giving Dukes Sr. orders to show his hands, Dep. Gregory advised me there was a gun on the bed. I glanced at the bed and observed a black in color revolver, approximately 5-8 feet from Dukes Sr. Dep. Gregory and I ordered Dukes Sr. to show his hands and come out of the bedroom. Dukes Sr. did not comply and he attempted to shut the bedroom door on us to conceal himself. Due to observing the gun in reach of Dukes Sr. Dep. Gregory shoved the door open, so that Dukes Sr. could not retreat and get possession of the firearm.

When Dep. Gregory shoved the door, Dukes Sr. retreated back into the bedroom in the direction of the bed where the firearm was. At this time Dep. Gregory entered the doorway and I lost sight of Dukes Sr. for a short time. I heard Dep. Gregory deploy his agency Taser, while ordering the subject to show his hands. There was a short period where I was unable to clearly see the subject, due to lighting and the bedroom door being in my line of sight.

Once the Taser was deployed, I entered the room and observed Dukes Sr. sitting on the floor with a Taser probe in the top right corner of his chest. I did not see where the second probe went. Dukes Sr. said multiple times "why did you do this to me." At this time is was discovered Dukes Sr. was not Dukes Jr. Myself and Dep. Gregory before this time, were not able to confirm if the subject was Sr. or Jr. until this point, due to the lighting and both Sr. and Jr. looking alike. Also the majority of the subjects face was not observed during the incident until after the Taser is deployed. Dukes Sr. was nude and was asking to put on his pants. I advised Dukes Sr. to grab his pants and put them on. While Dukes Sr. was putting his pants on, Dep. Gregory secured the firearm and removed the ammunition.

Once Dukes Sr. put his pants on, he stood up and Dep. Gregory placed him in hand restraints. Levy County Dispatch was advised to have EMS respond for a Taser deployment. Dep. Gregory and I walked the subject out to the roadway in front of his home so that he could meet with EMS.

While waiting for EMS, Dukes Sr. advised he opened the door to the home because he saw the light coming from the exterior of the home and he though it was Dukes Jr. returning home. Dukes Sr. advised the light looked like the light that is on his sons phone. This is why he opened the door and then retreated back into the bedroom. Dukes Sr. advised multiple times  "I am going to own Levy County", and he was going to sue all of the deputies.

Dukes, T. 000149

201905002271 - Levy County Sheriffs Office - Levy (FL38)

The home was cleared by Dep. Murphy and Cpl. Almeida and Dukes Jr. was not located on the property.

EMS responded to the scene and removed the Taser probe for Dukes Sr.'s body.

Dukes Sr. was transported to the hospital by his own request.

There is no video footage of this incident to my knowledge.



| Signed: Deputy T. Gaffey #581 | Reviewed: Sergeant K. Kinik #335 |
| --- | --- |

Dukes, T. 000150