UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

TERRY DUKES, SR.,

      Plaintiff,

v.                            CASE NO. 1:23-cv-45-AW-HTC

ROBERT B. McCALLUM JR. and
CHASE GREGORY,

      Defendants.

_____/

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, STATEMENT OF FACTS, and MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 56 and N.D. Fla. Loc. R. 56.1, Defendants ROBERT B. McCALLUM, JR., in his official capacity as Sheriff of Levy County, (the "Sheriff"), and Deputy CHASE GREGORY, individually, ("Deputy Gregory"), move for summary judgment on all claims in this action and state:

1.      This action arises out of a law enforcement encounter occurring at Plaintiff's home on the morning of Saturday, May 25, 2019.

2.      Having probable cause to arrest Plaintiff's son for the brutal beating of his pregnant girlfriend, Deputy Chase Gregory and other members of the Levy County Sheriff's Office arrived at the son's home to make contact. After knocking and announcing their presence, Plaintiff yelled, "I'm coming," opened the door to officers, and returned inside—actions that Deputy Gregory reasonably (and

correctly) interpreted as an invitation to enter. Unknown to Gregory, Plaintiff mistakenly believed his son was outside and had opened the door believing he was inviting his son inside.

3.      Inside the unlit home, Gregory could not identify the black male who had opened the door, but reasonably believed it was the suspect, Terry Dukes Junior. Ignoring commands to stop, the male retreated into a bedroom where, through an opening in the door, Gregory could see a handgun lying on the bed. The individual (Plaintiff) continued to refuse commands to come out or show his hands. When Plaintiff made movement towards the bed/gun, Gregory kicked the door open and deployed his Taser against Plaintiff—but the Taser failed to fully connect. Plaintiff was nonetheless quickly restrained and placed in handcuffs— and Gregory realized that Plaintiff was not the suspect they were after. Plaintiff was temporarily detained in handcuffs for approximately 15-minutes while deputies assessed the situation, called for EMS to treat Plaintiff, and confirmed the home was free of other occupants. Plaintiff was then released.

4.      Plaintiff sues Deputy Gregory, individually, as follows:

- Count I      Invasion of Privacy (Florida law);

- Count II     Trespass (Florida law);

- Count III    Unlawful entry (Fourth Amendment);

- Count IV    Unlawful seizure (Fourth Amendment); and

- Count V      False Arrest/False Imprisonment
              (Florida law).

[Doc.11, Amended Complaint].

5.      Deputy Gregory is entitled to summary judgment because he was acting in the good faith execution of his duties, because a reasonable officer in the same circumstances would have believed that consent had been given to enter the home, because the deployment of a Taser in these circumstances did not constitute excessive force, and because Plaintiff's temporary detention was reasonable under the Fourth Amendment.

6.      Plaintiff sues Sheriff McCallum, in his official capacity as Sheriff of Levy County, for just a single count of Failure to Train/Supervise/Discipline Deputy Gregory under 42 U.S.C. § 1983 (Count VII).[1] Sheriff McCallum is entitled to summary judgment because no widespread history of similar constitutional abuses indicated the need for additional training/supervision/discipline and because no other evidence exists to demonstrate that Deputy Gregory's actions, if unlawful, were caused by an official policy or practice of the Sheriff.

**WHEREFORE**, Defendants McCallum and Gregory respectfully request the entry of an Order granting final summary judgment in their favor on all claims.

---

[1]      There is no Count VI.

3

<u>STATEMENT OF FACTS</u>[2]

Only those facts known to law enforcement are relevant to this motion. *See Hernandez v. Hansell*, 2016 WL 8943279, at *1 (M.D. Fla. 2016), *aff'd,* 695 Fed. Appx. 523 (11th Cir. 2017) ("For purposes of summary judgment, the Court recites the facts in a light most favorable to Plaintiff and considers only those facts known to Defendants [ ] at the time of the incident.").

## I.   <u>The incident</u>.

In the early morning hours of Saturday, May 25, 2019, Levy County Sheriff's Detective Mike Wilkinson was called to a hospital in Gainesville to meet with the victim of a domestic battery. [Doc.26-1, pp.12[3], 15, 16; Ex.2]. Shaquanda Sheffield reported she was pregnant and had been violently beaten the night before by her boyfriend Terry Dukes Jr. at their residence at 900 Patterson Street, in Bronson, Florida. [Doc.26-1, p. 18--19, 25; Ex.2]. Ms. Sheffield warned that Dukes was smoking "Molly" and that there were firearms in the house. [Doc.26-1, pp.19, 29]. She advised the two were living at 900 Patterson Street, that she was afraid of Dukes, and that she wanted an injunction. [Doc.26-1, pp.18, 27]. Based on the victim's statements and his

---

[2]      The facts as stated herein are not admissions or stipulations for trial.

[3]      Page numbers refer to the numbers of the deposition transcript in the top right corner of the page.

observation of her injuries, including a bite on her face, [Doc.26-1, pp. 19, 31; Ex.2], Detective Wilkinson determined probable cause existed to arrest of 31-year old Terry Dukes Jr. ("Junior") for aggravated battery on a pregnant woman, a felony. [Doc.26-1, pp.27-28, 53-54; Exh.3].

When probable cause exists for an arrest, the practice of the Levy County Sheriff's Office (LCSO) is to first attempt to locate the individual and effect the arrest without a warrant.[4] [Doc.26-3, p.119-120; Doc.26-2, pp.68-69]. This is more feasible when deputies have possible locations for the suspect and is a more efficient use of limited resources. [Doc.26-3, p.119-120; Doc.26-2, pp.68-69]. If deputies are unable to locate the suspect within a reasonable time, the investigating deputy then seeks a warrant. [Doc.26-2, pp.68-69].

In accordance with this practice, Detective Wilkinson contacted the on-duty supervisor of the patrol division, Corporal Franco Almeida, and zone deputy Blake Murphy and asked them to go to the house at 900 Patterson Street and pick up Junior based on the probable cause for his arrest. [Doc.26-1, pp.28, 30;

---

[4] This does not mean deputies enter residences at will. *See, e.g.,* Directive 801 "In the absence of *consent or exigent circumstances*, even though probable cause exists for an arrest, a search warrant shall be obtained before entry into a third party premises for the purpose of arrest." and 806: "Absent exigent circumstances, the deputy must obtain prior permission from a supervisor to forcibly enter the residence or enter without the consent of an occupant at the residence," and discussing limited circumstances of nonconsensual entries when serving *arrest warrants*. [Doc.26-12].

Doc.26-4, pp.24, 27]. Detective Wilkinson gave him an officer safety briefing advising him that Junior was violent, was using Molly[5], and that there were firearms in the house. [Doc.26-1, p.29; Doc.26-5, pp.32-33; Doc.26-3, p.150-151]. Junior was also known to be a convicted felon. [Doc.26-4, p.28; Doc.26-6, p.32; Doc.26-7, p.98]. Detective Wilkinson believed it urgent to pick up Junior given the demeanor of the victim and Junior's history of nine prior violent encounters which included batteries and weapons charges. [Doc.26-1, pp.30-31].

For officer safety, as many deputies as are available will respond in circumstances such as this. [Doc.26-3, p.148; Doc.26-5, pp.42-43]. Corporal Almeida and Deputy Murphy connected with Deputies Tucker Gaffey and Chase Gregory, related the information provided them by Detective Wilkinson [Doc.26-5, p.33; Doc.26-3, p.142], and discussed going to the 900 Patterson Street house to arrest Junior. [Doc.26-4, p.27; Doc.26-5, pp.32-33]. The uniformed deputies drove to the house in separate vehicles without lights or sirens and parked on the street in front of the house. [Doc.26-5, pp.34-35; Doc.26-3, pp.153-154]. There were no cars at the house and the house was dark. [BM p.35, 54].

---

[5]     Molly is a street name for MDMA, a drug Deputy Gregory describes as making the user unpredictable. [Doc.26-3, p.143-144].

6

Corporal Almeida and Deputy Murphy approached the front door of the double-wide mobile home [Doc.26-5, p.35], while Deputy Gaffey positioned himself at the back northwest corner, and Deputy Gregory walked to the backdoor.[6] [Doc.26-6, p. 51-53; Doc.26-3, p.156]. The front door appeared to have items in front of it blocking the way in. [Doc.26-4, p.100]. Most of the windows of the mobile home were open; it was dark inside. [Doc.26-7, p.39, 192-193; Doc.26-5, p.35; Doc.26-6, p.53; Doc.26-3, p.178].

Standing on the porch at the top of the stairs, Deputy Murphy knocked loudly on the front door and loudly announced, "Sheriff's Office." He then knocked on the side of the house and again on the front door with the same announcement each time. [Doc.26-5, pp.35, 36, 50-51]. His flashlight was on. [Doc.26-5, p.47]. Deputies did not have their service weapons drawn. [Doc.26-5, p.56; Doc.26-3, p.172; Doc.26-6, p.63].

Inside the house, close to 6:00am, Plaintiff was in his bedroom which has a window on the front of the house, to the left of the front door. [Doc.26-7, pp.38, 50-51]. He saw a flashlight in his window and heard a hard hit on the side of his trailer. [Doc.26-7, pp.41-42, 50, 52]. Plaintiff knew someone was at the house; the flashlight made him think it was his son coming home. [Doc.26-7, pp.41,

---

6       Plaintiff has suggested the property was fenced and gated. If so, deputies have no recollection of them or of having to bypass such. [Doc.26-5, p.35 ("If there was, it would've been open."), p.50; Doc.26-4, p.29].

