```
 1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF FLORIDA
 2                GAINESVILLE DIVISION

 3             Case No. 1:23-cv-45-AW-HTC

 4

 5   TERRY DUKES, SR.,

 6              Plaintiff,

 7   vs.

 8   ROBERT B. MCCALLUM JR., et al.,

 9              Defendants.
     _____/
10
                      DEPOSITION
11
                         of
12
                  TERRY DUKES, SR.
13
             Taken on behalf of Defendants
14

15
             DATE TAKEN:  June 26, 2023
16           TIME:        9:52 a.m. - 3:46 p.m.
             PLACE:       310 South School Street
17                        Bronson, Florida

18
         Examination of the witness taken before:
19

20            Cynthia F. Leverett, FPR
                Stenographic Reporter
21          Notary Public, State of Florida
              www.NatureCoastReporters.com
22              Post Office Box 2392
              Chiefland, Florida 32644
23                 386-256-1457

24

25
```

```
 1                    APPEARANCES

 2

 3   ON BEHALF OF PLAINTIFF

 4        GRENDOLYN P. ADKINS, Esquire
          gadkins@coppinsmonroe.com
 5        Coppins Monroe
          1319 Thomaswood Drive
 6        Tallahassee, Florida 32308
          850-422-2420
 7

 8   ON BEHALF OF DEFENDANT

 9        JAMES SLATER, Esquire
          james@slater.legal.com
10        Slater Legal PLLC
          113 South Monroe Street
11        Tallahassee, Florida 32301

12                              - - -

13

14

15

16

17

18

19

20

21

22

23

24

25
```

INDEX


EXAMINATION OF TERRY DUKES, SR.:
        DIRECT BY MS. ADKINS                              4
        CROSS BY MR. SLATER                             148
        REDIRECT BY MS. ADKINS                         191
        RECROSS BY MR. SLATER                          200

CERTIFICATE OF OATH                                    202
DEPOSITION CERTIFICATE                                 203
ERRATA SHEET                                           205


                        - - -


EXHIBITS MARKED FOR IDENTIFICATION:

  1      Photograph                                   62

  2      Photograph                                   63

  3      Photograph                                   64

  4      Photograph                                   65

  5      Sketch                                       66

  6      Disability Claim Form                       174

  7      Composite of work evaluations              177

  8      Composite of records from CFEC             185

  9      CASOM                                      187

                        - - -

```
 1   WHEREUPON,

 2                        TERRY DUKES, SR.,

 3   acknowledged having been duly sworn to tell the truth

 4   and testified upon his or her oath as follows:

 5            THE DEPONENT:  I do.  Tell the truth, yes,

 6        ma'am.  Yes, ma'am.

 7                     DIRECT EXAMINATION

 8   BY MS. ADKINS:

 9        Q.  Mr. Dukes, we met a few moments ago.  My name

10   is Gwen Adkins.

11        A.  Gwen?

12        Q.  Yes, sir.

13        A.  Okay.

14        Q.  I'm an attorney, and I represent Sheriff

15   McCallum, Lieutenant Almeida, Deputy Gaffey, and

16   Deputy Gregory.  Okay?

17        A.  Okay.

18        Q.  I'm going to take your deposition today.

19        A.  You got to try to talk up a little more for

20   me.

21        Q.  I'm going to take your deposition today.  I

22   need you to answer the questions as best you can.

23        A.  Okay.

24        Q.  But we've already discussed the fact that

25   you're not feeling great; so if at any point in time
```

1    day will be fine.

2        Q.   Is metformin something that you ordinarily

3    take every day?

4        A.   Yes, ma'am, every day.  I got four or five

5    others ones.  I can't remember all of them now.

6        Q.   And in addition to the metformin do you also

7    take insulin as you need it?

