

```
 1   UNITED STATES DISTRICT COURT

 2   NORTHERN DISTRICT OF FLORIDA

 3   GAINESVILLE DIVISION

 4   CASE NO. 1:23-CV-45-AW-HTC

 5

 6   TERRY DUKES, SR.,

 7   PLAINTIFF,

 8

 9   V.

10

11   ROBERT MCCALLUM, JR., ET AL.,

12   DEFENDANTS.

13   _____/

14   VIDEOCONFERENCE DEPOSITION OF CORPORAL CHASE GREGORY

15   DATE:       JULY 24, 2023

16   REPORTER:   ANA MARTINEZ

17   PLACE:      ALL PARTIES APPEARED VIA VIDEOCONFERENCE

18

19

20

21

22

23

24

25
```

401 EAST JACKSON STREET,
SUITE 2370
TAMPA, FL 33602

315 EAST ROBINSON STREET,
SUITE 510
ORLANDO, FLORIDA 32801
CORPORATE

```
 1                    APPEARANCES

 2  ON BEHALF OF THE PLAINTIFF, TERRY DUKES, SR.:

 3  James M. Slater, Esquire

 4  Slater Legal P.L.L.C.

 5  113 South Monroe Street

 6  Tallahassee, Florida 32301

 7  Telephone No.: (305) 523-9023

 8  E-mail:  james@slater.legal

 9   (Appeared via videoconference)

10

11  ON BEHALF OF THE DEFENDANTS,

12  ROBERT MCCALLUM, JR., ET AL.:

13  Gwendolyn P. Adkins, Esquire

14  Coppins Monroe P.A.

15  2316 Killearn Center Boulevard

16  Suite 202

17  Tallahassee, Florida 32309

18  Telephone No.: (850) 422-2420

19  Facsimile No.: (850) 422-2730

20  E-mail: gadkins@coppinsmonroe.com

21   (Appeared via videoconference)

22

23

24

25
```

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1                         INDEX
                                             Page
 2  PROCEEDINGS                                5
    DIRECT EXAMINATION BY MR. SLATER           7
 3  CROSS-EXAMINATION BY MS. ADKINS          246
    REDIRECT EXAMINATION BY MR. SLATER       247
 4
                        EXHIBITS
 5  Exhibit                                  Page
         1    Answers to Plaintiff's Interrogatories 10
 6       2    Corporal Chase Gregory Personnel File  16
         3    Corporal Chase Gregory Professional
 7            Standards                        45
         4    Directive 806, Arrest Warrants   73
 8       5    General Order 1400.1, Response to
              Resistance                       73
 9       6    General Order 1505.1, Less Lethal
              Weapons                         100
10       7    2017 May Product Warnings       110
         8    Directive 643                   117
11       9    Wilkinson E-mail                120
        10    Answers to Plaintiff's Second
12            Interrogatories                 126
        11    RMS, Person Search Results      129
13      13    Photographs of Residence        160
        14    Corporal Chase Gregory's Recorded
14            Statement                       211
        15    Comparisons                     212
15      16    Sworn Complaint                 220
        12    LCSO Internal Investigation     221
16      18    E-mail From SAO                 236
        19    Taser Log                       239
17      20    Corporal Chase Gregory's Uniform
              Photos                          242
18
    FORMAL REQUEST
19  1 - Original Color Pictures, JPG Format

20

21

22

23

24

25
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1                    STIPULATION

2  The videoconference deposition of Corporal Chase Gregory

3  taken remotely on Monday the 24th day of July 2023 at

4  approximately 10:22 a.m.; said deposition was taken

5  pursuant to Rule 28 of the Federal Rules of Civil

6  Procedure. It is agreed that Ana Martinez, being a

7  Notary Public and Court Reporter for the State of

8  Florida, may swear the witness and that the reading and

9  signing of the completed transcript by the witness is

10  not waived.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1                PROCEEDINGS
 2         THE REPORTER:  On record.  Will all the
 3    parties, except for the witness, please state your
 4    appearance, how you're attending, and your location?
 5         MR. SLATER:  James Slater on behalf of
 6    Plaintiff, Terry Dukes, Sr.  I'm present in
 7    Tallahassee, appearing remotely.
 8         MS. ADKINS:  Gwen Adkins, I'm here on behalf of
 9    the Defendants in this case.  And I am physically
10    located at the Levy County Sheriff's Office in a
11    conference room with Chase Gregory, the deponent.
12         THE REPORTER:  Thank you, Counsel.  Okay.
13    Deputy Gregory, will you please state your full name
14    for the record?  It seems the deputy is frozen.
15         MS. ADKINS:  Were you able to hear him?
16         THE REPORTER:  No, ma'am.  It seems he's frozen
17    and the audio as well.
18         THE WITNESS:  Can you hear me now?
19         THE REPORTER:  Yes, sir.
20         THE WITNESS:  All right.  Colbert Chase
21    Gregory.
22         THE REPORTER:  Thank you.  And now will you
23    please hold your ID up to the camera?
24         MS. ADKINS:  So it's still -- the video is
25    still frozen.  Let's see if I can hold it up to my
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
1     camera here.

2            THE WITNESS:  Mine is, you-all are showing

3     present on mine.

4            THE REPORTER:  Okay.  Okay.  Thank you.

5            MS. ADKINS:  Yes.  So it's frozen for you?

6            THE REPORTER:  Yes.

7            MS. ADKINS:  Is there anything on yours that

8     you can click that would refresh it maybe?

9            THE REPORTER:  No, ma'am.

10           MS. ADKINS:  Not really.  Okay.

11           THE REPORTER:  No.  I'm sorry.

12           MR. SLATER:  You could try to turn off the

13    video.  Turn it back on.

