UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

TERRY DUKES, SR.,

    Plaintiff,

v.

ROBERT B. McCALLUM, JR., *et ano.*,

    Defendants.

Case No. 1:23-cv-45-AW-HTC

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to the Court's Scheduling Order (Docs. 6 & 8), Rule 56, and Local Rule 56.1, Plaintiff Terry Dukes, Sr. files this motion for partial summary judgment against Defendant Corporal Chase Gregory on liability for invasion of privacy (Count I), trespass (Count II), unlawful entry under the Fourth Amendment (Count III), unlawful seizure under the Fourth Amendment (Count IV), and false arrest/false imprisonment (Count V). As detailed here, it is undisputed that Corporal Gregory, then a sheriff's deputy, entered Plaintiff's home in the early morning of May 25, 2019 at 900 Patterson Street in Bronson, Florida to effect an arrest of his son without a warrant, exigent circumstances, hot pursuit, or consent. Because there is no genuine dispute as to any material fact as to those issues, Plaintiff is entitled to summary judgment as to liability on these federal and state-law claims.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.     The Parties

For at least the past decade, Terry Dukes, Sr. ("Mr. Dukes" or "Plaintiff") has resided at 900 Patterson Street in Bronson, Florida. (Doc. 29-1 at 167:6-17; 166:25–167:7; 167:23–68:4);[1] (Doc. 29-7).[2] At 900 Patterson Street, Plaintiff lived in a double-wide mobile home. (Doc. 29-1 at 10:20-24); *see also* (Doc. 29-2 157:15-16). Plaintiff had "no trespassing" signs posted on his property, including in May 2019. (Doc. 29-1 at 152:2-4); (Doc. 29-8 at Response No. 6); (Doc. 29-17) (photograph of Plaintiff's residence) & (Doc. 29-2 at 160:8–16) (identifying same). During his time at 900 Patterson Street, Plaintiff's son, Terry Dukes, Jr. ("Junior") would stay at his house "off and on." (Doc. 29-1 at 9:25–10:19). He would normally shine his flashlight into Plaintiff's window and asked to be let in the back door because he did not have a key to the house. (*Id.* at 51:8-15).

---

[1] Deposition transcript page references are to the deposition page, not the CM/ECF-generated page number.

[2] Plaintiff requests that the Court take judicial notice of the recorded warranty deed and printout from the property appraiser's website under Rule 201(d). *Universal Express, Inc. v. U.S. S.E.C.*, 177 F. App'x 52, 53 (11th Cir. 2006) (public records are "permissible facts" that a district court can consider) (citing *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003)); *see also Rhodes v. City of Jacksonville, Fla.*, 2022 WL 20538758, at *7 (M.D. Fla. Feb. 1, 2022), report and recommendation adopted sub nom. *Rhodes v. City of Jacksonville*, 2022 WL 20538756 (M.D. Fla. Feb. 23, 2022) (identifying a publicly recorded deed as a public record capable of judicial notice); *Coastal Wellness Centers, Inc. v. Progressive Am. Ins. Co.*, 309 F. Supp. 3d 1216, 1220 n. 4 (S.D. Fla. 2018) (government websites capable of judicial notice).

Gregory, then a deputy, was familiar with Plaintiff and Junior and had been to 900 Patterson Street several times prior to May 25, 2019. (Doc. 12 ¶ 25); (Doc. 29-2 at 136:19–37); (Doc. 29-9 at Response No. 19). Gregory knew that Junior would stay at 900 Patterson Street with Plaintiff but also a part of town called University Oaks. (Doc. 29-10 at Response No. 7); (Doc. 29-2 at 137:5–38:23).

## II.    The Incident

At around 3:13 a.m. on May 25, 2019, the Levy County Sheriff's Office was alerted to a possible battery involving a pregnant woman. (Doc. 29-11). At around 3:58 a.m. that morning, Detective Mike Wilkson of the Levy County Sheriff's Office responded to the complaint at Shands Hospital in Gainesville, Florida. (*Id.*) Detective Wilkison learned that Junior, Plaintiff's son, had purportedly battered his then-girlfriend, Shaquanda Sheffield. According to Sheffield's statement, Junior became violent and attacked her at around 2:30 a.m. on May 24, 2019 while they were at 900 Patterson Street. (Doc. 29-3 at 18:6–19:25; 27:4-10). Following that interview with Junior's then-girlfriend, Detective Wilkinson determined that he had enough evidence to establish probable cause to arrest Junior for battery on a pregnant woman. (*Id.* at 28:2-12). At that time, Detective Wilkinson did not apply for an arrest warrant for Junior. (Doc. 29-12 at Response No. 12).

Detective Wilkinson asserts he called Corporal Franco Almeida and Deputy Blake Murphy to go by 900 Patterson Street. (Doc. 29-3 at 28:2-12); (Doc. 29-5 at 27:10-14). Before sunrise on May 25, 2019, Gregory, Almeida, Murphy and Deputy

3

Tucker Gaffey left the Sheriff's Office for Plaintiff's residence at 900 Patterson Street. (Doc. 29-4 at 31:11–32:1); (Doc. 29-2 at 142:12-19). The deputies assert that they knew that Detective Wilkinson developed probable cause to arrest Junior for battery on a pregnant woman (*see* Doc. 26-11 ¶ 3); (Doc. 29-2 at 146:23–47:24), and they believed he could be under the influence of drugs and that he was possibly armed based on his status as felon. (Doc. 29-4 at 32:5–33:5); (Doc. 29-2 at 151:6–52:5). At the time they arrived at Plaintiff's home, the deputies did not possess any search or arrest warrants for Plaintiff's home, Plaintiff, or Junior. (Doc. 29-4 at 54:18-20); (Doc. 29-5 at 27:15-18); (Doc. 29-2 at 149:10-12); (Doc. 12 ¶ 22).  The deputies assert they were not in "hot pursuit" or "fresh pursuit" of Junior. (Doc. 29-12 at Response No. 11); (Doc. 12 ¶ 22 (admitting no fresh pursuit)). The underlying crime occurred more than 24 hours before Detective Wilkinson interviewed the victim. (Doc. 29-3 at 27:11-16). And there were no exigent circumstances justifying the deputies' entry into Plaintiff's home. (Doc. 12 ¶ 22 (admitting no exigency)).

