```
 1                UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF FLORIDA
 2                  GAINESVILLE DIVISION

 3               Case No. 1:23-cv-45-AW-HTC

 4

 5   TERRY DUKES, SR.,

 6                 Plaintiff,

 7   vs.

 8   ROBERT B. MCCALLUM JR., et al.,

 9                 Defendants.
     _____/
10
                         DEPOSITION
11
                            of
12
                     TERRY DUKES, SR.
13
                Taken on behalf of Defendants
14

15
                DATE TAKEN:   June 26, 2023
16              TIME:         9:52 a.m. - 3:46 p.m.
                PLACE:        310 South School Street
17                            Bronson, Florida

18
             Examination of the witness taken before:
19

20               Cynthia F. Leverett, FPR
                    Stenographic Reporter
21             Notary Public, State of Florida
                 www.NatureCoastReporters.com
22                 Post Office Box 2392
                 Chiefland, Florida 32644
23                      386-256-1457

24

25
```

```
 1                        APPEARANCES

 2

 3     ON BEHALF OF PLAINTIFF

 4         GRENDOLYN P. ADKINS, Esquire
           gadkins@coppinsmonroe.com
 5         Coppins Monroe
           1319 Thomaswood Drive
 6         Tallahassee, Florida 32308
           850-422-2420
 7

 8     ON BEHALF OF DEFENDANT

 9         JAMES SLATER, Esquire
           james@slater.legal.com
10         Slater Legal PLLC
           113 South Monroe Street
11         Tallahassee, Florida 32301

12                            - - -

13

14

15

16

17

18

19

20

21

22

23

24

25
```

INDEX

EXAMINATION OF TERRY DUKES, SR.:
        DIRECT BY MS. ADKINS                      4
        CROSS BY MR. SLATER                     148
        REDIRECT BY MS. ADKINS                  191
        RECROSS BY MR. SLATER                   200

CERTIFICATE OF OATH                             202
DEPOSITION CERTIFICATE                          203
ERRATA SHEET                                    205

                        - - -

EXHIBITS MARKED FOR IDENTIFICATION:

  1       Photograph                             62

  2       Photograph                             63

  3       Photograph                             64

  4       Photograph                             65

  5       Sketch                                 66

  6       Disability Claim Form                 174

  7       Composite of work evaluations         177

  8       Composite of records from CFEC        185

  9       CASOM                                 187

                        - - -

```
 1   WHEREUPON,

 2                      TERRY DUKES, SR.,

 3   acknowledged having been duly sworn to tell the truth

 4   and testified upon his or her oath as follows:

 5            THE DEPONENT:  I do.  Tell the truth, yes,

 6        ma'am.  Yes, ma'am.

 7                      DIRECT EXAMINATION

 8   BY MS. ADKINS:

 9        Q.  Mr. Dukes, we met a few moments ago.  My name

10   is Gwen Adkins.

11        A.  Gwen?

12        Q.  Yes, sir.

13        A.  Okay.

14        Q.  I'm an attorney, and I represent Sheriff

15   McCallum, Lieutenant Almeida, Deputy Gaffey, and

16   Deputy Gregory.  Okay?

17        A.  Okay.

18        Q.  I'm going to take your deposition today.

19        A.  You got to try to talk up a little more for

20   me.

21        Q.  I'm going to take your deposition today.  I

22   need you to answer the questions as best you can.

23        A.  Okay.

24        Q.  But we've already discussed the fact that

25   you're not feeling great; so if at any point in time
```

1    the whole building here, but we don't want no trash
2    out there.
3           Some of them, they'll be throwing it out
4    while you tell them not to throw it out.  You get four
5    or five of them out there.  You got try to watch four
6    or five of them at one time, and they just dumping;
7    and you got to try to clean it up before the DEP get
8    in there and write you up.
9           It was too much on me to deal with the -- you
10   know, before I got tased, I ain't have that problem.
11   I could deal with anything.  But after I got tased, it
12   just -- I got real emotional about, you know, how I
13   was done.  And it was so hurtful, the way it happened,
14   and I just -- I be thinking about that a lot, and I
15   just didn't want to be around nobody.
16        Q.   Who was your direct supervisor?
17        A.   Benny Jerrells.
18        Q.   And was he -- how long was he your
19   supervisor?
20        A.   He's still out there.  He been out there
21   about 40-some years.
22        Q.   Was he your supervisor the whole time you
23   were there?
24        A.   Yes, ma'am.
25        Q.   And when you left Levy County in 2020, did

1    you resign, or did you officially retire at that time?

