# Exhibit A

## to

# Slater Declaration

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

TERRY DUKES, SR.,

     Plaintiff,

v.

ROBERT B. McCALLUM, JR., *et al.*,

     Defendants.

Case No. 1:23-cv-45-AW-HTC

## PLAINTIFF'S DESIGNATION OF EXPERTS
## AND DISCLOSURE OF EXPERT TESTIMONY

Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, the Court's

Scheduling Order (Doc. 8), and the parties' stipulated agreement extending the

deadline to provide expert designations and disclosures, Plaintiff Terry Dukes, Sr.

states that the following persons may be called to provide expert testimony or present

evidence at trial on behalf of Plaintiff.

## I.    RETAINED EXPERTS

1. Roger Clark
   Police Procedures Consultant, Inc.
   10207 Molino Road
   Santee, CA 92071
   Phone: (208) 351-2458

Roger Clark is a retired member of the Los Angeles County Sheriff's Department with experience in police practices, including, without limitation, issues related to warrantless entry and use of force, including the function and use of Tasers. Mr. Clark's report is attached hereto. His curriculum vitae listing his past 10 years of publications and the cases in which he has testified as an expert in the last 4 years is attached to his report. Mr. Clark is being compensated at the rates identified on his attached fee schedule, which include $350 per hour for deposition and expert testimony and a rate of $250 per hour for the preparation of the attached report.

Plaintiff reserves the right to supplement Mr. Clark's report and/or provide a rebuttal report based on additional information that has not yet been made available, including documents and data that will be requested in discovery. Mr. Clark may use any document produced or offered as an exhibit, including those which may not have been disclosed to date, and the transcript of any hearing or deposition taken in this action. Mr. Clark may also refer to public documents, professional treatises and publications, and other illustrations to aid the Court in understanding his testimony. He may also testify to additional opinions in rebuttal to Defendants' experts' opinions. Plaintiff reserves the right to present testimony concerning any matter set forth herein, within Mr. Clark's report, and in any supplemental report.

2. Delvena R. Thomas, D.O.
   DRT Behavioral Services, PLLC
   2699 Stirling Road, Suite C407
   Fort Lauderdale, FL 33312
   Phone (305) 981-1700

Delvena Thomas is a board-certified psychiatrist and Lieutenant Colonel in the United States Army Reserves; she may be called to testify on Plaintiff's noneconomic damages and issues relating to causation, prognosis, and injury permanency. Dr. Thomas's report is attached hereto. Her curriculum vitae is attached to his report; Dr. Thomas has not authored any scientific publications in the last 10 years and her testifying experience in the last 4 years is included. Dr. Thomas is being compensated at the rate of $800 per hour.

Plaintiff reserves the right to supplement Dr. Thomas's report and/or provide a rebuttal report based on additional information that has not yet been made available, including documents and data that will be requested in discovery. Dr. Thomas may use any document produced or offered as an exhibit, including those which may not have been disclosed to date, and the transcript of any hearing or deposition taken in this action. Dr. Thomas may also refer to public documents, professional treatises and publications, and other illustrations to aid the Court in understanding her testimony. She may also testify to additional opinions in rebuttal to Defendants' experts' opinions. Plaintiff reserves the right to present testimony concerning any matter set forth herein, within Dr. Thomas's report, and in any supplemental report.

3. Mulder & Kirby Economists
   c/o Kristi Kirby, MBA, M.Ed.
   13907 N. Dale Mabry Hwy., Suite 204
   Tampa, FL 33618
   Phone: (813) 269-9000

Kristi Kirby or a representative from Mulder & Kirby Economists may be called to testify on Plaintiff's economic damages. Ms. Kirby's report is attached hereto. Her curriculum vitae, including all publications in the last 10 years and her testifying experience in the last 4 years is included. Ms. Kirby is being compensated at the rates identified on her attached fee schedule, which include $900 per hour for deposition and expert testimony and hourly rates between $75-250 for the preparation of the attached report.

Plaintiff reserves the right to supplement Ms. Kirby's report and/or provide a rebuttal report based on additional information that has not yet been made available, including documents and data that will be requested in discovery. Ms. Kirby may use any document produced or offered as an exhibit, including those which may not have been disclosed to date, and the transcript of any hearing or deposition taken in this action. Ms. Kirby may also refer to public documents, professional treatises and publications, and other illustrations to aid the Court in understanding her testimony. She may also testify to additional opinions in rebuttal to Defendants' experts' opinions. Plaintiff reserves the right to present testimony concerning any matter set forth herein, within Ms. Kirby's report, and in any supplemental report.

## II.    NONRETAINED TESTIFYING EXPERTS

Plaintiff also designates the following individuals who are not retained or specially employed to provide expert testimony, but who may be called to offer opinions on Plaintiff's condition.

1.  Pamela Smith, L.C.S.W.
    4300 SW 13th St
    Gainesville, FL 32608
    Phone: (352) 374-5600

Ms. Smith provided post-incident treatment to Plaintiff and based on his symptomology diagnosed him with posttraumatic stress disorder. She will be expected to testify on causation related to Plaintiff's posttraumatic stress disorder and high anxiety, and those diagnoses.

2.  Tessy M. Korah, M.D., D.F.A.P.A.
    1600 S.W. Archer Road
    Gainesville, FL 32610
    Phone: (352) 265-4357

Dr. Korah is an associate professor in the department of psychiatry at the University of Florida. She provided post-incident treatment to Plaintiff while he was hospitalized at Shands at the University of Florida. Based on his symptomology, Dr. Korah diagnosed him with posttraumatic stress disorder. She will be expected to testify on causation related to Plaintiff's posttraumatic stress disorder and high anxiety, and those diagnoses.

***

5

These individuals are Plaintiff's treating providers, and Plaintiff is not required to provide reports for these witnesses under Rule 26(a)(2)(C). *See Cedant v. United States*, 2023 WL 4986402 (11th Cir. Aug. 4, 2023). These witnesses may also be called as fact witnesses in this case.

Plaintiff reserves the right to call any expert designated by Defendants or called by Defendants at hearing or trial. Plaintiff further reserves the right to solicit testimony from any person identified by any party as a fact witness in this case, which may require such witness to rely upon their specialized knowledge, training, experience, education, or expertise in a particular filed or which may be considered "opinion" testimony. It is expected that such persons and any nonretained persons would provide testimony consistent with any and all records they have generated and/or any testimony or statements provided to any person or party and within the realm of their expertise and training. Plaintiff reserves the right to supplement this designation. Plaintiff reserves the right to designate additional experts and Plaintiff's experts reserve the right to supplement, amend, or modify any of the opinions expressed in their reports as additional information may become available through discovery and at trial. Plaintiff reserves the right to solicit testimony from any witness, lay or otherwise, who may have relevant opinions within the realms of their expertise, including any of Plaintiff's treaters or providers who have not be identified herein.

6

Dated: August 18, 2023.

Respectfully submitted,

SLATER LEGAL PLLC

By: */s/ James M. Slater*
          James M. Slater (FBN 111779)
          113 S. Monroe Street
          Tallahassee, Florida 32301
          Tel: (305) 523-9023
          james@slater.legal

          *Attorneys for Plaintiff*

## Certificate of Service

I hereby certify that on August 18, 2023, I served a true and correct copy of this document by electronic mail to Gwendolyn P. Adkins, counsel for Defendants.

By: */s/ James M. Slater*
          James M. Slater

# Exhibit 1
# Roger Clark Report

# Roger Clark

## Police Procedures Consultant, Inc.

10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458  rclark9314@aol.com

August 13, 2023

James Slater, Esq.
Slater Legal PLLC
113 South Monroe Street
Tallahassee, FL 32301

**Regarding:   *Terry Dukes, Sr., v. Robert B. McCallum, Jr., et al.  Case No.:
1:23-cv-00045-AW-HTC.***

Dear Mr. Slater:

Thank you for retaining me to analyze and render opinions regarding the May 25, 2019, unlawful entry and use of force inflicted Mr. Terry Dukes, Sr. (Mr. Dukes) by Levy County Sheriff's Office (LCSO), Corporals Chase Gregory (Deputy Gregory); Tucker Gaffey (Deputy Gaffey); and Franco Almeida (Deputy Almeida).  Pursuant to the requirements of Rule 26, I have reviewed the reports, statements, medical records, photographs,  policies, training and other material (as listed below) provided to me thus far regarding this case.  I am advised that depositions are pending.  Please be advised that when any additional material is submitted for my review, a supplementary report may be necessary in order to complete and/or refine my opinions.

It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.  That is, where there are differences in the events proffered by the Defendants, and or other witnesses, versus testimony proffered by Mr. Dukes and/or others, I do not opine for the trier of fact regarding who are the more believable witnesses.  I consider that the resolution of any such conflicts are obviously the purview of a jury to decide.

Additionally, it is necessary to state that I am not a lawyer nor a public official who hears and decides cases brought in court.  My opinions rest on the training given to every certified law enforcement officer and the reasonable professional standard of care as expressed and required pursuant to the training provided to every certified law enforcement officer.

**<u>Materials Provided and Reviewed Thus Far:</u>**

1.    Pleadings:
   a.    Complaint for Damages.
   b.    Defendants' Answer and Affirmative Defenses.

2.    Defendant Franco Almeida's Answers to Plaintiff's First Set of Interrogatories.

3.    Defendant Tucker Gaffey's Answers to Plaintiff's First Set of Interrogatories.

4.    Defendant Chase Gregory's Answers to Plaintiff's First Set of Interrogatories.

5.    Plaintiff's Responses and Objections to Robert McCallum Jr.'s First Set of Interrogatories.

6.    Defendant Chase Gregory's Answers to Plaintiff's Second Set of Interrogatories.

7.    Defendant Tucker Gaffey's Answers to Plaintiff's Second Set of Interrogatories.

8.    Plaintiff's Responses and Objections to Franco Almeida's First Set of Interrogatories.

9.    Plaintiff's Responses and Objections to Tucker Gaffey's First Set of Interrogatories.

10.    Plaintiff's Responses and Objections to Chase Gregory's First Set of Interrogatories.

11.    Defendant Robert McCallum, Jr.'s Answers to Plaintiff's Second Set of Interrogatories.

12.    Defendant's Answers and Affirmative Defenses.

13. Defendant Robert B. McCallum, Jr.'s Answers to Plaintiff's First Set of Interrogatories.

14. United States Court of Appeals, Eleventh Circuit, *Bashir v. Rockdale County*, 445 F.3d 1323 (2006).

15. Dukes v. McCallum Production:
   a. May 10, 2023, Defendants' Production, Exhibits 1 through 34.
   b. May 25, 2023, Defendants' Production, Exhibits.
   c. May 26, 2023, Plaintiff's Production, PL0001-PL00231.
   d. June 07, 2023, Plaintiff's Production, Deputy Interviews, Mr. Dukes' Interview, Photographs, Paramedic Mark Fowler Interview, Documents PL00232 through PL00669.
   e. July 21, 2023, Defendants' Production, Dukes 002496 through Dukes 002893.
   f. July 25, 2023, Defendants' Production, Photographs.

