UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

TERRY DUKES, SR.,

     Plaintiff,

v.

ROBERT B. McCALLUM, JR., *et ano.*,

     Defendants.

Case No. 1:23-cv-45-AW-HTC

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56, Local Rule 56.1, and the Court's Order modifying the briefing schedule (Doc. 31), Plaintiff Terry Dukes, Sr. responds in opposition to Defendants' Motion for Summary Judgment (Doc. 28). As grounds, Plaintiff states:

### I.    INTRODUCTION

Defendants Robert McCallum, Jr., Sheriff of Levy County, Florida, and his deputy Chase Gregory seek summary judgment in their favor as to all of Plaintiff's claims. Sheriff McCallum argues that he cannot be held liable for failing to train, supervise and discipline Gregory, and Gregory argues that his conduct at and inside Plaintiff's home was appropriate. Gregory claims that Plaintiff consented to his entry into Plaintiff's home; his use of force and seizure of Plaintiff inside the home was not excessive or unreasonable under the circumstances; and he is entitled to qualified

immunity for Plaintiff's Fourth Amendment claims and sovereign immunity for his state-law claims. Plaintiff has already asked that the Court find in his favor on his Fourth Amendment and state-law claims related to Gregory's entry into his home. (Doc. 30). Because arguments raised in Gregory's motion as to consent and entry into the home are already addressed in Plaintiff's motion for partial summary judgment, for purposes of judicial economy, Plaintiff incorporates those undisputed facts and arguments here. As to those issues, Plaintiff only responds to Gregory's arguments that are not already detailed in Plaintiff's summary judgment motion. As explained in that motion and here, the facts pertaining to what happened after Gregory entered Plaintiff's home are hotly disputed and not appropriate for adjudication at this stage. Accordingly, for the reasons stated below, Defendants' motion should be denied.

## **PLAINTIFF'S STATEMENT OF MATERIAL FACTS[1]**

Plaintiff restates and incorporates the statement of undisputed material facts from his motion for partial summary judgment (Doc. 30 at 2–9), as if fully set forth herein, and further states:

---

[1] As stated in Plaintiff's motion for partial summary judgment, the versions of events after Gregory entered Plaintiff's home on May 25, 2019 are hotly disputed. (Doc. 30 at 8 n. 4). Defendants should not be entitled to summary judgment on any claims related to what happened inside Plaintiff's home because they have not established the absence of any genuine dispute of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). However, as stated in Plaintiff's motion, should Gregory be liable for unlawfully entering the home, then he should also be liable for any force or seizure that occurred inside the home. (*See id.* at 18); *see also* Mem. of Law § II(B), *infra*.

## I.      Gregory Unlawfully Enters Plaintiff's Home and Seizes Him

Prior to entering Plaintiff's home, the deputies did not discuss who else might live at 900 Patterson Street prior to approaching it. (Doc. 37-3 at 55:11-17).[2] But they knew that Plaintiff owned the house, and that his son Terry Dukes, Jr. ("Junior") sometimes lived with Plaintiff. (Doc. 26-4 at 30:4-9).

After Plaintiff opened the back door to his home in the morning of May 25, 2019, he returned to his bedroom to get dressed. (Doc. 29-1 at 42:13-25). Plaintiff had to get ready for work at the landfill by 7:00 a.m. (*Id.* at 38:14-21). Plaintiff had gathered his things, such as his clothes and a towel to use the shower. (Doc. 26-7 at 56:9-21). Plaintiff typically left his clothes around where he could find them easily as he lived alone. (*Id.* at 56:22–57:2). The lights in Plaintiff's home did not work and required rewiring, so Plaintiff's only light source was his phone light. (*Id.* at 39:16-21).

According to Almeida and Murphy, they turned their flashlights on and off intermittently while at the front of the house. (Doc. 37-4 at 35:13-36:2); (Doc. 26-5 at 36:9-10). Deputy Gregory testified that he entered without his flashlight on. (Doc. 26-3 at 169:13-15). At the same time, Deputy Murphy testified that the deputies at the rear door had their flashlights on as he could see the house was illuminated. (Doc. 37-3 at 48:13-21). He could also see the trajectory of the light from the back change when Deputy Gregory presumably entered the home. (*Id.* at 48:20-25).

---

[2] Deposition transcript page references are to the deposition page, not the CM/ECF-generated page number.