53]. But he also knew something was different; his son never hits the house. [Doc.26-7, pp.41, 50, 53]. Plaintiff verbally responded "real loud," including "I'm coming!" and went to the back door "to let him in."[7] [Doc.26-7, pp.41-42, 50]. Ordinarily – "every single time" – Plaintiff answered the door with his gun in hand. [Doc.26-7, pp.47, 54]. This night something told him, "Just lay your gun on the bed," and he put his .38 special on the bed before he went to the door. [Doc.26-7, pp.47, 48, 54].

Plaintiff purposely did not turn on any lights, but walked from his room, through the "kitchen hall" about six feet to the back door, unlocked it, turned the knob and opened the door to allow his son to enter. [Doc.26-7, pp.39, 54-55, 59, 192]. He walked back to the room to get dressed. [Doc.26-7, p.42, 54]. It was almost 6:00am, and he had to be at work at 7. [Doc.26-7, p.56].

From his position beside the handrail at the bottom of the backstairs, Deputy Gregory could hear Deputy Murphy's knocking and the announcements

---

[7]      According to Plaintiff, he is hard of hearing and did not hear the first knock or the announcement of "Sheriff's Office." [Doc.26-7, p.41]. Because of the flashlight, he believed it was his son who had come home and he opened the door to allow him inside. [Doc.26-7, pp.41-42].

Gregory believed Junior to be inside the house; he had no reason to expect Dukes, Sr. [Doc.26-3, p.177]. Furthermore, if Dukes Senior is hard of hearing, this was unknown to Deputy Gregory who had previously engaged in conversation with him and never observed any sign of hearing impairment. [Doc.26-3, p.217].

of "Sheriff's Office" at the front of the house. [Doc.26-3, pp.158, 167-168]. He heard footsteps and a voice inside, then the back door opened enough that Deputy Gregory could make out an individual but not his identity. [Doc.26-3, pp.159-160, 163, 168]. The individual immediately turned back into the house. [Doc.26-3, pp.159-160, 168].

Deputy Gregory knew: deputies had probable cause to arrest Junior for a violent felony; Junior was known to live at this house and was reportedly at the house at this time; Junior was known to use and reportedly was using drugs at this time; uniformed deputies had knocked and announced their presence; a person inside the home was heard responding to the door following the announcement; a male unlocked and opened the door; and there had been no show of force to coerce entry into the home. [Doc.26-3, pp.141; 158-160, 163, 167-168; Doc.26-11, ¶3]. Under the totality of the circumstances, Deputy Gregory interpreted the overt actions of the occupant as nonverbal consent to enter the home.[8] [Doc.26-11, ¶5; Doc.26-3, pp.223-224]. Deputy Gregory then

---

[8]    Gregory knew from previous experiences that persons are very clear if they do not want law enforcement present, and that he had been given nonverbal consent in other situations. [Doc.26-11, ¶4]. He has been trained on Fourth Amendment law and understands consent to be a basis which allows law enforcement to enter a home without a warrant and that such consent may be nonverbal. [Doc.26-11, ¶6].

      Paul Kiley, Director of the Police Academy for Miami-Dade College, and a member of the training committee with the Florida Department of Law

crossed the threshold and entered the unlit home.[9] [Doc.26-3, pp.172, 193-194]. Gregory's gun was not drawn and his flashlight was not illuminated.[10] [Doc.26-3, pp.169, 192].

---

Enforcement Criminal Justice Standards and Training Commission, reviewed the actions of LCSO deputies for the morning of May 25, 2019, and opines that it "was very reasonable for Deputy Gregory to understand the door being opened, after the banging and announcing Sheriff's Office, the open door was an invitation to enter." [Doc.27-1, ¶5]. He has personally experienced the opening of a door as a nonverbal invitation. [Doc.27-1, ¶4]. Most importantly, Kiley opines that the actions taken were within generally accepted police practices *taught at Florida police academies* as being within the bounds of the Fourth Amendment. [Doc.27-1, ¶13].

Then-Corporal Almeida opines that if someone opens a door for a deputy as an invitation into the home, a deputy is allowed to go in. [Doc.26-4, p.97]. Communications can occur without speaking. [Doc.26-4, p.98]. Based on the situation leading up to entry here – loud knocking and announcing, someone saying they're coming, and opening a door where a deputy is positioned, "it's common sense." "A reasonable person would believe they're letting us in." [Doc.26-4, pp.98-99].

"If a law enforcement, of any kind, especially uniformed law enforcement, knocks and announces at your door or there for a lawful reason, you come to the door, open it for us, and move so we can enter the home, that would be interpreted as being invited into the home." [Doc.26-4, p.101].

[9]     There were no lights on in the house but there was sufficient ambient lighting that Gregory could see enough to walk and to see a male figure. [Doc.26-3, pp.178, 205-206]. Because there were no lights of any sort - clocks, stove, microwave, deputies believed there was no power to the home. [Doc.26-6, p.66]. Indeed, Plaintiff had to "run lamps to the room" because the switches were bad; the whole trailer needed rewiring. [Doc.26-7, pp.39, 77].

[10]     Deputies refer to this as the fatal funnel and are trained not to illuminate themselves in these circumstances as it can make them a target with no place to go if someone begins shooting. [Doc.26-3, p.192, 204-205].

From the backdoor, Gregory passed through the "kitchen hall" (a galley laundry and kitchen area) [Doc.26-3, p.206], where he could then see a male about to walk through a doorway into another room. [Doc.26-3, p.192-194, 197, 206-207]. Gregory again announced "Sheriff's Office" and ordered the individual to stop. [Doc.26-3, p.192, 197, 203, 207]. The male ignored the command and continued through the doorway to the room and began closing the door.[11] [Doc.26-3, pp. 197, 207]. It was announced over the radio that Gregory and Gaffey had entered the house. [Doc.26-3, pp. 170, 172, 197; Doc.26-6, p.61]; From his observation of the door opening and Gregory entering, Deputy Gaffey believed consent had been given and he and Corporal Almeida soon entered too. [Doc.26-3, p.172; Doc.26-6, pp.57-58; Doc.26-4, p.99-101].

Gregory announced "Sheriff's Office" several times and asked for Junior. [Doc.26-3, p.208; Doc.26-6, p.63]. Gregory identified himself and his agency and instructed the male to identify himself. [Doc.26-3, pp.208-209]. Gregory knocked loudly on the bedroom door and gave several loud commands to show and identify himself. [Doc.26-3, pp.208-209]. The male did not comply but

---

[11]     There is a dispute between the parties as to whether the bedroom door was opened or closed after Plaintiff entered the room: Plaintiff says it was always open, all deputies say it was primarily closed. This fact is immaterial because regardless of the position of the door, there is no evidence deputies could sufficiently see the male to identify him as Senior until such time as the Taser was deployed and they drew closer to Plaintiff. [Doc.26-3, p.227].

quickly peeked his head as if to see Gregory. [Doc.26-3, p.209]. Deputies were only able to see a portion of his face, they could not see enough to identify him.[12] [Doc.26-3, p.210; Doc.26-6, p.65; Doc.26-4, pp.49-50]. At one point, he stuck his right arm through the gap of the door enough that Gregory could see the individual was black and his voice told him it was a male. [Doc.26-3, pp.209, 215; Doc.26-6, pp.62-63; Doc.26-4, p.50]. Gregory and Gaffey were repeating commands for the male to show his hands. [Doc.26-5, p.57; Doc.26-3, pp.217-218; Doc.26-6, pp. 62-63; Doc.26-4, pp.49, 61]. When he continued not to comply and could not be identified, Gregory drew his service weapon. [Doc.26-3, p.215-216; Doc.26-6, p.63; Doc.26-4, p.44]. Deputy Gaffey held his Taser. [Doc.26-6, p.63].

---

[12]    Plaintiff admits he and his son look alike in the face but they are different in size and contends Gregory knew him well enough to know the difference. [Doc.26-7, pp.98-99]. Gregory too admits he was sufficiently familiar with Dukes Jr. and Sr. that he would have known the individual was Senior *if he had been able to see his face.* [Doc.26-3, pp.210-11].

At this time, Gregory believed that Senior lived at the house off of School Street close to Pine Street. [Doc.26-3, pp.131, 132, 161]. After this incident, Gregory learned that the Patterson Street address was owned by Senior and that the School Street home belonged to his brother. [Doc.26-3, p.131]. Although Sheffield told Detective Wilkinson that Senior also lived at the home, Wilkinson does not know whether he related this to the other deputies given everyone's familiarity with the home because of Junior. [Doc.26-1, pp.39-40].

Corporal Almeida and Deputy Gaffey did not know Senior. [Doc.26-6, pp.28-29; Doc.26-4, p.30]. Almeida had brief prior interactions with Junior at this same location; Gaffey had encountered Junior on one prior occasion. [Doc.26-6, p.29; Doc.26-4, pp.21-22].