8        A.   No, I ain't used insulin.  My numbers be

9    down, so I don't want to get lower -- I don't really

10   use the insulin because I had a low reading, about

11   50-something, and I got real shaky and like to have

12   passed out.  So I ain't been taking no insulin, just

13   my regular diabetes -- I got about five or six

14   medicines.  I started to bring them all.  I didn't

15   know if I was going to need them.

16       Q.   That's all right.  Tell me other medications

17   that you remember that you take on a daily basis now.

18       A.   I got the anxiety medicine.  I can't think of

19   the name of it.  And let's see.  About three others.

20   There's four or five; I just can't remember.  I got

21   about five or six medicines for diabetes that I take.

22       Q.   Mr. Dukes, who lives at Patterson Street with

23   you?

24       A.   I can't hear you, ma'am.

25       Q.   Who lives at the house at Patterson Street

1  with you?

2        A.   I'm home alone.

3        Q.   Has anyone ever lived there with you?

4        A.   My son, Terry Junior, was there off and on;

5  but we were having problems, so I told him, you know,

6  it's best for him to find somewhere to go.  Because he

7  was causing me problems trying to help him and

8  bringing people in my house, so I told him to leave.

9  We argued and stuff a lot, so I told him I can't

10  handle that.

11        Q.   How long ago has that been that you asked him

12  to leave and find someplace else?

13        A.   It's probably been -- I don't want to tell

14  you.  It's been a good little while.

15        Q.   A couple years, you think, or --

16        A.   Huh?

17        Q.   Has it been a couple years or couple months?

18        A.   I would say at least maybe a year, best of my

19  knowledge.

20        Q.   And the home at Patterson Street -- I'm

21  saying "home."  Is that a house, or is it an

22  apartment?

23        A.   It's a mobile home.  It's a little

24  double-wide, small double-wide.

25        Q.   Sir, do you own that, or do you rent it?

 1       A.   I think so.

 2       Q.   And do you know whether the girl was staying

 3   there as well at the time?  Was it Shaquanda?

 4       A.   I'm not -- I don't -- I don't want to tell

 5   you wrong.  I don't think she was, because she was in

 6   and out.  She a street person, so -- we wasn't getting

 7   along, so I can't remember, you know.  Because I told

 8   her to leave, and she keep coming back against my

 9   will.

10       She's a real something else to deal with, in

11   and out of jail and, you know -- you probably got a

12   record there of Shaquanda, but she was hard to deal

13   with, you know.

14       Q.   So Saturday morning, May 25, 2019, you are

15   preparing to go to work at 7:00 a.m.  Is that

16   accurate?

17       A.   Well, it was about, I think, 5:30, going on

18   6:00.  It was about maybe a quarter to -- some -- I'm

19   guessing, but it was close.  It was almost 6:00.  And

20   I wasn't feeling good, so I said I'm going to lay here

21   until 6:00.

22       By 6:00, I needed to be moving because I

23   ain't had but an hour to get to work.  So I needed to

24   be, you know, trying to get on up; but I wasn't

25   feeling good, so I laid there until about 6:00, close

1   to 6:00.

2       Q.  So you were awake but just resting in your

3   bed?

4       A.  Right.  Right.  I was awake, but I just

5   didn't feel good.

6       Q.  Were there any lights on at the house?

7       A.  Huh?

8       Q.  Were there any lights on in the house?

9       A.  Anybody in the house?

10      Q.  No, sir, any lights.

11      A.  This the deal.  Okay.  I had got up when I

12  heard a knock.  They hit my window, and I thought it

13  was my boy.  I didn't have no lights on at the time

14  because I was in the birthday suit, and I didn't turn

15  no lights on.  I used my flashlight.

16          My lights in the room, I had to plug up lamps

17  sometimes because the switches -- I got to have it

18  rewired.  And I had to plug up the lamp, but I

19  didn't -- at the -- when I got up, I didn't have no

20  light, nothing but my phone light.  I used it to go to

21  the back door.