14           MS. ADKINS:  How about you can use mine?

15           THE REPORTER:  Okay.  Thank you.  Okay.  Do all

16    the parties agree that the witness is in fact,

17    Deputy Chase Gregory?

18           MR. SLATER:  Yes.  Yes.

19           THE WITNESS:  We'll be marking that.

20           MS. ADKINS:  Okay.

21           THE REPORTER:  Okay.

22           MR. SLATER:  He's still frozen, Gwen.

23           MS. ADKINS:  All right.  Here we go.

24           THE REPORTER:  Okay.  And Deputy Gregory,

25    please raise your hand.
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

```
 1            THE WITNESS:  Give me one second.  We're just
 2      going to keep both these computers.  Let me turn
 3      this volume down.
 4            THE REPORTER:  Okay.  Thank you.  Do you
 5      solemnly swear or affirm that the testimony you're
 6      about to give will be the truth, the whole truth,
 7      and nothing but the truth?
 8            THE WITNESS:  Yes, ma'am.
 9            THE REPORTER:  Thank you so much.  You may
10      proceed.
11            MR. SLATER:  Thank you, Madam Court Reporter.
12                  DIRECT EXAMINATION
13          BY MR. SLATER:
14      Q.   Deputy Gregory, my name is James Slater, and
15 I'm representing Terry Duke, Sr.  You understand that
16 you're a defendant in a lawsuit brought by Mr. Duke, Sr.
17          in federal court?
18      A.   Yes, sir.
19      Q.   Okay.  And I want to go back.  You -- your
20 first name is Coulter; is that correct?
21      A.   That's correct.  Yes, sir.
22      Q.   And Chase is your middle name?
23      A.   Yes, sir.
24      Q.   And that's the name you generally go by,
25 Chase?
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  create a new -- basically, not a new person, but a new

2  entry.  That's why you have several different numbers

3  that range from 28379 to all the way to 4,000 -- 40,475.

4  It's just, anytime we go in and alter one of these names

5  and we add a DL or a Social.  Maybe it was a Hispanic

6  Mike and not a Bravo Mike, we have to go in there and

7  change that.  So depending on who did it and how they

8  did it, it can create a new entry.

9      Q.    Okay.

10     A.    Does that make sense?

11     Q.    That makes sense to me.  But here we see that

12  the only address listed for the individual born in 1960

13  is 900 Patterson Street.  Is that -- is that right?

14     A.    That's right.

15     Q.    Okay.

16     A.    But I don't know when that entry was entered

17  in there without getting into RMS.  That entry could

18  have been entered on the date of this incident.

19     Q.    I see.  Bear with me for a moment.  How many

20  times do you think you've been called to 900 Patterson

21  Street?  I know you said you were there a lot.  Any --

22  you know, more than 20, fewer than 20?

23     A.    Are we talking about from the date of this

24  incident until now, or throughout the course of me

25  working here?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Throughout the -- throughout the decade plus

2    you've been at the Levy County Sheriff's Office?

3    A.   Probably eight to 11 times, probably.  But

4    that --

5    Q.   I take it --

6    A.   -- that doesn't necessarily -- that doesn't

7    necessarily include me being called there.  We have

8    other, you know, I've had a -- we've had other cases or

9    dealings with Terry Dukes, Jr.  And we just know that's

10   where he lives at, so we may ride by and see if his car

11   is there or see if he's there.  I mean, we don't

12   necessarily have to have a call for service for us to go

13   to his house whenever we're dealing with him.  He would

14   bounce back and forth between this address and an

15   address out in another section of our county in -- in

16   the same town called University Oaks.  He would date a

17   girl out there and we'd have to go out there some, too,

18   to deal with him.  It wasn't just -- just secluded to

19   this address.

20   Q.   Okay.  So -- and you said University Oaks was

21   the other place where he would reside?

22   A.   Yeah.  So that may be, you know, seven, eight

23   minutes from -- from this house.  Same town.

24   Q.   Okay.  And how often would you go out to

25   University Oaks for Terry Dukes, Jr.?

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.   I've only been out there just -- just a couple

2 of times, sir.  I'm sure there are other deputies that

3 have, you know, been out there more, maybe less times

4 than I have.

5    Q.   And you were saying he would -- to your

6 understanding, Terry Dukes, Jr., would bounce back and

7 forth between Patterson and University Oaks; is that

8 right?

9    A.   When he's dating Shaquanda Sheffield, he's at

10 900 Patterson, and whenever he's dating -- her name is -

11 - her last name's Bryant.  Alexis Bryant?  I forget her

12 first name.  But whenever he's dating her, he'll go stay

13 out there.  He bounces back and forth between Bryant and

14 Sheffield.  When he's with Sheffield, he's at 900

15 Patterson.  When he's with Bryant, he's at University

16 Oaks.  Or if he's with both of them at the same time, he

17 goes night to night there and back.  I mean, it's -- I'm

18 not trying to be funny, it's just -- just what he does.

19    Q.   Okay.  So in your mind -- so in your mind,

20 there's two possible places that you would go to find

21 Terry Dukes, Jr. depending on the circumstances?

22    A.   No.  No.  I'm saying there is two separate

23 places that we can find him.

24    Q.   Okay.  I want to -- I want to talk -- I want

25 to go back now to the date of the incident.  You were --



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        Q.   Okay.  Let's let me walk through that a little
 2   bit.  So I heard -- I heard that you believe that
 3   Wilkinson relayed the information to Murphy that you
 4   were there.  How many of you were talking about this?
 5   You said -- I think you said you discussed it.  Who was
 6   there?
 7        A.   The ones that was listed in that report that
 8   you read off.
 9        Q.   So Murphy, Gaffey, Almeida, you, and then --