Plaintiff was awake at the time deputies arrived, just before 6 a.m., before sunrise. (Doc. 29-1 at 38:14–39:5); (Doc. 26-9 at 5:12-14); (Doc. 29-11 at Dukes, T. 177). There were no lights on in the house. (Doc. 29-1 at 39:6-21); (Doc. 29-2 at 178:14-17). The deputies claim they approached Plaintiff's home with Gregory and Gaffey going to the right of Plaintiff's front door and around the back of his house. (Doc. 29-2 at 155:7-17, 156:25–57:14). They claim that Almeida and Murphy remained in the front of the house. *Id.* The deputies assert that Murphy knocked and

4

announced on Plaintiff's front door, stating "Sheriff's Office." (*Id.* at 158:10-23).

Plaintiff, who is hard of hearing, heard a loud knock and banging at his front door,

and finally saw a flashlight shine through his bedroom window. (Doc. 29-1 at 40:20–

41:8). Plaintiff didn't hear anyone knock and announce "Sheriff's Office" or say

anything else. (*Id.* at 52:10–18). Plaintiff thought his son Junior had come home and

wanted Plaintiff to let him in the house. (*Id.* at 41:13–42:5, 152:5-11). After a loud

knock, Plaintiff said "I'm coming" and got up from bed. (*Id.* at 41:18-21, 42:2-3);

(Doc. 26-9 at 5:15-16).

The only working door to Plaintiff's house at the time was the back door.

(Doc. 29-1 at 42:6-12, 52:24–53:14). Plaintiff, who was naked at the time (Doc. 26-9 at

5:16-18), and using his phone flashlight (*see id* at 5:18-20), walked through the kitchen

and opened the back door to let his son in the house. (Doc. 29-1 at 42:6-22). Plaintiff

opened the back door (*Id.* at 54:18–55:1, 152:18-23); (Doc. 26-9 at 5:18-22), did not

say anything (*see* Doc. 29-1 at 152:12-16), heard no one say anything (*see id.* at 152:17-

18), and after his son didn't immediately come in, walked back to his bedroom to get

dressed and ready for work at the landfill. (*Id.* at 42:13–43:1, 55:2-8); (Doc. 29-8 at

Response No. 1). Had Plaintiff known that Levy County Sheriff's Office deputies

were at his door that morning, he would have gotten dressed, informed them that he

had a firearm in his home, and informed them that he was "Senior," not Junior. (Doc.

29-8 at Response No. 5).

At the time Plaintiff opened the back door, Gregory claims he was standing away from the door. (Doc. 29-2 at 157:19–58:9); (Doc. 29-15 at Duke, T. 14). He testified that he was standing to the right side of the hand rail:



(Doc. 29-13 at Dukes, T. 2910); (Doc. 29-2 at 166:9-17; 166:24–67:11).

Gregory did not speak to Plaintiff. (Doc. 29-2 at 169:5-7). In his deposition, Gregory stated he heard the subject—he "d[idn't know who opened up the back door" (*id.* at 178:8-13)—"mumbling something" but he "couldn't make out what he was saying" and "didn't know what he said." (*Id.* at 159:23–60:3). Gregory did not mention any mumbling in earlier sworn internal affairs interview or his sworn

complaint filed with the state attorney to charge Plaintiff with resisting arrest. (*See generally* Doc. 29-14); (Doc. 29-15 at Duke, T. 14).

In his other sworn statements, Gregory stated he "briefly observed a black male standing in the threshold. This male turned and walked back into the residence, so I walked up the stairs and entered the house through the door the black male just opened." (Doc. 29-10 at Response No. 7). In his sworn complaint signed days after the incident, he added "As soon as this door opened, I entered this residence through this door." (Doc. 29-15 at Dukes, T. 14). And in his sworn statement given during the course of an internal affairs investigation he stated "I could see somebody go back into the house, didn't say a word, just opened the door." (Doc. 29-14 at 18:47–19:05);[3] (*see also id.* at 22:10–4:00; 26:00-14) (Gregory stated he made two-second decision to enter the house; "was almost instantaneous"). Deputy Gaffey, who claims he was behind the house with Gregory, but on the opposite corner, confirms that he did not hear Gregory say anything before he went inside. (Doc. 29-10 at Response No. 7); (Doc 29-4 at 55:14-19).

Gregory did not request to enter Plaintiff's home. (Doc. 29-2 at 170:17-24). Rather than requesting admittance, Gregory used his tactical training to storm Plaintiff's home. (*Id.* at 170:17–72:5). Gregory asserts that the first time he said anything was once he was inside the home. (Doc. 29-10 at Response No. 10). After

---

[3] Audio recording references are to the minute and second: mm:ss.

entering the home, Gregory approached Plaintiff's bedroom.[4] (Doc. 29-2 at 191:20–92:21, 196:6-22). Gregory fired his Taser less-lethal weapon at Plaintiff, striking him in the right shoulder with a single probe. (Doc. 29-1 at 82:16-17); (Doc. 26-9 at 7:11-14):



(Doc. 29-13 at Dukes, T. 2909).

Gregory then handcuffed Plaintiff and escorted him out of his home. (Doc. 29-1 at 84:16–85:16, 106:6-13); (Doc. 26-9 at 7:15-18). He was charged with resisting arrest without violence premised on a sworn complaint by Gregory. (Doc. 29-1 at

---

[4] The parties hotly dispute what happened after Gregory approached Plaintiff in the house. As explained below, what happened between the time that Gregory entered Plaintiff's home and fired his Taser striking Plaintiff's shoulder does not impact the resolution of this motion because Gregory had no legal authority to enter Plaintiff's home.