2         A.   I guess you would -- I told them I was

3    quitting, but I told -- I guess you could say retired.

4    I had a bunch of vacation and sick time, so I used all

5    of that until I run out.  And then by that time, you

6    know, I was getting my retirement, but I had to quit

7    work five years early.  I had five more years to make,

8    and I'd had the full 30.  So my money wasn't that good

9    because I didn't make the full 30 years.  I quit five

10   years before time.

11        Q.   Were you able to draw retirement at that time

12   even though it was earlier than you had planned?

13        A.   It took a little bit to get my retirement;

14   but I was using my sick time and all that until I got

15   it, and it worked out.  By the time I run out of sick

16   time and vacation time, then everything -- the

17   retirement come through.

18        Q.   And with your retirement, did you have any

19   type of a medical or a disability retirement?  Or is

20   it strictly a normal retirement, if you will?

21        A.   With the county, I just had normal

22   retirement, but I had got the social security

23   disability help group to look at my case.  I called

24   them, and they said they would take my case.  And they

25   charged me, I think, like $600,000 to do my social

1   come and throw my stuff down where I can have quick

2   access.

3       Q.   And where did you sit down on the floor?  Was

4   it at --

5       A.   Right by that little door, walking in the

6   room.  The one that -- let me see which -- that's

7   walking into the room.  That's the door right there.

8       Q.   Yes, sir.

9       A.   And I was sitting like right on the -- in

10  front of -- when I got on the floor, I was sitting

11  like right in front of the door somewhere.  I wasn't

12  behind no door.  It was in the open.

13      Q.   So maybe in this area?

14      A.   Yes, ma'am.  That's the door.  That's the

15  entrance to the room.  And then, like I said, I think

16  I might have had a little dresser or something, but I

17  done chucked it all, took it back to the dump.  That's

18  the best I could explain.  The door was open.

19      Q.   Were you between the doorway and the bed when

20  you were sitting on the floor?

21      A.   The bed would have been back here, and I was

22  close to the door.  And I sat on my butt, and I had

23  the pants -- it was some pants right down there that I

24  just was trying to cover myself.  And I pulled them up

25  to my waist, and that's when they tased me.

1  buttoned, you had your pants on, correct?

2      A.   They wasn't never buttoned up.  They walked

3  me outside.  I just had them -- tried to keep -- you

4  know, I don't think I had the button on just enough

5  to -- and I don't think there was no belt.  I was just

6  trying to fasten them to keep from falling down and

7  just to cover myself.

8      Q.   But you at least had them on whenever they

9  put the cuffs on you and stood you up and walked out?

10     A.   I did have them on, but I don't think they

11 buttoned up good.

12     Q.   Did they pretty well walk you outside as soon

13 as they got the cuffs on you?

14     A.   Yes, ma'am.  They took the cuffs and put on,

15 and then they exit me back through the back door.

16 That's about all I can remember.

17     Q.   As you sit here today, can you describe

18 either of the officers or the deputies that were in

19 the room and had a gun drawn on you?

20     A.   Can I what?

21     Q.   Can you describe either one of them?

22     A.   No, ma'am.  They had full dress on.  I don't

23 know whether they had hats; but I thought I was seeing

24 two, and it was three.  But they scared me so bad I

25 didn't know, you know, what was really going -- they

1    scared me.  I was like almost in shock because I'm

2    looking for my boy.

3        Q.   When you went outside the house, did they

4    walk you outside?

5        A.   Yes, ma'am.

6        Q.   Where did you all go once you got outside?

7        A.   When we went outside, we went on, I guess,

8    from the back.  And I got big yard, big front yard.

9    They walked me out.  And they cars was out by the

10   road.  And they sit me on the back of a tailgate to

11   wait on the ambulance to come and pull their TASER out

12   my arm, their prong.

13       Q.   Did you say anything more to the deputies

14   while they were walking you outside?