16. Photographs:
   a. Color, Dukes 002702 - Dukes 002718.
   b. Dukes Residence (Scene)

17. Florida Statute 943.1717 (Taser use).

18 2011 Electronic Control Weapon Guidelines.  U.S. Department of Justice Office of Community Oriented Policing Services and Police Executive Research Forum (PERF), Washington, D.C., March, 2011.

19. TASER International Training Materials and Product Warnings.


**Brief Overview of Events & Commentary:**

At approximately 3:13 a.m. on May 25, 2019, LSCO was alerted to a possible battery involving a pregnant person.  At around 3:58 a.m., LCSO Detective Wilkinson responded to the battery complaint and learned that Mr. Dukes' then 31-year-old son, Terry Dukes, Jr. ("Junior"), had purportedly assaulted his girlfriend.  Detective Wilkinson claimed as a result of his investigation, he had sufficient probable cause to arrest Junior.

At around 5:15 a.m., Deputies Gaffey, Murphy, Gregory and Almeida arrived at Mr. Dukes' residence - 900 Patterson Street, Bronson, Florida - to arrest Junior.

At the time of their arrival, LCSO did not have any arrest warrant for Junior, or any search warrant for Mr. Dukes' residence.  Furthermore, there were no exigent circumstances or fresh pursuit at the time that warranted any entry of Mr. Dukes' residence without a warrant.

In the investigative report for Internal Investigation 2019-FI-08 (regarding the events that transpired at Mr. Dukes' home on May 25, 2019) LCSO acknowledged that, "[t]here was no fresh pursuit and no warrant existed at this point."

According to the investigative summary LSCO created in that investigation - and to which Sheriff McCallum, Jr. "agree[d] with the findings" - LSCO custom, practice, and policy at the time was to delay obtaining a warrant and instead "make attempts to locate and arrest a person when probable cause has been established."  LCSO concluded that the application for a warrant "would not have been appropriate at this juncture of the investigation."

At this point in the sequence of events, Deputies Gaffey, Almeida, Murphy, and Gregory had taken positions outside Mr. Dukes' residence.  While the Deputies were outside Mr. Dukes' house, Mr. Dukes heard and saw nothing.  Mr. Dukes has stated that Junior often came home early in the morning or late at night.  Mr. Dukes further stated that as he was preparing to shower and get ready for work, he notice a light outside his residence.

In the record, while the Deputies were outside the residence, one of them shone their flashlight through Mr. Dukes' window.  However, Mr. Dukes believed this was Junior and not law enforcement officers.  Additionally, according to Mr. Dukes, because he was hard of hearing, Junior would shine a flashlight into the home to alert his father that he had arrived.

Mr. Dukes was getting to shower and was nude when he was alerted by a flashlight, and believing his son needed to let him in the house, walked to the back door to unlock the door and let him in.  At the time, Mr. Dukes used his phone's flashlight to navigate to the door.  When Mr. Dukes opened the door, he did not say anything - he simply opened it and returned to his room to shower so that he could go to work.

Mr. Dukes has categorically stated that at no time did he invite or allow the Deputies into his home or otherwise give his consent for their entry.  It is uncontested that once Mr.

Dukes opened the door and turned away, Deputies Gregory and Gaffey entered without consent whatsoever.

Deputy Gaffey announced on the radio that the back door was opened, and that Deputy Gregory entered; Deputy Gaffey then followed Deputy Gregory inside the house; Deputy Almeida followed Deputy Gaffey into the house.

According to his interview in connection with the investigative report, Deputy Gregory admitted that after the door was opened, he entered the house without being invited inside.  The report - which Sheriff McCallum, Jr. approved - states:

> "The door was opened slightly by an unknown individual from inside, whom [Gregory] did not see.  This person immediately turned and retreated back inside the home. [Gregory] explained that he is trained in tactics (SWAT) which are more advanced than that of other deputies in the same position as a patrol deputy and said he knew not to turn his flashlight on. [Gregory] explained this would have done two things: given away his position and illuminated himself making him a target; so he entered the doorway of the home.
>
> He also stated that it was possible that "the door opened, and [Gregory and Gaffey] just followed someone in."

LCSO General Order 1105.3, Conduct Standards and Violation Levels - which was in effect at the time of the unlawful entry into Mr. Dukes' home - provides that supervisors are tasked with "ensuring all applicable laws" are "adhered to by those members under their supervision."

Deputy Almeida failed to ensure that Deputy Gregory and Deputy Gaffey obtained Mr. Dukes' consent prior to entering his residence.

At the time of entry into his home, Deputy Gregory, Deputy Gaffey, and Deputy Almeida:

   a.   Did not possess a warrant to arrest Mr. Dukes;
   b.   Did not possess a warrant to arrest Mr. Dukes' son;
   c.   Were not in hot pursuit of Mr. Dukes' son;
   d.   Were not in hot pursuit of Mr. Dukes;
   e.   Did not have exigent circumstances justifying entry into Mr. Dukes' home;

     f.      Did not possess a search warrant regarding Mr. Dukes' home; and

     g.      Did not have express or implied consent to enter Mr. Dukes' home.

It was clearly established at the time of their entry into Mr. Dukes' home that these officers' entry into Mr. Dukes' home without a warrant, hot pursuit, exigent circumstances, or consent, violated the Fourth Amendment to the United States Constitution.

Once in Mr. Dukes' home, the Deputies proceeded towards Mr. Dukes, who was nude and walking back towards his bedroom to get ready for work.  When he entered his bedroom to turn on the lights.  As Mr. Dukes neared the light switch panel, Deputy Gregory snuck up on Mr. Dukes, who was inside the bedroom by the door and shouted for him to get on the floor.  When Mr. Dukes then heard Deputy Gregory order him to get on the floor, he complied.

Deputy Gaffey, also in the home,Stated that he  had his Taser pointed at Mr. Dukes. Deputy Almeida was also outside Mr. Dukes' bedroom and stated that he had his firearm drawn.

Prior to hearing Deputy Gregory's order to get on the floor, Mr. Dukes had not heard any other orders from any of the officers, and Mr. Dukes was unaware of the deputies' entrance into his home.  He believed he had cracked the back door open for his son.

Although Deputy Gregory was there looking for Junior - who had police encounters at Mr. Dukes' residence in the past, including with Deputy Gregory - Mr. Dukes told Deputy Gregory that he was "Terry, Sr." and that his son was not at home.  He also asked the officers why they were in his home and told them he needed to go to work.

Mr. Dukes stated that he was on the ground in his bedroom, terrified and embarrassed to have strangers in his home while he was nude on the floor.  He repeatedly told Deputy Gregory that he wanted to put on pants to cover his naked body.

Mr. Dukes then moved forward, while seated on the floor and in front of his bed, in the direction of the bedroom door to reach for his pants and begun to put them over his legs while repeatedly telling the officers that he was putting on his pants.

Without giving any commands or announcing that he would use his taser on Mr. Dukes, Deputy Gregory deployed his Taser, hitting Mr. Dukes in the chest with one of the probes while he was putting on his pants.

Although there was a firearm on Mr. Dukes' bed at the time, Mr. Dukes did not move towards the gun. At all times, Mr. Dukes remained on the floor and only moved forward - away from the bed where the gun was located - to reach for and put on his pants.

As stated by Mr. Dukes, at the time Deputy Gregory deployed his Taser, it was clearly established that an officer could not use force - including "less lethal" force - on a subject on the ground who was several feet from a firearm and was not moving in the direction of the firearm.

After deploying his Taser, Deputy Gregory entered Mr. Dukes' bedroom, where Mr. Dukes was still reaching trying to pull his pants up to cover his naked body. Deputy Gregory, Deputy Gaffey, and Deputy Almeida finally permitted Mr. Dukes to continue to put on his pants.

Mr. Dukes was then placed in handcuffs and taken outside with the Taser probe still lodged in his chest. He remained outside in the cold without a shirt or shoes and in handcuffs until paramedics arrived, who removed the probe from his chest. Mr. Dukes was then taken to the hospital for observation.

Only after the incident at Mr. Dukes' residence did LCSO apply for and obtain a warrant for the arrest of Junior.

In connection with the incident, Mr. Dukes was charged with one count of resisting an officer without violence in the matter of State of Florida v. Terry Carl Dukes, Sr., Case No. 38-2019-MM-471-A. It is apparent that Mr. Dukes was criminally charged based on his statements that he would pursue legal action for the unlawful entry and force.

Notably, on June 6, 2019, the State Attorney's Office dropped the charges and filed a "No Information" with the court.


**Mr. Dukes' Interview Excerpts:**

"It was about maybe a quarter to six on a Saturday morning, May the 25, and it was the day after my birthday. It was still dusk dark, it wasn't, it wasn't quite day. It was still kind of dusk-like--not, not light. Uh my son usually comes home at night, sometimes he comes home early in the morning with the phone and tell you what. So I see this light, and uhh, I say "Okay, I'm coming." I wasn't dressed cause I was fitting to take a shower.

So I eased to the back door with my phone light, without turning on no lights in the house, with my phone light, and went to the back door, and cracked the back door, pushed it open about that far.  I didn't open it all the way wide open.  So, that's when, when I get up, I usually have my pistol in my hand, cause I in there on five acres out there, ain't nobody live around on neither side of.  For my protection, I go open my car door, or anything, always when I get up, I always usually have it [pistol].  And it's legal.  That morning, I got it and fitting to take it with me and something said put it down.  I put it down on the bed.  And so, by the time I seen it out, opened the door, I came back into the room to get stuff ready to get a shower.  By that time, they had walked in my house and snuck up on me.  And, it could have went, really been bad, worse that what it was, cause I'm really,  I'm got anxiety attacks bad.  They walk through my house, I can't hear.  I didn't even hear them walk through the kitchen, to my room.  When I looked up, they came in and talked to me--yelling, "get on the ground" and all this.  I'm talking about at the top of they voice.  And I'm like, "man, what's going on?"  You know, like I'm waking up in a nightmare.  That's when I say, uh, "Terry is not here.  He didn't come home last night.  He's not here, and I'm Terry Senior.  I'm fitting to get ready to go to work."  They was yelling, "Oh, no, you ain't going to work."  Talking to me loud and all negative, telling me to, "get on the floor, get on the floor."  I got on the floor, on my butt, naked.  [I] got on the floor.  I had a pair of pants on there, [I was] reaching down trying to pull my pants up.  I say, "Man, I'm naked, I want to put my pants on."  They kept yelling, "Don't move, don't move, don't move!"--this and that.  I said, "Look, I want to put my pants on."  That's when, that's when they tased me.  He didn't give no command or nothing--about I'm going to tase your or nothing.  He just took.  I'm scared, I thought it was going to kill me.  When they tased me, they got me up.  I had just had my pants buttoned up--half way crooked.  Then he come, while I was on the floor, and they put handcuffs on me.  I say, "Why are you all bothering?", because I ain't done nothing.  I told before, and all they had to do was just get out of my house and two, I don't see where they had a right to come in my house without a warrant.  Because I don't have a warrant, I don't have no warrant on me."

**Deputy Gregory Narrative:**

"On May 25, 2019, at approximately 05:15 hrs., Dep. Gaffey, Cpl. Almeida, Dep. Murphy, and I responded to the residence located at in reference to attempt to contact Terry Dukes Jr.

"Detective Wilkinson, on this date, developed probable cause for the charge of Aggravated Battery on a Pregnant Women, with Dukes Jr being the suspect (Case: 201905002270).