Plaintiff heard no one enter his home and was unaware of Gregory's presence until he saw him pointing a gun at him and shouting to get on the ground. (Doc. 29-1 at 43:2-17.) At this point Plaintiff saw two deputies in his home. (Doc. 26-7 at 77:23-25). Plaintiff immediately asked what was going on and told Gregory that his son was not in the house, and that he was Terry Dukes, Sr., not Junior. (*Id.* at 43:18-24). He said that "Terry is not here. He didn't come home last night. He is not here, and I am Terry Sr." (Doc. 26-9 at 6:22-25). Gregory was familiar with both Plaintiff and Junior. (Doc. 12 ¶ 25); (Doc. 29-2 at 136:19–37); (Doc. 29-9 at Response No. 19).  Plaintiff told Gregory who he was and repeatedly told them he was just trying to go to work, and that they needed to leave him alone. (Doc. 26-7 at 44:1-4).

Plaintiff testified that when Gregory told him to get on the ground, he stated that he would sit on the floor, and did so. (*Id.* at 44:4-6; Doc. 26-9 at 7:3-5). Plaintiff sat in front of the door to his bedroom out in the open. (Doc. 26-7 at 73:8-11; Doc. 37-1 at 74:9-12). At that time, the door to Plaintiff's bedroom was open and flush against the wall. (*Id.* at 154:23-155:3). Plaintiff, who was naked, saw a pair of pants in front of him, so he told Gregory that he planned to reach for his pants, and the while telling the deputies he was trying to go to work. (Doc. 26-7 at 44:7-15; Doc. 26-9 at 7:5-10). Dep. Murphy also heard Plaintiff respond to the deputies telling them he was naked and needed to get his pants. (Doc. 37-3 at 63:1-6).

Gregory responded by saying something to the effect of "you ain't going to work." (Doc. 26-7 at 44:16-18). Plaintiff kept eye contact with Gregory and said "I'm going to put my pants on. I'm going to put my pants on." (*Id.* at 44:23-25). Although the deputies at first told Plaintiff not to move (Doc. 26-9 at 7:8-9), Plaintiff repeated that he planned to put his pants on to cover his naked body, and the officers permitted him to pull his pants all the way up to his waist. (Doc. 26-7 at 44:19–45:4, 81:2-15). Once Plaintiff got his pants up to his waist area, before he could button his pants, Gregory deployed his Taser without any warning or command, striking Plaintiff in his shoulder. (*Id.* at 45:1-17; 46:11-22).[3] At no point before he was tased did Plaintiff get off the ground. (Doc. 37-1 at 160:23-161:3) When Plaintiff was struck with the Taser probe, he believed he was shot with a firearm. (Doc. 26-7 at 45:8-13). The Taser probe struck Plaintiff at a downward angle in his shoulder. (Doc. 26-4 at 88:10-21). The officers claimed the gun was on the left side of the mattress in Plaintiff's bedroom and that he lunged toward the bed. (*Id.* at 51:12–52:4).[4] The probe

---

[3] According to Plaintiff's police practices expert Roger Clark, Gregory's use of the Taser on Plaintiff while he was on the ground and not actively engaging in any criminal activity or threat toward officer safety violated his training, policies, and constitutional requirements. (Doc. 37-7 at 34). Mr. Clark also opined Gregory's X26, though classified as a "less lethal" weapon, can be lethal. (*Id.* at 28).

[4] The officers' stories diverge with respect to what the said Plaintiff did before Gregory tased him. Cpl. Almeida and Dep. Gaffey stated that Plaintiff was walking at an angle towards the bed and was shot in the front on his right shoulder (Doc. 37-4 at 64:9-15); (Doc. 26-6 at 68:2–69:22). Dep. Murphy, who claims he was outside Plaintiff's house looking through the bedroom window, testified that he observed, from outside, Plaintiff turn away from the deputies and walk towards the firearm on the bed. (Doc. 37-3 at 83:17-84:8). He

that missed Plaintiff struck a piece of furniture on the wall behind Plaintiff, not the area near the bed where his firearm was located. (Doc. 26-3 at 219:11-12). Gregory testified that the second probe struck "a little bit more to the right" of the wooden piece of furniture on the ground against the back wall in the second image below (the piece with glass doors and fishing rods and a crutch leaning against it) (Doc. 37-2 at 224:15–26:8).




(Doc. 37-8 at Dukes 2911).                    (Doc. 37-9, Ex. 13 to Gregory Dep.)

---

testified that Plaintiff was turned and walking towards the gun and was shot in the back. (*Id.* at 85:4-13). Plaintiff was struck in the front. (Doc. 28 at 15); (Doc. 26-3 at 219:6-17).