Gregory gave additional commands for the male to identify himself and to come from behind the door. [Doc.26-3, pp. 208-209, 216]. The male still did not comply but opened the door a little more and asked who Gregory was and why he was there. [Doc.26-3, p.216; Doc.26-4, p.49]. Gregory could still see only part of his face and now part of his body. [Doc.26-3, p.216]. All deputies can now see a bed in the room and a gun lying on it on the left side, about five to eight feet from the occupant. [Doc.26-3, p.216, 227; Doc.26-6 pp.63, 67; Doc.26-4, pp.51, 55]. Gregory gave more commands to show both hands, the male still did not comply. [Doc.26-3, pp.216-218; Doc.26-6, p.60]. Corporal Almeida pushed the door and the male pushed back.[13] [Doc.26-4, p.51].

From inside the room, Plaintiff looked and saw the green outfits of law enforcement, heard them hollering, and knew they were probably looking for his son, Junior. [Doc.26-7, pp.14, 43, 78]. He knew Junior had plenty of issues with the law, that he had problems with drugs (Molly in particular), and that he and Shaquanda fought and put holes in his walls. [Doc.26-7, pp.12, 13]. Junior was staying with him at the time but stayed out that night because he knew law enforcement was looking for him; any other time, he would come home. [Doc.26-7, pp.37, 38].

---

[13]    Plaintiff denies closing or pushing the door but acknowledges, "If I did anything I might have pushed the door trying to get my pants because I was right behind the door." [Doc.26-9, p.8].

Deputies were hollering, "Get on the ground" and had guns pointed at Plaintiff. [Doc.26-7, pp. 43, 76]. The deputies' commands were loud but Plaintiff knew *he* was "in no trouble" and "that's why [he] didn't get on the ground." [Doc.26-7 p. 76]. He got his clothes and his towel and was trying to get ready for work. [Doc.26-7, p.43]. He asked, "What's going on;" said, "My son is not here;" "I'm Terry Dukes Senior." [Doc.26-7, p.43]. Plaintiff continued talking to the officers and said, "Y'all need to leave me alone," and "I'm trying to go to work." [Doc.26-7, p.44]. He kept talking to them and thought they would leave him alone but they kept on so he got on the ground and was trying to cover himself. [Doc.26-7, pp.78-79]. When he reached for pants, he was hit with a Taser. [Doc.26-7 p.45; Doc.26-9, p.7].

Apart from him asking why and what were they doing, any words spoken by the male could not be understood by the deputies inside the home. [Doc.26-3, pp.208-209; Doc.26-6, pp.63-64; Doc.26-4, p.49]. The male turned and advanced toward the bed where the gun lay, which Plaintiff admits was loaded and unholstered.[14] [Doc.26-5, p.72; Doc.26-3, p.218; Doc.26-6, pp.67-69; Doc.26-4 pp.51, 57; Doc.26-7, p.75]. All in one motion, Gregory kicked the door open, drew his Taser with his left hand, and deployed it at the male who was by

---

[14]     Plaintiff also acknowledges the threat a gun poses stating, "If I'd've had my gun [at the door], it might have been a whole different situation. I might be dead." [Doc.26-7, p.48].

the bed and the gun. [Doc.26-3, pp.218, 222, 223; Doc.26-5, pp.73-74; Doc.26-4, pp.51, 57]. He did not issue any warning before deployment. [Doc.26-3, p.223; Doc.26-7, pp.45, 46, 49, 80]. One prong of the Taser struck the male in the upper right chest or shoulder and the other struck a piece of furniture in the room. [Doc.26-3, p.219, 221; Doc.26-4, pp.67, 71]. Thus, no shock was delivered. [Doc.26-4, pp. 88-89]. The male went to the ground and was handcuffed. [Doc.26-3, p.227; Doc.26-4, p.89]. As soon as Gregory got into the room and could identify the male, he knew it was Dukes Senior, not Junior. [Doc.26-3, p.227]. Deputies conducted a protective sweep of the home to confirm that no one else was inside. [Doc.26-3, p.234; Doc.26-4, p.89].

Plaintiff was naked at the time of the incident,[15] a fact unknown to deputies until they entered the room to cuff him. [Doc.26-3, pp.218, 228; Doc.26-6, p. 97; Doc.26-4, p.65]. Deputy Gaffey promptly helped Plaintiff with his pants and he was escorted out of the home. [Doc.26-6, pp.97-98; Doc.26-4, p.89]. Detective Wilkinson arrived on scene as deputies were coming out of the house with Plaintiff and had him sit on the tailgate of his truck where he began asking him about Junior. [Doc.26-1, pp.47-49]. Emergency Medical Services were called to remove the Taser barb and arrived and contacted Plaintiff at

---

[15]    Plaintiff states both that he was totally naked and, in contradiction, that he had put on pants and pulled them up to his waist though they were not buttoned. [Doc.26-7, pp.44, 80].

5:58am. [Doc.26-6, p.98; Doc.26-4, p.89; Doc.26-15], confirming there were no injuries beyond a small wound to the skin where the probe entered. [EMS records]. Plaintiff recalls he was in handcuffs until the ambulance arrived fifteen minutes later.[16] [Doc.26-7, p.106].

After the fact, Plaintiff mentioned that he had trouble hearing so deputies made certain to speak up so he could hear their conversation; however, none raised their voice nearly as loud as the verbal commands given by Deputy Gregory during the incident. [Doc.26-4, p.93]. In past communications with Senior, Gregory had never observed any sign of hearing impairment. [Doc.26-3, p.217].

This incident occurred at the end of the deputies' shift and they completed narratives regarding the incident when they next returned to duty along with documentation of their uses of force as required by LCSO.[17] [Doc.26-3, pp.139-141, Exh.12;  Doc.26-6, pp.64, 65, Exh.2;  Doc.26-4, pp.52-53, 58-59, Exh.3;  Doc.26-2, p.90]. The "response to resistance" (RTR) form documents the law

---

[16]     EMS records confirm they were dispatched at 05:43:00 and made contact with Plaintiff at 05:58:00, a span of fifteen minutes. [Doc.26-15].

[17]     After Junior was not located at the house that morning, Detective Wilkinson completed the probable cause paperwork and sent it to patrol so that deputies coming on shift could continue looking for him over the weekend. [Doc.26-3, p.121]. A warrant was obtained for Junior on May 29, 2019, which Wilkinson also provided to the U.S. Marshal's office since he was considered such a danger. [Doc.26-1, pp.51. 55]. Junior was arrested in July 2019 and pled guilty in September 2019. [Doc.26-1, p.51].

enforcement officer(s) involved, the types of resistance encountered, and the control measures employed. [Doc.26-2, pp.90-91, Exh.3; Doc.26-4, pp.58-59, Exh.3]. Deputies never cursed at Plaintiff, called him racial epithets or other names, said anything derogatory to Plaintiff, or threatened him. [Doc.26-7, pp.89-90].

## II.   Hiring by Levy County Sheriff's Office

Robert "Bobby" B. McCallum, Jr. took office as the Sheriff of Levy County in 2013. [Doc.26-2, p.32]. He is the sole decisionmaker for hiring personnel and makes his decisions from reviewing an application, a background investigation, and conducting an oral interview. [Doc.26-2, pp.31-32]. LCSO employs approximately 35 patrol deputies. [Doc.26-2, p.31]. It only hires law enforcement officers who have completed the mandatory law enforcement training approved by the Florida Criminal Justice Standards and Training Commission (CJSTC), who have been certified by the State of Florida, and who have met other statutory requirements. [Doc.26-2, p.31; Doc.26-12, ¶4]. Sheriff McCallum's deputies take an oath of office in which they pledge to respect the Constitutional rights of all people. [Doc.26-12, ¶12, Exh.C].

Chase Gregory was certified as a law enforcement officer by the State of Florida in 2009 after having completed the full-time 5-month-long Law Enforcement Academy at Gateway Community College. [Doc.26-3, pp.11-12]. He worked with the Chiefland Police Department for over a year before becoming

employed by LCSO in 2012 in a civilian capacity and then transferring to the patrol division as a sworn deputy sheriff in 2014. [Doc.26-3, p.14-16, 27-28]. He has met all requirements and continuously been recertified by the State of Florida since that time. [Doc.26-12, ¶9].

Gregory was hired under the prior Sheriff in a non-law enforcement capacity, and his personnel file reflects he was subjected to a background check at that time which included a criminal history and driver's license history. [Doc.26-12, ¶10]. In 2013, when he was being considered for a sworn position under Sheriff McCallum, personal references were contacted, he was interviewed, and as of September 2013, Gregory's background and fitness were reviewed and found to be in compliance with all statutory and administrative requirements for the State of Florida. [Doc.26-12, ¶10; Exh.B]. There was nothing in Gregory's background that demonstrated him unfit to be a sworn deputy or unable to lawfully perform the duties thereof. [Doc.26-12, ¶11].

III.    Department Policies and Procedures

LCSO is governed by a set of rules known as Directives and General Orders. These policies and rules are created or amended as necessary to meet the standards of Florida and federal law and the Florida and U.S. Constitutions. [Doc.26-12, ¶19]. These may be done internally within LCSO, in consultation with General Counsel for the Florida Sheriffs Association (FSA), and/or in

18

conjunction with review of the policies of other agencies made available to us through the FSA. [Doc.26-2, p.41].

Policies are distributed through the Department's DMS (document management system) program. [Doc.26-3, p.74; Doc.26-12, ¶15]. Deputies must read and sign acknowledging their review. [Doc.26-3, p.74; Doc.26-12, ¶15]. The policies remain accessible for them to reference whenever needed. [Doc.26-3, p.74; Doc.26-12, ¶15].