22      Q.  What kind of phone did you have at that time?

23      A.  I got it right here.  This might not be the

24  same one.  It's something like this.

25      Q.  It's what I'm going to call a smartphone?

```
 1        A.   Yes, ma'am.
 2        Q.   Do you know if it's an Apple or a Samsung?
 3        A.   I think I had a smartphone.
 4        Q.   Do you know whether that's an Apple or --
 5   like an iPhone or Samsung or anything like that?
 6        A.   I can't remember.
 7        Q.   Okay.  So all the lights are off in the
 8   house, and --
 9        A.   I just had my phone light.
10        Q.   And you didn't have any clothes on, you said?
11        A.   Right.  Right.  Because I didn't want my son
12   looking at me.  I thought that was him out there, but
13   it wasn't.  I don't like him looking at me.  And I
14   done told him, "Don't walk in front of me naked
15   because I don't want to look at you, and I don't want
16   you looking at me."
17             So I -- I had my phone light.  I hadn't
18   turned no lights on because I was heading to the back
19   door thinking my son was back there.
20        Q.   You indicated that you heard a knock.
21        A.   Huh?
22        Q.   You said earlier that you heard a knock.
23        A.   Okay.
24        Q.   What knock did you hear?
25        A.   Okay.  This is what happened.  I didn't
```

1    hear -- I think they was out there banging on the

2    trailer.  I didn't hear nothing at first because I

3    can't hear good.  And then they got closer to my room,

4    and I seen a flashlight up to the window.  And I

5    thought it was my son, but after a while they was -- I

6    seen a light.  They was knocking kind of -- they said

7    they was banging on the front door, but I was asleep,

8    you know.  I couldn't -- I can't hear good.

9              I got ready to -- I'm getting mixed up now.

10   What did I say?  I can't -- go back to the question.

11        Q.  Yes, sir.  And that's fine.  You take your

12   time.

13              My question was, what knock did you hear?

14        A.  I didn't hear the first banging.  When they

15   said they was out there, I didn't hear it; but I

16   heard -- or seen a flashlight up to the window.

17   That's when I thought it was my son.

18              And then after while they tapped kind of --

19   it wasn't where I could hear; but after a while they

20   hit the window hard, or the side of the trailer, and I

21   say, "I'm coming."

22              I thought it was my boy, because I was fixing

23   to tell him I'll hit him up side the head for knocking

24   on my trailer like that.  But I couldn't -- I heard

25   the first knock, but that second knock was so loud, I

1    said, "Now, boy, don't hit my trailer like that."

2              And that's when I got mad.  I said, "I'm

3    coming" real loud, and that's when I went on and got

4    my little flashlight and started to proceed out of my

5    room to the back door.

6              There's a little hallway in the kitchen.  And

7    then my room, you had to go around the corner to it

8    and come out and then go through the kitchen.  My

9    front door wouldn't open at the time; it was messed

10   up.  I got a new door since then.  But the front door

11   would -- it would jam, like, and I had to use the back

12   door.

13             So that's when I proceeded to the door to let

14   him in; but when I opened the door, he never came in.

15   And I didn't know it was the polices out there, about

16   five or six cars out there by the road.  I don't

17   exactly know where they was at, but I -- and nobody --

18   but I cracked the door.  And my son usually come right

19   on in.  But I cracked the door just a little bit to

20   let him in; and by the time I walked back, I didn't

21   never hear him come in.  He never -- and I thought it

22   was him.