10   but Wilkinson wouldn't have been there, right?
11        A.   Yeah.  He was at the hospital with the victim.
12        Q.   Okay, so you, Almeida, Murphy, and Gaffey.
13   Where were you when you were discussing this,
14   physically?
15        A.   At -- at the Sheriff's Office.
16        Q.   Okay.  Inside the office?
17        A.   Outside of our dispatch area.  Between our
18   dispatch area and the parking lot where CID parks their
19   vehicles.
20        Q.   Okay.  Do you know how Wilkinson reached out
21   to Murphy?  Was it a telephone call?  Was it an e-mail?
22        A.   You'd have to ask --
23             MS. ADKINS:  Form.
24        A.   -- you'd have to ask him, sir.  I don't know.
25             BY MR. SLATER:
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        Q.   Okay.  And what -- so -- and, so I -- I'm to
 2   understand that you just thought you were discussing
 3   whether to have more than one patrol unit go; is that
 4   right?
 5        A.   Correct.
 6        Q.   And it was because of your -- you said -- I
 7   think you said your past history with Terry Dukes and
 8   the possibility of drugs and firearms -- that he was on
 9   drugs and that he may have firearms; is that right?
10        A.   Not necessarily my past history, but the past
11   history that the Sheriff's Office has had with Terry
12   Dukes, Jr.
13        Q.   Are you -- were you personally aware of any
14   instances where he was on drugs prior to May 25, 2019?
15        A.   He is known to law enforcement at the
16   Sheriff's Office to be a known drug user.
17        Q.   What kind of drugs?
18        A.   In this case, Molly.  That was relayed by the
19   victim.
20        Q.   Is Molly -- is -- Molly's a street term?
21        A.   It is.
22        Q.   For what?
23        A.   To give you the -- to give you the exact name
24   for Molly, I cannot.  But probably like a very --
25        Q.   If I represent to you MDMA; does that sound
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  right?

2      A.   That -- it -- it does, but then -- but it has

3  an actual name, too.  But yes, I mean, that -- that is

4  what Molly is, MDMA.

5      Q.   Okay.  What are the -- what -- in your -- in

6  your experience, when -- in your experience, when

7  someone's on MDMA, what kind of -- what kind of -- what

8  -- how are they reacting when they're on it?

9      A.   Depends on the individual, it depends on what

10 they have done prior to using that, if they had any

11 other drugs in their system.  If -- I mean, MDMA is a

12 what they would call an upper, which would mean they

13 would tend to act a certain way.  But if they smoke

14 marijuana, which is a downer, it could affect the way

15 the MDMA would affect them.  It is just -- it is a drug

16 that is best described as unpredictable.  You cannot

17 predict what an individual's going to do when they're

18 under the influence of MDMA.  I can't sit here and say.

19 You know, marijuana, you can pretty much give a

20 description.  Okay, someone's under influence of

21 marijuana, they tend to have the same actions,

22 regardless of who you are.  It has the same effect. MDMA

23 is different.  They're unpredictable.

24     Q.   Have you -- have you read any studies about

25 MDMA?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      A.   Yeah.  I've -- I've read quite a bit of stuff

2  on MDMA, especially whenever Molly was -- was -- was

3  really getting popular and becoming a -- a popular drug

4  of choice and law enforcement was encountering a, you

5  know, a lot more than what they used to.

6      Q.   Do you recall what studies you read about

7  MDMA?

8      A.   Articles through Police 1, through websites on

9  the internet, to get --

10     Q.   You said Police 1?

11     A.   That would be a -- a one that I -- I don't

12 know if I -- that would be one that I do utilize for my

13 job. They have articles and updates, and they have stuff

14 that, you know, law enforcement around the country is

15 facing.

16     Q.   Okay.  And you said other articles?

17     A.   Yeah, I -- yeah -- I would do a -- a Google

18 web search of MDMA and then I would read articles that I

19 find related to that.  But to say specifically, I -- I

20 -- I had, you know, this search engine, this search

21 engine, this search engine, and this is -- is what I --

22 I -- I can't do that.  But I -- I can say for certain

23 that I have read and -- and -- and try to educate myself

24 on Molly and what the side effects are, what to expect

25 whenever you encounter somebody under the influence of

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  Molly to try to help me better prepare if I ever have to

2  experience somebody that is under that influence.

3          MR. SLATER:  Okay.  All right.  Let me -- let's

4      take a five-minute break and then we'll continue.  I

5      just need to run to the restroom.

6          THE REPORTER:  One moment, please.

7           (OFF THE RECORD)

8          THE REPORTER:  On record.  Thank you.

9           BY MR. SLATER:

10     Q.   All right.  Thank you for bearing with me.

11  All right, so we were -- I think where we left off, I

12  think that you were deciding on -- you were -- you were

13  at the -- you were at the Sheriff's Office deciding on

14  whether to send more than one patrol car.  And, so how

15  many -- how many -- when you went over to 900 Patterson

16  Street, how many cars were there?

17     A.   I'm going to assume me -- four.

18     Q.   Four?

19     A.   We -- we are each assigned a patrol car and we

20  -- we don't ride double.  We don't have, you know, two

21  for a car.  We all have our -- each patrol -- each of us

22  have a patrol car.

23     Q.   Okay.  When you went to 900 Patterson, what

24  did you know about the accusations against Terry Dukes,

25  Jr.? What did you understand to be the basis of the

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  probable cause to go there?

2       A.   That Detective Wilkinson established,

3  developed probable cause for aggravated battery on a

4  pregnant person.