107:9-19); (Doc. 29-15 at Dukes, T. 13-14); (Doc. 29-10 at Response No. 7). Those

charges were later dropped at the request of the Levy County Sheriff's Office. (Doc.

29-16).

## MEMORANDUM OF LAW

### I.    Legal Standard

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment "is

appropriate only if 'the movant shows that there is no genuine [dispute] as to any

material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v.

Cotton*, 572 U.S. 650, 656–57, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (per curiam)

(quoting Fed. R. Civ. P. 56(a)). An issue is "genuine" if a reasonable trier of fact,

viewing all the record evidence, could rationally find for the nonmoving party in light

of his burden of proof. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). And

a fact is "material" if, "under the applicable substantive law, it might affect the

outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th

Cir. 2004). "[W]here the material facts are undisputed and do not support a reasonable

inference in favor of the non-movant, summary judgment may properly be granted as

a matter of law." *DA Realty Holdings, LLC v. Tenn. Land Consultants*, 631 Fed. Appx.

817, 820 (11th Cir. 2015). To prevail on a motion for summary judgment, "the

nonmoving party must offer more than a mere scintilla of evidence for its position;

indeed, the nonmoving party must make a showing sufficient to permit the jury to

reasonably find on its behalf." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).

## II.   Discussion

Plaintiff is entitled to the entry of partial summary judgment on liability as to all his claims against Corporal Gregory. Corporal Gregory violated Plaintiff's Fourth Amendment rights and state law when he entered his home without a warrant, consent, hot pursuit, or any exigent circumstances.

### A. Plaintiff is entitled to summary judgment on liability for his Fourth Amendment claims.

For Plaintiff to establish his Fourth Amendment unlawful entry and unlawful seizure claims, he must establish (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under color of state law. *Holmes v. Crosby*, 418 F. 3d 1256, 1258 (11th Cir. 2005).

### 1.   Gregory was acting under color of state law.

First, there is no material dispute of fact that Gregor was acting under color of law when he unlawfully entered Plaintiff's home and seized him. A defendant acts under color of law when he deprives a plaintiff of a right through the exercise of authority that he has by virtue of his government office or position. *Almand v. DeKalb Cnty., Ga.*, 103 F. 3d 1510, 1513 (11th Cir. 1997). The dispositive question is whether the defendant was exercising the power he possessed based on state authority or was acting only as a private individual. *Id.* Rightfully, Gregory admits that he was acting

under color of law for purposes of the incident that occurred at Plaintiff's home in the morning of May 25, 2023. (*See* Doc. 12 ¶¶ 12, 109, 126). He entered Plaintiff's home, while on duty, and detained Plaintiff related to his effort to effectuate an arrest on Junior. *Cf. Almand v.DeKalb Cnty., Ga.*, 103 F. 3d 1510, 1514-15 (11th Cir. 1997) (off-duty plainclothes police officer did not act under color of law when he forced his way into the plaintiff's apartment and sexually assaulted her, but likely acted under color of law when he first went to the plaintiff's residence to speak to her about a police investigation.).

### 2. Gregory violated the Constitution when he entered Plaintiff's home.

It is undisputed that Gregory violated Plaintiff's Fourth Amendment rights because he entered his home without a warrant, exigent circumstances, fresh pursuit, or consent.

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980) (quoting *United States v. U.S. Dist. Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972)); *Morris v. Town of Lexington Alabama*, 748 F.3d 1316, 1322 (11th Cir. 2014). "The Fourth Amendment generally prohibits the warrantless entry of a

person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

Therefore, warrantless entry into the home is per se unreasonable, subject only to a few "jealously and carefully drawn" exceptions. *Georgia v. Randolph*, 547 U.S. 103, 109 (2006). "The prohibition does not apply, however, to situations in which voluntary consent has been obtained." *Rodriguez*, 497 U.S. at 181. "Where an officer enters a home without consent and without a warrant, "any resulting search or seizure violates the Fourth Amendment unless it was supported by probable cause and exigent circumstances." *Hardigree v. Lofton*, 992 F.3d 1216, 1224 (11th Cir. 2021).[5] Exigency is a situation in which "the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." *United States v. Burgos*, 720 F.2d 1520, 1526 (11th Cir. 1983). Under either consent or exigent circumstances, an officer who conducts a warrantless search or seizure inside the home bears the burden of proving that his conduct was justified. *See Sammons v. Taylor*, 967 F. 2d 1533, 1543 (11th Cir. 1992); *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984).

---

[5] The Eleventh Circuit in *Hardigree* offers examples of situations in which courts have found that exigent circumstances were present:

> where officers entered a home to prevent the destruction of evidence, *United States v. Mikell*, 102 F.3d 470, 476 (11th Cir. 1996), to pursue a fleeing suspect, *United States v. Santana*, 427 U.S. 38, 42–43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), and to break up a violent fight, *Brigham City v. Stuart*, 547 U.S. 398, 406, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006)."

*Id.*

Here, Gregory admits that he did not have a warrant, was not in fresh pursuit, and there were no exigent circumstances. (Doc. 12 ¶ 22). He asserts that he had Plaintiff's consent to enter the home based on a host of circumstances. (*See, e.g.*, Doc. 26-11 ¶¶ 3–5). As explained below, none of those circumstances establish express or implied consent because Gregory entered the home in response to the door opening without requesting admittance to enter.