15       A.   No, until I got on the tailgate of the truck.

16   I don't think I -- because, I mean, I was crying, and

17   I don't -- I didn't do too much talking.  I probably

18   was still crying until they got me on the back of the

19   truck, then I said some stuff.

20       Q.   And what did you say once --

21       A.   I said, "I'm going to sue y'all."  That's

22   what I told them.  I started to cuss, but I didn't

23   cuss.  I said, "I'm going to sue y'all."  I say, "I

24   don't believe" -- "think what y'all doing is right,

25   you know, and I ain't doing nothing."

```
 1              But I wasn't talking too much trash because I
 2    was hurting and mostly crying and everything.  It was
 3    cold out there.  They wouldn't let me put no shirt on,
 4    no shoes or nothing.  It was cold, but I'm a cold --
 5    warm-blood nature, I guess.  I get cold real easy.
 6    And I ain't had no shirt, no shoes, or nothing on, and
 7    I was chilly like.  Then that's when they told me sit
 8    on the back of the tailgate and wait on the ambulance.
 9         Q.  Did you specifically ask to put shoes or
10    shirt on?
11         A.  Huh?
12         Q.  Did you specifically ask --
13         A.  No --
14         Q.  Let me finish my question.  Did you ask to
15    put any shoes on?
16         A.  No, I didn't.
17         Q.  Did you ask to be able to put a shirt on?
18         A.  No.
19         Q.  How long before the ambulance arrived?
20         A.  It took at least -- I'm going to guess about
21    at least 20 or 30 minutes, if not longer.  I don't
22    know.
23         Q.  Did you sit on the tailgate that entire time
24    while you were waiting?
25         A.  Yeah.  They let the tailgate down, and they
```

1  don't really remember, you know -- I don't remember

2  hurting.

3           But when they shot me with it, I stood there

4  and looked at them.  I said -- I didn't know what to

5  say.  I said, "Man, what y'all doing?" and I started

6  to crying.

7           I had a lot of emotions between the time they

8  tased me until the time I got -- when I was on the

9  tailgate, I was still crying.  When my bossman got

10 there, I was more than likely still crying.  When

11 Jerry got there, I was upset because I didn't know why

12 I got done like that.  I never threatened them or

13 nothing.

14     Q.  And did the paramedics, did they indicate

15 that you needed any type of medical treatment?

16     A.  Yes, ma'am.  They had -- when they pulled the

17 TASER out, they say, "You got to go to North Florida

18 Regional because they got to do EKG or whatever on

19 you".  And they say, "You got to go."

20          I wasn't going to go.  He say, "No, you got

21 to go to the hospital because they got to do a EKG,

22 you know, for your heart."

23          When they tase you, they say you got to go,

24 you need to go, so I cooperated.  I think the

25 ambulance took me.

1        Q.   And which hospital did they take you to?

2        A.   North Florida, I think.  I'm pretty sure.

3        Q.   And my apologies.  Is that in Gainesville?

4        A.   Yes, ma'am.

5        Q.   Okay.  And how long were you at the hospital

6   in Gainesville?

7        A.   I'm not sure.  Maybe -- maybe an hour or two.

8   It wasn't -- they just had to run the EK -- the thing

9   on my heart, and it didn't take that long.  But I

10  think I waited trying to get a ride back home.  I

11  don't know if Jerry come got me or not.  I can't

12  remember that.

13       Q.   What did you do for the rest of that day?

14       A.   When I got home, I think I went immediately

15  to my momma's house.  My daughter was there, and my

16  twin brother's girl was there.  And I started to

17  telling -- I was crying.  I was telling them what --

18  how they done me, what happened, and I was real

19  emotional.

20       Q.   Did you go to work at all that day?

21       A.   No.  No.

22       Q.   Was your schedule, then, would it have

23  been -- did you work Monday through Saturday, or did

24  you do Tuesday through Saturday or --

25       A.   I can't quite remember, but I had days off.

1   We had to work -- I guess, look like it maybe been --

2   let me see.  Monday, Tuesday, and I might have had a

3   Wednesday or Thursday in the middle of the week, but

4   we had to work --

5       Q.   Saturday?

6       A.   -- or maybe Friday.  Maybe Wednesday,

7   Thursday, and Friday, it was my regular work days; but

8   Saturday -- I mean, off days.  I think it was

9   Wednesday and Thursday, but I had to work on Saturday.

10      Q.   Okay.

11      A.   So I probably had to come to work on Friday

12  and then come in Saturday, but I think I had like

13  maybe a Tuesday and Wednesday or Wednesday and

14  Thursday.  I got my days through the week.

15      Q.   The next day would have been Sunday.  You

16  didn't work Sunday, correct?