"Upon arrival, Dep. Gaffey and I walked to the back (West) section of this residence, while Cpl. Almeida and Dep. Murphy attempted to make contact with Dukes Jr at the front (East) section of this residence. Once at the back side of this residence I positioned myself beside the south west door steps (These steps led up to the back door), while Dep. Gaffey positioned himself on the north west corner of the residence. While at the front of the house Dep. Murphy knocked loudly and announced "Sheriff's Office". Dep. Murphy did this several times. After several attempts to make contact via "knock and announce", I faintly heard a male voice come from within the residence, however I couldn't hear what this male said. Right after I heard this voice, I heard the sound of footsteps coming from within the residence. Right after I started hearing these footsteps the back door opened. As soon as this door opened, I walked up the steps and entered the residence through the open door.

"Once inside I observed a subject walk into a bedroom and shut the door. After announcing "Sheriff's Office", and asking if Terry Dukes Jr was here, I heard a male voice come from within the bedroom I observed the subject walk into. I could not determine what this male was saying due to his voice being muffled. I announced "Sheriffs Office" a second time, and again, asked if Terry Dukes Jr was here. The male subject didn't say anything. I then knocked on this door while giving loud and clear commands to open the bedroom door. After several knocks / commands, this door opened slightly, and a male voice asked what I was doing. I advised the male he needed to identify himself, and to come out from behind the door. I advised the male subject again who I was, and that I worked for the Sheriffs Office. The male subject, instead of complying, opened the door a little bit more, stuck his right arm on the outside of the door, and then would quickly look through the gap in the door before concealing his face completely back behind the door.

"Once the subject stuck his arm out of the door, I could tell that the male behind the door was African American. Dukes Jr is African American.

"Based on the fact that Dukes Jr is African American, the male inside is African American, the male inside repeatedly refused my commands, and

Page 9 of  34

the male's suspicious behavior, I drew my service weapon, and began giving loud clear commands to the male. I advised the male to show me his hands and to come from behind the door. While I was giving these commands, the male subject opened the door a little bit more, asked who I was, and why was I there. Once the door opened more, I could see partially the male subject's torso and part of his face. Right past this male, was a bed, and on this bed I could see a pistol. Once I observed this pistol, I gave more clear commands to come from behind the door and to show both his hands. The male subject did not comply with my commands. As I continued giving commands, I heard the male say something (I couldn't understand what he said), and then walk from behind the door, and toward his bed where the gun was. Once I witnessed, through the gap in the door, the male walking toward the bed, I quickly opened the bedroom door, and deployed my TASER. The deployment of my TASER caused the male subject to fall in front of his bed.

"The distance from the door, to where I observed the gun, was approximately 8 feet. This bed was located directly behind and to the right of this door if looking from the outside of the bedroom.

"Once inside the bedroom it was learned that this male was Terry Dukes SR, the father of Terry Dukes Jr. Dukes Sr was nude, and after being allowed to put his pants on, Dukes Sr was secured in handcuffs. While Dukes Sr was putting his pants on I walked to the bed and cleared the firearm for safety purposes.

"I would like to note that within 10-15 seconds of me entering the residence, Dep. Gaffey entered the residence through the same door I did.

"I would like to note that during this incident, Dukes Sr attempted to shut the door several times, and with each time I would stop the door from closing by placing my foot against the bottom portion of it.

"Dukes Sr advised that the reason he opened the back door and then walked away, was because he thought it was Dukes Jr, and not Law Enforcement. Dukes Sr also advised the lights he seen shining in his house resembled Dukes Jr's cell phone light. Dukes Sr later advised that he did not know who was at his door. Dukes Sr also advised that he would "own all of Levy County after suing us", and that he was going to "have all of our jobs for doing this".

"Prior to arrival at this residence, Det. Wilkinson was advised by the victim in the above referenced case number that Terry Dukes Jr resides at this address. Apart from the victim advising this information, Law Enforcement is very familiar with Terry Dukes Jr from prior incidents, and this address, is the address Law Enforcement knows to be Dukes Jr's primary address. Det. Wilkinson was also advised by the victim that Dukes Jr, has been using the drug known as "Molly" (MDMA).

"During this incident Terry Dukes Sr, did not identify himself nor did he comply, or advise that he would comply, with the orders I gave in regards to showing his hands or coming from behind the door.

"I would like to note that this residence does not have power. The only light source inside this residence was either from my (or other deputies) flashlight, TASER light, or from the flashlight that is attached to my firearm. The door Dukes Sr was standing behind was painted white. The light reflecting off of this door clearly illuminates my Sheriffs Office insignia. During this incident Dukes Sr, on multiple occasions, would quickly look through the gap in the door before concealing his face back behind the door.

"I would like to note that Law Enforcement was informed that there were firearms inside this residence, and that Dukes Jr is known to have a violent past.

"Dukes Sr was evaluated by EMS on scene, and after being cleared by EMS, requested to be transported to the hospital.

"Photographs were obtained, and attached to this case file.

"A Sworn Complaint will be filed with the SAO for the charge of Resisting W/O Violence."  (Deputy Gregory, Dukes 002700 - Dukes 002701)

Deputy Gaffey Narrative:

"On the above listed date and time, I responded to the listed location in reference to locating Terry Dukes Jr. Detective Wilkinson advised he had probable cause for his arrest for the charge of Aggravated Battery on a pregnant person. I was informed that there are firearms in the home and Terry Dukes Jr. has a violent history.

"Dep. Gregory and I went to the back of the home and Cpl. Almeida and Dep. Murphy went to the front of the home. I posted on the rear, north corner of the home and Dep. Gregory went to the back door at the bottom of the steps. I heard Dep. Murphy announce "Sheriffs Office" three times. After the third time I heard movement inside the home. Approximately 30 seconds to one minuet later, I observed the back door to the residence open and Dep. Gregory walk up the wooden steps, inside through the back door.

"I followed shortly behind Dep. Gregory and entered the home. I observed Dep. Gregory in the kitchen and he advised someone opened the door and retreated back into the residence. We announced ourselves again shouting "Sheriffs Office" and a black male, later identified to be Terry Dukes Sr., opened the bedroom door slightly, so that only a portion of his face, right torso, and his right hand were visible. There is no power to the home, therefore there were no lights on and the only light in the home was from Dep. Gregory and my flashlights. I had my issued Taser pointed at the subject at this time ordering him to show both of his hands. Myself and Dep. Gregory ordered him multiple times to show both of his hands using loud verbal commands and the subject repeatedly asked why and did not comply.

"While giving Dukes Sr. orders to show his hands, Dep. Gregory advised me there was a gun on the bed. I glanced at the bed and observed a black in color revolver, approximately 5-8 feet from Dukes Sr. Dep. Gregory and I ordered Dukes Sr. to show his hands and come out of the bedroom. Dukes Sr. did not comply and he attempted to shut the bedroom door on us to conceal himself. Due to observing the gun in reach of Dukes Sr. Dep. Gregory shoved the door open, so that Dukes Sr. could not retreat and get possession of the firearm.

"When Dep. Gregory shoved the door, Dukes Sr. retreated back into the bedroom in the direction of the bed where the firearm was. At this time Dep. Gregory entered the doorway and I lost sight of Dukes Sr. for a short time. I heard Dep. Gregory deploy his agency Taser, while ordering the subject to show his hands. There was a short period where I was unable to clearly see the subject, due to lighting and the bedroom door being in my line of sight.

"Once the Taser was deployed, I entered the room and observed Dukes Sr. sitting on the floor with a Taser probe in the top right corner of his chest. I

did not see where the second probe went. Dukes Sr. said multiple times "why did you do this to me." At this time it was discovered Dukes Sr. was not Dukes Jr. Myself and Dep. Gregory before this time, were not able to confirm if the subject was Sr. or Jr. until this point, due to the lighting and both Sr. and Jr. looking alike. Also the majority of the subjects face was not observed during the incident until after the Taser is deployed. Dukes Sr. was nude and was asking to put on his pants. I advised Dukes Sr. to grab his pants and put them on. While Dukes Sr. was putting his pants on, Dep. Gregory secured the firearm and removed the ammunition.

"Once Dukes Sr. put his pants on, he stood up and Dep. Gregory placed him in hand restraints. Levy County Dispatch was advised to have EMS respond for a Taser deployment. Dep. Gregory and I walked the subject out to the roadway in front of his home so that he could meet with EMS.

"While waiting for EMS, Dukes Sr. advised he opened the door to the home because he saw the light coming from the exterior of the home and he though it was Dukes Jr. returning home. Dukes Sr. advised the light looked like the light that is on his sons phone. This is why he opened the door and then retreated back into the bedroom. Dukes Sr. advised multiple times "I am going to own Levy County", and he was going to sue all of the deputies.

"The home was cleared by Dep. Murphy and Cpl. Almeida and Dukes Jr. was not located on the property.

"EMS responded to the scene and removed the Taser probe for Dukes Sr.'s body.

"Dukes Sr. was transported to the hospital by his own request.

"There is no video footage of this incident to my knowledge." (Gaffey, Dukes 002709 - Dukes 002710)

**Florida Law: 943.1717, Fla. Stat.  Use of dart-firing stun guns**.

    (1)    A decision by a law enforcement officer, correctional officer, or correctional probation officer to use a dart-firing stun gun must involve an arrest or a custodial situation during which the person who is the subject of the arrest or custody escalates resistance to the

officer from passive physical resistance to active physical resistance and the person:

    (a)    Has the apparent ability to physically threaten the officer or others; or

    (b)    Is preparing or attempting to flee or escape.

(2)    The Criminal Justice Standards and Training Commission shall establish standards for instructing law enforcement, correctional, and correctional probation officers in the use of dart-firing stun guns. The instructional standards must include the effect that a dart-firing stun gun may have on a person.

(3)    The basic skills course required for certification as a law enforcement officer must include instruction on the use of dart-firing stun guns. The portion of the basic skills course on the use of dart-firing stun guns must be a minimum of 4 hours' duration.

(4)    A law enforcement officer, correctional officer, or correctional probation officer who has not received the dart-firing stun gun training described in subsection (3) and who is authorized by his or her employing or appointing agency to carry a dart-firing stun gun after the effective date of this act must complete, before issuance and use of a dart-firing stun gun, the 4-hour dart-firing stun gun training described in subsection (3) or an equivalent training course provided by the officer's employing or appointing agency in accordance with the Criminal Justice Standards and Training Commission standards outlined in subsection (2).

(5)    After completing the basic skills course, each law enforcement, correctional, and correctional probation officer who is authorized by his or her agency to use a dart-firing stun gun must complete an annual training course on the use of dart-firing stun guns. The annual training course on the use of dart-firing stun guns must be a minimum of 1 hour duration.

**Information Regarding the Taser Weapon:**

The taser is classified as an Electronic Control Weapon (ECW) [originally called Conducted Energy Device - CED], and is a unique use-of-force tool typically used by law enforcement officers to overcome a suspect's assaultive/combative behavior and/or resistance to arrest.  The most common ECWs in use throughout the nation are manufactured by Taser International.  The tasers used in this incident was the Model X-26 Taser.