Gregory then handcuffed Plaintiff and escorted him out of his home. (Doc. 29-1 at 84:16–85:16, 106:6-13); (Doc. 26-9 at 7:15-18). Plaintiff testified that none of the deputies helped him put his pants on, but they came over to him to place him in handcuffs. (*Id.* at 84:16-21). Plaintiff was walked outside without being allowed to button his pants. (Doc. 37-1 at 85:2-11). Plaintiff was forced to wait in handcuffs outside for twenty to thirty minutes for an ambulance to remove the Taser prong from his shoulder without a shirt or shoes. (*Id.* at 86:3-87:21). While waiting on the ambulance, Plaintiff overheard the deputies discussing what they would charge Plaintiff with. (Doc. 26-7 at 88:9-16). Plaintiff was charged with resisting arrest without violence premised on a sworn complaint by Gregory. (Doc. 29-1 at 107:9-19); (Doc. 29-15 at Dukes, T. 13-14); (Doc. 29-10 at Response No. 7). Those charges were later dropped at the request of the Levy County Sheriff's Office (LCSO). (Doc. 29-16).

## II.    Plaintiff Suffered Serious Injuries

Medical technicians who arrived on scene told Plaintiff he needed to go to the hospital for an EKG. (Doc. 37-1 at 92:14-19). Plaintiff was cleared from the hospital, but he continued to suffer from the events that morning. (*Id.* at 94:25–95:2). Plaintiff suffered from extreme mental and physical anguish, which came to a head when George Floyd was murdered on May 25, 2020—the one-year anniversary of the incident with Gregory. (*Id.* at 176:13–77:1). He retired early from his job at the landfill. (*Id.* at 30:25–31:10). He had suicidal ideations (*Id.* at 171:11–72:9), and was

taken to Shands Hospital in Gainesville for a psychiatric evaluation. (*Id.* at 115:16–16:2). He had never had such treatment before and was observed at the hospital for a week. (*Id.* at 116:6-15). He was diagnosed with posttraumatic stress disorder. (*Id.* at 187:4-9). Plaintiff previously suffered from anxiety and physical trauma to his arm, which were severely exacerbated by the incident. (*Id.* at 118:22–19:2; 137:10–38:5). Plaintiff was evaluated by Dr. Delvena Thomas, a board-certified psychiatrist and former chief psychiatrist for the U.S. Bureau of Prisons, who concluded that Plaintiff's prognosis was poor and that he had decompensated completely. (Doc. 37-7 at 52). Among other things, because of the incident, Plaintiff has suffered from suicidal ideations and anhedonia and avoids his bedroom and sleeps in the living room "due to reliving the traumatic experience" of what happened on May 25, 2019. (*Id.* at 47).

### III.   LCSO's Investigation Process and Plaintiff's Complaint

After the incident, Plaintiff filed a citizen's complaint against Gregory. (Doc. 26-8 at 33–40). The Professional Standards Division of LCSO initiated an investigation on June 17, 2019. (Doc. 26-8 at 31). The sole officer responsible for that investigation was Lieutenant Scott Tummond. (Doc. 26-8 14:20-23). LCSO delegated authority to Lt. Tummond to investigate deputy misconduct, imbuing him with discretion to make findings and conclusions for the agency. (Doc. 26-2 at 19:3–21:13).

As explained by Lt. Tummond, LCSO keeps track of all complaints in a Microsoft Word document that has only been maintained since 2017, and citizen

complaints made before 2017 are not accounted for in that document. (Doc. 26-8 at 20:8-15); (Doc. 37-5 at 21:2-18). In fact, before 2017, citizen complaints did not even have tracking numbers. (Doc. 37-5 at 21:16-18). Lt. Tummond could not be certain if complaints filed prior to 2017 could even be found, at least not without a formal investigation. (*Id.* at 22:2-7). For example, when a citizen complained about an incident, such as unlawful entry, before the 2017 process, the complaint could have been routed to the Division Commander, the Criminal Investigation Division, the Patrol Division, or the Detention Bureau. (*Id.* at 27:1-10; 29:11-19). According to Lt. Tummond, that would make tracking down a complaint from that time extremely difficult, as any record might be electronic but also could be kept in paper form in several places, assuming a formal investigation was even opened. (*Id.*).

The Professional Standards investigation into Gregory ended on September 19, 2019, with a finding that Gregory acted in accordance with LCSO policy. (Doc. 26-8 at 31). Gregory was exonerated for excessive or unnecessary force not resulting in injury. (*Id.*). Plaintiff did suffer an injury, however. *See* Statement of Material Facts § II, *supra*. In LCSO's investigation, Lt. Tummond concluded that Plaintiff's mere opening of the door was an "invitation" to enter the home: he testified that "You knock, somebody opens the door, that's construed or taken as an invitation to enter. Otherwise the door wouldn't have been opened." (Doc. 37-5 at 73:2-15). After being exonerated, Sheriff McCallum promoted Gregory to Corporal. (Doc. 26-2 at 89:5-11).