Of particular relevance to the issues in this case are:

| | |
|---|---|
| Directive 643 | Domestic, Repeat, Dating & Sexual Violence Investigations, effective 12/01/2010; |
| Directive 801 | Constitutional Issues Involving Arrests Searches and Seizures, effective March 1, 2011; |
| Directive 806 | Arrest Warrants, effective 12/01/2010; |
| General Order 1100.1 | Misconduct Complaints, effective 08/18/2016; |
| General Order 1300.0 | Arrestee handling procedures, effective 05/15/2017; and |
| General Order 1400.1 | Response to Resistance, effective 04/18/2018. |

Directive 643, Section E, discusses the efforts to be made to locate the suspect of serious domestic violence prior to seeking an arrest warrant. [Doc.26-12, ¶20, Exh.D]. Directives 801 and 806 outline the parameters of the Fourth Amendment and Florida law for the existence of probable cause, arrest powers with and without a warrant, exigent circumstances, fresh pursuit, and consent.

19

[Doc.26-12, ¶20, Exh.D]. General Order 1400.1 addresses permissible uses of force and the required documentation thereof. [Doc.26-12, ¶20, Exh.D]. It is the policy and training of LCSO to use the least amount of force necessary to accomplish the task at hand, to overcome the resistance being offered. [Doc.26-2, p.79]. Uses of force – anything beyond the handcuffing of a compliant subject - are required to be reported on a Response to Resistance Form. [Doc.26-2 p.90]. These are reviewed by successively higher levels of supervisors. [Doc.26-2 p.89-90; Doc.26-13, #3]. Finally, General Order 1100.1 governs the deputies' conduct and the procedures for handling complaints and discipline. [Doc.26-12, ¶20, Exh.D].

Paul Kiley, who serves on the CJSTC training committee and as Director of the Police Academy for Miami-Dade College, reviewed the agency's policies and found them to be within generally accepted police *practices taught at Florida police academies a*s being within the bounds of the Fourth Amendment. [Doc.27-1, ¶13].

IV.   <u>Training</u>.

In addition to the 700-plus hours a deputy receives through the Law Enforcement Academy, a deputy also receives field training from multiple field training deputies assigned to him. [Doc.26-12, ¶6; Doc.26-6, p.19; Doc.26-4, p.101]. The purpose of various instructors is for different instruction and

observation and approval of the fitness of the deputy to work independently. [Doc.26-12, ¶6].

Sheriff McCallum designates a specific person within LCSO for the training of deputies. [Doc.26-2, pp.32, 38]. A general instructor certification is required for the position and their duties include scheduling classes, conducting necessary training, and maintaining the records. [Doc.26-2, pp.38, 39]. They are tasked with training on Fourth Amendment issues. [Doc.26-2, p.39]. LCSO trains its deputies by teaching from its policies, quoting the text of the relevant Constitutional provisions and Florida statutes, and using the most up-to-date interpretations of the text based on caselaw and advice from its prosecutors and from Florida Sheriffs' Association counsel. [Doc.26-2, pp.42-43].

Persons teaching the training may be LCSO staff or others brought in from outside the agency. Deputies are also sent to training at other locations. [Doc.26-2, pp.38-39]. Instruction on Fourth Amendment issues involving entry into a residence or dwelling generally comes from the State Attorney's Office and includes instruction on proper handling of searches and seizures on a daily basis. [Doc.26-2, p.39-40; Doc.26-6, p.19; Doc.26-4, p.101]. Trainings occur both in the office and in structures. [Doc.26-4, p.21].

Gregory's training is extensive and includes additional training beyond that of other deputies because of his service on the Tactical Response Unit (TRU).

[Doc.26-14, #5 & Exh.A]. Gregory has completed multiple trainings to be an instructor and specifically completed another 40 hours of training to become a Field Training Officer for LCSO in March 2019. [Doc.26-12, ¶7; Exh.A].

Deputy Gregory was first trained on the Taser when he was in the law enforcement academy in 2009. He has had multiple trainings since that time which included slideshows, scenarios, and physical hands-on training deploying the Taser. [Doc.26-3, p.66]. Refresher training likely included reviewing the policy, seeing a slide-show on the way to use the Taser, and then actual practice deploying the Taser. [Doc.26-6, p.16-17].

Once again, police practices expert Paul Kiley reviewed LCSO's training and found it to be within generally accepted police practices. [Doc.27-1, ¶13].

V.    **Plaintiff's Complaint against Chase Gregory**

On May 29, 2019, Plaintiff made a formal written complaint against Deputy Chase Gregory alleging he used excessive force during the events at 900 Patterson Street on the morning of May 25. [Doc.26-8, Exh.1]. Each complaint received is assigned a number for tracking, the Plaintiff's complaint was CASOM[18] #19-05-IN-024. [Doc.26-8, pp.19-20, Exh.1]. Complaints are routed

---

[18]    CASOM is an acronym for Complaint Against a Sheriff's Office Member, a system implemented by Lieutenant Tummond around 2017 to better track each individual complaint. [Doc.26-8, pp.19, 25].

first to the Colonel, then to the Undersheriff, and ultimately the Sheriff if it is determined that the complaint needs further review. [Doc.26-8, pp.31-34].

Since January 1, 2017, the Sheriff's Office has not received any other complaint related to a warrantless entry into a home. [Doc.26-13, #7]. Since January 1, 2017, eight complaints have been received by the Sheriff's Office alleging excessive use of force. All were investigated, in only one was a violation of policy substantiated. [Doc.26-13, #8].

## VI.   Investigations and Discipline.

Sheriff McCallum determines when and by whom an internal affairs investigation will be conducted and issues an order through a memorandum. [Doc.26-8, p.34, Exh.1]. After reviewing Plaintiff's CASOM, Sheriff McCallum designated Lieutenant Tummond to investigate the complaint of excessive force made by Plaintiff against Chase Gregory for the events of May 25, 2019.[19] [Doc.26-8, p.34, Exh.1]. A new number is assigned for investigations. [Doc.26-2, p.18; Doc.26-8, p.36, Exh.1]. On June 4, 2019, Lieutenant Scott Tummond was ordered by Sheriff McCallum to investigate Mr. Dukes complaint against Gregory which became Investigation 19-FI-08. [Doc.26-8, p.37; Exh.1].

---

[19]   Sheriff McCallum did not order an investigation of the entry into the home and thus it was not part of the investigation. [Doc.26-8, pp.78-79]. Though Lt. Tummond could have expanded the investigation, he did not see this as a glaring situation with additional policy violations. [Doc.26-8, p.79].

The Sheriff delegates authority for the investigation to the investigator. [Doc.26-2, p.21]. The investigator determines what evidence is relevant for collection, and the investigator is given discretion in making findings and conclusions. [Doc.26-2, pp.19, 23-24]. A few years after he took office, Sheriff McCallum created the Professional Standards Division and designated Lieutenant Scott Tummond as its commander. [Doc.26-8, p.11]. In this capacity, Lieutenant Tummond supervises the records' division, and serves as the public information officer for LCSO, and is the primary investigator for internal affairs investigations within the Law Enforcement Bureau. [Doc.26-8, p.12]. He had approximately 17 years' experience in criminal investigations before becoming the director of Professional Standards in 2015 and has received multiple instructional courses on internal affairs investigations since. [Doc.26-8, pp.10-11, 13-14].

Lieutenant Tummond follows the protocols of Chapter 112, *Florida Statutes*, when conducting his investigations. [Doc.26-8, pp. 39, 78-80]. The precise nature of an investigation is dependent on each case. [Doc.26-8, p.38]. If Lieutenant Tummond learns of another potential policy violation during his investigation of the initial policy, Lieutenant Tummond can expand his investigation to include the additional policy. [Doc.26-8, p.41]. He did not

24

encounter those circumstances while investigating Plaintiff's complaint. [Doc.26-8, p.79].

Lieutenant Tummond is required to review and understand Sheriff's Office policies and procedures and refers to these in determining the outcome of an investigation. [Doc.26-8, p.15]. Investigations may be substantiated, unsubstantiated, exonerated, unfounded, and policy failure. [Doc.26-8, p.16]. Investigation 19-FI-08 was concluded on September 19, 2019, with Lieutenant Tummond finding Deputy Gregory "Exonerated"[20] of any violation of GO 1105.3 B 6 - Excessive or Unnecessary Force Not Resulting in Injury. [Doc.26-8, p. 42-45; Exh.1; Doc.26-13, #6].

Sheriff McCallum is responsible for deputy discipline. [Doc.26-2, pp.35-36]. The entire investigative file is provided to the Sheriff for review with the findings on top. [Doc.26-8, pp.44-45]. Sheriff McCallum reviewed the investigation and agreed with Lieutenant Tummond's findings. He signed off on the investigation and exonerated Deputy Gregory on September 20, 2019. [Doc.26-8, p. 101; Exh.1; Doc.26-2, p.41].

Sheriff McCallum, his command staff, and supervisors are constantly vigilant of whether policies are being followed and they correct, counsel, and discipline where needed, and also praise where appropriate. [Doc.26-12, ¶17].

---

[20] "Exonerated" means "The act occurred and it was lawful." [Doc.26-8, p.17].