23             So that's when I eased on back to the room so

24   I could get dressed, get, you know, cleaned up and get

25   ready for work.  Like I say, I ain't had but about an

1   hour, so I needed to move.  And the next thing I know,
2   they was in my house.  I didn't even hear them come in
3   because I can't hear good.  And next thing I know they
4   had guns pointed on me talking about get on the
5   ground, get on the ground.
6           I said, well -- and it scared -- it shocked
7   me because I didn't know they was in the house.  I
8   didn't even hear them come in.  Maybe they got soft
9   shoes on.  I can't hear anyway, but I never heard them
10  come in my house until I looked up.  And when I
11  looked -- I had my clothes, trying to get ready, you
12  know, and get my towel, whatever, trying to get ready
13  for work; and they just come in there, and they
14  shocked me.  "Get on the" -- because you know how they
15  holler.  They wasn't talking silent.  They was
16  hollering, "Get on the ground.  Get on" -- and they
17  had guns pointed on me.
18          I said, "What's going on?"  First of all, I
19  say -- I knew they was probably looking for him, but I
20  said, "My son is not here."
21          They were telling me to get on -- I said,
22  "Look, I'm just trying to tell you who I am.  I'm
23  Terry Dukes Senior.  Junior didn't come home last
24  night."
25          They started telling me, "Get on the ground."

1      A.   Yes, ma'am.

2      Q.   And if I were standing at your front door, is
3  it to the right or to the left of the front door?

4      A.   Let me see.  I think to the left.  It's all
5  the way back -- I was in the last room on the left.  I
6  got two bedrooms up front; but I was in the back room
7  back there, and it was like to the left from the door.

8           But that's when I happened to see a
9  flashlight.  And that's how my son usually come home,
10  he'll have a flashlight and shine up the window and
11  then knock and say, "Daddy, let me get in."

12          Because I wouldn't give him a key because he
13  was bringing them people and that girl in my house.  I
14  wouldn't give him no key.  Or he would lose them, and
15  I got tired of buying them.

16     Q.   And you said that you get up like that for
17  him a lot of mornings, right, get up to open that door
18  for him?

19     A.   Yes, ma'am.  Sometimes he'll come in late at
20  night, or sometimes he'll be early in the morning, you
21  know.  I just got up.  I thought it was him.  I didn't
22  know no police was out there.

23     Q.   Now, you said that whenever somebody hit the
24  trailer hard -- and you said that wasn't usual for
25  your son?

```
 1        A.   Right.  No, he wouldn't hit my -- but I
 2   didn't know the law was out there.  Because he ain't
 3   never hit my house.  He'll come and just tap, tap.  He
 4   might have to knock two or three times because I can't
 5   hear good; but when I hear him, I'll say, "Okay.  I'll
 6   be right there."
 7        But this knock -- when they first -- when I
 8   seen the light, they might have been knocking then;
 9   but after a while, it was a hard knock.
10        Q.   Did you hear anybody saying anything?
11        A.   No, ma'am.  No, ma'am.
12        Q.   You didn't hear anybody say "Levy County
13   Sheriff's Office"?
14        A.   No, until they got inside, and that's when --
15   I don't even know if they said -- all I remember them
16   telling me was get on the ground.  I don't remember
17   addressing their name or nothing; they might have, but
18   I was in shock then.
19        I'm talking about -- if it would have been
20   any different, and I'd've had my gun, I might would
21   have shot one of them; because when they got in there,
22   I didn't know they was in my house.  And they would
23   have probably killed me.
24        Q.   Your front door did not work at the time.
25        A.   No, ma'am.
```

1    Q.   Is that correct?

2    A.   It was an old door; and it got jammed, and I

3  started going out the back door.  I wouldn't even try

4  to open it because I didn't want it -- I wanted it to

5  stay locked so nobody couldn't just come in there on

6  me.

7         But I had to use the back door.  It's small,

8  you know, little trailer door.  It ain't made out of

9  --  but it was locked.  That front door a big door;

10  but it got jammed, and I left it alone because I

11  didn't want to -- you know, people just pushing the

12  door and coming in.  And I didn't have no -- I think

13  the deadbolt was messed up or something, so I just

14  left it locked.

15    Q.   So the back door that you went to that

16  morning, you knew somebody was at the house.  You

17  thought it was your son, correct?