5       Q.   Did you -- did you -- either through Detective

6  Wilkinson or any of the other deputies that were with

7  you out at the Sheriff's Office before you left to 900

8  Patterson, learn about any of the specific facts?  Not

9  the charge, but the specific facts underlying the

10 probable cause charge?

11      A.   No, sir.  Not -- not that I'm aware of.  But

12 they -- the others may say something differently, but to

13 my knowledge, no.  I was advised that --

14      Q.   Okay.

15      A.   -- that this incident -- I want say, this

16 actually came -- came through the Shands when she got to

17 Shands.  It didn't come through on the call for service

18 through patrol where we would go out and investigate it.

19 It was -- I don't -- I don't remember how this call was

20 reported.  All I remember is Detective Wilkinson had

21 probable cause to arrest Terry Jr. for this charge and

22 asked us to go to his house where he's supposed to be at

23 and try to find him so we could pick him up and get him

24 to the jail.

25      Q.   But Wilkinson didn't talk to you about that,



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  right?  You're just saying that's what you understood

2  from --

3       A.   He did not --

4       Q.   -- the other deputies?

5       A.   -- to me -- he did not speak to me

6  specifically.

7       Q.   Okay.  So one of the other deputies, either

8  Murphy, Gaffey, or Almeida is who told you what the

9  probable cause was and what Wilkinson wanted you to do?

10      A.   I don't -- I don't remember specifically who

11 said Detective Wilkinson has probable cause to arrest

12 Terry Dukes, Jr., can you-all go try to find him and

13 arrest him?  I don't remember who specifically said

14 that.  I just remember I -- I was advised of this

15 because of who it was, our history with him, the

16 allegations, the -- the -- the circumstances surrounding

17 this particular incident with the charge, the

18 information that the victim stated that, you know, was

19 clearly an officer safety issue.  We decided it best to

20 not send one or two to this house, rather, we -- if we

21 have the ability, we'd send as many as we can.  And, so

22 this night it was four of us.

23      Q.   Did -- were you the one who said that you

24 should go to 900 Patterson or was that one of the other

25 officers who decided that was the place to go to find

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1  Terry Dukes, Jr.?

 2          MS. ADKINS:  Form.

 3             BY MR. SLATER:

 4      Q.   Let me rephrase it.  Who decided that you

 5  would go to 900 Patterson Street to look for Terry

 6  Dukes, Jr.?

 7      A.   I believe Detective Wilkinson is the one that

 8  said this is where he was at because that's what the

 9  victim told him.

10      Q.   Did you have a warrant when you went to 900

11  Patterson Street?

12      A.   We did not.

13      Q.   Were you told that there was any exigent

14  circumstances related to the probable cause?

15      A.   Say that again?

16      Q.   Was there any exigent circumstances?

17          MS. ADKINS:  Form.

18      A.   Prior to going to the house?

19             BY MR. SLATER:

20      Q.   Did Detective Wilkinson -- to your

21  understanding, did Detective Wilkinson say that there

22  were any exigent circumstances related to the arrest of

23  Terry Dukes, Jr.?

24      A.   He gave us information that -- I -- I don't

25  know if I'm understanding your -- your -- I mean, I -- I

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  may be -- be misunderstanding exigent circumstances.  I

2  mean, typically that's used in a right here, right now

3  scenario, whereas an action needs to be taken right here

4  right now because of whatever is unfolding requires us

5  to take that -- take whatever action it is that we that

6  we take.

7       Q.   Yeah.  That's how I understand it, too.  And,

8  so my -- I guess my question is, that didn't exist here,

9  right?

10      A.   Well, at the time of this, he's at the

11 hospital, we're at the Sheriff's Office, and Dukes Jr.

12           is possibly at 900 Patterson.  What exigent

13 circumstances could there be at this specific time for

14 us to take immediate action?  As far as why we went in

15 numbers, as far as why we decided to black out and walk

16 up, I'm -- I'm having a hard time understanding what you

17 mean by exigent circumstances.

18      Q.   Well, so I think you --

19      A.   We had -- we had information -- we had

20 information that we felt was an officer safety issue and

21 we felt the exigency maybe that way to show up with four

22 of us instead of just one.

23      Q.   Why did you think it was an officer safety

24 issue?

25      A.   For reasons that I stated before.  Terry

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
 1  Dukes, Jr. is known to the Sheriff's Office to be a

 2  known drug user.  He's known to -- to be violent, he's

 3  known to be on drugs, illegal drugs.  He is, according

 4  to the victim, possibly on Molly, and is in the

 5  possession of a firearm.

 6       Q.   You were told before you went to 900 Patterson

 7  Street that Terry Dukes, Jr. had a firearm?

 8       A.   We were told there was possibly a firearm

 9  inside the residence.

10       Q.   Who told you that?

11       A.   I don't recall specifically, but if you would,

12  give me one second.  If you look at the stuff at number

13  5 under Detective Wilkinson's incident report, he

14  illustrates it.  I'm not speaking for Deputy Wilkinson

15  -- or Detective Wilkinson, I'm --

16       Q.   I'm sorry, what are you -- what are you

17  reviewing right now, Corporal?

18       A.   If you have -- you showed me the incident

19  report a second ago.  You should have Detective

20  Wilkinson's narrative supplement to my report.  I'm not

21  speaking for him.  I'm just stating it illustrated in

22  his report with what I just said about the firearm in

23  the residence.

24       Q.   Okay.  I'm just -- and I'm not asking you to

25  speak for him.  I'm just trying to understand what you
```