"The fact that a person answers a knock at the door doesn't mean he agrees to let the person who knocked enter." *McClish v. Nugent*, 483 F.3d 1231, 1247 (11th Cir. 2007) (holding that an officer violated the Fourth Amendment where an officer reached into plaintiff's home and pulled him out when he opened his door); *see also Gill as Next Friend of K.C.R. v. Judd*, 941 F.3d 504, 524 (11th Cir. 2019). For example, it has been established in this Circuit that an officer may establish implied consent from body language when in response to requests for admittance a subject yields the right of way to officers. *U.S. v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002). In *Bashir v. Rockdale County, Ga.*, the Eleventh Circuit established that entry into a home when the deputy merely followed the subject into the house but never asked for permission to enter violated the Fourth Amendment. 445 F.3d 1323, 1329 (11th Cir. 2006). Similarly, in *United States v. Edmondson*, the Eleventh Circuit held that no valid consent exists when an officer gains entry into the home by a show of force or "official authority." 791 F.2d 1512, 1514–15 (11th Cir. 1986) (officers with guns drawn knocked on door, announced "FBI. Open the door," and defendant opened the door

and put his hands on his head); *see also Moore v. Pederson*, 806 F.3d 1036, 1046 (11th Cir. 2015) (no consent to enter house where officer told plaintiff he planned to arrest him and plaintiff, who was inside doorway of house, simply put his arms behind his back); *United States v. Tovar-Rico*, 61 F.3d 1529, 1535–36 (11th Cir. 1995) (holding that there was no consent where five police officers knocked on defendant's door, announced their identity, and asked for permission to enter—and then rushed into the home with guns drawn as soon as defendant opened the door).

In *Ramirez-Chilel*, four police officers approached the defendant's home shortly before midnight, knocked on the door and identified themselves, and then asked for permission to search the house for evidence of counterfeit documents. 289 F.3d at 746–47. According to the testimony of one of the officers, the defendant "yielded the right-of-way" to allow them in. *Id.* at 747. The Eleventh Circuit held that there is "a distinction between the failure to object when officers follow someone into their home and the act of 'yielding the right-of-way' to officers at the person's front door." *Id.* at 752. "Although the officers did not receive any explicit verbal consent from [the defendant] to enter, the officers did receive some sort of implied consent to enter from [his] body language ...." *Id.*

Here, however, it is undisputed that Gregory did not observe Plaintiff's body language or recognize the person who opened the door. (Doc. 29-2 at 178:8-13); (Doc. 29-10 at Response No. 7); (Doc. 29-14 at 18:47–19:05). It is also undisputed that Gregory failed to request admittance into Plaintiff's home before entering. *See id.*;

(Doc. 29-2 at 169:5-7). According to the deputies, the only thing any of them did was knock and announce, "Sheriff's Office." (Doc. 29-2 at 158:10-23). The parties agree that Plaintiff opened the back door to his home after that (though they disagree on how far), and that Plaintiff turned back towards his bedroom. (Doc. 29-1 at 42:13–43:1, 55:2-8); (Doc. 29-8 at Response No. 1); (Doc. 29-10 at Response No. 7); (Doc. 29-14 at 18:47–19:05). Gregory testified that without identifying who the person was, requesting admittance, or saying anything, he stormed into Plaintiff's home based on his tactical training in a split-second decision. (Doc. 29-14 at 18:47–19:05, 22:10–4:00; 26:00-14); (Doc. 29-2 at 170:17–72:5). He did so while not being at the door greeting the person who opened it. Instead, he was out of the way by the side of the steps. (Doc. 29-15 at Dukes, T. 14); (Doc. 29-2 at 166:9-17; 166:24–67:11).

Based on those admissions and the undisputed evidence, Gregory violated the Fourth Amendment when he entered Plaintiff's home. Unlike *Ramirez-Chilel*, where the Eleventh Circuit examined body language after a <u>request for admittance</u>, here there was no such request, only a show of authority.[6] *United States v. Stiner*, 551 F. Supp. 2d 1350, 1357 (M.D. Fla. 2008) (relying on *Ramirez-Chilel*, *Edmonson*, and *Florida v. Royer*, 460 U.S. 491, 497 (1983) for the proposition that to determine whether

---

[6] In his declaration filed in support of his forthcoming summary judgment motion, Gregory asserts that there was no "show of force" to coerce entry into Plaintiff's home. (Doc. 26-11 ¶ 3). The officers, were, however, banging and displaying their "official authority" by announcing "Sheriff's Office." And either way, Gregory did not request admittance before entering, rushing into the house seconds after the door opened and the person—who he couldn't see or hear—walked back into the interior of the home.

consent is voluntary it must not be "merely acquiescence to a claim of lawful authority"). But even so, this is not a case where Plaintiff "yield[ed] the right-of-way" to Gregory by holding the door open for him, or standing back while he walked inside. *See also Holmes v. Kucynda*, 321 F.3d 1069, 1078–79 (11th Cir. 2003) (consent was given by stepping aside and acquiescing to entry); *Stiner*, 551 F. Supp. 2d at 1357 ("stepping aside at the front door and pointing to the location of the bedroom where the Defendant could be found were clearly indicative of her 'yielding the right-of-way' in consent for the officers to enter the premises and arrest the Defendant."). No, Gregory was not even standing up at the doorway when the back door opened; he was down on the ground and to the side of the door. (Doc. 29-15 at Dukes, T. 14); (Doc. 29-2 at 166:9-17; 166:24–67:11).

Instead, the more analogous case is *Bashir v. Rockdale County*. There, the Eleventh Circuit determined that unlike *Ramirez-Chilel*, where there was evidence of the plaintiff yielding to the officer after a request for admittance, there was no such evidence that Bashir yielded the right-of-way in response to a request for permission to enter. 445 F.3d at 1329. In that case, the officer spoke to the plaintiff who then noticed his unattended son. The plaintiff stopped talking to the officer, picked up his son, and walked into the house, followed by the officer. *Id.* at 1325–26. The failure to request admittance and enter Plaintiff's home without a warrant, exigency, or hot pursuit was unjustifiable in that case. *Id.* at 1329 ("Deputy Dais never asked for permission but simply followed Bashir into the house.").