17      A.   No.

18      Q.   Would you have gone back to work the next

19  regularly scheduled day --

20      A.   I think I did.

21      Q.   -- if that was --

22      A.   The regular --

23      Q.   -- Monday or Tuesday, whichever that would

24  have been?

25      A.   Yeah.  They cleared me at the hospital.  So

1   that Monday or whenever the next scheduled work, I

2   went back to work.

3        Q.   When this happened, was this a period of time

4   that you were or were not going to church on a regular

5   basis?

6        A.   I didn't hear you.

7        Q.   When this happened, in May of 2019, was this

8   a period of time that you were or were not going to

9   church on a regular basis?

10       A.   Hold up.  Hold up.  I ain't hear you right.

11  My stomach.

12            MS. ADKINS:  Okay.  Let's take a break.

13            (Recess had from 12:17 p.m. to 1:04 p.m.)

14  BY MS. ADKINS:

15       Q.   Mr. Dukes, we're going to go back on the

16  record.

17       A.   Okay.  Let me get one of these here down.

18       Q.   If you don't feel up to continuing, you just

19  let me know.

20       A.   Okay.  I ain't feeling good, but I'm going to

21  make it through this.

22       Q.   Well, I understand; but at the same time, if

23  it would be better for us to do this at a later date,

24  we can do that.

25       A.   I want to get it over with.  I believe I'll

1  you know, in my house.

2      Q.   Okay.  What is the first time that you sought

3  any type of medical or psychological treatment for

4  this incident after that hospital visit?

5      A.   After what happened?

6      Q.   Yes, sir.  So after you went, the paramedics

7  took you to the hospital, correct?

8      A.   Right.

9      Q.   And you told us you had a test, the EKG,

10  right?

11      A.   Had a what?

12      Q.   You had an EKG?

13      A.   Yes, ma'am.

14      Q.   And then you left the hospital?

15      A.   Right.

16      Q.   What's the next time that you sought any

17  medical treatment or psychological treatment related

18  to this?

19      A.   It was at Meridian.  I think I kept telling

20  Jerry, my buddy, that I needed to go have some

21  psychological because my mind was really messed up.

22  And I think they said that I stayed over there, what,

23  about a week, in the University of Shands [sic], and

24  they sent some psychologists in there.  And when they

25  sent them to talk to me, I do the same thing I'm doing

1   now, breaking down.  And, you know -- that's about all

2   I can -- before I forget where I'm at.

3       Q.   And do you remember when that was that you

4   would have gone for that treatment?

5       A.   I'm not sure.  I don't remember.

6       Q.   Before that time, whenever it was, had you

7   ever had any psychological treatment or mental health

8   treatment?

9       A.   No, ma'am.

10      Q.   You mentioned that you were there for about a

11  week.  Is that correct?  You said you were there for

12  about a week?

13      A.   I think it's something like that.  I thought

14  it was two, but I think Jerry told me it was less than

15  that, about a week.  He took me over there.

16      Q.   And was all of your treatment at the

17  hospital, was it all related to mental health

18  concerns?  Or did you have some --

19      A.   And anxiety.

20      Q.   Did you have any other medical or physical

21  concerns at the time?

22      A.   Just being a diabetic.  Other than that, it

23  was just mental for the PTSD and anxiety.  I was real

24  emotional.

25      Q.   Has any medical professional ever diagnosed

1   you with PTSD?

2        A.   (Nods head.)

3        Q.   Who was that?

4        A.   I don't know if it was from the hospital or

5   my doctor in Chiefland, but they got it that I've been

6   diagnosed with PTSD and anxiety attacks.

7        Q.   And do you remember when that diagnosis would

8   have been?