The X-26 Taser was designed to discharge electrical charges into a subject to create involuntary muscle contractions that override the suspect's voluntary motor responses. The X-26 has three modes of use: "probe," "touch-stun," and "elongated stun" modes. Projectiles with wires are contained in an ECW cartridge.  When fired in the probe mode, a cartridge projects, through a set of wires, a pair of barbs (or darts with hooks) that attach to clothing or penetrate the skin after the Taser is fired, delivering an electrical charge. As the barbs penetrate, the electrical current is sent down the wires and through the body between the two barb points.  The application of the electrical energy painfully influences and incapacitates the subjects' muscles and nerves.

The effect of the taser on a suspect through the application of an electrical pulse is called "neuromuscular incapacitation" (NMI).  The NMI pulse provides electrical energy that provides the officer the ability to dominate a suspect's motor nervous system by interfering with electrical signals sent to the skeletal muscles by the central nervous system.  Since the incapacitation is proportional to the muscle mass captured by the NMI, the amount of distance between the two probes when they embed is directly proportional to the effectiveness of the NMI.  It must be also noted that the infliction of pain occurs regardless of the distance between the two probes.  Thus, despite the distance between the embedded probes (and NMI result), significant pain is inflicted regardless of the existence or absence of NMI.

As previously noted, the X-26 Taser is designed to discharge for 5 seconds when the trigger is pulled.  The weapon will shut off automatically unless the officer keeps the trigger depressed.


**Established Professional DOJ and TASER Standards Regarding the Use of the Taser Weapon:**

The U.S. Department of Justice (DOJ), the International Association of Chiefs of Police (IACP), the Office of Community Oriented Policing Services (COPS), the Bureau of Justice Assistance (BJA), the National Institute of Justice (NIJ), and other policing

organizations and associations developed and published in 2006 and 2011 defining documents regarding the use of the Taser weapon (listed as item F on page 8 of this report.)  Among other issues, 53 specific and necessary guidelines governing the use of the Taser weapon are listed in the 2011 publication.  These guidelines include limiting taser use to no more than 3 cycles (15 seconds) and to avoid firing the weapon into the chest. As such, the 2006 and 2011 publications expresses the accepted professional standard of care and as endorsed by the U.S. Department of Justice.  They have not been revised since 2011.

**TASER Training Sent To All User Agencies Regarding Chest Shots:**

Following the original 2006 DOJ publication, in 2009 TASER International published Training Bulletin 15.0 which acknowledged and endorsed the DOJ 2006 published guidelines (including the 15 second limit), and added to their training to avoid firing the darts into the chest. This product warning was acknowledged in the 2011 DOJ publication as follows:

> "In October 2009, TASER International released: "Training Bulletin 15.0 Regarding Medical Research Update and Revised Warnings," which offered a new preferred target zone for ECWs.  It lowered the recommended target area from "center of mass" to "lower center of mass" for front shots.  By avoiding the chest whenever possible, TASER International indicated that law enforcement agencies may avoid the controversy about whether [ECWs] do or do not affect the human heart." (DOJ 2011 Publication, page 37.)

Since 2009, the TASER International Training/Certification lesson plans and their Product Warnings have included the 15 second limit and the increased risks to the heart when taser darts are fired into the chest.

> "Experts have identified dart-to-heart distances and transcardiac (across the heart) vectors as being key determining factors in whether an ECD can effect the heart.  The further an ECD dart is away from the heart the lower the risk of affecting the heart." (Taser Version 18 User Update (2012), page 44.)

When the DOJ updated the 2006 publication in 2011, they included even more specific cautions regarding the medical risks connected to a Taser's use on a subject are quoted as follows:

*"Medical Considerations: Repeated or multiple applications may increase risk of death:"*

"It is important to recognize that ECWs have been cited by medical authorities as a cause of, or contributing factor in, some deaths.  A number of factors appear to be associated with fatal and other serious outcomes. These factors include how the ECW was used and the physical or medical condition of the subject who received an ECW application.  Indeed, in July 2010 the American Academy of Emergency Medicine issued a Clinical Practice Statement advising physicians that they should consider additional evaluation and treatment for individuals who experienced an ECW application longer than 15 seconds."

"Although causation factors are not clear, the most common factors that appear to be associated with fatal and other serious outcomes include 1) repeated and multiple applications, 2) cycling time that exceeds 15 seconds in duration, whether the time is consecutive or cumulative, and 3) simultaneous applications by more than one ECW. Officers must be trained to understand that repeated applications and continuous cycling of ECWs may increase the risk of death or serious injury and should be avoided."

"Medical Considerations: High-risk populations:"

"Some populations currently believed to be at a heightened risk for serious injury or death following an ECW application include pregnant women, elderly persons, young children, visibly frail persons or persons with a slight build, persons with known heart conditions, persons in medical/mental crisis, and persons under the influence of drugs (prescription and illegal) or alcohol. (Emphasis added.) Personnel should be trained about the medical complications that may occur after ECW use and should be made aware that certain individuals, such as those in a state of excited delirium, may be at a heightened risk for serious injury or death when subjected to ECW application or other uses of force to subdue them."

"Drive Stun: Avoid use as a pain-compliance tactic:"

"The most commonly used ECWs can be used in two modes: probe and drive stun.  Many police managers and officers erroneously believe that applications of drive stun are as effective as applications with probes, but that is not correct.  The drive stun mode can be used to complete the circuit

in the event that one of the probes is ineffective or becomes dislodged.  The drive stun mode can also be used in close quarters for the purpose of protecting the officer or creating a safe distance between the officer and subject.  Absent these circumstances, using the ECW in drive stun mode is of questionable value.  The primary function of the drive stun mode, when not used to complete the circuit, is to gain subject compliance through the administration of pain.  Using the ECW to achieve pain compliance may have limited effectiveness and, when used repeatedly, may even exacerbate the situation by inducing rage in the subject.  For these reasons, agencies should carefully consider policy and training regarding when and how personnel use the drive stun mode, and should discourage its use as a pain compliance tactic.  Drive stun has an applicable but limited purpose that should be taught, explained, and monitored during ECW training and field use." (Page 14.)

In 2011, the U.S. Department of Justice National Institute of Justice (NIJ) as well as the Police Executive Research Forum (PERF), published substantial research and guidelines for the use of Tasers. Tasers used in the probe mode stun and temporarily disable people making them easier to arrest or subdue. But the same incapacitation can also make falls more dangerous since the subjects are not able to employ their arms and hands or other parts of their bodies to break their falls. Add to that the momentum of a running subject and sudden neuromuscular incapacitation, and subjects can fall like trees, often striking hard surfaces, like concrete, face first.

In 2010, PERF did a survey of more than 190 law enforcement agencies about their use of force policies and interviewed officials from agencies that had experienced two or more deaths in the past five years considered "proximate to the use of an ECW" (Electronic Control Weapon). In 2011, PERF drafted guidelines for ECW deployment, recognizing that ECWs are valuable and useful but not harmless. One of the risks of ECW use is injuries from falls, especially by running subjects who cannot break a fall because of muscular incapacitation and the forward momentum and hard surface intensify the fall injury – especially head injuries. One of those guidelines is:

> 26.     *Fleeing should not be the sole justification for using an ECW against a subject. Personnel should consider the severity of the offense, the subject's threat level to others, and the risk of serious injury to the subject before deciding to use an ECW on a fleeing subject.*

Taser's training materials warn "To use CEW in probe mode officer must reasonably perceive subject to be an immediate threat of harm/injury or fleeing or flight risk from

serious offense crime and the officer is justified in tackling the person." "Neuromuscular incapacitation (NMI) frequently causes subject to fall. Falls are often uncontrolled and subject is often unable to protect or catch himself. Falls, even from ground level, can cause serious injuries or death. Consider environment (including the ground surface) and the likelihood of a fall related injury."

Based on Deputy Gregory's statement, Mr. Dukes had uttered no threats, had not moved toward the firearm on his bed, and therefore, there was no exigent circumstance that justified Deputy Gregory's use of his X26 weapon–a weapon that can be lethal.

### **Minimum Standards for Force Options in Police Departments Country-Wide:**

A Subject's resistance or actions to an arrest will determine the type of force used by a peace officer.  The following chart illustrates how a subject's resistance or actions should be commensurate to the force applied by an officer:

> *Cooperative* - (no resistance):
>
> - Mere professional appearance
> - Nonverbal actions
> - Verbal requests and commands
>
> *Passive non-compliance* - Does not respond to verbal commands but also offers no physical form of resistance:
>
> - Verbal requests and commands
> - Officer's strength to take physical control, including lifting/carrying
> - Control holds and techniques to direct movement or immobilize a subject
>
> *Active resistance* - Physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, running away, or verbally signaling an intention to avoid or prevent being taken into or retained in custody:
>
> - Control holds and techniques to control the subject and situation

- Use of personal weapons in self-defense and to gain advantage over the subject
- Use of devices to secure compliance and ultimately gain control of the situation

*Assaultive* - Aggressive or combative; attempting or threatening to assault the officer or another person:

- Use of devices and/or techniques to secure compliance and ultimately gain control of the situation
- Use of personal body weapons in self-defense and to gain advantage over the subject

*Life-threatening* - Any action likely to result in serious injury or possibly the death of the officer or another person

- Utilizing firearms or any other available weapon or action in defense of self and others

NOTE: Officers must take into account the totality of the circumstances when selecting a reasonable force option.  It is not the intent of this chart to imply that an officer's force options are limited based on any single factor.

NOTE: Officers must be aware of and comply with their specific agency policies regarding appropriate force options.

Constant reevaluation requirement:

Peace officers must use the force option appropriate for the situation as conditions may change rapidly.  Officers must continually reevaluate the subject's action and must be prepared to transition as needed to the appropriate force options.


**Training Regarding the Fourth Amendment of the U.S. Constitution:**

In the United States Law Enforcement Officers assume their lawful authority from the United States Constitution, and are required to follow the standards by oath.  The Fourth Amendment to the U.S. Constitution provides that people, houses, and effects (belongings) shall be secure from unreasonable searches and seizures, and requires

Page 20 of  34

probable cause for the issuance of warrants.  The Fourth Amendment of the Constitution states:

> *"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.*"

The first part of the Fourth Amendment deals with the right of people to be free from unreasonable searches and seizures. The second part defines procedures officers must follow when obtaining a warrant.  In this set of facts, There was no consent, or urgency or other exception that would excuse the defendants from obtaining a warrant before entering the Dukes residence.

Notably, in United States Court of Appeals, Eleventh Circuit, *Bashir v. Rockdale County*, 445 F.3d 1323 (2006).the Court has address specific similar facts, including:

> *"Bashir contends his Fourth Amendment rights were violated when Deputy Davis and the unnamed deputies unlawfully entered his house and arrested him. He argues this right was clearly established at the time, such that a reasonable police officer in the deputies' position would have known what they were doing offended the Constitution. We agree.*

> "It is a "`basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980).[5] This basic principle is founded on "the very core" of the Fourth Amendment: "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Id. at 590, 100 S.Ct. at 1382 (quoting Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961)). The sanctity of the home is afforded special protection under the Fourth Amendment, such that "the reasons for upholding warrantless arrests in a public place do not apply to warrantless invasions of the privacy of the home." Id. at 576, 100 S.Ct. at 1375. "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Id. at 590, 100 S.Ct. at 1382. "As Payton makes plain, police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home." Kirk v.