## MEMORANDUM OF LAW

### I.   Legal Standard

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment "is appropriate only if 'the movant shows that there is no genuine [dispute] as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, 572 U.S. 650, 656–57, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (per curiam) (quoting Fed. R. Civ. P. 56(a)). An issue is "genuine" if a reasonable trier of fact, viewing all the record evidence, could rationally find for the nonmoving party in light of his burden of proof. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). And a fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). "[W]here the material facts are undisputed and do not support a reasonable inference in favor of the non-movant, summary judgment may properly be granted as a matter of law." *DA Realty Holdings, LLC v. Tenn. Land Consultants*, 631 Fed. Appx. 817, 820 (11th Cir. 2015). To prevail on a motion for summary judgment, "the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015). Accordingly, "the non-moving party must produce evidence, going beyond the pleadings, to show that a reasonable jury could find in favor of that party." *Shiver*, 549 F.3d at 1343.

## II.   Discussion

Defendants assert that they are entitled to summary judgment on each of Plaintiff's claims. Plaintiff has already briefed the issues related Gregory's liability for invasion of privacy (Count I), trespass (Count II), unlawful entry under the Fourth Amendment (Count III), unlawful seizure under the Fourth Amendment (Count IV), and false arrest/false imprisonment (Count V), as well as the issues of qualified and sovereign immunity. Plaintiff relies on and incorporates his arguments from his motion for partial summary judgment (Doc. 30) regarding Counts I through V, including whether qualified immunity is available under the plain text of the Ku Klux Klan Act of 1871, and if so, whether Gregory is entitled to qualified immunity on the issue of consent or sovereign immunity for Plaintiff's state-law claims. Plaintiff does, however, respond to several points on the issue of consent and addresses the substance of Plaintiff's unlawful seizure claims based on Gregory's position that he was lawfully in Plaintiff's residence.

### A. Deputy Gregory violated Plaintiff's Fourth Amendment Rights when he entered his home without consent.

Plaintiff incorporates his arguments on consent (and qualified immunity regarding unlawful entry) from his motion for partial summary judgment. (Doc. 30). Responding to Gregory's motion, Plaintiff reiterates that no reasonable officer in Gregory's position would believe they had voluntary consent to enter the home.

Gregory argues that—although the Eleventh Circuit has held that consent can be implied "where a defendant has yielded the right-of-way in response to an officer's request for admission to the home," (Doc. 28 at 30) (quoting *Jiles v. Lowery*, 2023 WL 2017354, at *3 (11th Cir. Feb. 15, 2023))—a request for admittance is only one of the factors in the totality of the circumstances analysis. To support his argument, he relies on *Judd*, which Gregory paints as finding implied consent without an explicit request for admittance. (Doc. 28 at 31 n. 21) (citing *Gill as Next Friend of K.C.R. v. Judd*, 941 F.3d 504 (11th Cir. 2019). But the question the Eleventh Circuit was answering in *Judd* was whether the district court abused its discretion when it concluded that the *jury's verdict* finding implied consent was not against the great weight of evidence. The panel concluded that whether the officers requested admittance or commanded their entry was a distinction without a difference under *those specific facts*. There, the jury "was free to conclude that [the officer's announcement] was instead an informative statement [not a coercive show of authority] to explain to K.C.R.'s father why the deputies were there. And it was also free to conclude that, by opening the door and stepping back, [the decedent's] father was giving the deputies his consent to enter his home." *Judd*, 941 F.3d at 526. In that case, the officers announced they were there to arrest the decedent:

> Q. Okay. The first time he opened the door, you said you're here to arrest [K.C.R.]?
>
> A. That's correct. ...

12

*Id.* at 519. The father went into the home and then came back to open the door, stepping aside.

But that is not what happened here. No one informed Plaintiff that they were there to make an arrest, resulting in Plaintiff stepping aside and allowing Gregory to enter. Plaintiff did not come to the door, close it, and then come back and step aside to usher Gregory into the home. When the door opened, Gregory was not standing by the threshold, but was down on the ground to the side of the stairs. (Doc. 29-13 at Dukes, T. 2910); (Doc. 29-2 at 166:9-17; 166:24–67:11). He didn't say anything to Plaintiff. (Doc. 29-2 at 169:5-7). The door opened, and he went inside. Under these facts, no reasonable jury could conclude that knocking and announcing "Sheriff's Office" alone "was instead an informative statement." *Judd*, 941 F.3d at 526. Thus, under the totality of the circumstances, Gregory should be liable for failing to obtain Plaintiff's consent before entering the home.[5] But even if the Court disagreed with that conclusion, at a minimum, Gregory cannot obtain summary judgment on these facts. The totality of the circumstances weighs heavily toward Plaintiff: there was no request for admittance; no verbal communication between Gregory and Plaintiff; and no non-verbal communication between Gregory and Plaintiff (Gregory could only identify that a Black male had opened the door and turned back to the interior of the