As reflected in his personnel file, Chase Gregory has received counseling, corrective measures, and formal discipline both before and after this incident in May 2019, for issues unrelated to warrantless entries or use of force. [Doc.26-12, ¶¶13, 14, 18].

## MEMORANDUM OF LAW

### I.   Standard of Review.

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (emphasis in original). "A genuine dispute requires more than some metaphysical doubt as to the material facts....the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment." *Hammett v. Paulding County*, 875 F.3d 1036, 1052 (11th Cir. 2017); *Walker v. Darby*, 911 F.2d 1573, 1576 (11th Cir. 1990) ("A party opposing summary judgment may not rest upon the mere allegations or denials in its pleadings."); *Anderson*, 477 U.S. 242 at 253 ("A mere scintilla of evidence … will not suffice.").

II. **Deputy Gregory did not violate Plaintiff's Fourth Amendment rights.**

Plaintiff asserts that Deputy Gregory violated his Fourth Amendment rights by entering his home, using excessive force, and seizing him without a warrant. For the reasons stated below, Plaintiff's claims are without merit.

A. **Plaintiff's actions reasonably conveyed consent to enter his home.**

The Fourth Amendment protects individuals from objectively unreasonable searches and seizures. *United States v. Braddy*, 11 F.4th 1298, 1307 (11th Cir. 2021) (citing U.S. Const. Amend. IV).

While entry into a home without a warrant is generally unreasonable, *Bashir v. Rockdale Cnty., Ga*., 445 F.3d 1323, 1328 (11th Cir. 2006) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)), warrantless entry does not violate the Fourth Amendment where voluntary (non-coerced) consent is provided. *Id*. *See also United States v. Johnson,* 608 Fed. Appx. 764, 767 (11th Cir. 2015) ("A warrantless search or entry does not violate the Fourth Amendment where there is voluntary consent given by a person with authority.") (cleaned up); *Illinois v. Rodriguez*, 497 U.S. 177, 181 L.Ed.2d 148 (1990) ("The prohibition [against warrantless entry into a home] does not apply...to situations in which voluntary consent has been obtained.").

Consent is an "objective" inquiry that neither turns on the suspect's subjective intent nor the officer's beliefs. *See Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The [objective] standard [asks]...what would the typical reasonable

27

person have understood by the exchange between the officer and the suspect?"); *Fuqua v. Turner*, 996 F.3d 1140, 1151 (11th Cir. 2021) (same); *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 668 (5th Cir. 2003) (explaining that "the primary inquiry in determining the scope of consent is what a reasonable, objective, third party observer would have understood the suspect had consented to.").

The plaintiff's outward conduct must be considered only in the context of the "totality of the circumstances" actually known to officers. *Gill as Next Friend of K.C.R. v. Judd*, 941 F.3d 504, 524 (11th Cir. 2019) (it is necessary to "analyze all the circumstances of an individual's action to determine whether in fact there was consent."); *Hernandez v. Hansell*, 2016 WL 8943279, at 1 (M.D. Fla. 2016), *aff'd*, 695 Fed. Appx. 523 (11th Cir. 2017) ("the Court ... considers only those facts known to [the deputies] at the time of the incident.")

Further, because "[t]he ultimate touchstone of the Fourth Amendment is reasonableness ... [and] to be reasonable is not to be perfect," "the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection." *Braddy*, 11 F.4th at 1308 (11th Cir. 2021). Searches and seizures based on reasonable factual mistakes therefore do not violate the constitution. *Id*. ("A mistake may be

of either fact or law [without violating the Fourth Amendment] so long as that mistake is objectively reasonable").

Finally, where officers produce "some evidence" of consent, the plaintiff bears the burden to prove that no reasonable officer could have believed that consent was provided. See *Judd*, 941 F.3d at 523 (11th Cir. 2019) ("In a § 1983 action, the plaintiff bears the burden of persuasion on every element....So here, once [the plaintiff] showed that there was a warrantless arrest [in her home] that was presumptively unreasonable (which she did), and once [the defendant] came forward with some evidence that the consent exception applied (which he did), it became [plaintiff's] burden once more "to show....that her father never consented [to the entry].").

Defendants acknowledge that in the absence of express consent, a resident's mere "failure to object" to entry does <u>not</u> generally constitute consent, "although it is a factor to consider." *Judd*, 941 F.3d at 524 (11th Cir. 2019). *See also Fuqua*, 996 F.3d at 1152 (11th Cir. 2021) ("an officer does not obtain valid consent...merely because the homeowner fails to verbally or physically object to his entering the home.").

Nonetheless, <u>consent "does not need to be expressly given but may be fairly inferred from the totality of the circumstances</u>." *United States v. Hankerson*, 2022 WL 11771569, at 2 (M.D. Fla. Oct. 20, 2022) (citing *Birchfield*

*v. North Dakota*, 579 U.S. 438, 476 (2016)). Relevant here, "<u>consent can be</u> <u>implied [by physical conduct], such as where a defendant has yielded the right-</u> <u>of-way in response to an officer's request for admission to the home</u>." *Jiles v. Lowery*, 2023 WL 2017354, at \*3 (11th Cir. Feb. 15, 2023) (citing *United States v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002)).

As one court summarized:

> We know that the mere failure to object to an officer's entry into the home does not constitute valid consent to the entry, but that some affirmative indication, even if non-verbal, that the officers are welcome to enter may be enough.

*Fuqua*, 996 F.3d at 1153 (11th Cir. 2021).

*Ramirez-Chilel* is instructive. In that case, police officers approached a residence, and then asked for permission to search the house. In response, the owner "yielded the right-of-way" to allow them in. *Ramirez-Chilel*, 289 F.3d at 747. Finding that the owner's physical actions constituted consent, the Eleventh Circuit distinguished cases such as *United States v. Gonzalez*, 71 F.3d 819, 830 (11th Cir. 1996), which had broadly held that "it is inappropriate to sanction entry into the home based upon inferred consent,"  by explaining that "a distinction [exists] between the failure to object when officers follow someone into their home and the act of 'yielding the right-of-way' to officers at the person's front door." *Id*. at 525. 2019). The Court held that there was no Fourth Amendment violation because while the owner did not give the officers "explicit

verbal consent ... to enter, the officers did receive some sort of implied consent to enter from Ramirez-Chilel's body language." *Id*. at 752 ("we ... find that Ramirez-Chilel demonstrated his consent to entry by 'yielding the right-of-way' for the officers to enter.").

Similarly, in *Holmes v. Kucynda*, 321 F.3d 1069 (11th Cir. 2003), police responding to a domestic disturbance knocked on the suspect's apartment door. When a man answered, the officers asked if they could enter the apartment. "Although the man did not respond verbally, he opened the door and took a step backward, indicating acquiescence." The Eleventh Circuit again held that this overt physical act was sufficient for officers to reasonably infer that consent had been given. *Id*. at 1079 ("the officers' entry into [the] apartment [in these circumstances] did not violate Holmes' constitutional rights.").

And in *Judd*, 941 F.3d 504 (11th Cir. 2019), the Eleventh Circuit held that a resident's physical act of "open[ing] the door wide and stepp[ing] back" was a sufficiently clear overt act for the officers to infer consent, and confirmed both that "consent need not be verbal to be valid" and that "[n]on-verbal cues can signal consent." *Id*. at 525.[21] *See also United States v. Stiner*, 551 F. Supp. 2d

---

[21]     Although an explicit "request for admission" is frequently part of the "totality of the circumstances," an explicit request is not required.  In *Judd*, for example, consent was implied from the resident's conduct (not merely their silence) where no explicit request to enter was made. Rather, the officers merely informed the resident they were there to make an arrest and the resident

1350, 1357 (M.D. Fla. 2008) ("the Court concludes Ms. Bartoletta implicitly consented to entry of the officers into the home ... [by the overt act of] stepping aside at the front door and pointing to the location of the bedroom where the Defendant could be found").

Physical actions alone can thus constitute consent under the Fourth Amendment. Here, based on the totality of the circumstances known to deputies and Plaintiff's overt physical actions, a reasonable officer could have believed that Plaintiff had provided consent to enter. The circumstances included: (a) knowledge that the male subject resided at this house, (b) uniformed deputies knocking and loudly announcing their presence; (c) Plaintiff verbally responding to the deputies' presence (according to Plaintiff, yelling: "I'm coming"), and (d) Plaintiff unlocking the door, opening the door, and returning inside in a manner that suggested an invitation to enter.[22] These facts are substantially similar to an individual "stepping aside" to allow entry.

---

opened the door and stood back—sufficiently suggesting consent. Courts have also held that some physical conduct, even following an explicit request to enter, is not enough. *See United States v. Gonzalez*, 71 F.3d 819 (11th Cir. 1996). It is the "totality of the circumstances" that controls and no bright-line rule about a "request for admittance" exists. *Judd*, 941 F.3d at 524 (11th Cir. 2019) (it is necessary to "analyze all the circumstances of an individual's action to determine whether in fact there was consent.").

[22]   There can be no issue of "coercion" in this case as Plaintiff contends he did not even know that the deputies were present. [Doc.26-7, p.51].

It is often difficult for the context of human actions and body language to be reduced to written words. But here, Plaintiff confirms that Deputy Gregory's interpretation of his actions was <u>correct:</u> Plaintiff intended his actions to convey an invitation to enter. He simply argues that he mistakenly *thought it was his son* he was inviting inside. [ECF-11, ¶31 ("[Plaintiff] believed his son was home … and walked to the back door to let his son in the house.")]. Deputy Gregory's interpretation of Plaintiff's outward actions was thus not only "objectively reasonable," it was an accurate interpretation of the "come inside" message Plaintiff *intended to convey*.