18    A.   Right.

19    Q.   Okay.  But you also -- something was a little

20  different because he doesn't usually hit the side of

21  the trailer.

22    A.   No.  He usually shine the light, "Daddy, I

23  need to get in."  And he don't knock like that.

24    Q.   And there was something that had told you

25  don't take your gun with you to the door, correct?

 1      A.   Yeah.   That's the only time something spoke

 2   to me and say, "Lay your gun on the bed."

 3           And I usually have it every single time I go

 4   to open the door.   That time, something say, "Just lay

 5   your gun on the bed."   And I followed my mind.   I laid

 6   it on the bed.

 7      Q.   What kind of gun was it?

 8      A.   .38 special.

 9      Q.   When you walked to the back door, you

10   unlocked it.   Is that correct?

11      A.   Right, and cracked it.

12      Q.   And you turned -- I assume it's a knob that

13   you turn, correct?

14      A.   Yes, ma'am.   I don't know.   I think the

15   deadbolt was working too, and the little knob at that

16   time.   And I just unlocked it and cracked the door and

17   proceeded back to my room to get ready to go to work.

18      Q.   So you had at least -- you turned the knob

19   and opened it?   You said cracked it --

20      A.   Just cracked it about that -- it wasn't far.

21   I just opened it and cracked it.

22      Q.   Six or eight inches or so?   Is that what

23   you're indicating?

24      A.   Yeah, it was just a little bit.   It might

25   have not been that.   I just cracked it, the door, so

1   he could get in.

2       Q.   And the purpose of cracking the door was to

3   allow him to enter, correct?

4       A.   Yeah, to let him in.  That's why I just

5   opened -- you know, cracked it, just to let him in.

6       Q.   And you turned around and walked back to your

7   bedroom?

8       A.   Right.

9       Q.   Did you close the door to your bedroom?

10      A.   No.  The door was open when I got up because

11  I don't sleep behind -- even then I didn't sleep

12  behind closed doors.  It's something like a fear.  I

13  like to have it open because I'm there by myself, and

14  I like to have it open where I can see in case --

15  because I can't hear somebody come in there.  I like

16  to be able to see.

17           I can't -- I don't even sleep in my room now.

18  I have to sleep in the open.  I got a fear since they

19  did this.  My bed in the living room in there now.  I

20  can't sleep behind closed doors, and I never did.  I

21  always would leave my door open, would have to see,

22  you know, the light or hear -- try to hear something.

23  My hearing bad.  I want to try to hear something, you

24  know.

25      Q.   When you went back into your bedroom, is the

1       A.   Yes, ma'am.

2       Q.   Do you disagree with that, or you agree it

3   was only one that hit you?

4       A.   I agree -- I think it just -- he -- it's like

5   he did me a favor or something.  He was like, "Well,

6   you ain't get shot," but I tell you it was like a

7   shot.  "I ain't hit you with but one TASER," but I was

8   weak.

9            My twin brother worked at a jailhouse.  They

10  shot them with two, and it knocked them to the ground.

11  But that one, I was so mad, I really didn't feel it.

12      Q.   And, Mr. Dukes, I know you talked earlier

13  about them having guns drawn on you, and yet they

14  didn't shoot you, correct?

15      A.   No.

16      Q.   And hit you with a TASER with the one prong?

17      A.   One prong.

18      Q.   Sir, have you ever thought that you were

19  fortunate in some ways that that's all they hit you

20  with, given the situation?