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   were told, right?  So I'm trying to understand what you

2   knew.  Not what -- not what Detective Wilkinson knew,

3   what you knew when you went to the house.

4        A.   -- this information where the information came

5   from.  Who specifically said it on this night before

6   going to the house?  I can't answer that, because I

7   don't -- there was four us talking.  I don't recall.

8        Q.   Okay, but what you're telling me you do recall

9   is that someone said there is possibly a firearm in the

10  house?

11       A.   That is correct.

12       Q.   And my understanding from your testimony is,

13  you did not know, other than the -- other than there

14  were -- there was a -- there was probable cause to

15  arrest Terry Dukes, Jr. for aggravated battery on a

16  pregnant person, you did not know any of the other --

17  you did not know the specific facts of what was said to

18  have occurred before you went to the house?

19       A.   I don't know every specific detail of what was

20  said in that interview.  I do not know.

21       Q.   Is it normal to go -- is it normal in your

22  experience as a -- as a patrol deputy, patrol corporal

23  to go -- to go to pick someone up at their house to

24  arrest them without getting any more information than

25  that?



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

1    A.   It is.

2    Q.   Okay --

3    A.   The policy that you -- the policy you read

4 earlier gives us that that option, and it's actually

5 more practical to do it that way.

6    Q.   Is it -- is it your normal practice to go try

7 to arrest someone at their home without an arrest

8 warrant?

9    A.   We have --

10       MS. ADKINS:  Form.

11    A.   Yes, if we have probable cause, we will

12 hopefully do a diligent search of where we may know

13 they'll be at to effect that arrest.  That is -- that is

14 a very common practice, I think, among the law

15 enforcement community, not just our agency.

16       BY MR. SLATER:

17    Q.   All right.  I want to -- I want to now shift

18 to when you arrived at 900 Patterson Street.  So my

19 understanding is there were four patrol cars that

20 arrived on the scene.  Where did you park?

21    A.   Yeah, we -- we didn't -- we didn't immediately

22 drive up to the residence.  We --

23    Q.   Okay.  Where'd you go?

24    A.   We parked before the residence and blacked out

25 -- well, the term we would use is black out our cars.  We

**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    would turn all of our lights off and we would park

2    before the residence and then we would approach on foot.

3    It's a -- it's a tactic that law enforcement probably

4    around the world use it whenever they are going to

5    arrest a suspect for a violent crime or if a suspect

6    that they know can be violent, has a tendency to be

7    violent, or all the above.

8        Q.   Okay.  And is this -- did you come in from --

9    I believe there's like a grocery on one side heading up

10   Patterson and then Patterson curves and then intersects

11   with some other streets.  Were you coming in from the

12   side where the grocery is, or the other way?

13       A.   We did.  We came up the side of where Dollar

14   General is located.  We turned right there and traveled

15   all the way to where the road 90's back to the left. And

16   when it 90's back to the left, that's Wilson Ave. And

17   whenever we turned left, we drove almost to where the

18   residence is at, but we stopped just shy of it.  We

19   blacked out our cars and stopped just shy of it.  And

20   then we got out and we walked up on foot from there.

21       Q.   Okay.  And why did you black out your cars?

22       A.   Because if we show up at the house and if

23   Dukes, Jr. is there and sees our car, there is a great

24   possibility that he will take off on foot and it would

25   defeat our purpose of being there, which would be to

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  take him into custody.

2      Q.  Did you decide -- when did you decide that you

3  were going to black out?  Was that on the way there? Was

4  that before you left the Sheriff's Office?

5      A.  That most likely was determined before we left

6  the Sheriff's Office.

7      Q.  Okay.  Do you know if you determined anything

8  else that you would do before you left the Sheriff's

9  Office besides blacking out your vehicles and parking

10 further up from the residence?

11     A.  We decided who was going to go to the front

12 door and who was going to go to the back.

13     Q.  Okay.  And what did you decide on that?  Who

14 was going to go to the front door?

15     A.  Corporal Almeida and Deputy Murphy was going

16 to go to the front.  While Deputy Gaffey and myself was

17 going to go to the back of the residence.

18     Q.  Okay.  Did you make any sort of -- so my

19 understanding is the plan on where you were going to

20 park, what you're going to do when you get up to the

21 house, who's going to be in the front, who's going to be

22 back, that was most likely decided at the Sheriff's

23 Office, not outside the residence?

24     A.  Correct.

25     Q.  Okay.  When you get to the -- so when you walk



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

```
 1  up, are you walking together?  Are you splitting up into
 2  teams for front and back?  How are you approaching the
 3  house?
 4       A.   Deputy Gaffey and myself, if I remember
 5  correctly, we walked together around the -- if you're
 6  facing the residence from the road, it'd be to the right
 7  side of the -- of the house.  This would be the -- I
 8  guess the north side.  We walked around the corner on
 9  the north side.  Deputy Gaffey stayed on that northwest
10  side of the residence, and I walked to the back door.
11       Q.   Okay.  Did -- so you walked -- if you're
12  coming up straight at the house, right?  You're saying
13  Gaffey or Murphy walked to the left by the front door,
14  to the left of the front door?
15       A.   I don't know where Deputy Murphy walked.  I
16  mean --
17       Q.   Okay.  Sorry.
18       A.   -- Gaffey -- Deputy Gaffey walked, if you're
19  walking up to the house to the right of the house and
20  then around the house.
21       Q.   Okay.
22       A.   Deputy Gaffey stayed at the corner, and I went
23  to the back door behind the house.
24       Q.   Okay.
25       A.   While Deputy Murphy and Deputy -- Corporal
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1  Almeida walked up to the front of the house.  And the

 2  house they approached, I do not know if they did it

 3  together.  If one went here, one -- I don't know.  You'd

 4  have to talk to them.

 5      Q.   Okay.  Okay.  So you and Gaffey have split up.

 6  He's at the corner.  You're at the back door.  And the

 7  back door is the furthest -- if you're at -- if you come

 8  around the side of the house on the right side, the door

 9  is all the way to the end; is that right?

10      A.   Almost to the end -- almost to the end.

11  Almost to the end.

12      Q.   Okay.

13      A.   I'll say probably maybe three-quarters of the

14  way, just over halfway, if I remember correctly.

15      Q.   And the house is -- it's a mobile home, right?

16      A.   It is.

17      Q.   And there's steps that lead up to get into it?

18      A.   From the back door, yes, sir.

19      Q.   Okay.  So at this time, were you up -- did you

20  go up to the door when you first arrived there, or did

21  you stay back at all?

22      A.   No, sir.  Typically, when we do this, if not

23  for officer safety issue, it's not -- it's not smart to

24  stand at the back door.  So we would typically stand on

25  -- it -- it depends on the door.  If it's an outward-

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    swinging door, if an inward-swinging door.  If it is an

2    outward-swinging door, which way does it open?  If it's

3    an inward-swinging door, which way does it swing inward?

4    That would determine whether we position to the left or

5    to the right, but there's a lot of factors that go --

6    that go -- I know it sounds simple, just walking up to

7    this back door.  But there's -- I mean, there's other

8    factors that go into this that helps us make our

9    decision as to where we stand.

10        Q.   Okay.  And what were you doing while you were

11   standing back there?  Were you doing anything?

12        A.   I was waiting for Deputy Murphy and Deputy --

13   Corporal Almeida to -- in theory, somebody answer their

14   -- their front door, somebody's knocking.  So they was

15   knocking, trying to make contact with Dukes, Jr. or

16   whoever was inside, if anybody was inside.  I was

17   just --

18        Q.   Did you hear -- did you hear knocking?

19        A.   I could hear knocking and Sheriff's Office

20   clearly from where I stood.

21        Q.   Do you remember whose voice you heard saying

22   that?

23        A.   Deputy Murphy, I believe.

24        Q.   Okay.  You -- at any time before you went

25   inside the house, did you knock on the back door?

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