Because consent is not freely given without a request for admittance, even if Plaintiff's body languages suggested that he "yielded the right of way"—which the evidence shows he did not, as Gregory was not standing on the stairs at the door, he did not speak or identify himself in anyway, and Plaintiff did not stand back, but rather he walked away—Gregory's entry was not "objectively justifiable behavior under the Fourth Amendment." *United States v. Spivey,* 861 F.3d 1207, 1215 (11th Cir. 2017). Because the behavior is objectively unjustifiable, his subjective intentions do not matter. *Id.*[7] That is the case even if Plaintiff were indeed "mumbling" when he opened the back door (*see* Doc. 29-2 at 159:23–160:3)—which Gregory did not identify in prior sworn statements—because Gregory claims he did not "know what he said." (*Id.* at 160:1). And it does not matter that Plaintiff thought he was opening his door for his son—Plaintiff's subjective belief is not relevant because Gregory admits he did not see anything that would suggest what Plaintiff's body language expressed. (Doc. 29-10 at Response No. 7) ("I briefly observed a black male standing in the threshold. This male turned and walked back into the residence, . . .").

Accordingly, because there is no "conflicting evidence" or "disputed factual issues" on whether Gregory had a lawful basis to enter Plaintiff's home on the

---

[7] In his declaration, Gregory explains his apparent subjective beliefs about guns, drugs and past experiences of people "very clearly tell[ing] you to leave." (Doc. 26-11 ¶¶ 3–4). Gregory claims that the totality of the circumstances militates toward his understanding that there was consent to enter. But because the entry was objectively unreasonable, Gregory's "interpret[ation of] the actions" does not come into play. (*Id.* at ¶ 5).

morning of May 25, 2019, this motion should be granted on Plaintiff's Fourth
Amendment unlawful entry claim in Count III. *Carlin Commc'n, Inc. v. S. Bell Tel. & Tel.
Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986) ("[T]he court may not weigh conflicting
evidence to resolve disputed factual issues; if a genuine dispute is found, summary
judgment must be denied.").

### 3. Because Gregory's presence in Plaintiff's home was unlawful, he cannot rebut the presumption that the arrest and subsumed force was unreasonable.

Similarly, because Gregory cannot establish that his presence in Plaintiff's
home was justified by exigent circumstances or consent, he cannot rebut the
presumptive unreasonableness of Plaintiff's arrest.[8] *Bashir*, 445 F.3d at 1328 (citing
*Payton*, 445 U.S. at 588–89)); *see also Hanie v. City of Woodstock*, 2008 WL 476123, at *7
n. 5 (N.D. Ga. Feb. 19, 2008) ("Because Plaintiffs have successfully stated a claim for
illegal entry into the home, any injuries that are sustained as a result of a false arrest
within the home or force used against Plaintiffs inside of the home are compensable
under the same theory.") (relying on *Bashir* & *Sauls*).

---

[8] Plaintiff's assertion that Gregory used excessive force on him (Doc. 11 ¶¶ 105, 121–
22), is subsumed within his Fourth Amendment unlawful seizure claim. *Bashir*, 445 F.3d at
1332; *Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000); *Williamson v. Mills*, 65 F.3d 155,
158–59 (11th Cir.1995) (holding that a claim that any force during a false arrest is excessive
is subsumed in the false arrest claim itself because damages for false arrest include damages
for use of force to effect that false arrest); *Alston v. Swarbrick*, 954 F.3d 1312, 1319-20 (11th
Cir. 2020). For the same reasons Gregory cannot evade liability for the unlawful seizure, he
cannot evade liability for the force that occurred in effecting that seizure.

A seizure takes place "whenever a police officer accosts an individual and restrains his freedom to walk away." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). The Supreme Court has identified three categories of police-citizen encounters in determining which level of Fourth Amendment scrutiny to apply: (1) brief, consensual and non-coercive interactions that do not require Fourth Amendment scrutiny, *Florida v. Bostick*, 501 U.S. 429 (1991); (2) legitimate and restrained investigative stops short of arrests to which limited Fourth Amendment scrutiny is applied, *Terry*, 392 U.S. at 1; and (3) technical arrests, full-blown searches or custodial detentions that lead to a stricter form of Fourth Amendment scrutiny, *Brown v. Illinois*, 422 U.S. 590 (1975).

"An arrest is quintessentially a seizure of a person, and therefore subject to the Fourth Amendment's reasonableness requirement." *McClish*, 483 F.3d at 1238. An in-home arrest "is plainly subject to the warrant requirement; probable cause alone is insufficient." *Id.* Once an officer breaches the threshold into a home, "a warrant (or exception) is always required for a home arrest, 'even if the arrestee is standing in the doorway of his home when the officers conduct the arrest.'" *Bailey v. Swindell*, 940 F.3d 1295, 1303 (11th Cir. 2019) (quoting *Moore*, 806 F.3d at 1050 n.14). A "warrantless arrest in a home violates the Fourth Amendment unless the arresting officer had probable cause to make the arrest *and* either consent to enter or exigent circumstances demanding that the officer enter the home without a warrant." *Bashir*, 445 F.3d at 1328 (emphasis in original); *cf. United States v. Bervaldi*, 226 F.3d 1256, 1263, 1267 (11th Cir. 2000) (holding police officers did not violate a person's Fourth Amendment

rights by entering the person's home when the officers had an arrest warrant for a suspect, went to the address they believed was the suspect's home, believed the suspect was inside the home, knocked on the door, and later entered the house).

So, it does not matter whether Gregory had probable cause to arrest Plaintiff for conduct that he asserts occurred in the home—resisting arrest—because he had no lawful basis to be in the home at all. *Minnesota v. Olson*, 495 U.S. 91, 95, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85 (1990) ("It was held in *Payton*... that a suspect should not be arrested in his house without an arrest warrant, even though there is probable cause to arrest him."); *Edmondson*, 791 F.2d at 1515 ("A finding of probable cause alone ... does not justify a warrantless arrest at a suspect's home."). And, "if an arresting officer does not have the right to make an arrest, he does not have the right to use some degree of physical coercion or threat thereof to effect it." *Bashir*, 445 F.3d at 1332; *see also Sauls*, 206 F.3d at 1171; *Williamson*, 65 F.3d at 158–59.

For these reasons, Plaintiff is also entitled to summary judgment on liability for his Fourth Amendment unlawful seizure claim in Count IV.