9        A.   I don't remember.

10       Q.   Apart from -- or aside from that week or

11  whatever period of time --

12       A.   I can't hear you.

13       Q.   Yes, sir.  Aside from the week or whatever

14  period of time it was that you spent in the hospital,

15  have there been other times that you have had

16  treatment for mental health for this anxiety, PTSD,

17  etc.?

18       A.   I don't think -- I don't -- I don't want to

19  answer because I don't want to say the wrong thing;

20  but they had treated me a few times, not just one

21  place.

22            Seemed like I have been -- you know, since

23  the incident, that is, seem like I had been to two --

24  a couple places.  It's been so long, I can't remember;

25  but they was trying to -- I went to a couple places,

1  it seemed like, and that's what they had diagnosed me

2  with:  PTSD and anxiety.

3      Q.   And you mentioned Meridian.  What other

4  places can you remember?

5      A.   That's about it, Meridian and -- that's

6  right, the Meridian and the University of Shands.  I

7  have been to those two places.  I don't know which one

8  I went to first.  But mostly at Meridian it was like

9  counseling; but at the other place, they doing the

10  psychological evaluation, doctors and stuff.

11      Q.   And then you said also your primary care may

12  have been one?  Your primary care physician, did you

13  mention that that may have also been someone who

14  treated you for the anxiety?

15      A.   My primary doctor?

16      Q.   Yes, sir.

17      A.   His name is Dr. Barber, Matthew Barber, in

18  Chiefland.  I think he diagnosed me, Dr. Barber, with

19  PTSD and anxiety attacks.  And then Meridian or the

20  other, Shands, I think they diagnosed me with PTSD and

21  anxiety.

22      Q.   Mr. Dukes, did you have anxiety before this

23  incident?

24      A.   My momma like nervous, and I just be a little

25  nervous.  I think I got that from her, but not

1    until -- when they hit me with that TASER, it got

2    worse.

3         Q.   Had you ever received any treatment from a

4    physician or a mental health provider for the anxiety

5    before this incident?

6         A.   I don't understand you.

7         Q.   Yes, sir.  Before the May 2019 incident, had

8    you ever received any treatment from either your

9    primary care or from a mental health counselor for

10   anxiety?

11        A.   I don't want to tell you the wrong thing.  I

12   don't -- I think I was -- I had that little anxiety

13   and got medicine for it, but I don't want to answer

14   the wrong thing.  I don't remember.

15        Q.   Do you remember any particular medicine that

16   you would have been given for the anxiety before this?

17        A.   Before that?

18        Q.   Yes, sir.

19        A.   I can't call the name of it.  They gave me

20   some little, small pills, but I can't think of -- and

21   I think I was treated for anxiety before that, but it

22   wasn't as bad until this incident happened.  It

23   wasn't -- you know, I just be real -- I been always a

24   little nervous and shaky and real easy to get spooked,

25   you know, but I can't recall just right.  I don't want

1  wearing any on May 25th, 2019?

2      A.  I'm pretty sure I wasn't; because if I'd have

3  had some, I probably would have heard them come in.

4  If I would have had them on, I probably would have

5  heard them come in the house; but I'm pretty sure I

6  did not have any at the time.  They were either out of

7  date or I was trying to get more.

8          They won't work on them after so long, you

9  know.  You have to update.

10     Q.  Mr. Dukes, you don't have any physical

11  injuries as a result of the interaction with the

12  deputies on May 25th, 2019, correct?

13     A.  I have -- they hurt my shoulder; I told you

14  that.  I was already diagnosed with tendinitis,

15  bursitis, and a small rotor cuff tear, but they

16  wouldn't operate on it because it wasn't bad enough.

17         But I feel like they -- my arm hurts all the

18  time now.  I can't pick up my grandkids.  They done

19  got too big now, but when they was little I couldn't

20  pick them up because I was afraid I'd drop them.

21         So my strength has been affected, and my arm.

22  I can't hardly use my -- my left arm stronger than my

23  right arm, and I'm a right-handed person.