Louisiana, 536 U.S. 635, 638, 122 S.Ct. 2458, 2459, 153 L.Ed.2d 599 (2002). Additionally, the prohibition on warrantless in-home arrests does not apply to situations where voluntary consent to enter has been obtained. See Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990); Holmes v. Kucynda, 321 F.3d 1069, 1078-79 (11th Cir.2003). As the foregoing makes clear, a warrantless arrest in a home violates the Fourth Amendment unless the arresting officer had probable cause to make the arrest and either consent to enter or exigent circumstances demanding that the officer enter the home without a warrant.

"It is undisputed Deputy Davis and the unnamed deputies did not have a warrant prior to entering Bashir's home and effecting his arrest. The warrantless arrest inside the home was, therefore, presumptively unreasonable. Although the district court ruled the officers had probable cause to arrest Bashir for disorderly conduct, a ruling Bashir has not challenged on appeal, the existence of probable cause does not by itself validate a warrantless home arrest. Payton, 445 U.S. at 588-89, 100 S.Ct. at 1381 (quoting with approval United States v. Reed, 572 F.2d 412, 423 (2d Cir.1978)); see also Kirk, 536 U.S. at 637, 122 S.Ct. at 2459 (reversing state court ruling that warrantless entry, arrest, and search did not violate the Fourth Amendment because there had been probable cause to arrest); Minnesota v. Olson, 495 U.S. 91, 95, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85 (1990) ("It was held in Payton . . . that a suspect should not be arrested in his house without an arrest warrant, even though there is probable cause to arrest him."); United States v. Edmondson, 791 F.2d 1512, 1515 (11th Cir.1986) ("A finding of probable cause alone . . . does not justify a warrantless arrest at a suspect's home."). The deputies must show their presence in the home was justified, either by exigent circumstances or consent.

"The exigent circumstances exception to the warrant requirement recognizes a "`warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant.'" United States v. Holloway, 290 F.3d 1331, 1334 (11th Cir.2002) (quoting Michigan v. Tyler, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978)). Situations in which exigent circumstances exist include: "danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit." Id. None of these exigencies existed at the time of Bashir's arrest. According to Deputy Davis's own deposition testimony, Bashir was not

disorderly prior to entering the home and did not commit a crime outside. Once inside and seated at the kitchen table with his son on his lap, Bashir might have raised his voice to Deputy Davis, but he did not rise up out of his chair or physically threaten Davis in any way.[6] Thus, the record evidence reveals a complete absence of exigent circumstances attendant to the deputies' entry into the home and Bashir's arrest.

"Deputy Davis argues his presence in the home was lawful because Bashir consented to it. He concedes, however, he never asked Bashir for permission to enter the house and Bashir never expressly invited him inside. He nonetheless contends Bashir "effectively invited" him into the house for him to explain what had happened. According to Davis, Bashir's invitation can be implied from the fact Bashir spoke to him as he walked into the house and asked him questions once they were inside.

"Davis's implied consent argument fails because it is belied by the record evidence and because it is contrary to circuit precedent. The record shows the only time Bashir spoke with Deputy Davis outside was when Bashir asked to speak with the officer in charge. Davis directed Bashir to Sergeant Reed and did not participate in Bashir's conversation with Reed. When Bashir abruptly quit the conversation, he picked up his child and, in his words, "never said anything to anybody anymore other than until I got in the house there." Deputy Davis's deposition testimony confirms Bashir said nothing to him as he walked into the house.[7]

"Bashir's actions fall far short of the conduct we have previously held sufficient to imply voluntary consent. In United States v. Ramirez-Chilel, 289 F.3d 744, 752 (11th Cir.2002), we found consent could be implied from the defendant's body language when, in response to the officers' requests for admittance, the defendant "yield[ed] the right-of-way" to the officers. Conversely, there is no evidence in the record Bashir yielded the right-of-way in response to a request for permission to enter. Deputy Davis never asked for permission but simply followed Bashir into the house. These facts are materially similar to those of United States v. Gonzalez, 71 F.3d 819, 830 (11th Cir.1996), where we found consent to enter could not be inferred. In Gonzalez, a woman refused an officer permission to enter and search her home, and the officer simply followed her inside as she went to get a glass of water. Id. at 829. We held the warrantless entry was presumptively unreasonable and "reject[ed] the government's argument that [her] failure to `bar' [the officer's] follow-on entry when she went into her

house to get a drink of water can be viewed as an adequate implied consent to that warrantless intrusion." Id. We also rejected the notion that "failure to object to a search equals consent to the search." Id. at 829-30 (internal quotations omitted). To permit the government to show consent to enter from the lack of an objection to the entry "would be to justify entry by consent and consent by entry. This will not do." Id. at 830 (quoting United States v. Shaibu, 920 F.2d 1423, 1426 (9th Cir.1990) (internal quotations omitted)). Thus, consent cannot reasonably be inferred from Bashir's simple act of disengaging from conversation with Sergeant Reed and walking into the house. Nor can consent reasonably be inferred from Bashir's conduct once Davis was already inside.

"Unable to show exigent circumstances or consent, Deputy Davis advances a final argument to justify his warrantless intrusion. He contends his presence in the home at the time of Bashir's arrest was a lawful extension of his earlier entry when he assisted in arresting Mrs. Bashir. We will assume for the purposes of discussion that Davis's initial entry to arrest Mrs. Bashir was lawful under the "hot pursuit" exception to the warrant requirement. See generally United States v. Santana, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) (discussing the "hot pursuit" exception). It does not follow, however, that Davis's reentry 20 minutes later should similarly be excused.

"Davis does not argue the exigent circumstances surrounding Mrs. Bashir's arrest continued to exist after the arrest was completed. See Mincey v. Arizona, 437 U.S. 385, 393, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978) (stating a warrantless entry must be "strictly circumscribed by the exigencies which justify its initiation") (quotation omitted). Instead, Deputy Davis posits something different: since the initial entry to arrest Mrs. Bashir was lawful, police investigating the arrest could lawfully enter and reenter the home for some period of time thereafter, and thus, his presence in the home at the time of Bashir's arrest was lawful. Davis cites no case law supporting his position.[8] But we need not consider whether he is correct on the law because he is wrong on the facts. At oral argument, Davis conceded his reentry was unrelated to any investigation of Mrs. Bashir's arrest. Indeed, the record is silent as to whether there was any investigation underway that required the presence of officers in the home. There were no officers inside when Bashir arrived at least 20 minutes after Mrs. Bashir's arrest. Although officers and medical personnel were still on the scene, all were outside either providing medical treatment, standing around the front

yard, or talking with each other. Davis himself was "standing still" and "saying nothing" for 20 minutes before Bashir arrived. Thus, under these facts, Davis's reentry cannot reasonably be explained as a lawful extension of his initial entry.

"In *sum, Bashir's warrantless arrest in his home is presumptively unreasonable under the Fourth Amendment and the record taken in the light most favorable to Bashir does not establish the existence of any exception to the warrant requirement*. Thus, Bashir has satisfied the first prong of the qualified immunity analysis by demonstrating that his warrantless arrest was unlawful."  (Emphasis added.)

### Additional Opinions Thus Far:

1.  As stated above, entry into Mr. Dukes' resident occurred in violation of his constitutional rights and therefore the Defendant Deputies did so without any lawful authority.  Accordingly, their acts within the residence (ufe of force and arrest) occurred without lawful authority.

2.  Assuming arguendo, that Mr Dukes was arrestable the use of force inflicted was excessive and not necessary and was an assault under color of authority.

3.  At the time of the Taser deployment, Mr. Terry Dukes did not appear to represent a threat to any person.  Therefore, Deputies Almeida and Gaffey failed to intervene and/or stop Deputy Gregory's use of excessive force, which violated policy and training.

4.  Mr. Dukes had complied with orders to sit down and was not actively involved in any criminal activity; as such, Deputy Gregory's use of a taser was unnecessary, excessive, and was in violation of policy, training, and Mr. Dukes' constitutional rights.

5.  Taking Mr. Dukes' set of facts as true, that he did not give consent for the Deputies to enter his residence and taking the Defendants' set of facts as true, that they did not have a warrant to enter Mr. Dukes' residence, then the Defendant's violated policy, training,

and Mr. Dukes' constitutional rights, when they entered his residence.

6.    Taking Mr. Dukes' set of facts as true, that he complied with order to "get on the floor" and announced that he was going to pull his pants up, then Deputy Gregory used excessive and unnecessary force, when he deployed his X26 into Mr. Dukes' chest.

7.    There is nothing in the record of any discipline, re-training, or changes in policy and procedure provided for my review.  It is apparent that the LCSO and the their chain of command has endorsed the conduct and procedures that resulted in the constitutional violations under color of authority inflicted upon Mr. Dukes.  As such, citizens are in similar risk by the Defendant Deputies and any others on the LCSO who are similarly trained and supervised

## My Qualifications To Review This Case:

My opinions are based in part on my training, professional experience and education.  I am a twenty seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant.  I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5, 1988).  The POST Command College was a Masters level two-year course of study requiring a thesis, in Police Administration, with the diploma awarded by the California Department of Justice (and not the California University system).

During the course of my service with the department, I had a wide range of duties.  Those duties included an 18 month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail).  I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander, and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers.  Those cases included possible complaints relating to both misdemeanor and felony crimes.  They frequently required follow up investigations and interviews before the exact nature of the case could be determined.  As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer.  Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later.  During that time, I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator.  At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance.  This process gave me an expertise in the POST Basic curriculum.  I also supervised the training of cadets at our Reserve Training Academy.  They were taught proper investigation, interview, and apprehension procedures.  Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals.  I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption.  The majority of our cases were homicide cases, including the murder of police officers.  Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy busts, and reverse stings.  We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations.  These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations.  In that regard, the unit processed, under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