---

[5] Gregory relies on his police practices expert, Paul Kiley, to conclude that Plaintiff consented to Gregory's entry. (Doc. 28 at 33). But, Plaintiff's police practices expert, Roger Clark, disagrees that Plaintiff's action of opening the door and returning into the home after commands by the deputies evidences implied consent. (Doc. 37-7 at 13–14).

home) (Doc. 29-10 at Response No. 7). Accordingly, Gregory's motion should be denied.

**B. Even if Gregory were lawfully in Plaintiff's home, he has not met his burden to establish a lack of genuine dispute over whether Plaintiff was unlawfully seized in the home.**

To begin with, the Court "can only grant summary judgment if everything in the record demonstrates that no genuine issue of material fact exists." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quotation marks omitted). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.'" *BBX Capital v. FDIC*, 956 F.3d 1304, 1314 (11th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Further, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

When there is a conflict "between the facts evidenced by the parties, [courts] credit the nonmoving party's *version*" at the summary judgment stage. *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc) (emphasis in original). Here, Gregory has not met his burden. There is a stark conflict between the parties' versions of the events in Plaintiff's home. Put simply, Gregory claims that Plaintiff was trying to hide

behind the door in his bedroom and moved towards a gun on his bed.[6] Plaintiff

claims that he was sitting on the ground, naked, and that he advised Gregory who he

was and slowly moved to put his pants on to cover his naked body, to which Gregory

did not object or issue any commands before firing his Taser.[7] This is not "some

metaphysical doubt as to the material facts." *Ray v. Equifax Info. Servs., LLC*, 327 F.

App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., v. Zenith Radio

Corp.*, 475 U.S. 574, 586 (1986)). The parties' positions are completely disputed (and,

tellingly, at least one of Gregory's fellow officers has a different version from

Gregory). *See* footnote 4, *supra*. Thus, crediting Plaintiff's version of the events at this

stage, Gregory's motion must fail.

---

[6] Gregory attempts to obfuscate Plaintiff's version of the events and generate inconsistency by cherry-picking lines from Plaintiff's deposition and sworn statement. For example, Gregory relies on the following statement to convince the Court that Plaintiff admitted he was behind the *closed* door, supporting Gregory's version of the events: "If I did anything I might have pushed the door trying to get my pants because I was right behind the door." (Doc. 28 at 13 n. 13 (citing Doc.26-9 at 8:22-24). But, when read in its entirety, it is clear that Plaintiff did not mean that he was behind a *closed* door, but that he was behind the threshold because, as Plaintiff stated just before the line quoted by Gregory: "my room door always stay open and I was on the floor." (Doc. 26-9 at 8:19-22). On the other hand, the deputies' versions of events in the home can be discounted because they are not consistent with respect to how Plaintiff purportedly went for his gun and even where he was shot by Gregory. It is undisputed that one Taser probe struck Plaintiff in his right shoulder, and the other landed to the right of the bed on the right side of a dresser, not in the direction of the left side of the bed where the gun was located and to where Gregory asserts Plaintiff was moving.

[7] Defendants argue that Plaintiff contradicted himself by stating at one point he was naked and at another he had his pants up to his waist. (Doc. 28 at 15 n. 15). Not so. Plaintiff testified that he was completely naked and then pulled his pants on up to his waist while making eye contact with Gregory. The statements are only contradictory when discounting the passage of time and sequence of events in the house.

And assuming Gregory was unlawfully in Plaintiff's home, it does not matter whose version of the events is correct, as any force used in the home while being unlawfully present violates the Fourth Amendment. *See Hanie v. City of Woodstock*, 2008 WL 476123, at *7 n. 5 (N.D. Ga. Feb. 19, 2008) ("Because Plaintiffs have successfully stated a claim for illegal entry into the home, any injuries that are sustained as a result of a false arrest within the home or force used against Plaintiffs inside of the home are compensable under the same theory.") (relying on *Bashir v. Rockdale Cnty., Ga.*, 445 F.3d 1323, 1329 (11th Cir. 2006) & *Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000) for that proposition).