Plaintiff's private/uncommunicated/secret misconception about *whom* he was inviting inside is irrelevant. *See Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (consent is an "objective" standard determined by what a reasonable officer would have "understood by the exchange"). As in *Ramirez-Chilel*, *Holmes,* and *Judd*, Plaintiff's actions intended to communicate—and communicated—consent to enter. The opinions of fellow law enforcement officers and of police practices expert Paul Kiley also interpreting Plaintiff's actions as nonverbal consent under the totality of the circumstances demonstrate the reasonableness of Gregory's understanding of the exchange. Gregory did not violate Plaintiff's Fourth Amendment rights and he is entitled to summary judgment on Count III.

**B. Deputy Gegory's tempered use of force was not excessive, and Plaintiff's subsequent temporary seizure was lawful.**

Count IV asserts that Plaintiff was subjected to excessive force and seized in violation of the Fourth Amendment. The claims lack merit.

### i. *Use of a Taser was reasonable in the circumstances.*

"Although suspects have a right [under the Fourth Amendment] to be free from force that is excessive, they are not protected against a use of force that is necessary in the situation at hand." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (quotation omitted); *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002) (force reasonably proportionate to the situation is not unlawful).

Excessive force claims are thus "evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." *Saucier v. Katz*, 533 U.S. 194, 207 (2001). "That inquiry is dispositive: When an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim." *Torres v. Howell*, 2022 WL 1664355, at 2 (11th Cir. May 25, 2022). This inquiry requires "careful attention to the facts and circumstances of each particular case." *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Long v. Slaton*, 508 F.3d 576, 580 (11th Cir. 2007) ("Because the test of reasonableness ... is not capable of precise definition or mechanical application, we must slosh our way through the fact-bound morass of reasonableness.") (cleaned up).

Courts don't generally "second-guess the decisions made by police officers in the field." *Vaughan v. Cox*, 343 F.3d 1323, 1331 (11th Cir. 2003). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. "It is doctrinal gospel, that [courts] do not view an officer's actions with the 20/20 vision of hindsight." *Shaw v. City of Selma*, 884 F.3d 1093, 1101 (11th Cir. 2018); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1167 (11th Cir. 2009) ("Our task is not to evaluate what the officers could or should have done in hindsight.").

To aid in this inquiry, the Supreme Court and the Eleventh Circuit have developed six guiding factors to determine whether force was excessive: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, (3) whether he is actively resisting arrest or attempting to evade arrest by flight, (4) the need for the application of force, (5) the relationship between the need and amount of force used, and (6) the extent of the injury inflicted. *See Graham v. Connor*, 490 U.S. 386, 396 (1989); *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002) (*citing Lee*, 284 F.3d at 1197-98).

"A mechanical application of these factors is not appropriate" as the factors are only contextual considerations that may apply differently in each circumstance. *Scott v. Harris*, 550 U.S. 372, 386 (2007) (Ginsburg, concurring); *Penley v. Eslinger*, 605 F.3d 843, 850 (11th Cir. 2010) (cleaned up).

Here, the circumstances confronting Deputy Gregory were tense. They were there to arrest Plaintiff's son for a violent felony. The son had a lengthy criminal history and was known to, and reportedly was, using drugs at the time. After entering the unlit home, Gregory could not tell who the retreating person who had opened the door was—but reasonably believed it could be the suspect.

Gregory also did not know the person's intent with the unusual act of opening the door to allow entry, but not greeting them. It was possible that the deputies had been lured inside for ambush. Outside the bedroom door, the (at the time) unidentified black male refused to show himself and refused to show his hands, but an opening in the door showed that the person was in close proximity to a handgun. It was also unknown whether anyone else was in the room. Plaintiff continued to refuse requests to show himself. When Gregory saw Plaintiff turn towards the bed/gun, he reacted with reasonable force: a single Taser discharge.[23]

---

[23]    To Gregory's credit, he had the presence of mind and judgment to pull and deploy his Taser with his left hand instead of discharging the firearm he was holding in his right. "[I]t might have been a whole different situation. [Plaintiff]

In the context of the six guiding factors: (1) the "severity of the crime" being investigated was high—the violent beating of the suspect's pregnant girlfriend; (2) the suspect posed "an immediate threat to the safety of the officers" in light of his refusal to comply with commands and proximity to a handgun; (3) Plaintiff was "actively resisting" by failing to follow commands and pushing back against the bedroom door as officers tried to enter; (4) force was "needed" in the moment to prevent Plaintiff from acquiring the handgun and escalating the situation to a potentially deadly encounter; (5) the "amount of force" used was minimal; and (6) Plaintiff suffered virtually no injury from the Taser deployment—which did not even fully connect.

Deputy Gregory's single use of non-lethal force (a Taser) in the circumstances confronting him was not unreasonable. *See Barfield v. Rambosk*, 641 F. App'x 845 (11th Cir. 2015) (taser shock did not violate the plaintiff's constitutional rights where he refused commands, resisted arrest, and reached towards his waistband, which the officer feared might have indicated an intent to reach for a weapon); *Torres v. Howell*, 2022 WL 1664355, at *4 (11th Cir. May 25, 2022) ("An officer need not wait until there is a physical struggle for

might be dead." [Doc.26-7, p.48]. Police practices expert Paul Kiley opines: "It was very responsible thinking in a highly stressful situation for the deputy and Terry Dukes Sr. to deploy a taser to gain control of Mr. Dukes Sr. rather than lethal use of force." [Doc.27-1, ¶9].

37

control of [a] weapon before a situation presents an imminent danger of serious physical injury."); *Moore v. Gwinnett Cnty., 805 F. App'x* 802, 809 (11th Cir. 2020) (finding "a single taser shock in this situation was not disproportionate to the need for force" where a suspect failed to comply with multiple commands to place her hands behind her back and submit to arrest); *Anthony v. Coffee Cnty.*, 579 F. App'x 760,766 (11th Cir. 2014) (use of a taser was not an unreasonable split-second decision because although the arrestee was not belligerent, he was uncooperative and refused an officer's order); *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (permitting an officer to deploy his Taser against an unarmed and non-violent arrestee who failed to follow reasonable instructions); *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1356 (11th Cir. 2015) (concluding the use of a taser was reasonable to effectuate the arrest of a suspect who was hostile, belligerent, and uncooperative).

Indeed, courts have approved even deadly force in similar circumstances. *See Hammett v. Paulding Cnty.*, 875 F.3d 1036, 1051 (11th Cir. 2017) (finding the use of deadly force reasonable when Hammett disobeyed an officer's instruction to show his hands and moved aggressively towards the officer, despite finding out after the fact that Hammett did not have a deadly weapon); *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (deadly force

was reasonable when the officer was "suddenly confronted" by the suspect and "forced to decide in a matter of seconds whether to deploy deadly force").

Because Deputy Gregory's tempered use of force was reasonable in the circumstances, it did not violate the Fourth Amendment.

### ii. _Plaintiff's temporary 15-minute detention was lawful._

Temporary seizures that fall short of full custodial arrest are afforded only "limited Fourth Amendment scrutiny." _United States v. Perkins_, 348 F.3d 965, 969 (11th Cir. 2003). In such cases, courts "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." _Croom v. Balkwill_, 645 F.3d 1240, 1247 (11th Cir. 2011) ("When evaluating a limited seizure...we look to the 'objective reasonableness' of the law enforcement officer's actions, asking: "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?").

Although Plaintiff was <u>not</u> arrested, his detention was lawful as deputies had probable cause[24] to believe he had committed the crime of resisting,

---

24      Even "[r]easonable suspicion of criminal activity—a less demanding standard than probable cause—justifies a brief, investigatory detention," _United States v. Philpot_, 2022 WL 1537988, at *2 (11th Cir. May 16, 2022), and exists "when a law enforcement officer has a particularized and objective basis for

obstructing, or opposing the execution of their legal duties by refusing to comply with their commands in violation of § 843.02 *Florida Statutes.* At the time Gregory issued commands to Plaintiff inside the home, he was performing his legal duty to apprehend a violent suspect and, indeed, had reason to believe that the black male retreating into the home was the violent suspect. Gregory had a duty to investigate the black male's identity and his commands to Plaintiff in the execution of these duties were lawful. Plaintiff's noncompliance was sufficient for a reasonable officer to believe that probable cause existed to believe that Plaintiff had committed the crime of obstruction. *See e.g. Hadden v. Loar*, 2016 WL 10520024, at *7 (S.D. Fla. Dec. 27, 2016) (granting summary judgment in a "mistaken identity" case where the plaintiff "was arrested because, at the time of contact, he was suspected to be [another person/suspect] and, in the course of that encounter, he was alleged to have obstructed the investigation."). Plaintiff's detention for a reasonable amount of time to consider such charges—and whether probable cause was mitigated—was thus not unlawful.