21           MR. SLATER:  Object to the form.

22      A.   Well, to me, I don't understand at all why

23  they even tased me because I wasn't doing nothing; and

24  they didn't warn me.  And I told them I was trying

25  to go to -- I don't understand why he even, you know,

1    pulled the trigger on the TASER.  I didn't do nothing.
2    BY MS. ADKINS:
3         Q.  As soon as you were hit with the TASER, what
4    happened next?
5         A.  Okay.  That's when I started to crying.  When
6    they hit me, I didn't realize it.  I thought I was
7    shot with a gun; but when I seen the rope come out, I
8    said "They done tased me" to myself.  I might have not
9    hollered out loud.  I say, "Why y'all bothering with
10   me?"
11        I went to crying then, because I said I ain't
12   doing nothing.  I don't deserve -- I was saying to
13   myself.  I didn't talk a whole lot to them, maybe, but
14   I didn't understand why.  You know, I'm naked, trying
15   to get my pants on, and you just hauled off and tased
16   me.
17        Q.  At that point in time are there any other
18   lights that are turned on, or it's still dark?
19        A.  Uh-uh.  It was still dark.  They had lights
20   on them guns, so they could see.  And I might have
21   still had my flashlight, but I might have put it down,
22   on my phone, you know, to gather my stuff.  But I
23   couldn't -- but there wasn't no lights on in there
24   because I didn't want him looking.  That's why I kept
25   it dark.

1      Q.   Do you know who the deputies were that were
2  in your room?
3      A.   I didn't know at that time, but -- wait.  I
4  don't want to get ahead of myself.  I didn't know
5  Gregory at that time; because when they come -- I
6  didn't know who was in the house.  I thought it was
7  just two.  They said it was three.
8           So I was in shock, so I really, you know,
9  didn't understand a whole lot.  They scared me, you
10  know.  They come in, and I didn't hear them.  And I'm
11  looking for my boy.  When I turned around, they
12  yelling at me, talking about get on the ground.  And I
13  said, "What's going on?"
14           I ain't even know what was going on, and I
15  ain't him.
16      Q.   After you were tased, did one of them either
17  help you or allow you to get your pants on?
18      A.   No.  They come around and put the cuffs on
19  me.  They didn't try to help me do nothing.  They just
20  come around -- he said, "Well, I got to put the cuffs
21  on you."
22           I ain't understand that.  Why you going to
23  put cuffs on me, and I ain't done nothing?  They done
24  tased me, you know.  Why you going to put cuffs on me?
25      Q.   At this point in time, even if they're not

1   about your son, about Junior?

2        A.   No, not as I can recall.

3        Q.   How long a period of time were you in the

4   handcuffs?

5        A.   Huh?

6        Q.   How long a period of time were you in

7   handcuffs?

8        A.   Okay.  From the time that I got on the floor

9   and they tased me, he come behind there, put the cuffs

10  on me, walked me outside.  And I think they kept the

11  cuffs on me until the ambulance got there to take

12  that -- take that prong out my arm.  I think that's

13  the way it went; I'm pretty sure.

14            But I sat on the tailgate for a while waiting

15  on the ambulance, and they didn't come right away.

16  You know, they might have been a little piece off.

17  From that time, you know, it was just -- you know, I

18  just -- I be losing it sometimes.  I forget what I'm

19  fixing to say.  I'm going to stop right there.

20       Q.   Have you ever seen Deputy Gregory at any

21  point in time since this incident?

22       A.   I haven't seen him.  If I did, I wouldn't

23  recognize him in his suit.  I ain't seen him but -- I

24  probably just don't -- but I ain't seen him but one

25  time, that one time.

1          And I probably -- I didn't recognize him in

2    the house.  Even though the boy introduced me, I

3    didn't recognize him because I was in shock and I

4    didn't know who -- I thought it was three officers --

5    I mean, two officers, and they said it was three.  So

6    I don't really know -- couldn't tell who was who.

7          Q.   Were you charged with anything that day?

8          A.   Do what?

9          Q.   Were you charged?  Were any criminal charges

10   brought against you that day?

11         A.   That's a good question.  They tried to say

12   they were going to charge me for resisting arrest.

13         Q.   Who told you that?

14         A.   They was outside talking, trying to figure

15   out what they was going to charge me with, and they

16   came up with the idea of talking -- but the charge, it

17   was dropped.  They wrote me a letter from the

18   sheriff's office saying that they dropped the charges

19   of me resisting arrest.  I didn't resist arrest.