```
 1        A.   I did not.  That would defeat the purpose of
 2   me being there.
 3        Q.   Okay.  So before you went into the house, how
 4   long were you out there waiting?
 5        A.   A few minutes, maybe.  To give an exact time,
 6   I can't -- I can't do that.  I'll say a few minutes.
 7        Q.   And then what happened?
 8        A.   After several series of knocks and announce --
 9   we'll call it knock and announce, knock and announce,
10   Sheriff's Office.  I could hear some faint footsteps and
11   someone talking or mumbling, come to the house.  It
12   sounded like it was getting closer to me as -- then
13   shortly after I heard that, the back door opened up all
14   the way.  And as the back door was opening up, I could
15   see an individual as the door was opening.  An
16   individual turned -- you were going to say something?
17        Q.   No, I'm sorry.  I missed -- was a cough.
18        A.   Oh.
19        Q.   I'm sorry.
20        A.   As the door was opening up, I could see an
21   individual turn as the door was opening up, and, like,
22   going walk -- walking back inside the house.
23        Q.   Did this individual talk to you?
24        A.   He -- no, he mumbled.  He -- I could hear him
25   saying or mumbling something as, like, before opening
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    the door.  I don't know what he said.  And, like, as the

2    door was opening, I could hear him mumbling something,

3    but I -- I couldn't make out what he was saying.

4        Q.   Okay.  So then you see him go back into the

5    house and I'm going to show you what -- to assist sort

6    of as we go through this, I'm going to show you what

7    I've marked as Plaintiff's 13.

8              (EXHIBIT 13 MARKED FOR IDENTIFICATION)

9              BY MR. SLATER:

10       Q.   These are a series of photographs taken at 900

11   Patterson Street.  Do you recognize the first

12   photograph?

13       A.   I do.

14       Q.   Okay.  Does this look like a 900 Patterson

15   Street to you, the house there?

16       A.   It does.

17       Q.   Okay.  And you can see the front door is sort

18   of to the right frame of the picture?

19       A.   See them.

20       Q.   Okay.  And you can see the two windows to the

21   left on the far left.

22       A.   The one -- the one just to the left of the

23   front door or the ones that's farthest to the left?

24       Q.   The farthest to the left, those two windows?

25       A.   See them.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   swung on May 29 -- 25, 2019?

2        A.   Yes, sir.

3        Q.   Okay.  And here, the picture's backed up a

4   little bit in the same room.  You can still see the

5   door, there flush against the wall.  Okay.  And then

6   finally, picture 11 is just closer to still inside that

7   room, looking out at the living room; is that right?

8        A.   (No audible response).

9        Q.   Okay.  So let's go back -- and I don't have

10  the full -- we don't have the full house pictured here,

11  but you went to the right, was your testimony.  You went

12  around the back, and you went to -- towards this back

13  door.  I'm on picture 3.  But you weren't standing at

14  the door, you were standing further back.  About how

15  many feet back were you standing?

16       A.   No, I -- I -- I was standing just to the right

17  of that handrail on the right side.

18       Q.   I see.  Okay.

19       A.   About where your cursor's at right there.  I

20  was standing right there.

21       Q.   Right -- about right here or further out?

22  Okay.

23       A.   No, not there.

24       Q.   So you're just pointing right off of the

25  picture -- like, right outside of the range of the

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  picture?

2       A.   No, sir.  I was standing just to the right of

3  that handrail.  Right --

4       Q.   Okay.

5       A.   -- where your cursor is there.

6       Q.   Okay.  So I -- can you see this box I've

7  created?

8       A.   That's it -- that's -- that's far as --

9       Q.   Okay.  So right here.  So just --

10      A.   Right off --

11      Q.   Just --

12           THE REPORTER:  Pardon me.  This is the court

13      reporter speaking.  I'm having a little bit of

14      trouble hearing.  Please remember to speak one at a

15      time for the record, and to take a little pause in

16      between question and answer.  Thank you.

17           MR. SLATER:  My apologies.  I'm known for just

18      talking and talking over folks and I -- it's a

19      problem, so I apologize.  But all right.