### 4. Gregory cannot invoke qualified immunity.

To begin with, it is Gregory's burden to show that he is entitled to qualified immunity or that the defense applies, not Plaintiff's. *See Espanola Way Corp. v. Meyerson*, 690 F. 2d 827, 830 (11th Cir. 1982) ("Qualified immunity is an affirmative defense and thus must be asserted by defendants."); *Off. of Thrift Supervision v. Paul*, 985 F. Supp. 1465, 1470 (S.D. Fla. 1997) ("'[o]n a plaintiff's motion for summary judgment,' a

defendant asserting an affirmative defense 'bears the initial burden of showing that the affirmative defense is applicable.'') (citation omitted); *Singleton v. Dep't of Corr.*, 277 Fed. Appx. 921, 923 (11th Cir. 2008) ("the burden of establishing an affirmative defense lies on the defendant, not on the plaintiff"). That said, for the reasons asserted above, Gregory is not entitled to qualified immunity on Plaintiff's Fourth Amendment claims because it has been clearly established prior to May 25, 2019 that Gregory's conduct that morning violated the Fourth Amendment. Specifically, it is undisputed that he entered Plaintiff's home without a warrant, exigent circumstances, fresh pursuit, or consent. *McClish*, 483 F.3d at 1247; *Ramirez-Chilel*, 289 F.3d at 752; *Bashir*, 445 F.3d at 1329; *Edmondson*, 791 F.2d at 1514–15; *Moore*, 806 F.3d at 1046.

Plaintiff contends that even if Gregory could invoke the doctrine of qualified immunity, it should not apply to his section 1983 claims because it contradicts the text of the statute. Qualified immunity is an affirmative defense to personal liability rooted in common law. *Moore v. Morgan*, 922 F.2d 1553, 1557 (11th Cir. 1991); *Harlow v. Fitzgerald*, 457 U.S. 800, 806-07 (1982) ("As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability"). It is not, however, specifically enumerated in the U.S. Code version of section 1983, which the Supreme Court has relied on in grounding the doctrine. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) ("[c]ertain immunities were so well established in 1871" that "Congress would have specifically . . . provided had it wished to abolish them."); *Will v. Mich. Dep't of State*

*Police*, 491 U.S. 58, 67 (1989) (relying on the presumption that the 42nd Congress "likely intended" for common law to apply); *Briscoe v. Lahue*, 460 U.S. 325, 337 (1983) (same).

Section 1983 is *not* silent on whether common-law immunity applies. *See Sosa v. Martin Cnty.*, Fla., 57 F.4th 1297, 1303 (11th Cir. 2023) (Jordan, J., concurring) ("If federal statutes are supposed to be interpreted according to ordinary public meaning and understanding at the time of enactment, and if § 1983 preserved common-law immunities existing at the time of its enactment, the qualified immunity doctrine we have today is regrettable. Hopefully one day soon the Supreme Court will see fit to correct it.") (citations omitted); *Rogers v. Jarrett*, 2023 WL 2706752, at *7 (5th Cir. Mar. 30, 2023) (Willett, J., concurring) ("All to say, the Supreme Court's original justification for qualified immunity—that Congress wouldn't have abrogated common-law immunities absent explicit language—is faulty because the 1871 Civil Rights Act *expressly included such language*.") (emphasis in original), cert. denied sub nom. *Rogers v. Jarrett*, 2023 WL 6378558 (U.S. Oct. 2, 2023).[9]

The U.S. Code omitted material language from the statute originally passed by Congress in 1871. *See* Reinert, Alexander A., *Qualified Immunity's Flawed Foundation*, CALIFORNIA LAW REVIEW, 111 Calif. L. Rev. 101, 166–67 (forthcoming), available at http://dx.doi.org/10.2139/ssrn.4179628. The original statute contained "additional

---

[9] Although the Supreme Court recently denied certiorari review in *Rogers*, Plaintiff makes this argument to preserve it.

significant text" in between the words "shall" and "be liable"—that government

officials "shall, **any such law, statute, ordinance, regulation, custom, or usage**

**of the State to the contrary notwithstanding**, be liable" under the statute. Ku

Klux Klan Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871) (emphasis added); *Jarrett*, 2023

WL 2706752, at *7 (quoting original text of the statute). Put simply, the

Notwithstanding Clause means that the common law does not prevent persons from

being held liable under section 1983. First, the "ordinary public meaning at the time

of [section 1983's] enactment" establishes that common-law immunity was

precluded.[10] *Bostock v. Clayton County*, 140 S. Ct. 1731, 1738 (2020). Second, in

determining what the law says, the United States Code is only "prima facie" evidence

---

[10] The Court should evaluate two key phrases: (1) "custom[ ] or usage of the State," and (2) "to the contrary notwithstanding." As understood by the 42nd Congress, a "usage or custom" was the common law itself. *Strother v. Lucas*, 37 U.S. 410, 437 (1838). Whether a rule was established by "usage" or through "custom," it existed by "a common right, which means a right by common law." *Id.*; *see also Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 659 (1834) ("The judicial decisions, the usages and customs of the respective states" established the "common law . . . in each [state]."); *Western Union Telegraph Co. v. Call Pub. Co.*, 181 U.S. 92, 102 (1901) (citing Black's Law Dictionary for proposition that common law springs from "usages and customs"). The original text of section 1983 also said that officials will be liable for constitutional violations "notwithstanding" any "contrary" common-law principles. The ordinary public meaning of "notwithstanding" remains that same today as it did for the 42nd Congress in 1871. *See Bryan A. Garner*, Garner's Modern English Usage 635 (4th ed. 2016) ("This usage [of notwithstanding] has been constant from the 1300s to the present day."). "Notwithstanding" means "[w]ithout opposition, prevention, or obstruction from," or "in spite of." Complete Dictionary of the English Language 894 (Webster's 1886); *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 939 (2017) (explaining that the ordinary meaning of "notwithstanding" is "in spite of" or "without prevention or obstruction from or by").

of the text of the law—meaning the text's absence of the clause from the Code is not dispositive.[11] *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993), citing 1 U. S. C. § 204(a). And like with this omission from the U.S. Code, the Supreme Court has already viewed the omission of two other Notwithstanding Clauses from other civil rights statutes as non-substantive changes to the law. *See Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 422 (1968); *The Civil Rights Cases*, 109 U.S. 3, 16–17 (1883). Because the U.S. Code did not substantively change section 1983, as legislated in 1871, Congress did not intend for any common-law immunity to section 1983. On this textual basis, Gregory should not be permitted to invoke an immunity doctrine that is expressly forbidden by the text of the statute.