24         So it's a lot of physical problem that I had

25  after I've been tased because I can't -- I can't work

1   like I used to because I don't have the strength and
2   my arm hurt.  And I had a lot of strenuous stuff to
3   pick up and stuff, cleaning up behind people.  When I
4   was healthy, I didn't have no problem, but now I can't
5   pick up -- it's hard for me to do anything.
6       Q.   When did you first see a doctor related to
7   your shoulder after the incident?
8       A.   I can't remember what year, but I got it --
9   it's on record.  I went at North Florida Regional and
10  told them my shoulder was hurting, and they checked it
11  and told me what I had; but after they tased me, it
12  got worse.  I can't hardly use my right hand now.
13      Q.   And going back to the TASER.  So we know that
14  you had the one prong in the shoulder; but apart from
15  that, you didn't have the two prongs, and those didn't
16  connect, correct?
17      A.   I got the first part.  They didn't hit me but
18  one TASER -- I mean one prong.
19      Q.   So there wasn't a connection, like you had
20  said before --
21      A.   It was just one TASER.  Just one -- one
22  prong.  It wasn't no two.  It was just one.
23      Q.   And so you felt the prong in your shoulder,
24  but you didn't have the electrical current, correct?
25           MR. SLATER:  Object to the form.

1   take a shower?

2        A.   Right.

3        Q.   And you said you believe there may have been

4   a table to the left of the door?

5        A.   Maybe, or a dresser drawer.  It might have

6   been a dresser drawer.

7        Q.   But you don't recall exactly what was there?

8        A.   I don't recall because it's been so long.

9        Q.   Was the door at the time -- and I'm looking

10  back to what was previously marked as Exhibit 4.  You

11  see here how the door shuts all the way against the

12  wall?

13       A.   That's how it was that -- that -- I'm

14  pretty --- I'm more -- pretty sure that's how it was

15  because I don't shut my door.  I can't sleep -- even

16  before this happened, I couldn't sleep with no door

17  shut because I want to hear stuff and see because, you

18  know, people break in.  I want to see, and I want to

19  know.  I always leave my door open.

20       Q.   So in this photo there's nothing behind the

21  door, right?

22       A.   Nothing.

23       Q.   The door goes flush?

24       A.   Just right there flush against the wall.

25       Q.   Is it your testimony today that in May of

1   2019, on the date of the incident, that the door was

2   flush against the wall?

3        A.   I'm pretty sure.

4             MS. ADKINS:  Object to the form.

5   BY MR. SLATER:

6        Q.   There wouldn't have been a table behind the

7   door or anything like that?

8        A.   No, sir.  No, I couldn't get to it.  Because

9   I leave it in the open, you know, whatever was there.

10  I leave it open where I can just pick up my stuff and

11  go to the bathroom.  I always leave my door -- it

12  might not be flush all the time, but I always leave my

13  door open.

14       Q.   Were you ever -- on the morning when the

15  deputies came into your home, were you ever behind

16  this door?

17       A.   Not to my recollection.  I was getting ready

18  to go to work.  I ain't got no reason to be behind the

19  door.  It ain't but a little, small door, and you

20  ain't got much room to get behind the door.

21       Q.   Can you show me on this photograph where you

22  were sitting when you were tased?

23       A.   I believe the door right there.  I was

24  sitting maybe a little behind, you know, over this

25  way.  I wasn't -- I don't think I -- I was right there

1    ground when --

2         A.   Right.

3         Q.   -- the deputies were in your house, right?

4         A.   Right.

5         Q.   And you went to put on your pants, right?

6         A.   Yeah.  I was sitting down.

7         Q.   And you, in fact, did put on your pants?

8         A.   Yeah, I was sitting down.  After I was trying

9    to tell them that I wasn't Tee Junior; I was telling

10   them I was Tee Senior, and I held them up a little bit

11   because I was trying to tell them my boy wasn't there.

12   That's all I tried telling them, then I got on the

13   floor.

14            As I can remember, I got on the floor on my

15   backside.  And I seen the pants right in front of me,

16   and I say -- I kept eye contact, looked them straight

17   in the eye because they had guns on me; and I didn't

18   want to make no move, no sudden move, because I

19   figured they might have shot me.  But I kept -- sat on

20   my backside and told them, "I got some pants right

21   there."  And I kept eye contact.  I said, "I want to

22   cover myself."

23        Q.   At any point between when you started pulling

24   up your pants on your body and the point where Deputy

25   Gregory shot you with the TASER, did you get up off

1  the ground?