Additionally, the majority of the over 2,300 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents.  From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous.  Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension.  This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department.  These methods and principles are also embraced by every state

training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel." This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, New York and Wisconsin. I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission. I have testified before the Harris County (Texas) Grand Jury and the Cleveland Grand Jury. I have also submitted written opinions in matters before Alaska, Delaware, Idaho, Montana, North Carolina, New York, Oregon, Kentucky, and Wyoming Federal and State Courts. I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California. I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish Police Officer' Standard of Care" at the National Police Accountability Project, National Lawyers Guild Convention, in New Orleans, Louisiana. I was selected (March 30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on the topics of "Ethics, Police Investigations, the California POST Curriculum, and the M26 and X26 Taser weapons." On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the Prospective of a Police Expert." On October 15, 2015 I was the invited presenter at a Community Forum in Victorville, California on the topics of Police Procedures, Community Policing, Use of Force, and features of the M26, X26 and X2 Taser weapons. I was selected (January 24, 2020) to present on the topic of: "Use of force litigation under California's negligence standard and the impact of AB 392" at the National Police Accountability Project held at Loyola Law, Los Angeles, California. On February 18, 2020, and on March 10, 2021, I lectured (at request) at the University of California - Irvine, School of Law, Civil Rights Litigation Clinic.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project and the Texas Civil Rights Project (Austin, Texas). As a result of my expert testimony in *Border Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden. The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the USDC in *Burns v. City of Redwood City*, 737 F.Supp.2d.1047. I have been recognized, and my expert report was quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force in *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463, 485 (9th Cir. 2007). The Ninth Circuit also drew from my expert report in a second published case involving Police Detective Investigations. *Torres, et al. v. City of Los Angeles, et al.*, 540 F.3d 1031, 1042-43 (9th Cir. 2008). The *Torres* case was appealed to the U.S. Supreme Court and returned for trial. I provided the expert opinion in *Chavies Hoskin v. City of Milwaukee, et al.* (E.D. Wis Case No. 13-cv-0920), regarding field strip and cavity searches, hiring, training, discipline and supervision, and which resulted in significant policy changes within the MPD. My opinions supported argument in the Ninth Circuit case: *A. D., a Minor; J. E., a Minor; Sue Casey, Plaintiffs-Appellees, v. State of California Highway Patrol, Defendant, and Stephen Markgraf.*, No. 09-16460, D.C. No. 3:07-cv-05483-SI (9th Circuit, Published Opinion). My opinions supported argument in the Ninth Circuit case: *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1102 (9th Cir. 2014). The Ninth Circuit also drew from my expert reports regarding credible threats justifying the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), and *(Baton use) Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding Jail Administration and Administrative Responsibilities, *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding an officer's violation of the 14th Amendment if an officer kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013). The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012). The Ninth Circuit also drew from my expert report regarding the use of impact weapons (PepperBall) on civilians in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012). I was the expert in the Ninth Circuit opinion regarding the allegations proffered by police officers and their use/display of firearms against civilians in *Green v. City and County of San Francisco*, 751 F. 3d 1039 (9th Cir. 2014). Most

recently, I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014).  I was the expert at trial in the Ninth Circuit opinion regarding the order of evidence at trial in *Estate of Manuel Diaz, v. City of Anaheim*, et al., No. 14-55644.  My opinion is quoted in the Ninth Circuit opinion regarding the use of lethal force in *A.K.H. a minor, et al, v. City of Tustin, et al.*, No. 14-55184.  My opinions supported argument in the Ninth Circuit case: *Estate of Angel Lopez, et al., v. Kristopher Michael Walb*, No. 14-57007 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court.  My opinions supported argument in the Ninth Circuit case: *Estate of Shakina Ortega, et al., v. City of San Diego, et al.*  No. 14-56824 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court.  My opinions supported argument in the Ninth Circuit case: *Jerry Newmaker, et al., v. City of Fortuna, et al.*  No. 14-15098 (for publication).  My opinions supported argument in the Ninth Circuit Case: *Tonya E. Shirar, v. Miguel Guerrero, et al.* regarding use of lethal force and "suicide by cop,"  No. 15-55029 (not for publication).  My opinions supported argument in the Ninth Circuit Case *Angel Mendez; Jennifer Lynn Garcia, v County of Los Angeles, et al.,* Nos. 13-56686, and 13-57072 (for publication) and which was settled before the Supreme Court, No. 16-369, regarding the use of lethal force and searches.  My opinions supported argument in the Ninth Circuit case: *Chien Van Bui, et al, v City and County of San Francisco, et al*, No. 14-16585 (not for publication), regarding the use of lethal force.  My opinions supported argument in the Sixth Circuit opinion, Case No. 16-5322*, Carey Woodcock v. City of Bowling Green, et al,* Originating Case No. 1:13-cv-00124 regarding the use of lethal force.  My opinions supported argument in the Ninth Circuit opinion, Case No. No. 14-17388 (for publication), *Johnathan Jones, et al v. Las Vegas Metropolitan Police Department, et al,* Originating Case No. 2:12-cv-01636- regarding the use of lethal force and Taser weapons.  My opinions supported argument in the Ninth Circuit opinion, Case No. 16-15606 (for publication), *Christian Longoria, et al v. Pinal County, et al,* Originating Case No. 2:15-cv-00043, PHX SRB, regarding the use of lethal force after a vehicle pursuit.  My opinions supported argument in the Ninth Circuit case: *S. B. v. County of San Diego,* 864 F.3rd 1010 (9th Cir. 2017), (for publication) regarding issues of qualified immunity.  My opinions supported argument in the Tenth Circuit case: *Russell Tenorio v. Brian Pitzer,* Case No. 2012-CV-01295 (U.S. Supreme Court No. 15-795) regarding issues of qualified immunity and use of deadly force.  I participated as a retained expert in the USDC Fifth District case, *Stephen McCollum et al., v. Texas Department of Criminal Justice, et al.,* Case No.3:12-CV-02037 regarding in-custody hyperthermia deaths.  My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 17-55116 (for publication), *Susan Mellen, et al v Marcella Winn, et al,* D.C. Case No. 2:15-cv-03006, GW AJW, regarding Detective Investigations and Qualified

Page 31 of 34

Immunity.  My opinions supported argument in the Ninth Circuit Case *Richard Vos; Jenelle Bernacchi, v City of Newport Beach, et al.,* Nos. 16-56791 (for publication) and which was settled by the Supreme Court, No. 16-56791, regarding the use of lethal force and mental illness.  My opinions (and quoted by name) supported argument in the Ninth Circuit Case *S.R. Nehad, et al. v. Browder, et al.*, No. 18-55035 (for publication) regarding the use of lethal force and custom and practice.  My opinions supported argument in the Ninth Circuit opinion, Case No. 17-55930 (not for publication), *Estate of Kevin Brown, et al. v. Michael Lambert, et al.*, D.C. No. 3:15-cv-01583-DMS-WVG, regarding Detective Investigations and Qualified Immunity.  My opinions supported argument in the Ninth Circuit opinion, Case No. 15-56339 (for publication), *Shane Horton, by his Guardian Ad, Litem Yvonne Horton, v. City of Santa Maria; Santa Maria Police Department; Andrew Brice*, D.C. Case No. 2:14-cv-06135- SJO-PJW, and *Jonathan Michael Castro v. County of Los Angeles, et al,* D.C. Case No. CV 10-5425 DSF (JEMx), 833 F.3d 1060 (9th Cir. 2016) (en banc), regarding jail standards, in-custody suicidal prisoners and qualified immunity.  My opinions supported argument in the Ninth Circuit opinion, Case No. 17-56270 (not for publication), *James Soler v. County of San Diego, et al.,* D.C. No. 3:14-cv-02470-MMA-RBB, regarding required verification of persons taken into custody pursuant to a warrant of arrest.  My opinions supported argument in the Ninth Circuit opinion, Case No. 18-17404 (for publication) *Tan Lam, v. City of Los Banos, et al.*  D.C. No. 2:15-cv-00531-MCE-KJN, regarding the use of lethal force.  My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 19-56035 (for publication), *Tiffany Tabares, et al v. City of Huntington Beach, et al*, D.C. Case No. 8:18-cv-00821, JLS-JDE, regarding use of force and subjects suffering mental illness.  I was retained as consultant regarding the October 15, 2019 Law Enforcement Activity Related Death (including positional asphyxia) of Mr. Angel Zapata-Hernandez by San Diego Metropolitan Transit System (MTS) Code Compliance Officers.  My consultations included recommendations and resulted in significant changes in policy and training by the MTS.  I was a retained expert in the Temporary Restraining Order restricting the use of kinetic weapons during demonstrations issued April 19, 2021 in *Black Lives Matter v. City of Los Angeles, et al*, Case No.: CV 20-5027 CBM (Asx)..  My opinions supported argument in the Ninth Circuit opinion, Case No. 20-16351 (not for publication), *Terrance Amons, et al., v. Dillon Tindall et al.*  D.C. No. 4:19-cv-00301 KAW regarding use of lethal force.  My opinions supported argument in the Ninth Circuit opinion, Case No. 20-56254, D.C. No.2:19-cv-05370-CAS-JC (for publication), *Paulette Smith, individually and as Successor in Interest to Albert Dorsey, deceased, v. Edward Agdeppa, and City of Los Angeles, et al.*, regarding the use of lethal force.  My opinions supported argument in the Ninth Circuit opinion, Case No. 21-16709 (for publication), *Jose Murguia for himself and for the Estates of Mason and Maddox Murguia, v. Heather Langdon, et al.*  D.C. No. 4:19-cv-00942 DAD-RAM regarding "State-created danger."  My opinions supported

Page 32 of  34

argument in the Ninth Circuit opinion, Case No. 20-15651, D.C. No.2: 17-cv-02776 - JCM-NJK (for publication), *Rudy Rivera, v. Corrections Corporation of America*, regarding false imprisonment and callous disregard.  My opinions supported argument in the Ninth Circuit opinion, Case No. 19-56462, D.C. No.5: 18-cv-00762 - DMG-SP (for publication - Declined Review by the Supreme Court), *Estate of Clemente Najera Aguirre; J.S.;Y.S., v. County of Riverside; Dan Ponder* regarding the inflection of lethal force.

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles*, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006).  The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.*, 57 Cal.4th 622 (2013).  I was quoted by the California Appellate Court (Second Appellate District, Division Three) and the California Supreme Court in *B.B., a Minor, etc., et al., v. County of Los Angeles, et al., Case No. B264946 Super. Ct. Nos. TC027341, TC027438, BC505918* regarding positional asphyxia issues.

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography).  On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect.  California Penal Code Section 311.11 is required training for all Law Enforcement Officers in California and taught extensively in the POST Basic Learning Domain #9: "Crimes Against Children,"pages 1-18 to pages 1-21.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death of Tamir Rice by City of Cleveland police officers.  In March, 2016 I was requested by the Delaware Attorney General to review and provide my opinions regarding the shooting death of Jeremy McDole.  The AG report was published May 12, 2016.  I provided a written Opinion for New Mexico AG regarding the shooting Death of Teresa Anaya that included requested training opinions.  I have also consulted with, and provided written opinions at the request of the U.S. Attorney (New York), the Santa Clara County District Attorney, and the San Francisco District Attorney.  On June 16, 2021, I was selected by the Los Angeles County District Attorney as a member of FACCT - an independent team assigned to re-examine fatal use of force incidents by law enforcement officers and recommend further action when appropriate.  On November 7, 2021, I was an Honoree of the 2021 National Lawyers Guild of Los Angeles at their annual Awards Gala as a recognized defender of Constitutional Rights.  I was the retained Use of Force consultant

regarding the May 28, 2010 homicide of Mr. Anastacio Rojas (USDC Case No. 11-CV-0522-L NLS) and which was taken under formal consideration by the Inter-American Commission on Human Rights (an international human rights tribunal) on November 2022.

I have been found competent by both Federal and State Courts to render opinions as to responsibilities as occurred in this case. A number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26, Model X26 and Model X2 ECDs. I own each, along with the download software. I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices. I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage. Two published examples are *Lee v. Nashville*, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S. Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007). My most recent Federal acceptance/certifications as an expert in the general use and deployment of the TASER weapon (including Taser International product warnings/bulletins sent to every agency using the Taser weapon) occurred in Los Angles, California on November 7, 2017 in *William Mears, et al., v. City of Los Angeles, et al,* USDC Case No.: CV 15-08441 JAK (AJWx) and on February 22, 2018 in *Maria Hernandez; A.J., Jr., et al, v. City of Los Angeles, et al,* USDC Case No. 2:16-c-02689 AB (JEMx), and on May 3, 2018 in Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No. 16-cv-06073-TJH-MRW, and on November 1, 2018 in *Alma Rosa Godinez, v. San Diego County, et al. Case No. 3:16-cv-00236 BAS-NLS*. There are many others.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

I reserve the right to modify my opinions to the extent additional information is provided.