To support his argument, Gregory relies on <u>his</u> version of events. He argues that the person in the bedroom was near a handgun, and it was unknown whether anyone else was in the room, that Plaintiff had refused to show himself, and that Plaintiff had turned towards the bed where the gun was located. (Doc. 28 at 36). Based on his version, he asserts that his Taser strike did not violate the Constitution, because Plaintiff had refused commands and was moving towards a firearm. (*Id.* at 37) (collecting cases). But, crediting Plaintiff's version, in which he told Gregory he was "Senior" not "Junior" and that he planned to put on his pants while sitting naked on the floor—to which after initial commands were issued, Gregory impliedly consented, allowing Plaintiff to bring his pants all the way up to his waist before firing—, the use of force was excessive. *Saunders v. Duke*, 766 F.3d 1262, 1268–69 (11th Cir. 2014).

### 1.   Gregory's unlawfully seized Plaintiff by using excessive force.

The Fourth Amendment's freedom from unreasonable seizures includes the "right to be free from the use of excessive force in the course of an arrest." *Hardigree v. Lofton*, 992 F.3d 1216, 1231 (11th Cir. 2021). The reasonableness of Gregory's force depends on ""whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002). This is not a situation where the Court is asked to consider what Gregory knew "with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009). Instead, based on Plaintiff's version of the events, no reasonable officer in Gregory's position would believe that firing his Taser at Plaintiff was necessary. Based on the circumstances—Plaintiff was not an immediate threat to the officer's safety while sitting on the floor, he was not resisting arrest or attempting to evade Gregory but had told the officers he was putting on his pants, which he was permitted to do— there was no need for any force. It was not reasonable for Gregory to fire his Taser at Plaintiff without any giving any commands or warning while Plaintiff was getting himself dressed on the floor directly in front of Gregory and after identifying himself to Gregory as the suspect's elderly father.[8]

---

[8] Gregory admits that he would have known if the individual was Plaintiff or Junior if he had been able to see his face. (Doc. 28 at 12 n. 12) (citing Doc. 26-3). Under Plaintiff's version of the incident, Gregory had seen his face, thereby vitiating any need to use force while Plaintiff was naked and on the ground.

Although the severity of Junior's crime could militate in favor of the need for the application of force generally, *Graham*, 490 U.S. at 396, based on Plaintiff's version of events, he was not an immediate threat to officer safety nor was he resisting arrest. *Id.* Assuming for purposes of Defendants' motion that Plaintiff's version of the events is true, *Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009) is instructive. There, officers encountered a man standing on the grassy median of the road who waved for help. *Id.* at 901. Although the man was behaving erratically, he "never acted in a threating or belligerent manner toward the officers, nor did he even curse at them." *Id.* at 902. One of the officers without warning tased Oliver, causing him to lose control of his body and fall onto to the "scorching hot asphalt." *Id.* at 902–03. He was then tased several more times. The Eleventh Circuit held that the officer violated Oliver's Fourth Amendment rights and concluded that "the force employed was so utterly disproportionate to the level of force reasonably necessary that any reasonable officer would have recognized that his actions were unlawful." *Id.* at 908.

Gregory relies on, among other cases, *Draper v. Reynolds*, for the proposition that a single use of a Taser was reasonable under the circumstances. There, the Eleventh Circuit stated that "[a]lthough being struck by a taser gun is an unpleasant experience, the amount of force [the officer] used—a single use of the taser gun causing a one-time shocking—was reasonably proportionate to the need for force and did not inflict any serious injury." 369 F.3d 1270, 1278 (11th Cir. 2004). But crediting Plaintiff's version, there was no need for any force, and therefore any use of force

under those circumstances was excessive regardless of the nature or injury. *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008). In *Hadley*, for example, the Eleventh Circuit held that an officer's "single punch" to a suspect's stomach constituted excessive force "without any consideration of whether or to what extent the suspect was injured by the blow" because the force was gratuitous and unnecessary based on the circumstances. *Id.* Even so, Plaintiff <u>did</u> suffer a serious injury from Gregory's gratuitous use of force. He was struck by the Taser probe, taken to the hospital, and has continuous physical pain and severe psychological pain and suffering—among other things, he was diagnosed with posttraumatic stress disorder, was hospitalized in a psychiatric ward, and can no longer sleep in the bedroom where Gregory tased him.

### 2. Gregory unlawfully seized Plaintiff by restraining him.

On top of using excessive force, Gregory unlawfully seized Plaintiff by placing him in restraints. Gregory concedes that Plaintiff was seized but argues that Plaintiff was not arrested but merely briefly detained either "for a reasonable amount of time to consider such charges—and whether probable cause was mitigated" or for "officer safety" as a non-suspect while the officers swept the house looking for Junior. (Doc. 28 at 39–42). Again, Gregory misses the mark.