Alternatively, the United States Supreme Court has specifically held temporary detentions of non-suspects lawful in circumstances where the

---

suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014).

interests of officer safety outweigh a minimal intrusion. *Muehler v. Mena*, 544 U.S. 93, 100–02 (2005) (law enforcement acted reasonably by detaining innocent/non-suspect occupants of a residence in handcuffs for up to three hours while they conducted a search to "minimize the risk of harm to both officers and [the] occupants"); *Michigan v. Summers*, 452 U.S. 692, 702–03 (1981) (same, noting that "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation."); *Lagasse, City of Waterbury*, 2011 WL 2709749, at *7 (D. Conn. 2011) (concluding that "the use of handcuffs to temporarily detain individuals on the scene during an investigation ... can be a reasonable protective measure."). *See also Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 469 (S.D.N.Y. 2008) ("The officers were searching the residence for drugs, guns and a drug dealer. It was therefore objectively reasonable for them to handcuff [the two adult males present] for the sake of the officers' safety and that of everyone else present."); *Riordian v. Joyner*, 2005 WL 752210, at *6 (D.Conn. 2005) ("Handcuffing [the plaintiffs] was also a reasonable protective measure until defendants could rule out the possibility that [the plaintiffs] could access a weapon. Defendants used reasonable force to protect themselves under the circumstances").

Here, it was reasonable in the circumstances (the hunt for the suspect in a violent felony, the discovery of the gun, Plaintiff's unusual behavior, Plaintiff's non-compliance with commands, and the use of force) to temporarily detain Plaintiff while deputies assessed the situation and conducted a protective sweep of the home for other occupants. Plaintiff was released after just 15-minutes when the search/investigation was completed, the scene made safe, and EMS arrived to treat Plaintiff's minimal injuries.

## III.   Deputy Gregory is entitled to qualified immunity.

### A.   Overview of Qualified Immunity.

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quotation omitted). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (cleaned up).

To qualify for immunity, the "government official [must first prove] that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred." *Gonzalez v. Lee Cnty. Hous. Auth*., 161 F.3d 1290,

1294–95 (11th Cir. 1998) (quotation omitted). Here, there is no dispute that Gregory was acting within his discretionary authority as a deputy with the Levy County Sheriff's Office as all times relevant to this action.

"[T]he burden [thus] shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. To meet that burden, Plaintiff must show "(1) that the ... official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Fuqua v. Turner*, 996 F.3d 1140, 1149 (11th Cir. 2021) (cleaned up). The two prongs can be addressed in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). As shown in Section II, above, Deputy Gregory's actions did not violate Plaintiff's Fourth Amendment rights. This section therefore focuses only on Plaintiff's inability to prove the second element, that Gregory violated clearly established law.

For a right to be clearly established, "the contours of [the] right [must be] sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up). This Court has identified three ways for the law to be clearly established:

> First, the plaintiffs may show that a materially similar case has already been decided. Second, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation. Finally, the conduct involved in the

43

case may so obviously violate the [statute] that prior case law is unnecessary.

*Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012) (cleaned up). Courts "look to the law as it was interpreted at the time of the challenged conduct by the United States Supreme Court, the Eleventh Circuit, and the Georgia Supreme Court." *Sheba Ethiopian Rest., Inc. v. DeKalb Cnty., GA*, 2023 WL 3750710, at *5 (11th Cir. June 1, 2023) (citing *Terrell* at 1255).

"For the law to be clearly established to the point that qualified immunity does not protect a government official, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *King v. Pridmore*, 961 F.3d 1135, 1145 (11th Cir. 2020).

The Supreme Court has emphasized the "longstanding principle that clearly established law should not be defined at a high level of generality." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quotation omitted). "[T]he clearly established law must be particularized to the facts of the case." *Id*. (quotation omitted). "Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id*. (cleaned up); *see also District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) ("We have repeatedly stressed that courts must not define

44

clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.") (quotation omitted)).

>   B.  <u>Deputy Gregory's entry into Plaintiff's home did not violate clearly established law</u>.

It is clearly established that an officer violates the Fourth Amendment by making a warrantless entry into a home *without* consent (or other recognized exceptions). But such a "high-level" analysis is both unhelpful and inappropriate. The issue here is whether the law was clearly established that "every reasonable official would have understood" that Plaintiff's overt actions could not constitute "consent" under the Fourth Amendment.

As discussed above, the opposite is true. While a mere "failure to object" is insufficient, consent <u>can</u> be inferred from overt physical acts. *See e.g. Fuqua*, 996 F.3d at 1153 (11th Cir. 2021) ("some affirmative indication, even if non-verbal, that the officers are welcome to enter may be enough."); *Ramirez-Chilel*, 289 F.3d at 752 (11th Cir. 2002) ("[Plaintiff] demonstrated his consent to entry by 'yielding the right-of-way' for the officers to enter"); *Holmes v. Kucynda*, 321 F.3d 1069 (11th Cir. 2003) (act of "open[ing] the door and [taking] a step

backward" was sufficient to imply consent); *Judd*, 941 F.3d at 525 (11th Cir. 2019) ("[n]on-verbal cues can signal consent.").[25]

### C. Deputy Gregory's use of force and temporary seizure of Plaintiff did not violate clearly established law.

No clearly established law would have instructed Gregory that the use of a Taser in the circumstances of this case would violate the Fourth Amendment. Indeed, substantial case law confirms that use of a Taser in similar circumstances is constitutional. [Section II(B)(i), above]. If this Court holds that deployment of a Taser against a non-compliant suspect of a violent crime who makes a move toward a gun was excessive, it will be the first to do so.

### IV. Plaintiff's state-law claims fail as a matter of law.

Plaintiff also sues Deputy Gregory, individually, for the state law torts of "Invasion of Privacy," "Trespass," and "False Arrest/False Imprisonment."[26] [Doc.11, Counts I, II, and V].

### A. Torts do not arise from the lawful execution of law enforcement duties.

Plaintiff's tort claims fail because none of the alleged torts support a cause of action against officers performing their lawful duties. *See Reed v. Echevarria*,

---

[25]    Although *Judd* was decided five-months after the events of this case, it did not change the law and relied on *Ramirez-Chilel* and *Holmes* as having previously clearly established that "consent need not be verbal to be valid."

[26]    Plaintiff was <u>not</u> arrested and this claim is properly treated only as a claim for "false imprisonment."

2023 WL 4532600, at *2 (M.D. Fla. July 13, 2023) ("To prove false imprisonment, a plaintiff must show...the _unlawful_ detention and deprivation of liberty of a person[.]"); *Funderburk v. Snyder*, 2:21-CV-14290, 2023 WL 3871555, at *6 (S.D. Fla. Mar. 27, 2023)[27] ("invasion of privacy" claim applies "to factual scenarios involving police officers who _improperly_ enter a private home."); and *Newcome v. Hernando Cnty. Sheriff's Office*, 2022 WL 309429, at 7 (M.D. Fla. Feb. 2, 2022) (dismissing trespass claim because "[a]lthough Plaintiffs allege that unspecified officers entered their property and home without permission [and] without having any warrant or exigent circumstance, Plaintiffs do not allege that...the officers were not otherwise performing their lawful duties at the time of entry.").

As one court aptly summarized: "Florida law does not impose [tort] liability on law enforcement officers who act in a reasonable and constitutional manner in carrying out their duties." *Denson v. U.S.*, 574 F.3d 1318 (11th Cir. 2009), (Carnes, J. concurring). Because Gregory's actions were taken in the lawful execution of his duties, Plaintiff's tort claims fail as a matter of law.

---

[27]    *Report and recommendation adopted*, 2023 WL 3619186 (S.D. Fla. May 24, 2023).

## B. Plaintiff's state-law claims are barred by sovereign immunity.

*Even if* the Court were to find one or more of Deputy Gregory's actions to be unlawful, the state law claims against him individually are barred by his statutory sovereign immunity from suit.

Florida law provides absolute sovereign immunity from suit to governmental employees accused of committing torts in the course and scope of their governmental employment:

> No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property[.]

§ 768.28(9)(a), *Fla. Stat.*

Rather, when a government employee acts within the scope of his or her employment and does not act with bad faith, malicious purpose, or wanton and willful disregard of human rights, safety, or property, the "exclusive remedy" for a party injured by the employee's negligence is an action against the governmental entity itself:

> The exclusive remedy for injury or damage suffered as a result of an act, event, or omission of an officer, employee, or agent of the state or any of its subdivisions or constitutional officers shall be by action against the governmental entity . . . unless such act or omission was committed in bad faith or with

48

> malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

§ 768.28(9)(a), *Fla. Stat*. *See Keck v. Eminisor*, 104 So. 3d 359, 363, 366 (Fla. 2012) ("If a State officer, employee, or agent acts within the scope of employment and does not act in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard, the plaintiff's exclusive recourse is to seek damages from the governmental entity.").

In this context, the terms "bad faith" and "malicious purpose" are constructed to require "actual malice," which means the conduct "must be committed with ill will, hatred, spite, or evil intent." *See N.R. by Ragan v. Sch. Bd. of Okaloosa County, Florida*, 418 F. Supp. 3d 957, 989 (N.D. Fla. 2019), and *Peterson v. Pollack*, 290 So. 3d 102, 109 (Fla. 4th DCA 2020).

The terms "willful," and "wanton" mean a wrong committed "intentionally, knowingly and purposely," or with "with a conscious and intentional indifference to consequences and with the knowledge that damage is likely to be done to persons or property," *Peterson v. Pollack*, 290 So. 3d 102, 109-10 (Fla. 4th DCA 2020).