20         Q.   Were you ever arrested on that charge, and

21   were you ever taken to jail on that?

22              MR. SLATER:  Object to the form.

23         A.   Huh?

24   BY MS. ADKINS:

25         Q.   Were you ever arrested for the charge of

1        A.   Right, you go right into the kitchen.

2        Q.   Okay.  Did you have "No Trespassing" signs

3    outside your property in May of 2019?

4        A.   Yes.

5        Q.   You testified that when you opened -- you

6    cracked open the back door on the date of the

7    incident --

8        A.   Right.

9        Q.   -- and that you believed it was your son.  Is

10   that right?

11       A.   I was thinking it was my son.

12       Q.   Did you talk or say anything when you cracked

13   the door open?

14       A.   No.  I just cracked the door and turned

15   around and went back in the room to get ready for

16   work.

17       Q.   Did you hear anyone say anything to you?

18       A.   No, sir.

19       Q.   I want to show you now what's been marked

20   previously as Defense Exhibit 4.  Does this fairly and

21   accurately depict the inside of the room that you were

22   sleeping in on May of 2019?

23       A.   Is that the room there?

24       Q.   The one that the picture is being taken

25   inside of, was this your bedroom?

1  buttoned up.  That's when he just opened fire on me.

2       Q.   I'm going to show you what's been previously

3  marked as Defense Exhibit 3.  This is a photograph

4  taken outside the bedroom, okay, standing in sort of

5  the middle of the space here near the kitchen.

6            Can you show me, to the best of your ability,

7  where you believe the deputies were standing in this

8  space, if it's able to be -- if we can pinpoint that

9  on here?

10       A.   Let me look.  I can't see.

11       Q.   Sure.  You had testified earlier that this is

12  your bedroom?

13       A.   That's the bedroom.  Okay.  I was turned like

14  the bathroom, going to the bathroom, fixing to get my

15  clothes together and take them in there to get cleaned

16  up.  And I was -- they walked in; and all of a sudden

17  I heard them telling me to get on the ground, yelling

18  at me, and it scared me because I didn't hear them

19  come in.

20            And then it kind of shocked me, but I was

21  trying to get -- I didn't have but an hour to get

22  ready to go.  I was trying my best to get on in there,

23  because I got to try to be to work by at least by 7:30

24  because we have stuff to do before the job start.  And

25  I was just trying to --

1        A.   I was there.

2        Q.   You said that your son is a different build

3   and a different height from you?  How tall do you

4   think your son is?

5        A.   I'm 5'7", and I got to look up at him.  So he

6   may be close to six-foot tall.  I don't know, but I

7   never asked him how -- he way bigger than me, and his

8   arms long, and he big.  He might have not been as big

9   at the time, but he always -- his momma tall, and he

10  tall after his momma.

11       Q.   In Bronson -- how long have you lived in

12  Bronson?

13       A.   Okay.  I grew up in -- we come from

14  Clearwater as babies.  And my momma and daddy

15  divorced.  So I worked in Bronson for -- at the mill

16  for some years, at the Bryce mill.  And then I

17  eventually got a job in Chiefland at Georgia-Pacific.

18  They built the new plant, so I moved to Gainesville

19  and drove from Gainesville to Hawthorne.

20            And then, after a certain many years, I came

21  back home.  After I quit from out there, I came back

22  to Bronson, and I've been there ever since -- well, I

23  moved the second time to Gainesville.  Married my wife

24  in Gainesville.  We divorced.

25            But I had moved to Gainesville, too, and was

1  driving from Gainesville to the landfill, but that

2  didn't last but about -- it lasted seven years.  So

3  after that, we broke it off.  My land was paid for,

4  and that's when I went to get me a -- put a land

5  package deal on my trailer.