20           BY MR. SLATER:

21      Q.   So Corporal, so I understand correctly, you

22  were in the frame of this picture, just, like, right

23  against the right handrail?

24      A.   Where that handrail comes to an end at the

25  bottom, I was just to the right of that.  Right there

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  where your cursor is.

2      Q.  Okay, great.  And so eventually, you heard

3  some noises and the door opened?

4      A.  I heard Deputy Murphy announcing, Sheriff's

5  Office, and I heard loud knocking several times.  And

6  then between that, I heard some footsteps and some

7  noise, a voice coming from inside the house.  And then a

8  few moments later, the back door opens up all the way.

9  And I could see somebody kind of turning as the door was

10  opening up, almost as if you would go to your back door,

11  turn the knob, and just push it out and then turn around

12  as soon as you did that.  Instead of crossing that

13  threshold, just open the door, turn it out, turn it --

14  push it out and then turn around and walk away.

15      Q.  Okay.  And you said all the way.  Are you

16  suggesting that the door was open as far as it goes on

17  the hinge, like, in picture -- like, in picture 4?

18      A.  No, because at the time, there was a handrail

19  up there.  So it wouldn't -- it -- the handrail was

20  prevented from opening up all the way, but it was opened

21  up wide enough to where I didn't have to open that door

22  to go in the house.  It was opened up wide enough for me

23  to walk straight into the house.

24      Q.  And you said you saw the person inside walk

25  away, walk and walk towards the kitchen; is that right?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.   Walk away from the door from that spot right
2  there.  There's only one place they could go.  That
3  would be back through the laundry room, back through the
4  kitchen.
5    Q.   Okay.  Did you say anything when the door
6  opened?
7    A.   No, sir, I did not.
8    Q.   Okay.  At the time the door was open, did you
9  have your gun drawn or your -- I'm sorry, your taser
10  drawn?
11    A.   I did not have my firearm or my gun, or my
12  taser drawn.
13    Q.   Did you shine your flashlight at the subject
14  when the door was open?
15    A.   I did not.
16    Q.   Okay.  Stop sharing for a second.  When you --
17  when the -- when the person went back into -- went back
18  away from the door, did you alert any of your fellow
19  officers?
20         MS. ADKINS:  Form.
21    A.   No, not immediately.
22         THE REPORTER:  And just to clarify for the
23     record, Ms. Adkins, you just placed an objection,
24     correct?
25         MS. ADKINS:  That's correct.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1          THE REPORTER:  Thank you.

 2             BY MR. SLATER:

 3     Q.    When you say not immediately, how long until

 4  you -- until you alerted your other deputies?

 5     A.    Within 15 seconds of that door opening.

 6     Q.    15 seconds?

 7     A.    I would say 15 to 20 seconds.  Yes, sir.

 8     Q.    And how did you -- how did you alert them?

 9     A.    My radio.

10     Q.    And what did you say on the radio?

11     A.    That I was inside the house.  I don't remember

12  specifically what I said.  I'm sure I could go back, and

13  I actually still have that recording.  I could listen to

14  it.  But I do remember telling -- notifying them that I

15  was inside the house.  Anything past that, I don't, you

16  know, recall.

17     Q.    Why did you go inside the house without

18  announcing yourself, or why do you go inside the house

19  without announcing your presence?

20             MS. ADKINS:  Form.

21     A.    Because my training and experience, it would

22  be more feasible for me to get through that threshold of

23  the door before I announce, Sheriff's Office.  So that's

24  what I did.

25             BY MR. SLATER:

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1      Q.   And why -- so you said based on your

 2  experience, what kind of --

 3      A.   My training.

 4      Q.   What kind of training is that?

 5      A.   Tactical entry.  Building entry.

 6      Q.   Okay.  Is this tactical entry, meaning, like,

 7  your SWAT training?

 8      A.   You could say that, yes, sir.  No, we -- we've

 9  -- we've had -- we've had probably since this incident

10  training, among the whole entire Sheriff's Office with

11  the law enforcement division with trying to teach, you

12  know, those that are not a part of the TRU team and had

13  a tactic -- tactic of -- I can't say the word,

14  tactically enter a house or business, or do so in a --

15  in a -- in a safe manner, depending on the situation.