### B. Plaintiff is entitled to summary judgment on liability for his state-law claims.

---

[11] It is the original Statutes at Large that provides the actual "legal evidence of laws." 1 U. S. C. § 112; *see also United States v. Welden*, 377 U.S. 95, 98 n.4 (1964) ("the Code cannot prevail over the Statutes at Large when the two are inconsistent."). Relevant here, shortly after passing the Ku Klux Klan Act of 1871, the 43rd Congress compiled the Revised Statutes of 1874 to codify the laws. But Congress intended "to preserve absolute identity of meaning" in the law when codifying it. 2 Cong. Rec. 4220 (1874) (Sen. Conkling). Indeed, as one representative stressed, "We have not attempted to change the law, in a single word or letter, so as to make a different reading or different sense." 2 Cong. Rec. 129 (1873). Rather, when a change was made, that change, "however minute," was simply meant to miniaturize and condense the law. 2 Cong. Rec. 4220 (1874). This was true for omissions, too, which the 43rd Congress viewed as a necessary tool "to strike out the obsolete parts and to condense and consolidate." 2 Cong. Rec. 129 (1873). Such an omission did not, however, substantively change the law. The Revised Statutes later became the U.S. Code—the very code the Supreme Court relied on in establishing the doctrine of qualified immunity in section 1983 claims. But when Congress decides to "revis[e] and consolidat[e] the laws," it does not change the effect of the law unless Congress explicitly says so. *See United States v. Welden*, 377 U.S. 95, 98 n.4 (1964).

In his operative complaint, Plaintiff asserts that Gregry invaded his privacy (Count I), committed trespass (Count II), and falsely arrested/falsely imprisoned him (Count V). Each of those claims is addressed in turn.

### 1. Invasion of privacy.

A claim for invasion of privacy can be based on several theories, including intrusion of a person's physical solitude or seclusion. *Allstate Ins. Co. v. Ginsberg*, 863 So. 2d 156, 161 (Fla. 2003). To prove invasion of privacy by intrusion, as asserted here, Plaintiff must show three things: a private quarter; a physical or electronic intrusion into that private quarter; the intrusion be "highly offensive to a reasonable person." *Celestine v. Capital One*, 2017 WL 2838185, at *3 (S.D. Fla. June 30, 2017) (quoting *Stasiak v. Kingswood Co-op, Inc.*, 2012 WL 527537, at *1 (M.D. Fla. Feb. 17, 2012)); *Hall v. Sargeant*, 2019 WL 1359485, at *7 (S.D. Fla. Mar. 26, 2019). Each of those elements is met here. <u>First</u>, Plaintiff's home qualifies as a "private quarter." *Guin v. City of Riviera Beach*, 388 So. 2d 604, 606 (Fla. 4th DCA 1980) ("invading [plaintiff's] home" satisfied intrusion on another's privacy) (quoting W. PROSSER TORTS § 117 at 807 (4th ed. 1971)); *Spilfogel v. Fox Broad. Co.*, 2010 WL 11504189, at *5 (S.D. Fla. May 4, 2010) ("Invasion of privacy by intrusion is a claim for the intentional trespass or intrusion upon physical solitude, such as by breaking into the plaintiff's home or peeking into her window"), *aff'd*, 433 F. App'x 724 (11th Cir. 2011). <u>Second</u>, it is undisputed that Gregory entered Plaintiff's home, and as set forth above, he did so without Plaintiff's consent, a warrant, or exigent circumstances. *Napier v. Fowler*, 2009

WL 10699620, at *10 (S.D. Fla. Dec. 1, 2009) ("to make out a claim for invasion of privacy under Florida law […] based on an officer's unlawful entry of a residence, a plaintiff must allege facts sufficient to support the inference that the officer entered the residence without a warrant and in the absence of probable cause and exigent circumstances."). Third, storming into Plaintiff's under the cover of darkness to confront him—an elderly naked man in his bedroom—with his firearm drawn "is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Watts v. City of Hollywood*, 146 F. Supp. 3d 1254, 1268 (S.D. Fla. 2015) (quoting *Stoddard v. Wohlfahrt*, 573 So. 2d 1060, 1062 (Fla. 5th DCA 1991)). Given that the Fourth Amendment precludes the conduct Gregory undertook, his entry was "atrocious, and utterly intolerable in a civilized community." *Stoddard*, 573 So.2d at 1062. For these reasons, the Court should adjudge Gregory liable for invasion of privacy as asserted in Count I.

### 2. Trespass.

Under Florida law, "[t]respass to real property is an injury to or use of the land of another by one having no right or authority." *Brown v. Solary*, 19 So. 161 (Fla. 1896). To recover for trespass, a plaintiff must have had an ownership or possessory interest in the property at the time of trespass. *Vincent v. Hines*, 84 So. 614, 616 (1920); *Hutchins v. Strickland*, 674 So. 2d 870, 872 (Fla. 1st DCA 1996); *Glen v. Club Mediterranee, S.A.*, 450 F.3d 1251, 1254 (11th Cir. 2006) (lack of ownership interest would bar trespass claim). Any unauthorized entry onto real property is a trespass. *See*

*Coddington v. Staab*, 716 So. 2d 850, 851 (Fla. 4th DCA 1998) *Guin*, 388 So. 2d at 606

(Fla. 4th DCA 1980) ("merely entering a building constitutes a trespass.").

Additionally, "[a] police officer may be held liable in trespass for entering upon the

property of another." *Potts v. Johnson*, 654 So. 2d 596, 599 (Fla. 3d DCA 1995) (citing

Guin, 388 So. 2d at 606). That said, a police officer has a right to enter private

property "when the lawful performance of his duty requires," including in emergency

situations. *Guin*, 388 So. 2d at 606; *Feliciano v. City of Miami Beach*, 847 F. Supp. 2d

1359, 1368 (S.D. Fla. 2012). Like for Plaintiff's other claims, implied consent can be a

defense to a trespass claim. *Fla. Pub. Co. v. Fletcher*, 340 So. 2d 914, 918 (Fla. 1976).

Here, however, because Plaintiff did not consent to Gregory's entry, and Gregory had

no lawful basis—including in an emergency—to enter the home, his conduct

constitutes a trespass onto Plaintiff's property, for which it is undisputed he held an

ownership interest at the time.

### 3.  False arrest/false imprisonment.

Florida courts are split on whether there is a distinction between false arrest

and false imprisonment. *See Strickland v. Jacobs*, 66 So.3d 412, 414 n. 1 (Fla. 2d DCA

2011) (*comparing Mathis v. Coats*, 24 So.3d 1284, 1289 (Fla. 2d DCA 2010) ("False arrest

and false imprisonment are closely related, but false imprisonment is a broader

common law tort; false arrest is only one of several methods of committing false

imprisonment.") *with Andrews v. Fla. Parole Comm'n*, 768 So.2d 1257, 1266 (Fla. 1st

DCA 2000) ("[F]alse imprisonment and false arrest are essentially the same tort[.]");

*Weissman v. K–Mart Corp.*, 396 So.2d 1164, 1165, n 1 (Fla. 3d DCA 1981) ("False arrest and false imprisonment are different labels for the same cause of action."). Ultimately, any distinction between the torts does not affect this relief.

False imprisonment and false arrest in Florida are defined as "the unlawful restraint of a person against his will, the gist of which action is the unlawful detention of the plaintiff and the deprivation of his liberty." *Johnson v. Barnes & Noble Booksellers, Inc.*, 437 F.3d 1112, 1116 (11th Cir.2006) (quoting *Escambia Cnty. Sch. Bd. v. Bragg*, 680 So.2d 571, 572 (Fla. 1st DCA 1996)). In order to prevail on a false arrest/false imprisonment claim under Florida law, a plaintiff must prove: "(1) the unlawful detention and deprivation of liberty of a person; (2) against that person's will; (3) without legal authority or "color of authority"; and (4) which is unreasonable and unwarranted under the circumstances." *Eiras v. Fla.*, 239 F. Supp. 3d 1331, 1340 (M.D. Fla. 2017) (citation omitted). The restraint may be caused by actual force or by threat, the threat may be by conduct or by words. *Lewis v. Atlantic Disc. Co.*, 99 So. 2d 241 (Fla. 1st DCA 1957). There need be no confinement in a jail or prison. *Washington Cnty. Kennel Club, Inc. v. Edge*, 216 So. 2d 512 (Fla. 1st DCA 1968).

Here, it is undisputed that Gregory unlawfully detained and arrested Plaintiff—placing him in handcuffs after firing his Taser at him—despite his lack of authority to do so given his unlawful presence in Plaintiff's home. Because Plaintiff was detained against his will and the detention was unlawful, Gregory is liable for false arrest/false imprisonment under Count IV. *Johnson*, 437 F.3d at 1116.

### 4. Gregory is not entitled to sovereign immunity under section 768.28(9)(a), Florida Statutes.

"[W]hether an act was committed with malicious purpose, bad faith, or with wanton and willful disregard [to preclude immunity] is not a question that must be submitted to a jury, but rather, can be decided by the Court depending on the facts." *Blue v. Miami-Dade Cnty.*, 2011 WL 2447699, at *2 (S.D. Fla. June 15, 2011) (citing *Prieto v. Malgor*, 361 F.3d 1313, 1320 (11th Cir. 2004)). In resolving such facts, "the Court must view all facts in the record in the light most favorable to the Plaintiff." *Moore v. Eger*, 2017 WL 6367598, at *6 (M.D. Fla. Oct. 20, 2017), *aff'd in part*, *appeal dismissed in part* sub nom. *Moore v. Sheriff of Seminole Cnty.*, 748 F. App'x 229 (11th Cir. 2018) (citation omitted). Here, Gregory implemented his tactical training to essentially raid Plaintiff's home before sunrise without consent, a warrant, exigency, or hot pursuit. Unlike *Moore,* where there was uncertainty as to whether exigent circumstances existed and the resident was belligerent and drunk, or *Roldan v. City of Hallandale Beach*, 2023 WL 4489959, at *12 (S.D. Fla. July 12, 2023), where the officers "tried to explain the circumstances to Plaintiff and even comforted him," Gregory did not speak to Plaintiff or make his presence at the back door known. Instead, in a split-second decision using his tactical training, he raided the house, only to announce his presence after his entry. His conduct was "in a manner exhibiting wanton and willful disregard of human rights, safety, or property." § 768.28(9)(a), Fla. Stat. He is not entitled to sovereign immunity.

## CONCLUSION

For all these reasons, Plaintiff Terry Dukes, Sr. requests that the Court enter summary judgment on liability against Corporal Chase Gregory for Counts I-V in his First Amended Complaint (Doc. 11).

Dated: October 15, 2023.

Respectfully submitted,

*/s/ James M. Slater*
James M. Slater (FBN 111779)
Slater Legal PLLC
113 S. Monroe Street
Tallahassee, Florida 32301
james@slater.legal
Tel. (305) 523-9023

*Attorneys for Plaintiff*

### Certification Pursuant to L.R. 7.1(F)

Pursuant to Local Rule 7.1(F), I hereby certify that the above document contains 7,951 words, inclusive of headings, footnotes, and quotations, but exclusive of the case style, signature block and certificates.

By: */s/ James M. Slater*
James M. Slater