2      A.  No, I stayed there until they put the cuffs

3  on me.

4      Q.  Were you turned towards your bed?

5      A.  I was like turned toward the door.  I was

6  looking -- they was in the doorway, like away from me

7  about four, five feet.  And they was in the doorway

8  hollering at me to get down.  That's the only time I

9  held them up, because I was trying to tell them who I

10  was.  That's when I sat on the floor, and I told them

11  I got some pants on, I want to put them on and cover

12  myself.

13      Q.  But at no time when you were putting the

14  pants on did you get up to go to your bed?

15      A.  No.  No.  Definitely no.

16      Q.  Did you shut the door?

17      A.  I understand that's what they said, I tried

18  to slam the door in their face.  I was in shock, but I

19  don't recall trying to slam no door in nobody's face,

20  because I was trying to get my pants on.  I don't

21  recall that.

22      Q.  Mr. Dukes, you had testified earlier about

23  having some memory trouble since your meningitis.  Is

24  that right?

25      A.  Yes, sir.

 1   counseling; but Jerry -- I think he said -- he say --
 2   he got -- the situation got so bad, that it would be
 3   bothering me so bad, I said, "Jerry, I need to go
 4   somewhere and get some help."
 5         And somehow or another -- I think -- I don't
 6   know whether Shands called -- I might have called
 7   them.  I told them I needed to come in and get some
 8   help because I was -- I'm talking about to lose it at
 9   the time.  I just couldn't function right.  I said, "I
10   need to get some help."
11      Q.   Did you ever have any thoughts of self harm?
12      A.   Oh, yeah.
13      Q.   Can you talk to me a little bit about that?
14      A.   After it happened, I wanted to take my own
15   life.  I didn't feel like my life was worth living no
16   more.  I just wanted -- but I was a coward.  I could
17   not take no gun and kill myself because they told me
18   self murder -- you know, they talk like you're going
19   to hell; that the Bible -- that what they -- I don't
20   know that, but I wasn't -- I wanted to just to end it
21   because I was feeling so low I just didn't want to be
22   around no more, but I was a coward.
23         I could not take that gun and kill myself.  I
24   said, no, because I don't want to go to hell.  And
25   that's what they taught us, said self murder, you're

1  going -- I don't know if that's true or not.  If I

2  could have done it, I would have, but I just couldn't

3  do it.

4        I love me, and I don't want to take my own

5  life.  I'd rather for something to happen to me

6  natural or accident.  I just -- I'm not the type of

7  person -- I don't have the courage to take a gun and

8  kill myself.  I'm just -- I was a coward.  I can't do

9  that.

10    Q.  Since you went to Shands, have you had any

11 other thoughts of self harm?

12    A.  Yeah.  They come and go, but I just tell

13 myself, Terry, I can't kill myself.  But it -- I have

14 thought -- especially since that happened, I have

15 thought a bunch of thoughts about killing -- I ain't

16 talking about just injuring and shooting myself in the

17 leg.

18        I didn't want to be here no more because the

19 way I was done.  I just did not want to be in this

20 world no more; but I knew I got children,

21 grandchildren, and I didn't want to put my family

22 through that.  And, two, I'm just scared.  I don't

23 want -- I can't -- I couldn't do it.

24    Q.  I want to ask you, were there any times where

25 you were having mental health issues, and you had to

1   threatening me, and they won't do -- I just couldn't

2   deal with it no more.  And it was a lot of mental

3   stress, and the work -- I could do the work, but the

4   mental stress -- I ran dozers and everything, but just

5   dealing with the public and my condition.

6          I never lashed out at anybody, but I just

7   didn't feel like I could handle all the pressure.  It

8   was getting too much on my brain, and I felt like I

9   needed -- I felt like if I stayed there, I was going

10  to die because I just wasn't -- you know, I felt like

11  it would have killed me, worrying about what happened,

12  and I just couldn't deal with it.

13     Q.   Do you remember anything else going on in the

14  world that you were -- you know, around this time that

15  may have impacted your ability to work?

16     A.   Yeah, the George Floyd cases; and all them

17  people got killed by the law, and I went to thinking,

18  well, you know, it could have been me.  And I got real

19  stressed out about that because I felt like, you know,

20  it shouldn't have happened like that, but I

21  couldn't -- I just got to where I couldn't deal with

22  being around people no more.  I didn't want to be

23  around a whole bunch of people.

24          And then I look at George's situation, and

25  I'd think about me.  If I would have had my gun, I

1    might not be here, see.

2        Q.   I want to ask you, Terry -- you're okay.   Do

3    you need a minute?

4        A.   I'm all right.

5        Q.   I'll represent to you that this is -- July of

6    2020 is after the COVID pandemic started.   Was the

7    dump still open during COVID?

8        A.   Oh, yeah.   They don't close down.   I don't

9    think they close down for nothing.

10       Q.   Did you work inside or outside at the dump?

11       A.   I worked outside.

12           MR. SLATER:   I want to show you now, Terry,

13           some of your employment records.   We'll mark this

14           as Plaintiff's Exhibit 7.

15           (Exhibit 7 was marked for identification.)

16   BY MR. SLATER:

17       Q.   Terry, I'm showing you what I've marked as

18   Plaintiff's Exhibit 7.   We've marked this with Bates

19   stamp as Plaintiff 108 through 116, and you see at the

20   top here it says "Levy County Performance Evaluation."

21   I want you to take a minute just to flip through these

22   pages.

23       A.   All S's.

24       Q.   Before we talk, just take a minute to look

25   through.   Let's go through these quickly.   Let's start

1    incident?

2         A.   Uh-huh.  I never missed a -- had my lights

3    cut off the whole time I've been out there.

4         Q.   I know you've testified that you were

5    diagnosed with PTSD after the incident.

6         A.   Yes, sir.

7         Q.   Were you ever diagnosed with PTSD before the

8    incident?

9         A.   No.

10              MR. SLATER:  I'm going to show you what we'll

11         now mark as Plaintiff's 9.

12              (Exhibit 9 was marked for identification.)

13   BY MR. SLATER:

14        Q.   These are produced by the defense.  You see

15   here at the bottom it says Dukes T. 137 -- these are

16   just the page numbers -- through 144.  All right.  And

17   at the top on page -- we'll say Defense 137, it says

18   CASOM, Complaint Against a Sheriff's Office Member.

19              And here it has your name, Terry C. Dukes

20   Senior.  It lists your P.O. box and your address as

21   900 Patterson Street; and it lists the date and time

22   of incident, May 25th, 2019.  That's the date when the

23   deputies came into your home?

24        A.   Right.

25        Q.   And then you'll see starting on Defense 139

```
1                          CERTIFICATE OF OATH

2

3        STATE OF FLORIDA
         COUNTY OF LEVY
4

5              I, the undersigned Notary Public, do
         hereby certify that TERRY DUKES, SR., who produced
6        a Florida Driver's License as identification,
         personally before me on June 26, 2023, and was duly
7        sworn to tell the truth.

8              WITNESS my hand and official seal this
         July 17, 2023.
9

10

11

12        Cynthia F. Leverett
          Notary Public
13        State of Florida at Large
          My commission expires 9-27-24
14

15

16

17

18

19

20

21

22

23

24

25
```

1                    DEPOSITION CERTIFICATE

2

     STATE OF FLORIDA
3    COUNTY OF LEVY

4           I, Cynthia F. Leverett, Stenographic Reporter
     and Notary Public in and for the State of Florida at
5    Large, do hereby certify there came before me the
     deponent herein, named TERRY DUKES, SR.; that a
6    review of the transcript was requested, and
     arrangements have been made for that review.
7           I further certify that the foregoing
     transcript is a true and complete record of my
8    stenographic notes taken at the time and place
     indicated herein.
9           I further certify that I am neither attorney
     or counsel for, nor related to or employed by any of
10   the parties to the action in which this deposition is
     taken; and, furthermore, that I am not a relative or
11   employee of any attorney or counsel employed by the
     parties hereto, nor financially interested in the
12   action.
            The foregoing certification of this
13   transcript does not apply to any reproduction of the
     same by any means unless under the direct control
14   and/or direction of me as the certifying reporter.

15

            DATED this July 17, 2023.
16

17

18

19

20   _____
     Cynthia F. Leverett, FPR
21   Certified Stenographic Reporter

22

23

24

25