I declare under penalty of perjury that the foregoing is true and correct. Executed August 13, 2023 at Santee, CA.

Roger A. Clark

# Exhibit 2

# Delvena Thomas Report

**Dukes, Terry**

**DOB 24 May 1960**

**BACKGROUND:**

Post-Traumatic Stress Disorder (PTSD) is a complex and debilitating mental health condition that can affect individuals who have experienced or witnessed a traumatic event. PTSD can occur in anyone who has faced a traumatic incident, such as combat, physical or sexual assault, natural disasters, accidents, or terrorist attacks. The experience of such events can overwhelm an individual's ability to cope, leading to profound psychological and emotional distress. The effects of PTSD can be long-lasting, disrupting daily functioning and overall well-being.

One of the primary symptoms of PTSD is the re-experiencing of the traumatic event through distressing memories, nightmares, or flashbacks. These intrusive thoughts can be incredibly distressing and make it challenging for individuals to engage in regular activities. Avoidance is another common symptom, where individuals deliberately avoid reminders of the traumatic event, such as people, places, or activities associated with the experience. This avoidance can isolate individuals and further impact their quality of life.

Hyperarousal is another characteristic symptom of PTSD, which often manifests as hypervigilance, exaggerated startle responses, irritability, and difficulties with concentration and sleep. Individuals with PTSD may become easily agitated or have angry outbursts, creating challenges in their relationships and social interactions.

The causes of PTSD are multifaceted. The severity and duration of the traumatic event, as well as an individual's proximity to it, can contribute to the development of PTSD. Additionally, pre-existing mental health conditions, such as anxiety or depression, can increase the vulnerability to developing PTSD. Lack of social support and coping mechanisms can also play a role in the onset and maintenance of the disorder.

**HISTORY OF PRESENT ILLNESS and TIMELINE of Terry Dukes, 63 years old:**

**CC: "I have two conditions – the PTSD and the anxiety, and my arm always shakes from where they hit me in it."**

**PSYCHIATRIC EXAMINATION AND ASSESSMENT ON August 11, 2023**
The complainant, Mr. Terry Dukes, SR, is a 63-year-old man, who has a past medical history significant for hypertension, Listeria Meningitis, sarcoidosis, prostate cancer, status post prostatectomy, diabetes, arthritis in neck, shoulders and back, right torn rotator cuff, hearing loss, anxiety and has had a traumatic experience in his home during the early morning hours on May 25, 2019. He has been diagnosed with Post Traumatic Stress Disorder as an outpatient and as an inpatient. The diagnosis code is 309.81 or F43.10.

Mr. Dukes continues to be compliant with the Zoloft 25 mg po each morning. He continues to relive his traumatizing experience and is easily tearful today and advises on many other occasions. He becomes tearful in this assessment as evidenced by change of voice, clearly sounding as if he's crying. He becomes very unsettled as he relives the experience. He begins speaking fast and describing a lot of the incident and the way it makes him feel. He is unsettled, sadness conveyed, mentions repeatedly how he was indecent, exposed because of not having any clothing. He describes feeling hypervigilant at times. He also conveys being frustrated with the amount of information that was misrepresented by the police department. He describes how he must relive his situation when seeing reports on the news and on the radio about other minority men and women who have endured violent encounters with the police.

Mr. Dukes describes new sleeping challenges – cannot fall asleep due to feeling unsafe, "afraid", hypervigilant. He is not sleeping soundly when he does fall asleep. He states the trauma has "affected my whole life". He describes severe sadness, low mood, constantly reliving the situation, at times flashbacks. He has not been able to date or feel comfortable around women. He is very nervous and is uncomfortable around crowds more than before. He stopped going to church. He used to attend church every Sunday but stopped attending since the incident. He cannot attend bible study either due to the discomfort of being around crowds and people. He has had outbursts in public and on at least one occasion had to be escorted by a close friend out of the bank because of an episode. He has noticed more irritability than ever before. He has been suicidal "a lot of times". Today he denies suicidal thoughts.

He states he has loss of interest, loss of interest in taking care of himself, loss of appetite. He is not eating healthy because he does not care about himself. +Anhedonia, +disinterest, +significant appetite changes. He began self-medicating more with alcohol than he has in the past. He has also done the same with cannabis. He expresses trying to make an effort not to use cannabis or overuse alcohol.

He describes that on the early morning of May 25, 2019, sheriff's officers came into his home moments before he was to shower. He was naked and begging to get dressed. He was tazed by the police officer while trying to grab his pants to cover his nakedness, it seems without cause, placed in handcuffs, walked outside of his home without shoes, half dressed in the cold. He was

advised that they did so that they could wait on an ambulance. He then requested to call his employer as it appeared he would not make it to work that day.

This traumatic experience has resulted in physical disabilities resulting in his inability to perform his job duties, subsequent loss of wages, and mental distress including constant fear, loss of interest in things or anhedonia. He avoids his bedroom due to reliving the traumatic experience encountered with the sheriff's office, LCSO. A previous (RT) shoulder injury was aggravated from this experience, and he has noticed changes for the worse in grip strength. He cannot fall asleep, stay asleep and has sleeping difficulties. During outpatient visits to psychiatrists in 2020 and 2021 he reported wishing he was dead and thoughts about committing suicide. He had thoughts about killing himself daily in February 2021.

He was seen at Palm Medical Group in September 2022 due to a change of insurance resulting in a change of his PCP. It seems he went to establish care with a new PCP. He advised during that visit that he has not used his psychiatric medications in about a year, so referral made to psychiatry. Prior to October 5, 2022 it is difficult to appreciate if Mr. Dukes was actually administered the depression scale, PHQ-9. At a visit on October 5, 2022, it is documented as a score of 16 which suggest moderately to severe depression. He was advised to follow-up with mental health and no medications were ordered. He was seen again on October 27, 2022, and scored a 15 on the PHQ-9 suggesting again, moderately severe depression. At this appointment he advised that he has been unable to see psychiatry and was started on Zoloft, an anti-depressant, 25 mg by mouth daily. At a follow-up visit November 10, 2022, he reported compliance with Zoloft 25 mg by mouth daily. Another PHQ-9 depression screening was conducted that day and he scored a 17. He was seen for follow-up on December 22, 2022, and continued on the Zoloft, same dose of 25 mg by mouth each day. At a visit on February 01, 2023, a PHQ-9 rating scale indicates score of 0. He was seen again on February 28, 2023, and PHQ-9 score documented as a score of 2. He was continued on Zoloft 25 mg by mouth daily. At a visit on March 28, 2023 – PHQ-9 documented as a 0. He returned on May 17, 2023, and scored 17 on the PHQ-9. Again, he was continued on 25 mg of the Zoloft. His last documented follow-up in the chart notes reviewed by this writer were dated for June 28, 2023. Patient was continued on Zoloft 25 mg by mouth daily.

Patient is seen virtually by this writer. His history, all collateral listed in this examination are reviewed with him. A Psychiatric Review of Systems was also conducted – see next paragraph.

**PSYCHIATRIC REVIEW OF SYSTEMS:** very tearful, sadness, tearful constantly during this assessment, +despair, +frustration, +helpless, +hopeless, +Anhedonia, +disinterest.

**CURRENT MEDICATIONS:**

Zoloft 25 mg po qam

Metformin 1000 mg po bid

Amlodipine 2.5 mg po qam

atorvastatin

Insulin

thiamine

**RECORDS REVIEWED:**

Shands at the University of Florida medical records. Starts in fall of 2020. 66 pages.

North Florida Regional Medical Center medical records. Begins with January 2016. 338 pages.

Meridian Behavioral medical records. 34 pages.

Chiefland medical records. Dates of Jan. 2016 to July 6, 2023. 900 pages.

Complaint for damages – Terry Dukes, SR, Plaintiff v Robert B. McCallum, JR, and others filed March 1, 2023. 31 pages.

Dukes Statement to LCSO, dated May 29, 2019. 8 pages. Recorded interview for Levy County Sheriff's Office. 28:34 in length.

Terry Dukes Deposition dated June 26, 2023.

Palm Medical Group medical records. Starts in September 2022. 120 pages.

**MEDICAL HISTORY AS APPRECIATED FROM MEDICAL RECORDS, COLLATERAL AND INTERVIEW OF PATIENT:**

**PAST PSYCHIATRIC HISTORY:** no outpatient psychiatric treatment until this incident occurred. Prior to trauma, was treated by his PCP for "anxiety", "anxiety attacks". Per collateral, diagnosed with "anxiety attack". An outpatient note in 2011 advises of a history of "anxiety attack". He was treated by his PCP until about 2020 or so.

Since the event, in need of "constant counseling" by his church clergy. Did seek outpatient mental health care at Meridian Behavioral in December 2020. It appears he was treated by Meridian in 2021 and 2022 as well. They diagnosed Post Traumatic Stress Disorder, Alcohol Use Disorder.

He was also seen in 2020 by Chiefland and in December 2020 diagnosed with Generalized Anxiety Disorder.

+HOSP September 2020 – 9/6/20 to 9/10/20 admitted to Geriatric Unit of Shands Vista of the University of Florida under the service of Dr. Korah with complaints of perseverating on his arrest 1.5 years prior, reminders of his experience when watching the news and they show situations involving the police and Black people, flashbacks, increase of alcohol consumption, thoughts about "ending it", feels unsafe at home, presence of anhedonia, constant fear, financial challenges due to inability to work the way he used to, feels on edge, hypervigilance demonstrated by moving his bed next to the back door and watching people approach while holding his gun next to him, nightmares, inability to work at times. Per chart review, the justification for this admission was "suicide attempt/gesture/ideation, psychosis and PTSD". Patient was diagnosed with Post Traumatic Stress Disorder, Alcohol Use Disorder. Previous medications of Seroquel and trazodone were discontinued.

Seen by psychiatric consultant during a medical admission August 2020. Prescribed trazodone and diagnosed anxiety and PTSD. Endorsed low mood, sadness, low energy, perseveration on memories, flashbacks, considered consistent with PTSD diagnosis.

**PSYCHIATRIC MEDICATIONS USED IN THE PAST:** hydroxyzine, gabapentin, quetiapine, sertraline, trazodone, buspirone, temazepam (was changed to trazodone).

**SUBSTANCE ABUSE:** in 2020 diagnosed with Alcohol Use Disorder Severe and Unspecified Cannabis Use Disorder. Has had a documented positive drug screen - +cannabis. He has attended AA in the distant past.

Has smoked cigarettes in the past, never regularly – has smoked up to half a pack daily, but smoked cigars in the past, no use of alcohol or recreational drugs currently. In 2020 about 1.5 years following his traumatic experience with the police he began overconsuming alcohol. He was also using cannabis as admitted during a psychiatric admission in September 2020.

**PAST MEDICAL HISTORY:  allergies** – Crestor, Lipitor, pravastatin, simvastatin

an old shoulder injury was aggravated May 25, 2019, and also what sounds to be some nerve damage of compromise resulting in constant hand shaking. In addition, reported myocardial infarction and a seizure.

Diabetes Mellitus and hypertension

Hypercholesterolemia

Hearing loss

Sarcoidosis

Prostate Cancer, status post prostatectomy

Acute Hepatitis diagnosed August 2020

**SOCIAL HISTORY:**

He lives in his own home which is located on five acres of land. He is divorced x2 and lives alone. He has two sons and a daughter.

He has a high school diploma.
He was working as a "spotter" at the dump when traumatic event occurred. He has worked as a heavy equipment operator for over 25 years. He can no longer work due to the damage caused by the situation with LCSO in May 2019. He has reported that an old shoulder injury was aggravated and what sounds to be some nerve damage of compromise resulting in constant hand shaking.

He wanted to retire after 30 years but due to mental anguish retired five years early which was unplanned.

**LEGAL HISTORY:** no prior arrest history prior to the arrest in 2019 for this same incident with the police encounter.

DUI for alcohol use "years ago" x2 – arrested both times for each – several years ago. He recalls he was approximately ages 19 and 28 when arrested.

**SUPPORT SYSTEM:**

Friend, Jerry Mongo.

**FAMILY MENTAL HEALTH HISTORY:**

No suicides known.

At least one offspring with substance abuse.

**CONCLUSIONS:**

It is crucial to recognize that PTSD is a genuine medical condition and not a sign of weakness or personal failure. Mr. Dukes experienced suicidal thinking for the first time in his life after the encounter with the police in May 2019. He indicated this during his deposition on June 26, 2023. He also experienced a negative change in his performance evaluations at work. Whereas the year prior he achieved above satisfactory, the year of the incident he did not. He noted during his deposition lack of patience, discomfort being around crowds, discomfort being in public and worsened coping skills. He described new inability to work with others and what sounded to be an inability to compromise and work with customers and co-workers. He became frustrated and resigned from work resulting in an early retirement. His objective was to stay another five years for full his pension but due to these new mental health challenges he retired and thus did not receive his full pension.

His symptoms of PTSD and its associated stress may have contributed to his inability to control and maintain blood pressure. Although he has reported periods of medication non-compliance, PTSD, stress, depression may still contribute to the body's inability to regulate and balance blood pressure and blood sugar. The effects of stress, depression and PTSD on his other co-occurring chronic illnesses cannot be discounted.

PTSD can be a lifelong illness. Although there are times when patients are not fully symptomatic, it has been my experience from working with the US Military and several police precincts that soldiers and officers with PTSD will continue to experience one or few symptoms that are experienced in PTSD. The treatment is limited as one modality is not sufficient to extinguish symptoms. Often, patients require more than one or two modalities to manage their symptoms. Cognitive-Behavioral Therapy (CBT) is a widely used and evidence-based treatment for PTSD. It aims to help individuals identify and challenge negative thoughts and beliefs associated with the traumatic event. CBT is conducted with a licensed mental health professional. Every case is different, some may require two sessions weekly and others once weekly. Eye Movement Desensitization and Reprocessing (EMDR) is another therapy that has shown promising results in treating PTSD. It involves recalling distressing memories while following a therapist's hand movements or other forms of bilateral stimulation.

Medication, such as selective serotonin reuptake inhibitors (SSRIs), can also be prescribed to manage specific symptoms of PTSD. These medications can help alleviate depression, anxiety, and sleep disturbances associated with the disorder. However, medication alone is not considered a comprehensive treatment approach and is often combined with therapy for optimal results.

Support from friends, family, and support groups is invaluable for individuals with PTSD. Mr. Dukes does not have much support. He identified his only support system as Mr. Jerry Mongo. Mr. Mongo seems to be the only person who can physically and financially assist Mr. Dukes when needed.

In conclusion, PTSD is a debilitating disorder that affects individuals who have experienced or witnessed traumatic events. Its symptoms can significantly have an impact on a person's daily life and overall well-being as we have seen with Mr. Dukes. He has thought about killing himself, has had mental outbursts, could no longer function on his job which had been his career since 1995, or so, resulting in an early retirement. He retired five years sooner than was planned and as a result is receiving less retirement money. He retired five years earlier than planned due to his inability to function mentally and due to the damage caused to his extremity during the events on May 25, 2019 involving the sheriff's office. He has a very poor prognosis. He is home and retired from work, not by choice, and has little to no support. Mr. Dukes has experienced a decline in his physical and mental well-being, and it is unlikely that these things will stabilize or improve during the next 5-10 years. He has decompensated completely mentally requiring in-patient stabilization for his own safety and at times continues to feel suicidal.

To remedy or address Mr. Dukes' mental illnesses, specifically PTSD, he would require regular mental health interventions, mainly with a psychiatrist in person that would include medication management, individual psychotherapy and group psychotherapy. It is unclear if this is an option in his catchment area and if it exists, Mr. Dukes would need reliable transportation and assistance during his travels. Due to his limited technical skills, virtual video sessions are highly unlikely. Again, his prognosis is poor.

These opinions are based on my review of the information indicated in this report. I remain open to reviewing additional information and analysis if required. The opinions I present in this report are made to a reasonable degree of medical certainty and are based on my professional experience, expertise and training.

A copy of my curriculum vitae is attached to this report as exhibit A. My fees for this report are $800 per hour to review documentation and to write a report regarding my findings and expert opinions. In addition, I charge $800 per hour for deposition and court testimony. Finally, I charge $200 per hour for travel time and actual expenses for travel costs such as mileage, airfare, hotel, and rental car of Uber fees.

Delvena R. Thomas, D.O., M.P.H.

Board Certified Psychiatry and Neurology

Florida License # OS10439

# DELVENA R. THOMAS

305-981-1700

drdelvenathomas@gmail.com

drdelvenahelp.com

2699 Stirling Road
Ste C407
Fort Lauderdale, FL 33312

## Current Service

**PRIVATE PRACTICE, OWNER/CEO**
*DRT Behavioral Services, PLLC and Wellness Spa*
2013-Present

**MEDICAL DIRECTOR**
 *Be Strong International*
2021-Present

**MEDICAL DIRECTOR**
*Ketamine Clinic South Florida*
2020-Present

**CONSULTING PSYCHIATRIST**
*National Football League*
2015-2021

**LIEUTENANT COLONEL**
*U.S. Army Reserves, 807th Medical Command*
May 2003-Present
Responsible for psychiatric evaluation of active-duty service members; treatment inclusive of medication management; treatment venues inclusive of outpatient settings and/or inpatient settings. Provide psychopharmacology and psychotherapy to soldiers and their families. Examine, evaluate, diagnose and treats psychiatric disorders. Prepare and review case histories and obtain/evaluate data through interview techniques.

**Operation Iraqi Freedom** (Baghdad, Iraq Dec 2007-Apr 2008), **Operation Enduring Freedom** (Afghanistan Aug 2010 – Nov 2010), & **Operation Enduring Freedom** (Kuwait Aug 2014-Jan 2015): provided emergent assessments for combat stress clinics and inpatient treatment, including comprehensive psychiatric assessments, medication management, coordinated care with soldiers' leadership in Iraq, Afghanistan, Kuwait with goal of achieving higher functioning; acted as medical and psychiatric consultant to clinical psychologists and clinical social workers, assigned psychiatric nurses and technicians to functions contributing to the diagnosis and treatment of patients.

**STAFF PSYCHIATRIST**

*Guidance Care Center/Westcare – a Baker Act receiving facility*

September 2012-Present
Manage part time crisis stabilization unit and a detoxification unit. Duties include admission psychiatric assessments, including physicals, creating treatment plans that

Dr. Thomas maintains privileges at Aventura Hospital in Aventura, Fl; and Broward Health North in Pompano Beach, Fla.

## Past Professional Experience

**CONSULTING PSYCHIATRIST**
*Cleveland Clinic Florida*
July 2015-March 2018

**STAFF PSYCHIATRIST**
*Sunspire Health*
September 2016-2018
Psychiatrist for IOP to provide medication management.

**CLINICAL ASSISTANT PROFESSOR, VOLUNTARY FACULTY**
*Florida International University's Herbert Wertheim College of Medicine*
January 2013-Dec 2015

**STAFF PSYCHIATRIST**
*Citrus Health Network*
June 2012-December 2015
Independently managed this 28-bed short-term residential facility. Patient population includes forensic cases requiring step-down before release from jail, addictions.

**CLINICAL DIRECTOR, CHIEF PSYCHIATRIST**
*U.S. Department of Justice Bureau of Prisons*
July 2007-Jan 2015
Performed on-site management of mental health clinics for two federal prisons in Miami, FL. and supervised a medical team that included two physician assistants, five nurses and a chief dental officer.  Responsible for telemedicine services for four prison facilities. Completed evaluation of patient care rendered by all clinical staff and organization of CME training and quarterly meetings focused on quality assurance, internal procedures and other specific areas of important focus. Primarily responsible for conducting routine, emergent psychiatric assessments in several locations; developed comprehensive treatment plans for inmates that also addressed comorbidities, such as diabetes, hypertension and liver disease. Participated as an expert witness in mental health hearings.

**ATTENDING PSYCHIATRIST**
*Bayview Mental Health*
Dec 2008- May 2012

Independently managed this 20-bed Baker Act receiving crisis unit. Provided full comprehensive psychiatric assessment within 24 hours of patients arriving to facility, to include "biopsychosocial" formulation with appropriate treatment plan.

**PSYCHIATRY RESIDENT**
*University of Maryland Medical Systems*
July 2003-June 2007
Under the supervision of attending psychiatrists, completed necessary clinical rotations in order to fulfill requirements of accredited four-year psychiatry neurology residency program; completed and satisfied requirements for Step 3 of medical licensure.

## Education

**MORGAN STATE UNIVERSITY, BALTIMORE, MD**
*Master's Degree, MPH, Public Health (2007)*

**PHILADELPHIA COLLEGE OF OSTEOPATHIC MEDICINE, PHILADELPHIA, PA**
*Medical Degree D.O. (2003)*

**COLLEGE OF NOTRE DAME OF MARYLAND, BALTIMORE, MD**
*Bachelor of Arts (1998)*

## Job-Related Training

- Diplomate of the American Board of Psychiatry and Neurology; Board Certification (December 2022)
- Post Graduate Education and Training (July 2003 - June 2007), University of Maryland Medical Systems (ACGME # 400-23-21-289)
- American Heart Association's BLS (expiration November 2022)

## Skills

Intermediate Spanish (spoken, written, reading)

## Volunteer Activity

Delta Sigma Theta Sorority, Incorporated, the Broward County Alumnae Chapter
Hosanna 4 Youth
Be Strong International

The Key Clubhouse of South Florida – member Board of Directors

## Affiliations

- National Medical Association, Local JWBMS, Inc. Miami - Member
- Florida Psychiatric Association - Member
- American Psychiatric Association – Member
- Florida Medical Association
- National Organization of Black Law Enforcement Executives (NOBLE)
- Miami-Dade Chamber of Commerce: Health & Wellness Chair
- Greater Fort Lauderdale Chamber of Commerce
- City of Hollywood Chamber of Commerce

## Court Appearances and Similar

*Goosby v. Branch Banking & Trust Company*, No. 1:17-cv-23419-CMA (S.D. Fla.)