<u>First</u>, he has failed to meet his burden to demonstrate the absence of a genuine dispute over the events leading up to restraining Plaintiff with handcuffs. *Shiver*, 549 F.3d at 1343. Plaintiff asserts that he was compliant, that Gregory knew he was not the suspect, and that Gregory fired his Taser anyway. Handcuffing Plaintiff to

"consider such charges"—which is what Plaintiff says Gregory did—was unreasonable given the lack of reasonable belief that he needed to protect himself or maintain the status quo. *United States v. Kapperman*, 764 F.2d 786, 790 n.4 (11th Cir. 1985). Crediting Plaintiff's version, the answer to "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate,'" *Croom v. Balkwill*, 645 F.3d 1240, 1249 (11th Cir. 2011) (quoting *Terry v. Ohio,* 392 U.S. 1, 21–22 (1968)), is <u>no</u>. Gregory relies on *Hadden v. Loar*, for the proposition that obstructing an investigation or mistaken identity can justify a detention. 2016 WL 10520024, at *7 (S.D. Fla. Dec. 27, 2016). But that's Gregory's version of the facts, to which there is a genuine material dispute.

<u>Second</u>, as for Gregory's alternative argument, the scope and duration of Plaintiff's detention was not reasonable. "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion). Plaintiff was taken outside and held in handcuffs while the officers decided what possible crime he could have committed. He was held outside in handcuffs for 20-30 minutes. This is not a momentary stop for "a brief question or two." *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975); *U.S. v. Place*, 462 U.S. 696, 709 (1983). Even if the initial seizure were reasonable, it would have become unreasonable after the house was cleared and Plaintiff was left awaiting an ambulance in handcuffs.

### 3. Gregory is not entitled to qualified immunity for his gratuitous use of force.[9]

Gregory warns the Court that if it "holds that deployment of a Taser against a non-compliant suspect of a violent crime who makes a move toward a gun was excessive, it will be the first to do so." (Doc. 28 at 46). But the Court is not tasked with making a credibility determination about whose version of the events is correct and whether Gregory is entitled to qualified immunity based on the weight of the evidence. No, the question is whether crediting Plaintiff's version of the events, Gregory is entitled to qualified immunity. He is not.

First, Plaintiff disagrees that qualified immunity is available at all based on the plain text of the Ku Klux Klan Act of 1871 but recognizes that the Supreme Court has not weighed in on the recent discovery that the statute was incorrectly transcribed into the U.S. Code. (*See* Doc. 30 at 20–24).

Second, assuming that qualified immunity is available notwithstanding the plain text of the statute, the "relevant facts are construed in the light most favorable to the non-movant—*i.e.*, the plaintiff—and the court should decide the issue based on those facts." *Simmons v. Bradshaw*, 879 F.3d 1157, 1163–64 (11th Cir. 2018). Because all reasonable inferences are made in favor of Plaintiff, crediting his version of the

---

[9] Gregory is also not entitled to summary judgment or sovereign immunity for Plaintiff's state-law claims for the arguments presented in Plaintiff's motion (Doc. 30). Specifically, crediting Plaintiff's version of the events, Gregory's conduct was committed in bad faith, with malice, and with reckless disregard.

events, Gregory's gratuitous use of force violated law clearly established at the time of the incident. *Smith v. Mattox*, 127 F.3d 1416, 1418-20 (11th Cir. 1997) (no qualified immunity for officer breaking arm of suspect who "docilely submitted" to request to get down); *Priester v. City of Riviera Beach*, F.3d 919, 926-27 (11th Cir. 2000) (no qualified immunity for K-9 attack when suspect was already subdued and lying on ground); *Hadley*, 526 F.3d at 1333–34 ("Applying the excessive force standard would inevitably lead every reasonable officer ... to conclude that the force used here— punching a non-resisting criminal suspect for no apparent reason other than malice— is not protected by our constitution.") (quotations and citations omitted); *Oliver*, 586 F.3d at 908 ("obvious clarity" that use of Taser on compliant, non-resisting suspect "was so utterly disproportionate to the level of force reasonably necessary that any reasonable officer would have recognized that his actions were unlawful."); *Saunders*, 766 F.3d at 1268–69 (gratuitous use of force is excessive).

In *Chaney v. City of Orlando, Fla.*, 2005 WL 8159900, at *12 (M.D. Fla. Dec. 2, 2005), a sister court found that the officer was not entitled to qualified immunity for using his Taser because—unlike in *Draper*, where the suspect was "hostile, belligerent, and uncooperative," and refused to comply with commands—Chaney's version of the events bore out that he was in his vehicle and asked the arresting officers why he was stopped. The court denied the motion for summary judgment on qualified immunity grounds because under the "totality of the circumstances" standard used in *Draper*, it was "not clear that [the officer's] use of his taser and of other physical force was in

good faith or with malice." *Id.* So too here. Plaintiff alleges he was compliant; in plain sight on the ground and not near the gun on his bed; not resisting; he informed the officers that he was not the suspect; he asserts that Gregory knew he was not the suspect; and he informed the officers that he was reaching for his pants in front of him (away from the gun), which the officers permitted him to do (pulling them up to his waist) prior to Gregory firing his Taser and then handcuffing him. Taking those facts as true, Gregory's use of <u>any</u> force or seizure would violate the Fourth Amendment.

### C. Deputy Gregory's violation of Plaintiff's rights results from the environment Sheriff McCallum has provided through his training and supervision.

"A municipality can be sued directly under § 1983 when one of its customs, practices, or policies causes a constitutional injury." *Barnett v. MacArthur*, 956 F.3d 1291, 1296 (11th Cir. 2020); *see also Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1116 (11th Cir. 2005) (government entity itself must cause the constitutional violation). To state a *Monell* claim, a plaintiff must allege facts showing: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *Marantes v. Miami-Dade Cty.*, 649 F. App'x 665, 672 (11th Cir. 2016) (quoting *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004)). *Monell* liability can also be established based on a failure to adequately train employees where such a failure, "evidences a deliberate indifference to the rights of its

inhabitants [that] can be properly thought of as a . . . policy or custom." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989); *Griffin v. City of OpaLocka*, 261 F.3d 1295, 1308 (11th Cir. 2001). Deliberate indifference in this context requires proof that agency policymakers disregarded the "known or obvious consequence" that a particular omission in their training program would cause city employees to violate citizens' constitutional rights. *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

Generally, "a pattern of similar constitutional violations by untrained employees" is necessary to establish the requisite deliberate indifference. *Id.* At the same time, a plaintiff may succeed on a "single-incident" theory. *Id.* at 63–64. In *Canton*, the Supreme Court counseled that a municipality could incur liability for failing to train its employees based on a single constitutional violation where the need for training was "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. As explained in *Canton*:

> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Id.* at 390 n. 10 (citation omitted).

In this context, *Canton* rings true. Sheriff McCallum, as final policymaker (Doc. 12 ¶ 10), knew to a moral certainty that his officers would enter local residences to carry out warrantless arrests. The need to train officers on the lawful bases to enter a home was "so obvious" that the failure to do so constitutes "deliberate indifference." Here, the evidence shows that Sheriff McCallum was deliberately indifferent to that need.

First, Sheriff McCallum's staff to whom he delegated responsibility for officer investigations, contend that the mere opening of a door after a deputy knocks and announces is an "invitation" to enter. Lt. Tummond, who was delegated authority by LSCO to undertake internal affairs investigations, and whose testimony therefore binds the agency, *U.S. v. Afram Lines (USA), Ltd.*, 159 F.R.D. 408, 413 (S.D.N.Y.1994), testified that "[o]therwise the door wouldn't have been opened." (Doc. 37-5 73:2-15). Yet, as explained above, the mere opening of a door on its own cannot justify warrantless entry into a home. Sheriff McCallum, who was responsible for deputy discipline (Doc. 26-2 at 35-36), reviewed the entire investigative file on Gregory and agreed with Lt. Tummond's analysis and findings notwithstanding. (Doc. 26-8 at 44-45, 101); (Doc. 26-2 at 41). He even promoted Gregory. Although Plaintiff concedes that a ratification theory requires approval before the final act, the testimony of LCSO officials is evidence of the agency's position on consent.

Second, it is impossible to determine whether LCSO deputies have committed unlawful warrantless entries prior to 2017, which could show a pattern of unconstitutional conduct before the May 25, 2019 incident at Plaintiff's home. Lt. Tummond testified that unless a formal investigation was opened pre-2017, complaints made during that time may not exist anymore. As such, given that LCSO has not properly maintained records prior to 2017 to determine whether similar conduct occurred, Plaintiff should be permitted to proceed on his "single-incident" theory.

## CONCLUSION

For all these reasons, Plaintiff Terry Dukes, Sr. requests that the Court deny Defendants' motion for summary judgment.

Dated: November 10, 2023.

Respectfully submitted,

*/s/ James M. Slater*
James M. Slater (FBN 111779)
Slater Legal PLLC
113 S. Monroe Street
Tallahassee, Florida 32301
james@slater.legal
Tel. (305) 523-9023

*Attorneys for Plaintiff*

26

**Certification Pursuant to L.R. 7.1(F)**

Pursuant to Local Rule 7.1(F), I hereby certify that the above document contains 6,891 words, inclusive of headings, footnotes, and quotations, but exclusive of the case style, signature block and certificates.

By: */s/ James M. Slater*
James M. Slater