Here, there is no dispute that Deputy Gregory was acting within the course and scope of employment at all relevant times. And the facts do not demonstrate or support that his actions were motivated by any type of malice or "bad faith" sufficient to strip him of the statutory immunity. To the contrary, the facts

establish that, even if he was incorrect, Deputy Gregory acted under a good-faith belief that Plaintiff's actions constituted consent to enter the home, and that the use of minimal force and temporary detention of Plaintiff was necessary and appropriate in the circumstances confronting him. If Gregory was mistaken and if his actions violated Plaintiff's rights, such negligence is insufficient to overcome his individual immunity from suit. There is no suggestion, and certainly no evidence, that any of Gregory's actions were in bad faith. This was not his case. He went to the home as a part of a team at Detective Wilkinson's request. He did not know Senior lived at this address. He happened to be the deputy at the door that was opened. His actions are fully explained as a response to the totality of the circumstances as they were occurring. There was no ill motive on his part.

Individual sovereign immunity under § 768.28(9)(a), *Fla. Stat*. was designed to protect officers from liability for mistakes made in the good faith performance of their duties. If Deputy Gregory's actions were wrong, they were merely negligent and Deputy Gregory is entitled to good faith immunity here.

V.  <u>The Sheriff is not liable under 42 U.S.C. § 1983 for failing to adequately train/supervise/discipline Deputy Gregory.</u>

Plaintiff sues the Sheriff for a single count of "Failure to Train/Supervise/Discipline under 42 U.S.C. § 1983." [ECF-11, pp.30-34].

To establish the Sheriff's under 42 U.S.C. § 1983, "plaintiff must show that: (1) his constitutional rights were violated,[28] (2) the [Sheriff] had a policy (or custom) that constituted deliberate indifference to that constitutional right, and (3) the [Sheriff's] policy (or custom) caused the violation." *Baker v. City of Madison*, 67 F.4th 1268, 1281–82 (11th Cir. 2023) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).

"The inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Thompson v. Sheriff of Indian River Cnty., Fla.*, 2022 WL 1124801, at *3 (11th Cir. 2022) (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989)).

To establish such deliberate indifference, "a plaintiff must demonstrate that the [defendant] <u>knew of the need to train</u> in a particular area and that it <u>made a deliberate choice not to take any action</u>." *Mingo v. City of Mobile, Ala.*, 592 Fed. Appx. 793, 799 (11th Cir. 2014). "In short, liability only attaches where "a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality." *Thompson* at 3.

---

[28]    Plaintiff fails this element for the reasons described in Section III(A) above and the Court need go no further. *See Baker v. City of Madison*, 67 F.4th 1268, 1282 (11th Cir. 2023) ("[B]ecause there was no underlying constitutional violation, Baker's municipal liability claim against the City fails as a matter of law.").

The Supreme Court has explained that a "pattern of similar constitutional violations" is "ordinarily necessary" to establish liability for failure to train. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). This path requires evidence of "a widespread pattern of similar constitutional violations by untrained employees." *Mingo at* 799.[29] Alternatively, a single violation is sufficient only when the plaintiff can prove the defendant "has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Thompson* at 3. Plaintiff cannot establish either.

Here, Plaintiff has no evidence of a widespread history of similar abuses ignored by the Sheriff. Sheriff McCallum's policies require self-reporting and documentation of uses of force and provide for the receipt, tracking, and investigation of complaints against members of the sheriff's office. In the two-plus years preceding this event, there were no other reports of unlawful warrantless entries and eight reports of unlawful use of force for which solely one was sustained. Sheriff McCallum cannot be said to ignore issues. Nor can this be deemed to demonstrate a pattern and practice of abuses.

---

[29]     Any alleged pattern must concern "factual situations that are substantially similar to the case at hand," *Buckler v. Israel*, 680 F. App'x 831, 836 n.3 (11th Cir. 2017), and "the [underlying] complaints must have merit." *Poulin v. Bush*, 2023 WL 185122, at *18 (M.D. Fla. 2023) (noting that "[m]erely identifying complaints of excessive force does not establish the merits of the same") (citing *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987) ("[T]he number of complaints bears no relation to their validity.")).

Plaintiff's theories of deficient supervision and/or discipline carry the same requirements and fail for the same reasons. *See e.g. Alvoid v. Sch. Dist. of Escambia Cnty.,* 582 F. Supp. 3d 1140, 1158 (N.D. Fla. 2021) (in claims that the defendant "failed to adequately supervise, train, monitor, and discipline its employees" or otherwise "alleging municipal inaction" under § 1983, a plaintiff must prove "the existence of a widespread and persistent pattern of violations...[and the defendant's] actual or constructive knowledge of the violations...[which they] deliberately ignored."); and *Hawk v. Klaetsch*, 522 F. App'x 733, 736 (11th Cir. 2013) ("a plaintiff must demonstrate ... [a] persistent failure to take disciplinary action against officers").

Nor did the Sheriff "fail to train" his deputies on fundamental Fourth Amendment law. The record demonstrates that the Sheriff trained his deputies on the Fourth Amendment through policies, through required training, and through supervision. Other than the alleged unconstitutional actions of Deputy Gregory *in this case*, Plaintiff offers no evidence of the Sheriff's knowing deliberate indifference to training, supervision, or discipline of his deputies. The claim thus fails as a matter of law. *See e.g. Holmes v. Kucynda*, 321 F.3d 1069, 1078 (11th Cir. 2003) ("Holmes offers no evidence, other than the actions of [the officers in this case] to show that the County's [officer training] program

provides inadequate training. As a consequence, the district court properly granted summary judgment on behalf of Cobb County.").

Plaintiff's Amended Complaint implies other theories for holding the Sheriff liable under § 1983, but none are viable. For example, Plaintiff complains that the Sheriff's practice of attempting to arrest individuals based upon probable cause without burdening prosecutors and the court for a warrant is itself an "unconstitutional" policy. But there is nothing "unconstitutional" about it. Warrantless arrests based upon probable cause are fully permissible. *See e.g. Wooden v. Town of Eatonville*, 2023 WL 5091809, at 7 (11th Cir. Aug. 9, 2023) ("A warrantless arrest of an individual in a public place ... is consistent with the Fourth Amendment if the arrest is supported by probable cause.") (*quoting Maryland v. Pringle*, 540 U.S. 366, 370 (2003)).

To be sure, probable cause arrests cannot occur *inside* a home absent consent, hot pursuit, or exigent circumstances. But it is not the Sheriff's policy to make such arrests. Directives 643 and 801 outline the circumstances in which deputies may arrest without a warrant and when a warrant is needed.

More importantly, Deputy Gregory did <u>not</u> enter Plaintiff's home because of an unconstitutional policy allowing warrantless entry "without a warrant, hot pursuit, exigent circumstances, or...consent," [Doc.11, ¶47]; he entered the

home because he reasonably believed that Plaintiff's actions constituted "consent" to enter—a constitutionally permissible basis for entry.

Plaintiff also asserts that the Sheriff "ratified" Deputy Gregory's actions by approving Deputy Gregory's investigative report and by failing to discipline him after the fact. [Doc.11, ¶¶145-47]. This argument misunderstands the law. For "ratification" to occur, a policymaker must approve the conduct *before* it occurs/becomes final:

> To hold the City liable on a ratification theory … The policymaker must review the decision before it becomes final and approve the decision and the basis for it. Ms. Perez appears to argue that … an alleged coverup in the instant case [is] evidence of ratification. <u>This is not the law. Ms. Perez has presented no evidence that a relevant policymaker ratified the decision to shoot Mr. Machado prior to the shooting</u>. Accordingly, the Court finds no evidence to create a genuine issue of material fact as to a ratification theory of liability.

*Perez v. City of Hialeah*, 2022 WL 1446682, at *21 (S.D. Fla. Mar. 31, 2022).

For the reasons stated herein, Plaintiff fails to establish the Sheriff's liability under 42 U.S.C. § 1983; the Sheriff is thus entitled to summary judgment.

## VI.    Conclusion.

For the reasons stated herein, Defendants McCallum and Gregory are entitled to summary judgment on all claims against them.

55

## <u>WORD LIMIT CERTIFICATION</u>

The undersigned certifies that this Motion, Statement of Facts, and Memorandum contains 11,319 words. Defendants are aware of the 8,000-word limitation of Local Rule 56.1(B), but requested a total of 12,000 in the parties' Joint Motion for Leave to Exceed Word Limit [Doc.25], on which the Court has not yet ruled. Should the Court deny the motion, Defendants will revise and resubmit their motion and memorandum as the Court directs.

Respectfully submitted this <u>15th</u> day of October 2023.



 Gwendolyn P. Adkins, (FBN: 0949566)
gadkins@coppinsmonroe.com
jclark@coppinsmonroe.com
kwillis@coppinsmonroe.com

Coppins Monroe, P.A.
2316 Killearn Center Blvd., Suite 202
Tallahassee, FL 32309
Office: 850-422-2420 ǀ Fax: 850-422-2730

ATTORNEYS FOR DEFENDANTS
ROBERT B. McCALLUM JR. and
CHASE GREGORY, individually

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Federal Rule of Civil Procedure 5(b)(3) and N.D. Florida Local Rule 5.1, this document is being filed electronically and service shall be through the Court's transmission facilities on all persons appearing before this Court.

<u>/s/ Gwendolyn Adkins</u>
Attorney