6        So I think I've been out there now, I think,

7  over 10 or 12 years.

8     Q.  And in the 10 or 12 years that you've lived

9  at this latest stint in Bronson, have you lived

10 anywhere other than 900 Patterson Street?

11    A.  Yeah, I used to rent right behind me, a

12 house.  A guy had a house back there right on the

13 other side of the street.  So I was renting from him,

14 and then he wanted to go up on the rent.  And I

15 went -- and my brother said, "You can live in my

16 house."  He had a big old house.  He said, "We'll

17 charge you $200 a month, 250."

18        So I moved in there; it wasn't long.  I

19 didn't stay there long, maybe a year.  I don't even

20 know if it was a year; but after that, that's when I

21 went on and used my land to put a trailer on my

22 property.

23    Q.  How long have you been living at

24 900 Patterson Street?

25    A.  I'm guessing, but I don't want to guess.  My

1    driving from Gainesville to the landfill, but that

2    didn't last but about -- it lasted seven years.  So

3    after that, we broke it off.  My land was paid for,

4    and that's when I went to get me a -- put a land

5    package deal on my trailer.

6              So I think I've been out there now, I think,

7    over 10 or 12 years.

8        Q.   And in the 10 or 12 years that you've lived

9    at this latest stint in Bronson, have you lived

10   anywhere other than 900 Patterson Street?

11       A.   Yeah, I used to rent right behind me, a

12   house.  A guy had a house back there right on the

13   other side of the street.  So I was renting from him,

14   and then he wanted to go up on the rent.  And I

15   went -- and my brother said, "You can live in my

16   house."  He had a big old house.  He said, "We'll

17   charge you $200 a month, 250."

18             So I moved in there; it wasn't long.  I

19   didn't stay there long, maybe a year.  I don't even

20   know if it was a year; but after that, that's when I

21   went on and used my land to put a trailer on my

22   property.

23       Q.   How long have you been living at

24   900 Patterson Street?

25       A.   I'm guessing, but I don't want to guess.  My

```
 1                    CERTIFICATE OF OATH

 2

 3    STATE OF FLORIDA
      COUNTY OF LEVY
 4

 5            I, the undersigned Notary Public, do
      hereby certify that TERRY DUKES, SR., who produced
 6    a Florida Driver's License as identification,
      personally before me on June 26, 2023, and was duly
 7    sworn to tell the truth.

 8            WITNESS my hand and official seal this
      July 17, 2023.
 9

10

11

12    Cynthia F. Leverett
      Notary Public
13    State of Florida at Large
      My commission expires 9-27-24
14

15                    CYNTHIA LEVERETT
                      Commission # HH 036051
16                    Expires September 27, 2024
                      Bonded Thru Budget Notary Services
17

18

19

20

21

22

23

24

25
```

1                    DEPOSITION CERTIFICATE

2

STATE OF FLORIDA
3    COUNTY OF LEVY

4           I, Cynthia F. Leverett, Stenographic Reporter
and Notary Public in and for the State of Florida at
5    Large, do hereby certify there came before me the
deponent herein, named TERRY DUKES, SR.; that a
6    review of the transcript was requested, and
arrangements have been made for that review.
7           I further certify that the foregoing
transcript is a true and complete record of my
8    stenographic notes taken at the time and place
indicated herein.
9           I further certify that I am neither attorney
or counsel for, nor related to or employed by any of
10   the parties to the action in which this deposition is
taken; and, furthermore, that I am not a relative or
11   employee of any attorney or counsel employed by the
parties hereto, nor financially interested in the
12   action.
            The foregoing certification of this
13   transcript does not apply to any reproduction of the
same by any means unless under the direct control
14   and/or direction of me as the certifying reporter.

15

            DATED this July 17, 2023.
16

17

18

19

20   _____
     Cynthia F. Leverett, FPR
21   Certified Stenographic Reporter

22

23

24

25