16      Q.   Okay.

17      A.   And one -- one -- one of those -- one -- one

18  of the things that we do is if we do enter a house or a

19  business or whatever, instead of announcing, Sheriff's

20  Office, as we -- as we're standing in the doorway or

21  trying to get through the doorway, we will announce it

22  after we enter in.  Now, that is not a, you know,

23  something we do on every single -- you know, every

24  situation is different.  You know, sometimes if we're

25  executing a search warrant or arrest warrant, where we
```

MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  actually have a physical warrant signed by the judge and

2  we're there to execute that, there are certain things

3  that we have to do per state law that would require us

4  to do that before we execute a actual warrant.  Does

5  that make sense?

6       Q.   Sure.  So you go inside the house.  Do you

7  turn your flashlight on at all?

8       A.   After I enter the house.

9       Q.   Okay.  And do you turn your flashlight on

10 after you've radioed the deputies?

11      A.   I don't recall what order it was in.

12      Q.   What did you say over the radio?

13           MS. ADKINS:  Form.

14      A.   I don't recall exactly what I said.  I just

15 remember saying that I was inside the house.

16           BY MR. SLATER:

17      Q.   Did you have any -- your service weapon or

18 your taser drawn at this point?

19      A.   Not at that time.

20      Q.   Did you do anything else to alert your

21 deputies besides calling over the radio?

22      A.   No, sir.  Within seconds of me notifying them

23 over the radio, they were coming inside the house.

24      Q.   Do you recall giving an interview in

25 connection with your entry into the house at 900

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1  announcing Sheriff's Office, right?

 2      A.  Correct.

 3      Q.  Okay.  And so your understanding, then, is

 4  after announcing Sheriff's Office, that Dukes, Junior

 5  came and opened the door and just left it open for you

 6  to come in; is that right?

 7      A.  Okay.  Say that one more time?

 8      Q.  Your understanding is after -- after Deputy

 9  Murphy knocked and announced that the Sheriff's office

10  was there, that Dukes, Junior came to the back door,

11  opened it up and went back inside, right?

12      A.  I don't know who opened up the back door.  I

13  couldn't tell.

14      Q.  Okay.  Right.  You couldn't -- there's no --

15  was there a light on?  Any light on in the house at the

16  time?

17      A.  There was not.

18      Q.  Did you try to turn on any of the lights in

19  the house while you were inside?

20      A.  I did not.

21      Q.  Okay.

22      A.  Not that I recall.  I -- I don't -- I don't

23  think I did, but I don't recall if I did after, you

24  know, everything was done, and after Dukes Senior was

25  secured in handcuffs, I'm not -- I'm not certain if

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1  standing?

 2       A.   That far-left corner of that table, right --

 3       Q.   So I'm going to draw a little box.

 4       A.   Yeah.  Yes, right there.

 5       Q.   Okay.

 6            MR. SLATER:  Okay, so let the record reflect

 7       that Corporal Gregory testified that he was standing

 8       just to the left of the left leg of the table, but

 9       in front of what looks like some sort of black bag.

10            BY MR. SLATER:

11       Q.   Is that -- I don't know what that is.  It

12  looks like a black bag, but just in front of the bag,

13  and just to the left of the -- of the left leg of the

14  table. Okay, so that -- so just for sort of -- also for

15  clarity's sake, so just basically, what, one or two feet

16  behind the door entrance, in front of the door entrance,

17  just kind of straight, like, basically in the middle of

18  the doorframe, but one or two feet back?

19       A.   Correct.

20       Q.   Okay.  Okay.  So you came around from the

21  kitchen -- let me go back to photograph 5.  So you came

22  around, and then did you go straight for this room, or

23  were you -- were you looking around?  Do you -- walk me

24  through what you were doing once you came into the

25  house.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1       A.   I walked through the door, I got inside the --

2   and you got to remember, I mean, all this is done within

3   a matter of seconds, and by the time it took me to walk

4   up the steps, cross that threshold, and get to a

5   position where I felt safe enough to announce Sheriff's

6   Office, by the time I got to that position, the

7   individual was already almost going inside of his door

8   into that bedroom.  From the distance from that doorway

9   to his bedroom, I would say is probably 25 feet, maybe.

10  So it took me, you know, going up the steps, entering

11  that threshold, and getting out of that, what we'd call

12  the fatal funnel, that danger zone, getting out of that

13  area, which -- and with this, would be the kitchen. When

14  I entered -- you know, as I was going to the kitchen and

15  out of that, what we'd call, the fatal funnel, that's

16  whenever I announced the Sheriff's Office and asked the

17  individual to stop.  By that time, he was going inside

18  the bedroom, though.

19      Q.   He wasn't -- so you're saying he wasn't in the

20  bedroom yet, but he was walking inside of it to get

21  inside of it?

22      A.   That's correct.

23      Q.   Okay.  Did you have -- so when did your

24  flashlight go on?

25      A.   Whenever I was inside that -- in front of the

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

27&36W Gregory Chase 01-27-2021                    Page 156

1      Q.   Okay.  Well, that's fine.  Gwen and I --

2           MR. SLATER:  Gwen, let's chat about that after

3      this.

4           MS. ADKINS:  Sure.

5           BY MR. SLATER:

6      Q.   Okay.  So the six to eight seconds, from the

7  point of starting to get inside the house to the point

8  where you're at the -- at the bedroom door here, did you

9  hear any noises inside the house?

10     A.   No.  Walking up the steps and going inside the

11 house, I don't recall hearing -- I -- what do you mean

12 by noises?

13     Q.   Okay. Let's just step back -- oh, I didn't

14 realize my camera is off.  Let's just step back for a

15 second.  My understanding is that you were positioned to

16 the right side of the railing on the back -- you know,

17 right next to the back steps leading into the back door,

18 that the back door comes open, okay, that you see a

19 person, but you can't identify who it is, and you see

20 that person walk back away from the door towards the

21 kitchen, okay, and then you start to come into the

22 house; is that right?

23     A.   That's correct.

24     Q.   Okay.  And you come in, and in a period of six

25 to eight seconds, you've shined your flashlight to alert

MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1                          CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA

 4   COUNTY OF ORANGE

 5

 6        I, the undersigned, certify that the witness in the

 7   foregoing transcript personally appeared before me and

 8   was duly sworn.

 9

10   Identification:  Produced Identification

11

12

13

14

15        _____

16        ANA MARTINEZ

17        Court Reporter, Notary Public

18        State of Florida

19        Commission Expires: December 11, 2026

20        Commission Number: HH 340162

21

22

23

24

25
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1              C E R T I F I C A T E

 2

 3  STATE OF FLORIDA

 4  COUNTY OF ORANGE

 5

 6      I, ANA MARTINEZ, Court Reporter and Notary Public

 7  for the State of Florida at Large, do hereby certify

 8  that I was authorized to and did report the foregoing

 9  proceeding, and that said transcript is a true record of

10  the said proceeding.

11

12      I FURTHER CERTIFY that I am not of counsel for,

13  related to, or employed by any of the parties or

14  attorneys involved herein, nor am I financially

15  interested in said action.

16

17  Submitted on: August 4, 2023.

18

19

20

21

22  _____

23          ANA MARTINEZ

24          Court Reporter, Notary Public

25
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS